UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ROBERT T. PERRY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-1371 CKK |
| | ) | |
| VINCENT K. SNOWBARGER, | ) | |
| Interim Director, Pension | ) | |
| Benefit Guaranty Corporation | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Defendant,[1] by and through counsel, hereby moves pursuant to Fed. R. Civ. P. 12(b)(1) and (6) to dismiss the Amended Complaint in this action.   In the alternative, the Defendant moves for summary judgment in his favor, pursuant to Fed. R. Civ. P. 56. The Court is respectfully referred to the accompanying memorandum

---

[1]  The caption has been modified to reflect the proper title of defendant Vincent Snowbarger as Interim Director of the Pension Benefit Guaranty Corporation ("PBGC"), who has been sued in his official capacity only.  See Amended Complaint, ¶¶ 6-7 (describing the defendant as "a federal agency").   If Plaintiff later contends that the action was intended to be against Mr. Snowbarger in an individual capacity, although undersigned counsel do not represent defendant in such a capacity at this time (thus no defense or defenses are hereby waived as to any such individual-capacity claim), the Court may sua sponte dismiss any individual capacity claims for failure timely to effect proper service.  See Fed. R. Civ. P. 4(m); Plaintiff's Response To Minute Order To Show Cause (Docket No. 4) (contending that service on former PBGC Director Bradley Belt satisfied requirements of service such that "[o]n 11/16/06 the Plaintiff served the summons and complaint on all parties to the action").

of points and authorities in support of this motion and the
accompanying statement of material facts not in dispute.

Respectfully submitted,

_____
JEFFREY A. TAYLOR, DC Bar #498610
United States Attorney


_____
RUDOLPH CONTRERAS, DC Bar #434122
Assistant United States Attorney


_____
W. MARK NEBEKER, DC Bar #396739
Assistant United States Attorney

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
ROBERT T. PERRY,                    )
                                    )
            Plaintiff,              )
                                    )
        v.                          ) Civil Action No. 06-1371 CKK
                                    )
VINCENT K. SNOWBARGER,              )
Interim Director, Pension           )
  Benefit Guaranty Corporation      )
                                    )
            Defendant.              )
_____)
```

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS OR,
<u>IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT</u>

<u>I.  INTRODUCTION</u>

To resolve two earlier civil actions, Plaintiff accepted a settlement package in which he received, <u>inter alia</u>, thousands of dollars in cash, payment of his attorney fees, training and a promotion in return for his agreement to resign from the Pension Benefit Guarantee Corporation ("PBGC") after he received a period of time to find a new job.  The Stipulation Of Settlement And Dismissal ("Settlement" or "Stipulation") specifically includes an agreement by Plaintiff that he "agrees not to institute any other actions, charges, complaints, appeals or other proceedings against Defendants or any of Defendants' past or present employees, officers, agents or representatives concerning any matter related to his employment with PBGC and the termination of his PBGC employment that are <u>based in any way on action or inaction as of this date</u>. . ."  Stipulation (Att. A) at 2

(emphasis added).  Among the complaints raised by Plaintiff
before the Settlement in the earlier actions were claims "of
flagrant, malicious, and unlawful behavior and actions on the
part of Mrs. Valda Johnson and Mr. Stuart Bernsen [who] have over
a period of approximately six months disseminated false claims
against [Plaintiff]. . ."  Perry 10/6/05 Deposition at 66-67 and
Deposition Exhibit 20 (January 13, 2004 Memorandum from
Plaintiff).

     Notwithstanding that one of the expressed purposes of the
earlier Settlement was "avoiding the expenses . . . of
litigation", see Stipulation, ¶ 4, Plaintiff's current action, in
which he is represented by new counsel, stems largely from
matters that have already been settled.  The few minor complaints
that post-dated the Stipulation Of Settlement do not amount to
adverse actions or retaliation within the meaning of Title VII,[1]
and Defendant's reasons for allowing them (that the flyers
Plaintiff complained of were protected union activity) are
indisputably proper.  The remaining claims also fail as a matter
of law, because Plaintiff's exclusive remedy under Title VII bars

---

        [1] Plaintiff's introduction to the Complaint indicates that
he has brought the action to redress discrimination based on
race, color, sex and retaliation.  Complaint, ¶ 1.  The Counts of
the Complaint, however, are limited to race and retaliation.
Id., ¶¶ 23, 33, 42.  Moreover, he has failed to pursue any claim
for discrimination based on color through the EEO process as
required.  See Steven Weiss Affidavit (Att. E), ¶¶ 4 and 15 and
corresponding Exhs. 1, 7-8; Bowden v. United States, 106 F.3d 433
(D.C. Cir. 1997); 29 C.F.R. Part 1614.

his claims under 42 U.S.C. §§ 1981, 1983, 1985, and 1986, which statutes do not state any claim or provide any waiver of sovereign immunity for claims against Defendant.  Moreover, this Court lacks jurisdiction over Plaintiff's $300,000 Breach of Contract claim and Defendant is not in breach of the Stipulation anyway.

## II.  STATEMENT OF FACTS

1.  Plaintiff Robert T. Perry ("Perry" or "Plaintiff") is an African American male who was employed as a GS-511-13 Auditor by PBGC.  Amended Complaint ("Complaint"), ¶¶ 5, 8.

2.  Defendant Vincent K. Snowbarger is the Interim Director of the PBGC, a wholly-owned United States Government corporation established under section 4002 of the Employee Retirement Income Security Act of 1975 ("ERISA"), 29 U.S.C. § 1302, to administer the pension plan termination insurance program under Title IV of ERISA.  29 U.S.C. §§ 1301-1461.

3.  Plaintiff filed two District Court civil EEO complaints involving PBGC, Civil Action Nos. 03-2495 and 04-1996, which were resolved by a Stipulation Of Settlement And Dismissal ("Stipulation" or "Settlement") entered by the Court November 8, 2005, a copy of the which Settlement is attached hereto as Att. A (November 8, 2005 Stipulation Of Settlement And Dismissal );  Complaint, ¶ 9.

4.  The Settlement included settlement of "all claims for

-3-

damages prior to and including the date Plaintiff signs this Stipulation of Settlement and Dismissal" and under the terms of the Settlement Plaintiff released the PBGC from any and all liability for "all matters related to his employment with Defendants up to and including the date of this Stipulation of Settlement and Dismissal," which was November 8, 2005. Att. A at 2; Complaint, ¶ 10.

5. In November 2005 and May 2006, Defendant issued four SF-50 forms to effectuate the formal Personnel Actions that were required under ¶¶ 2(a)-(c) and (f) of the Stipulation. Att. A at 3, ¶¶ 2a, 2b, 2c, 2f; Complaint, ¶¶ 11-12; Att. B (Pilipovich Affidavit), ¶ 4 and corresponding Exh. 2. Specifically, Defendant retroactively promoted Plaintiff to a GS-13, Step 3 auditor position without back pay, and prospectively promoted Plainitff to a GS-13, Step 10 Auditor position for a period of one year. Att. B, ¶ 3. Plaintiff was paid the GS-13, Step 10 salary until he was placed in leave without pay status on May 14, 2006, consistent with the terms of the Stipulation. Id.

6. The Stipulation was silent as to what remarks or information could be included in, or excluded from, any of the paperwork necessary to effectuate the personnel actions required by the Stipulation. See Att. A; Att. B, ¶ 5.

7. As required by Paragraph 2c of the Stipulation, Defendant detailed Plaintiff to another department within PBGC.

-4-

Att. A, ¶ 2c; Att. B, ¶ 3.

8.  As required by Paragraph 2d of the Stipulation, Defendant paid for approximately $10,100.00 in training opportunities for Plaintiff.  Att. A, ¶ 2d; Att. B, ¶ 3.

9.  As required by Paragraph 2g of the Stipulation, Defendant paid Plaintiff a lump sum payment of $60,000.00.  Att. A, ¶ 2g; Att. B, ¶ 3.

10.  As required by Paragraph 2n of the Stipulation, Defendant provided Plaintiff with an appropriate letter of recommendation.  Att. A, ¶ 2n; Att. B, ¶ 3.

11.  As required by Paragraph 2p of the Stipulation, Defendant paid Plaintiff's attorney's fees in the amount of $80,000.00.  Att. A, ¶ 2p; Att. B, ¶ 3.

12.  As required by  Paragraph 2s of the Stipulation, Defendant issued Plaintiff a "fully successful" performance appraisal for FY 2005.  Att. A, ¶ 2s; Att. B, ¶ 3.

13.  On December 13, 2005, Robert Perry complained via email to Rick Lattimer in the Human Resources Division ("HRD") about language in the "Remarks" section of the SF-50's that were issued in November 2005.  Complaint, ¶ 11; Att. B, ¶ 6 and corresponding Exh. 3.  Mr. Lattimer responded  to Plaintiff in a subsequent email that the SF-50's were prepared so as to explain to the Office of Personnel Management ("OPM") the manner in which Plaintiff was promoted.  Att. B, ¶ 6 and corresponding Exh. 3.

14.   Plaintiff responded to Mr. Lattimer's email on December 14, 2005, specifying the language he wanted removed from the Remarks section of the November SF-50's.  Att. B, ¶ 6 and corresponding Exh. 3.

15.   Plaintiff's then counsel contacted the U.S. Attorney's Office on January 4, 2006 and questioned the "Entry under 'Remarks' in SF-50s resulting from Settlement."  Att. B, ¶ 7 and corresponding Exh. 4.  On January 5, 2006, the U.S. Attorney's Office sent a letter to Plaintiff's counsel informing him that the references in the Remarks section were included to protect PBGC in the event that OPM questioned the personnel actions.  Att. B, ¶ 7 and corresponding Exh. 5.  The letter further informed Plaintiff's counsel that in an effort to address Plaintiff's concerns, PBGC would issue Plaintiff an SF-50 for his Cost-of-Living Adjustment ("COLA") increase as soon as the COLA went into effect, rather than Plaintiff having to wait a couple of months to receive the SF-50 from Department of the Interior, which processes PBGC's payroll.  Id.  The COLA SF-50 issued on January 9, 2006, did not contain a reference to the Stipulation in the Remarks section.  Att. B, ¶ 7 and corresponding Exh. 6.  At that point, if Robert Perry had to submit an SF-50 during the application process with a potential employer, the COLA SF-50 would have been the one he would submit because it was the most recently issued SF-50.  Id.

-6-

16.   In February 2006, although not required to do so by the language of the Settlement, PBGC reissued and backdated the three November 2005 SF-50's that Plaintiff and his counsel found objectionable.  Att. A; Att. B, ¶ 8 and corresponding Exh. 7.  The Remarks section of the three reissued SF-50's no longer contained a reference to the Stipulation, as requested by Plaintiff and his counsel.  Id.

17.   As required by paragraph 2f of the Stipulation, on May 14, 2006, Plaintiff was placed in Leave Without Pay ("LWOP") status for a period not to exceed six months.  Att. A; Complaint, ¶ 12; Att. B, ¶ 9.  To effectuate this personnel action, PBGC issued Plaintiff an SF-50 with the codes and remarks required by the Office of Personnel Management's "Guide to Processing Personnel Actions," which requires the use of code 460 and the Nature of Action to read "LWOP NTE (date)" whenever LWOP is scheduled to exceed 30 calendar days.  Att. B, ¶ 9 and corresponding Exh. 8.  When the Nature of  Action Code is 460, OPM's "Guide to Processing Personnel Actions" requires the use of specific remarks addressing service credit and FEGLI, which language was included on Plaintiff's LWOP SF-50.  Id.

18.   On June 7, 2005, Plaintiff sent an email to various members of PBGC upper management, including the Executive Director, EEO Manager, and Human Resources Director.  Att. B,  ¶ 12 and corresponding Exh. 11.  Plaintiff's email complained that

-7-

certain flyers had been circulated within PBGC that Plaintiff
felt might incite others to take "untold actions against [him]."
Id.

19.  The flyers followed a representational election held by
the Federal Labor Relations Authority in February 2005, wherein
the National Association of Governmental Employees ("NAGE")
prevailed over the Independent Union of Pension Employees.  Att.
B, ¶ 11.

20.  On February 2, 2005, a new Executive Board of NAGE
Local R3-77 was sworn in, including Plaintiff as Acting
Secretary/Treasurer, Richard "Dick" Petta as President, and
Dwayne Jeffers as Vice-President At Large.  Att. B, ¶ 11.

21.  The flyers that were disseminated following the union
elections were critical of PBGC management and NAGE officials,
including Plaintiff.  Att. B, ¶ 11.

22.  HRD Director Pilipovich responded to Plaintiff's June
7, 2005 email on June 8, 2005.  Att. B, ¶ 12 and corresponding
Exh. 11.  Ms. Pilipovich informed Plaintiff that there would be
an investigation of Plaintiff's complaint.  Id.  Two PBGC
employees, Ricardo Silva, HRD Specialist, and Ray Forster,
attorney, met with Plaintiff to investigate Plaintiff's June 7,
2005 complaint.  Att. B, ¶ 12.

23.  While PBGC investigated Plaintiff's June 7, 2005
complaint, Plaintiff was allowed to work from home for a period

-8-

of time.  Att. B, ¶ 13.  On June 16, 2005, PBGC sent an email to
all PBGC employees and contractors regarding its commitment to
providing a workplace free from violence and harassment.  Id. and
corresponding Exh. 12.

24.  On September 28, 2005, Plaintiff contacted PBGC's EEO
Office to request EEO counseling.  Att. C (Rixene Hicks
Affidavit), ¶ 3 and corresponding Exh. 1.  PBGC employee Dwayne
Jeffers was Plaintiff's representative.  Id., ¶ 6.  Dwayne
Jeffers is an African American male.  Att. D (Jeffers' Complaint
filed in, Civil Action No. 03-1762 RMC (D.D.C.)), ¶ 6.

25.  On September 28, 2005, Dwayne Jeffers contacted PBGC's
EEO Office to request EEO counseling regarding an EEO complaint
that was similar in nature to the one raised by Plaintiff.  Att.
C, ¶ 9.  Plaintiff was Mr. Jeffers' representative.  Id.

26.  On October 21, 2005, Plaintiff sent his EEO counselor
an email message providing documents related to his EEO
complaint.  Included within his email, Plaintiff stated that his
complaint "consists of PBGC's willingness to permit management
and employees to commit retaliatory acts against [him] without
taking appropriate actions to curtail or stop [his] workplace
harassment and threats of workplace violence."  Att. C, ¶ 4 and
corresponding Exh. 3.

27.  On October 31, 2005, Plaintiff sent an email to various
PBGC management officials complaining that he had received what

-9-

he alleged to be another harassing email.  Att. B,  ¶ 14 and
corresponding Ex. 13.  On November 2, 2005, HRD Director
Pilipovich issued a memorandum to Plaintiff informing him that
PBGC had retained a law firm, Littler Mendelson, P.C., to
complete PBGC's investigation into Plaintiff's June 2005
complaint.  Id.  Ms. Pilipovich's memorandum informed Plaintiff
that the investigation concerned "complaints made to HRD, not
complaints which are or may be in the informal or formal EEO
process."  Id.

28.  On November 4, 2005, Plaintiff sent an email to his EEO
counselor, Rixene Hicks, informing her that he was withdrawing
the EEO complaint he initiated on September 28, 2005, and
discussed in his October 21, 2005 email message to Ms. Hicks.
Att. C, ¶ 8 and corresponding Exh. 6.

29.  On December 22, 2005, PBGC offered to resolve Dwayne
Jeffers' September 28, 2005 informal EEO complaint by allowing
Mr. Jeffers to work from PBGC's remote location in Kingstowne,
Virginia.  Att. C, ¶ 9 and corresponding Exh. 7; Complaint, ¶ 17.
Mr. Jeffers rejected PBGC's offer of resolution, and Rixene Hicks
issued Mr. Jeffers a Notice regarding his right to file a formal
EEO complaint on December 30, 2005.  Att. C, ¶ 9 and
corresponding Exh. 8.

30.  The same December 22, 2005 offer to resolve Dwayne
Jeffers' September 28, 2005 informal EEO complaint was not

-10-

extended to Plaintiff.  Att. C, ¶ 10 and corresponding Exh. 6; Complaint, ¶ 18.  Indeed, Plaintiff did not have an EEO complaint pending on December 22, 2005.  Att. A; Att. C, ¶ 10; Att. E (Steven Weiss Affidavit), ¶ 4.

31.  Plaintiff initially sought counseling for his EEO Complaint 06-04 on January 5, 2006.  Att. E, ¶ 4 and corresponding Exh. 2.  Plaintiff's formal EEO Complaint 06-04 dated February 2, 2006 alleged race and sex discrimination and retaliation by PBGC through: (1) inappropriate language in the SF-50's issued in November 2005; (2) hostile work environment by PBGC employees Stuart Bernsen, Valda Johnson, and Rhonda Baird, who Plaintiff alleged distributed flyers and emails about Plaintiff; and (3) disparate treatment when Plaintiff was not offered the same opportunity for flexiplace that was offered to Plaintiff's representative, Dwayne Jeffers.  Att. E, ¶ 4 and corresponding Exhs. 1 and 2; Complaint, ¶¶ 1, 11, 15-18.

32.  Plaintiff's formal EEO Complaint 06-04 did not identify "color" as a basis for the complaint.  Att. E, ¶ 4 and corresponding Exh. 1.

33.  Among the documents Plaintiff submitted in support of his EEO Complaint 06-04, Plaintiff included several flyers and hundreds of emails.  Att. E, ¶ 8.

34.  Various of the flyers Plaintiff submitted in support of his EEO Complaint 06-04 do not mention Plaintiff.  Att. E, ¶ 8.

35.  Of the flyers Plaintiff submitted in support of his EEO
Complaint 06-04, all but two of the flyers naming Plaintiff were
disseminated in May and June of 2005.  Att. E, ¶ 11; Att. B, ¶ 11
and corresponding Exh. 10.  Of the two flyers not disseminated in
May/June 2005 that Plaintiff submitted in support of his EEO
Complaint 06-04, one was disseminated on November 8, 2005, and
the other was disseminated on November 9, 2005.  Att. E, ¶ 11 and
corresponding Exhs. 4 and 5.

36.  The flyer disseminated on November 8, 2005, which was
entitled "NAGE Ordered to Pay $2.2 Million to Union Member,"
references Plaintiff, Dwayne Jeffers, and Dick Petta in the last
paragraph, which reads in pertinent part, "And look what NAGE
local has done.  Petta, Perry and Jeffers bad mouth other
employees and rat on them to PBGC management to get people into
trouble.  NAGE needs to go."  Att. E, ¶ 11 and corresponding Exh.
4.

37.  The flyer disseminated on November 9, 2005, which was
entitled "Belt - Petta Stop New Benefits for Employees;
Management and NAGE Prepare for Cuts," references Plaintiff,
Dwayne Jeffers and Dick Petta in two paragraphs that read in
pertinent part, "As for the so-called union - Dick Petta, Robert
Perry and Dwayne Jeffers - they have sat back and let management
do as it pleases", and "It is not that Dick Petta, Robert Perry
and Dwayne Jeffers are in over their heads and are clueless.  The

-12-

problem is that management was dedicated all along to stopping a new collective bargaining agreement, and Petta, Perry and Jeffers helped them." Att. E, ¶ 11 and corresponding Exh. 5.

38.  In support of his EEO Complaint 06-04, Plaintiff submitted eleven email messages from Rhonda Baird that were sent to Plaintiff after November 8, 2005. Att. E, ¶ 12 and corresponding Exh. 6. Most of the emails were sent to multiple recipients, and most of them referenced union related matters. Id.

39.  In support of his EEO Complaint 06-04, Plaintiff submitted no emails post-dating November 8, 2005 from Valda Johnson or Stuart Bernsen to Plaintiff. Att. E, ¶ 13.

40.  Following the completion of the investigation conducted by Littler Mendelson, P.C. into the complaints raised by Plaintiff and Dwayne Jeffers, on February 16, 2006, HRD Director Pilipovich sent Plaintiff a memorandum explaining the results of the investigation and the Agency's determinations. Att. B, ¶ 15 and corresponding Exh. 15. Ms. Pilipovich's memorandum correctly explained that PBGC had determined that the flyers and emails about which Plaintiff and Dwayne Jeffers complained did not violate any PBGC policies or directives, did not pose a safety threat, and they fell within the scope of protected activity under Federal law governing labor relations in the federal sector. Id.

-13-

41.  Plaintiff initially sought counseling for the claims in his EEO Complaint 06-11 on March 15, 2006.  Att. E, ¶ 15 and corresponding Exh. 9.  Plaintiff's formal EEO Complaint 06-11, dated April 18, 2006, alleged race and sex discrimination and retaliation by PBGC when HRD Director Michele Pilipovich issued the February 16, 2006 memorandum regarding Plaintiff's complaints about flyers and emails by PBGC employees Stuart Bernsen, Valda Johnson, and Rhonda Baird.  Att. E, ¶ 15 and corresponding Exh. 7; Complaint, ¶¶ 1, 15-16.  Plaintiff's formal EEO Complaint 06-11 did not identify "color" as a basis for the complaint. Att. E, ¶ 15 and corresponding Exh. 7.

42.  Plaintiff initially sought counseling for the claims in his EEO Complaint 06-18 on May 10, 2006.  Att. E, ¶ 15 and corresponding Exh. 9.  Plaintiff's formal EEO Complaint 06-18, dated July 24, 2006, alleged race and sex discrimination and retaliation by PBGC through: (1) inappropriate language in the SF-50 issued May 14, 2006 when Plaintiff went into leave without pay status; and (2) dismissal of Plaintiff's formal EEO Complaint 06-04 on May 3, 2006.  Att. E, ¶ 15 and corresponding Exh. 8. Plaintiff's formal EEO Complaint 06-18 did not identify "color" as a basis for the complaint.  Att. E, ¶ 15 and corresponding Exh. 8.

## III.  ARGUMENT

### The Relevant Legal Standards

-14-

"In determining whether a complaint states a claim, the court may consider the facts alleged in the complaint, documents attached thereto or incorporated therein, and matters of which it may take judicial notice." Stewart v. National Education Association, 471 F.3d 169, 173 (D.C. Cir. 2006); Savage v. Scales, 310 F.Supp.2d 122, 129 and n.8 (D.D.C. 2004); see also Opoka v. INS, 94 F.3d 392, 394 (7th Cir. 1996) ("Indeed, it is a well-settled principle that the decision of another court or agency, including the decision of an administrative law judge, is a proper subject of judicial notice."); Marshall County Health Care Auth. v. Shalala, 988 F.2d 1221, 1222 (D.C. Cir. 1993) ("The district court may ... examine matters of public record in ruling on a Rule 12(b)(6) motion...."). A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) will not be granted unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957); see also Haynesworth v. Miller, 820 F.2d 1245, 1254 (D.C. Cir. 1987). Conclusory legal and factual allegations, however, need not be considered by the court. Domen v. Nat'l Rehab. Hosp., 925 F.Supp. 830, 837 (D.D.C. 1996) (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)).

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment may be granted if the pleadings, depositions, answers to interrogatories, admissions on file and affidavits or declarations, if any, show that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c).  Material facts are those "that might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. at 255; see also Washington Post Co. v. U.S. Dept. of Health and Human Services, 865 F.2d 320, 325 (D.C. Cir. 1989).  But the non-moving party's opposition must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations or other competent evidence setting forth specific facts showing that there is a genuine issue for trial.  See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  The non-moving party is "required to provide evidence that would permit a reasonable jury to find" in its favor.  Laningham v. U.S. Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987).  If the evidence is "merely colorable" or "not significantly probative," summary judgment may be granted.  Anderson v. Liberty Lobby, Inc., 477 U.S. at 249-50.

Settlement agreements "are in the nature of contracts."  See Makins v. District of Columbia, 277 F.3d 544, 546-47 (D.C. Cir. 2002)(citing Gaines v. Cont'l Mortgage & Inv. Corp., 865 F.2d 375, 378 (D.C. Cir. 1989)).  "In cases in which the dispositive issue involves the construction of a contract, summary judgment may be appropriate if the provisions of the contract are unambiguous." Davis v. Chevy Chase Financial Ltd., 667 F.2d 160, 169 (D.C. Cir. 1981); see also America First Inv. Corp. v. Goland, 925 F.2d 1518, 1520 (D.C. Cir. 1991); Farmland Industries, Inc. v. Grain Bd. of Iraq, 904 F.2d 732, 735-36 (D.C. Cir. 1990); Minebea Co. v. Papst, 374 F.Supp.2d 202, 208-09 (D.D.C. 2005). Furthermore, it is settled that whether a contract term is or is not ambiguous is a question to be determined by the court.  See Minebea Co. v. Papst, 374 F.Supp.2d at 208-09; Carey Canada, Inc. v. California Union Ins. Co., 708 F.Supp. 1, 4 (D.D.C. 1989).  With respect to assertions that a contract has been breached, "[t]he determination whether a material breach has occurred is generally a question of fact. Nevertheless, the materiality of a breach of contract is not always a question of fact, even if the issue is disputed; thus, if there is only one reasonable conclusion, a court must address what is ordinarily a factual question as a question of law." 23 WILLISTON ON CONTRACTS §§ 63:3 (4th ed.).

-16-

America v. Preston, Civil Action No. 03-1807 PLF, 2006 WL
3788810, *3 (D.D.C. Dec. 27, 2006).

In asserting a claim under Title VII, Plaintiff must
generally establish an adverse employment action. Stewart v.
Ashcroft, 352 F.3d 422, 426 (D.C. Cir. 2003). An "adverse
employment action" is "a significant change in employment status,
such as hiring, firing, failing to promote, reassignment with
significantly different responsibilities, or a decision causing
significant change in benefits." Burlington Indus., Inc. v.
Ellerth, 524 U.S. 742 (1998). Criticism or poor performance
evaluations are not necessarily adverse actions and they should
not be considered such if they did not affect the employee's
grade or salary. Brown v. Brody, 199 F.3d 446, 457-58 (D.C. Cir.
1999); see also Taylor v. Small, 350 F.3d 1286, 1293 (D.C. Cir.
2003).

Applying these standards, Plaintiff has failed to allege
facts that would support a claim under Title VII and summary
judgment is appropriate in any event.


## 42 U.S.C. §§ 1981, 1983, 1985, and 1986

Plaintiff's claims under 42 U.S.C. §§ 1981, 1983, 1985, and
1986 are barred because Title VII is his exclusive remedy for
employment discrimination claims against the federal government.

Appellant's claim for retaliation in violation of 42
U.S.C. § 1983 fails because Title VII of the Civil

-17-

Rights Act of 1964, 42 U.S.C. § 2000e et seq., is "the
exclusive judicial remedy for claims of discrimination
in federal employment." Richardson v. Wiley, 569 F.2d
140, 141 (D.C. Cir. 1977) (per curiam) (quoting Brown
v. GSA, 425 U.S. 820, 835, 96 S.Ct. 1961, 48 L.Ed.2d
402 (1976)).  Moreover, the deprivation of rights
protected by Title VII cannot be used as the basis for
a conspiracy claim under Section 1985(3).  Great
American Federal Savings & Loan Ass'n v. Novotny, 442
U.S. 366, 378, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979).

Groce v. Powell, No. 06-5031, 2006 WL 3018058, *1 (D.C. Cir. June

27, 2006); Maye v. Reno, 231 F.Supp.2d 332, 339 (D.D.C. 2002)

(finding that there is no Section 1985 claim available to federal

worker in light of other, exclusive statutory remedies) (citing

Bush v. Lucas, 462 U.S. 367, 375-76 (1983); Brown v. GSA, 425

U.S. 820 (1976); Great American Federal Sav. & Loan Ass'n v.

Novotny, 442 U.S. 366, 378 (1979); Spagnola v. Mathis, 859 F.2d

223, 228-29 (D.C. Cir. 1988)); Richardson v. Wiley, 569 F.2d 140,

141 (D.C. Cir. 1977) (per curiam) (federal employee covered by

Title VII may not sue under any other federal statute, including

42 U.S.C. § 1981); Herbin v. Hoeffel, No. 99-7244, 2000 WL

621304, *1 (D.C. Cir. Apr. 6, 2000) ("Because appellant did not

state a claim under 42 U.S.C. § 1985(3), there is no basis for

relief under 42 U.S.C. § 1986."); Bennett v. U.S. Chess

Federation, Civil Action No. 05-2225 RJL, ___ F.Supp.2d ___, 2006

WL 1883424 at *6 (D.D.C. July 7, 2006) ("a colorable claim under

§ 1985 is a prerequisite to stating an adequate claim for neglect

to prevent under § 1986.") (citing Thomas v. New World

Communications, 681 F.Supp. 55, 72 (D.D.C. 1988)).

-18-

In addition, the claims under 42 U.S.C. § 1983 are subject to dismissal because such claims apply only to actions by persons acting under color of state law, and the defendant's employees who acted were acting under color of federal law.  There has been no waiver of sovereign immunity for such a claim.  FDIC v. Meyer, 510 U.S. 471, 478 (1994) (a constitutional tort claim is not cognizable under the Federal Tort Claims Act); Settles v. U.S. Parole Commission, 429 F.3d 1098, 1106 (D.C. Cir. 2005) (sovereign immunity bars Section 1983 claims against a government agency); Kauffman v. Anglo-American School of Sofia, 28 F.3d 1223 (D.C. Cir. 1994); Clark v. Library of Congress, 750 F.2d 89, 102-104 (D.C. Cir. 1984) (sovereign immunity acts as a bar to a damages remedy against a federal employee in an official capacity).

> In any event, Section 1983 provides:
> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the person injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.  For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983 (emphasis added).  Thus, § 1983 does not

generally apply to federal officials acting under color of federal law.  See Daly-Murphy v. Winston, 837 F.2d 348, 355 (9th Cir. 1987).

For these reasons, Plaintiff has failed to state any claim under 42 U.S.C. §§ 1981, 1983, 1985, and 1986.

Title VII

Plaintiff asserts three counts based on claims of employment discrimination, Counts I through III.  The first two are claims that Plaintiff has suffered from a Hostile Work Environment, the third that he was subjected to unspecified "adverse employment actions by Defendant" due to "Plaintiff's filing and prosecuting the aforementioned EEO claims."  Complaint, ¶¶ 42, 44.  What follows is a summary of the specific factual assertions Plaintiff has made:[2]

_____

[2]  Plaintiff also asserts that he has suffered some unspecified "series of discrete acts of retaliation immediately prior to the administrative Complaint in this matter as well as subsequent to the filing of the Complaint."  See Complaint, ¶ 21.  Because these claims were not timely raised in the administrative EEO process, they cannot form the basis for relief in this Court.  See, 29 C.F.R. § 1614.105(a)(1); National R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002); Bowden v. United States, 106 F.3d 433, 437 (D.C. Cir. 1997); 29 C.F.R. Part 1614 (Federal Sector Equal Employment Opportunity); Battle v. Rubin, 121 F. Supp. 2d 4, 7 (D.D.C. 2000) ("a party must timely file all applicable administrative complaints and appeals in order to bring a claim in federal court"); Williams v. Munoz, 106 F. Supp. 2d 40, 42 (D.D.C. 2000) ("timely administrative charge is a prerequisite to initiation of a Title VII action").  As the Supreme Court reiterated in Morgan, "'strict adherence to the procedural requirements specified by the legislature is the best guarantee

1)  The agency has issued various Standard Form 50s ("SF-50s"), that included the bases for the personnel actions taken, i.e., that they were taken "pursuant to a stipulation and settlement. . .," that "FEGLI coverage continues until your time in nonpay status totals 12 months," and that Plaintiff's Leave Without Pay status was "NTE" (not to exceed) 12 months, Complaint, ¶¶ 11-12;

2)  Defendant was aware of and did not act to end flyers, e-mails, intimidation, blackmail, slander, inflammatory, defamatory, and libelous statements and threats by Stuart Bernsen, Valda Johnson and Rhonda Baird, Complaint, ¶ 15;

3) Plaintiff was not offered the same proposal for a settlement that was offered in late 2005 to his representative (Dwayne Jeffers) for settlement of Jeffer's EEO complaint, Complaint, ¶¶ 16-18.

Nearly all of these actions, however, were resolved through the Settlement.  Those issues that were not resolved in the Settlement cannot support a claim for relief under the appropriate standards.

### Hostile Work Environment (Counts I and II)

In order to prove a hostile work environment claim on the basis of race, "a plaintiff must demonstrate: (1) that he or she suffered intentional discrimination because of race; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same race in that position; and (5) the existence of respondeat superior liability." Moore v. Ashcroft, 401 F.Supp.2d 1, 42 (D.D.C. 2005) (internal quotations and citations omitted).  In assessing whether a plaintiff has adequately alleged a hostile work environment, courts should to look at "'all the circumstances,' including 'the frequency of the discriminatory conduct; its severity;

_____

of evenhanded administration of the law.'" 536 U.S. at 108 (quoting Mohasco Corp. v. Silver, 447 U.S. 807, 826 (1980)). Thus, for any claim not specified in Plaintiff's EEO Complaints, he has failed timely to exhaust the necessary administrative remedies.

-21-

whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." <u>Faragher</u> v. <u>City of Boca Raton</u>, 524 U.S. 775, 787-88, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (<u>quoting</u> <u>Harris</u> v. <u>Forklift Sys., Inc.</u>, 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). Although a plaintiff is "not required to plead a *prima facie* case of hostile work environment in the complaint, the alleged facts must be able to support such a claim." <u>Moore</u>, 401 F.Supp.2d at 42 (<u>citing</u> <u>Sparrow</u> v. <u>United Air Lines, Inc.</u>, 216 F.3d 1111, 1114 (D.C. Cir. 2000)).

<u>Kriesch</u> v. <u>Johanns</u>, --- F.Supp.2d ----, 2007 WL 30346, *3 - *4 (D.D.C. Jan. 05, 2007).

> [T]he Supreme Court has stated that "to establish hostile work environment, plaintiffs ... must show harassing behavior 'sufficiently severe or pervasive to alter the conditions of [their] employment.' " [<u>Pennsylvania State Police</u> v.] <u>Suders</u>, 542 U.S. [129] at 133, 124 S.Ct. 2342 (2004) (<u>quoting</u> <u>Meritor Savs. Bank, FSB</u> v. <u>Vinson</u>, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)).

<u>Veitch</u> v. <u>England</u>, 471 F.3d 124, 131 (D.C. Cir. 2006).

> "The workplace is 'hostile' for purposes of Title VII . . . only when the offensive conduct 'permeates [the workplace] with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" <u>Bell</u> v. <u>Gonzales</u>, 398 F.Supp.2d 78, 91 (D.D.C. 2005) (<u>quoting</u> <u>Oncale</u> v. <u>Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75, 78, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (<u>in turn quoting</u> <u>Harris</u> v. <u>Forklift Sys., Inc.</u>, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993))). In deciding whether the plaintiff has met this threshold requirement, the Court must examine all of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." <u>George</u> v. <u>Leavitt</u>, 407 F.3d 405, 416 (D.C. Cir. 2005) (<u>quoting</u> <u>Harris</u>, 510 U.S. at 23, 114 S.Ct. 367 (internal quotation marks omitted)).

-22-

* * *

> Further, the Court [has] refused to permit the
> plaintiff to "bootstrap" the same series of incidents
> alleged as retaliation "into a broader hostile work
> environment claim." Id. [Keeley v. Small, 391 F.Supp.2d
> 30, 50-51 (D.D.C. 2005).](citing Lester v. Natsios, 290
> F.Supp.2d 11, 33 (D.D.C. 2003) ("Discrete acts
> constituting discrimination or retaliation claims ...
> are different in kind from a hostile work environment
> claim that must be based on severe and pervasive
> discriminatory intimidation or insult.")).

Edwards v. EPA, 456 F.Supp.2d 72, 84, 96 (D.D.C. 2006).  The

relevant allegations in the instant action do not meet this

standard.

                    Retaliation (Count III)

     The assessment of a valid claim for retaliation has been

described slightly differently than for other disparate treatment

claims:

> The anti-retaliation provision protects an individual
> not from all retaliation, but from retaliation that
> produces an injury or harm. . . . In our view, a
> plaintiff must show that a reasonable employee would
> have found the challenged action materially adverse,
> "which in this context means it well might have
> 'dissuaded a reasonable worker from making or
> supporting a charge of discrimination.' " Rochon [v.
> Gonazles,], 438 F.3d [1211] at 1219 [(D.C. Cir. 2006)]
> (quoting Washington [v. Illinios Dep't of Revenue], 420
> F.3d [658] at 662 [(7th Cir. 2005)].
>
> We speak of material adversity because we believe
> it is important to separate significant from trivial
> harms.  Title VII, we have said, does not set forth "a
> general civility code for the American workplace."
> Oncale v. Sundowner Offshore Services, Inc., 523 U.S.
> 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998); see
> Faragher [v. City of Boca Raton], 524 U.S. [775] at 788
> [(1998)](judicial standards for sexual harassment must
> "filter out complaints attacking 'the ordinary

-23-

> tribulations of the workplace, such as the sporadic use
> of abusive language, gender-related jokes, and
> occasional teasing'"). An employee's decision to
> report discriminatory behavior cannot immunize that
> employee from those petty slights or minor annoyances
> that often take place at work and that all employees
> experience.
>
>                 * * *
>
> We refer to reactions of a reasonable employee
> because we believe that the provision's standard for
> judging harm must be objective. An objective standard
> is judicially administrable. It avoids the
> uncertainties and unfair discrepancies that can plague
> a judicial effort to determine a plaintiff's unusual
> subjective feelings. We have emphasized the need for
> objective standards in other Title VII contexts, and
> those same concerns animate our decision here.

Burlington Northern and Santa Fe Ry. Co. v. White, 126 S.Ct.
2405, 2415 (2006). The few facts that Plaintiff alleges beyond
the settlement date do not satisfy this standard. Rather, no
reasonable jury could conclude that requiring Plaintiff to ask
for SF-50s without remarks before getting them or to tolerate
criticism from those he has opposed for control of a Union would
dissuade him from pursuing his EEO claims. In any event, the
agency has articulated its proper reasons for allowing these
things to take place, and changed those it felt it could change
before this action was commenced. See Taylor v. Small, 350 F.3d
at 1294.


### The SF-50s

Plaintiff claims that the SF-50s issued in this case somehow

support his claims.  In fact, the Settlement reached in the earlier cases specifically called for the actions that were reflected in each SF-50.  <u>See</u> Settlement (Att. A), ¶ 2. Plaintiff complains that the remarks section of each SF-50 truthfully noted that the action was taken in compliance with a settlement; Plaintiff was harmed, he claims, because he could not use the SF-50s if he wanted to submit them to agencies to which he might apply for employment without revealing that he had settled a prior suit.  Complaint, ¶¶ 11, 13.  Although Plaintiff bargained for what documentation he was entitled to in the settlement, <u>see</u> Settlement (Att. A), ¶¶ 2a, 2n, 2s, nothing in the Settlement prohibited the agency from preparing paperwork that correctly described the settlement as a basis for taking the various personnel actions called for in that settlement agreement.  <u>See</u> Att. A.  Having agreed to accept the promotion and thousands of dollars and specific documentation regarding his employment, Plaintiff cannot now base a claim on the agency's action to effect the terms of that settlement under the limitations for which Plaintiff and the Agency bargained.

In any event, after Plaintiff complained about the remarks in the November 2005 SF-50s, the agency accelerated the issuance of another SF-50 showing Plaintiff received a cost of living adjustment and making no mention of the settlement.  <u>See</u> Pilipovich Affidavit (Att. B), ¶¶ 6-7 and corresponding Exhs. 3-

6.  Thus, by January 2006, if Plaintiff was required to submit an SF-50 during the application process with a potential employer, the available SF-50, which made no mention of the Settlement, would have been the one he would submit, because it was the most recently issued SF-50.  <u>Id</u>.

Nevertheless, in February 2006, although not required to do so by the language of the Settlement, PBGC reissued and backdated the three November 2005 SF-50's that Plaintiff and his counsel found objectionable.  Att. A; Att. B, ¶ 8 and corresponding Exh. 7.  The Remarks section of the three reissued SF-50's no longer contained a reference to the Stipulation, as requested by Plaintiff and his counsel.  <u>Id</u>.  Because these issues were resolved as requested by Plaintiff in the informal EEO process and before Plaintiff initiated this action, he has failed to state a claim upon which relief may be granted.  <u>See</u> <u>Taylor</u> v. <u>Small</u>, 350 F.3d at 1294 (Permitting employers the opportunity to correct workplace wrongs prior to litigation is the objective of the EEO process; thus, because the employer corrected plaintiff's rating and her bonus before she filed suit, there was no unremedied adverse employment action when the suit was filed and the district court properly granted summary judgment in favor of the defendant on the claim).

Similarly, the final SF-50 about which Plaintiff complains does not support any assertion that he was the subject to

-26-

harassment or retaliation.  As required by paragraph 2f of the
Stipulation, on May 14, 2006, Plaintiff was placed in Leave
Without Pay ("LWOP") status for a period not to exceed six
months.  Att. A, ¶ 2f; Complaint, ¶ 12; Att. B, ¶ 9.  To
effectuate this personnel action, PBGC issued Plaintiff an SF-50
with the codes and remarks required by the Office of Personnel
Management's "Guide to Processing Personnel Actions," which
requires the use of code 460 and the Nature of Action to read
"LWOP NTE (date)" whenever LWOP is scheduled to exceed 30
calendar days.  Att. B, ¶ 9 and corresponding Exh. 8.  When the
Nature of  Action Code is 460, the Office of Personnel
Management's ("OPM's") "Guide to Processing Personnel Actions"
requires the use of specific remarks addressing service credit
and FEGLI, which language was included on Plaintiff's LWOP SF-50.
Id.  These facts are not adverse to Plaintiff in any manner other
than to limit the length of his period of leave without pay to
the agreed upon term.  Settlement (Att. A), ¶ 2f.  See Brown v.
Brody, 199 F.3d at 457-58; Taylor v. Small, 350 F.3d at 1293.  In
any event, as described herein, neither the language in this SF-
50, nor any delay in Plaintiff receiving the other SF-50s of his
liking, would dissuade a reasonable worker[3] from making or
supporting a charge of discrimination nor did they cause any

---

[3]  In fact, even Plaintiff himself was not dissuaded from
presenting additional EEO Complaints in his waning days at the
agency.  See Att. E, ¶ 15 and corresponding Exhs. 7-9.

change in the terms of his employment other than the change
agreed upon in the Settlement.  See Burlington Northern and Santa
Fe Ry. Co. v. White, 126 S.Ct. at 2415; Brown v. Brody, 199 F.3d
at 457-58.

### Failure To Silence Bernsen, Johnson & Baird On Union Matters

Plaintiff has asserted that he was a Union Shop Steward and
has served as a union official from April of 1999 to July of
2003, representing members of the National Association of
Government Employees ("NAGE") Local R3-77.  Complaint in Civil
Action No. 03-2495 CKK, ¶ 6; Complaint in Civil Action No. 04-
1996 CKK, ¶¶ 13-15 (noting allegations that Plaintiff was found
to have sexually harassed a coworker named Elizabeth Baker).  In
2003, NAGE Local R3-77 filed suit against NAGE to resolve a
bitterly disputed matter.  Id.; Amended Complaint in Johnson v.
Holway, Civil Action No. 03-2513 ESH, ¶ 67 (By September 2003 the
defendants (NAGE and Holway) "treated a handful of complainers,
including . . . Robert Perry, . . . as the Executive Committee of
Local R3-77 in place of the elected officers, Johnson, Bernsen
and Baker, because these plaintiffs had exercised their rights as
union members. . ."); id., ¶¶ 76-85 (alleging that the defendants
violated various rights of Johnson, Bernsen and Baker because of
views, arguments, and opinions they expressed).  Plaintiff raised
the claims regarding Stuart Bernsen and Valda Johnson long before
the Settlement.  And the only assertedly offensive flyer that

-28-

post-dated his Settlement, and therefore could form a basis for a claim not resolved in the Settlement, was a single flyer dated November 9, 2005.  <u>Faragher</u> v. <u>City of Boca Raton</u>, 524 U.S. 787-88; Att. E, ¶ 11 and corresponding Exh. 5.  The flyer disseminated on November 9, 2005, was entitled "Belt - Petta Stop New Benefits for Employees; Management and NAGE Prepare for Cuts," and referenced Plaintiff, Dwayne Jeffers and Dick Petta in two paragraphs that read in pertinent part:

> As for the so-called union - Dick Petta, Robert Perry and Dwayne Jeffers - they have sat back and let management do as it pleases

> \* \* \*

> It is not that Dick Petta, Robert Perry and Dwayne Jeffers are in over their heads and are clueless.  The problem is that management was dedicated all along to stopping a new collective bargaining agreement, and Petta, Perry and Jeffers helped them.

Att. E, ¶ 11 and corresponding Exh. 5.  The e-mails about which Plaintiff complained were equally innocuous, referencing Union activity.

Acting upon an independent investigation of the complaints, the agency concluded that these flyers and emails did not violate any PBGC policies or directives, did not pose a safety threat, and fell within the scope of protected activity under Federal law governing labor relations in the federal sector.  Att. B, ¶ 15 and corresponding Exh. 15; Att. E, ¶¶ 12-13 and corresponding Exh. 6.  Those e-mails and flyers raised by Plaintiff that

predate the Settlement cannot form the basis of the instant claim (see Settlement (Att. A), ¶ 1); and those that were conveyed more than 45 days in advance of Plaintiff seeking counseling on January 5, 2006, would be untimely anyway. Att. E, ¶ 4 and corresponding Exh. 2; 29 C.F.R. § 1614.105(a)(1).

Plaintiff identified two flyers dated after June 2005 to support his claim that the flyers somehow constituted a hostile work environment. See Att. E, ¶ 11 and corresponding Exhs. 4-5. Yet Plaintiff first sought EEO counseling on these matters on January 5, 2006. Id., ¶ 4 and corresponding Exh. 2. Because Plaintiff waited beyond the 45 days permitted by EEO regulations to seek counseling, he may not pursue those claims at this time. 29 C.F.R. § 1614.105(a)(1); National R.R. Passenger Corp. v. Morgan, 536 U.S. at 108 (quoting Mohasco Corp. v. Silver, 447 U.S. at 826); Bowden v. United States, 106 F.3d at 437; Battle v. Rubin, 121 F.Supp.2d at 7; Williams v. Munoz, 106 F.Supp.2d at 42.

Even considering the communications that Plaintiff says offended him after November 8, 2005, they cannot form a viable claim under Title VII, because they would not dissuade a reasonable employee in his situation from engaging in protected activity and because they could not support a claim of hostile work environment. Faragher v. City of Boca Raton, 524 U.S. at 787-88; Burlington Northern and Santa Fe Ry. Co. v. White, 126

S.Ct. at 2415. Moreover, the agency's decision not to step in and attempt to quell communications regarding Union activity was made for the legitimate and proper reasons that the communications had been identified as not violating any PBGC policies or directives, did not pose a safety threat, and fell within the scope of protected activity under Federal law governing labor relations in the federal sector. Att. B, ¶ 15 and corresponding Exh. 15.

        Plaintiff Not Offered What Mr. Jeffers Was In Settlement

    Plaintiff makes the claim that he was not offered a settlement including "the option to work out of Defendant's Kingstown Office or the maximizing of flexiplace," which was offered to another employee, Dwayne Jeffers. Complaint, ¶¶ 17-18. First of all, Plaintiff had already settled all of his claims with the agency when, on December 22, 2005, PBGC offered to resolve Dwayne Jeffers' September 28, 2005 informal EEO complaint by allowing Mr. Jeffers to work Kingstowne, Virginia. Att. A; Att. C, ¶ 9 and corresponding Exh. 7; Complaint, ¶ 17. So the two cannot be said to have been similarly situated. Second, there is no basis to argue that race or retaliation somehow motivated the decision, because the two men are of the same race and Mr. Jeffers was Plaintiff's representative in the EEO process, and Plaintiff was Mr. Jeffers' Representative. Att. C (Rixene Hicks Affidavit), ¶¶ 6, 9; Att. D (Jeffers' Complaint

-31-

filed in, Civil Action No. 03-1762 (D.D.C.), ¶ 6; Complaint, ¶ 5.

Moreover, Plaintiff either never asked for these things in

settlement, or did and <u>settled</u> for something else, a concept that

appears lost on him.  Since Plaintiff has settled his claim,

securing thousands of dollars, a promotion, training and other

benefits, he cannot properly now be heard to ask for more to

settle those claims.  <u>See</u> Att. A.

    <u>Breach Of Contract (Count IV)</u>

    This Court lacks subject matter jurisdiction over the Breach

of Contract claim under the Tucker Act, 28 U.S.C. § 1491(a)(1).[4]

The courts routinely treat administrative settlements of

discrimination claims as contracts.  <u>See</u>, <u>e.g.</u>, <u>Saksenasingh</u> v.

<u>Secretary of Education</u>, 126 F.3d 347, 348-49 (D.C. Cir. 1997);

<u>Bowden</u> v. <u>United States</u>, 106 F.3d 433, 436 (D.C. Cir. 1997).  The

D.C. Circuit has held that actions for breach of such contracts

belong in the Court of Federal Claims where the amount sought

exceeds $10,000, as does Plaintiff's claim.  <u>See</u> Complaint at 9;

<u>Hansson</u> v. <u>Norton</u>, 411 F.3d 231, 232-33, 235 (D.C. Cir. 2005)

---

    [4] Plaintiff has not cited the Tucker Act, or any statutory
provision to support jurisdiction of a contract claim in support
of the Court's jurisdiction.  <u>See</u> Complaint, ¶ 3.  This, in
itself, could be fatal to such a claim.  <u>See</u> Fed. R. Civ. P.
8(a)(1).  In any event, the Settlement itself provided that the
Court would retain jurisdiction only "as necessary to enforce the
terms of this Stipulation of Settlement and Dismissal."  Att. A
at 8.  Rather than seeking enforcement of the terms of the
Settlement, Plaintiff seeks damages for a theorized breach.  <u>See</u>
Complaint at 9.

(dispute over the reasonableness of an award of attorney's fees
where the Resolution Agreement provided that plaintiff would
receive reasonable attorney's fees and costs where the agency
awarded approximately one quarter of the fees sought).  The Court
reasoned that such claims "neither requir[ed] an interpretation
of Title VII with respect to [the] discrimination complaint nor
[sought] equitable relief under Title VII."  Id. at 237; see
Brown v. United States of America, 389 F.3d 1296, 1297 (D.C. Cir.
2004) (affirming dismissal of claim alleging breach of
administrative settlement of EEO charges "because this contract
question arises in a suit against the United States for more than
$10,000 in damages, jurisdiction to decide whether the Department
breached the settlement agreement lies exclusively in the Court
of Federal Claims.").[5]

> Defendant relies on recent D.C. Circuit jurisprudence
> indicating that district courts lack jurisdiction over
> claims for damages arising out of Title VII settlement
> agreements where the claims do not involve
> interpretation of Title VII. . . . (citing Hansson v.
> Norton, 411 F.3d 231, 232-33, 235 (D.C. Cir. 2005);
> Brown v. United States, 389 F.3d 1296, 1297 (D.C. Cir.
> 2004)).  Indeed, quite recently in Rochon v. Gonazles,
> [438 F.3d 1211 (D.C. Cir. 2006),] a case in which the
> plaintiff alleged both violations of Title VII and
> breach of a Title VII settlement agreement and sought
> both monetary damages and equitable relief, the D.C.
> Circuit stated that, "the combination of a claim for
> equitable relief brought under Title VII and a related

_____

[5]  The D.C. Circuit emphasized that "[i]n order for Brown
either to pursue remedies for breach of contract or to seek
relief under Title VII, she must first prove the Department
breached the settlement agreement."  Brown, 389 F.3d at 1297.

claim for breach of contract does not give the district
court jurisdiction over the contract claim that, if
brought separately, would be exclusively in the Court
of Federal Claims ...." 438 F.3d 1211, 1214 (D.C. Cir.
2006).

However, in <u>Rochon</u>, the D.C. Circuit went on to
note that it was "not immediately clear whether
Rochon's claim, if brought separately, would fall
within the jurisdiction of the Court of Federal Claims"
because that court does not have jurisdiction over
claims for damages sounding in tort. <u>Id</u>. (noting,
however, that the Court of Federal Claims may retain
jurisdiction over a suit where the "primary thrust of a
complaint is breach of contract") (citation and
internal quotations omitted); <u>see also</u> <u>Taylor</u> v. <u>United
States</u>, No. 05-1045 C, 2006 WL 2949283, *7 (Fed. Cl.
Oct. 13, 2006) (Court of Federal Claims lacks
jurisdiction over Title VII claims).  As Defendant
acknowledges, it is equally unclear whether the Court
of Federal Claims would assert jurisdiction over
Plaintiff's breach of contract claim in this case. . .
.  That court has recently declined jurisdiction to
enforce a Title VII settlement agreement which, like
the Settlement Agreement in this case did not authorize
monetary damages as remedy for a breach, <u>see</u> <u>Schnelle</u>
v. <u>United States</u>, 69 Fed. Cl. 463, 466-67 (Fed. Cl.
2006), and it is undisputed that the Court of Federal
Claims cannot award an equitable remedy in the absence
of a viable claim for money damages, <u>Taylor</u>, 2006 WL
2949283 at * 13.

<u>Munoz</u> v. <u>England</u>, Civil Action No. 05-2472 CKK, 2006 WL 3361509,

*5 n.2 (D.D.C. Nov. 20, 2006).[6]

---

    [6]  This Court in <u>Munoz</u> noted the possibility of the Court
exercising ancillary jurisdiction where it already had
jurisdiction to award equitable relief. <u>See</u> <u>Munoz</u>, 2006 WL
3361509, *5 n.2 (<u>citing</u> <u>Rochon</u>).  In this case, Plaintiff has now
resigned from the agency, <u>see</u> Att. A, ¶ 2i, leaving any request
for equitable relief moot.  <u>See</u> <u>Arizonans For Official English</u> v.
<u>Arizona</u>, 520 U.S. 43, 64-67 (1997) ("To qualify as a case fit for
federal-court adjudication, an actual controversy must be extant
at all stages of review, not merely at the time the complaint is
filed."); <u>Anyanwutaku</u> v. <u>Moore</u>, 151 F.3d 1053, 1057 (D.C. Cir.
1998) ("when a prisoner seeking injunctive or declaratory relief

-34-

Even if the Court had jurisdiction, Plaintiff would fail to state a claim for relief under the Settlement.

> In this case, the court can construe plaintiff's complaint, on its face, to allege a common law breach of contract claim, and to request damages in the amount of $1,000,000.  As noted above, plaintiff must show the existence of a valid contract, a duty arising from that contract, a breach of that duty, and that the breach caused the damages claimed by plaintiff. . . . [A]ssuming the 2002 settlement agreement is a valid contract, plaintiff nevertheless fails to provide any evidence that the government breached the contract. Specifically, plaintiff does not allege that the government failed to perform any of its duties under the 2002 settlement agreement. Indeed, all of the evidence indicates that the government satisfied its contractual obligations.  Thus, plaintiff fails to state a claim for breach of contract.

Taylor v. United States, 73 Fed.Cl. 532, 545-46 (Fed. Cl. 2006).

As in Taylor, even were the Court to consider Plaintiff's breach of contract claim, it is clear that the terms of the Settlement reached in his earlier cases have not been breached by the Defendant.  The Court of Appeals emphasized in Brown that "[i]n order for Brown either to pursue remedies for breach of contract or to seek relief under Title VII, she must first prove the Department breached the settlement agreement."  Brown, 389 F.3d at 1297 (emphasis added).  In this case, the gravamen of the case involves whether there was a contractual obligation to

---

challenges his parole eligibility date but is subsequently released on parole, his claims are moot unless he alleges continuing adverse consequences from the challenged parole records").

exclude truthful remarks from his SF-50s, or to shield Plaintiff from the criticism of his union opponents.  That preliminary inquiry does not require application of any Title VII concepts and does not even involve an examination of any person's intent. And, simple resort to the language of the Stipulation reveals that there was no breach under the facts alleged.  <u>See</u> Att A. The Settlement's terms do not include a contractual promise to protect Plaintiff from every workplace slight, indeed, there is no term of the contract that is offended by the actions alleged in the Complaint.  <u>Id</u>.

<u>CONCLUSION</u>

For all of the foregoing reasons, Defendant respectfully requests that the Court dismiss this action or, in the alternative, grant summary judgment in favor of Defendant on all claims herein.

Respectfully submitted,

_____
JEFFREY A. TAYLOR, DC Bar #498610
United States Attorney


_____
RUDOLPH CONTRERAS, DC Bar #434122
Assistant United States Attorney


_____
W. MARK NEBEKER, DC Bar #396739
Assistant United States Attorney


-36-

Agency Counsel:
JUDITH STARR
General Counsel
PHILIP R. HERTZ
Deputy General Counsel
JAY A. RESNICK
Assistant General Counsel
ROBIN S. HORNING
Attorney
MARGARET E. DRAKE
Attorney
PENSION BENEFIT GUARANTY CORPORATION
1200 K Street, N.W.
Washington, DC  20005-4026
(202) 326-4000

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ROBERT T. PERRY,                        )
                                        )
            Plaintiff,                  )
                                        )
            v.                          )  Civil Action No. 06-1371 CKK
                                        )
VINCENT K. SNOWBARGER,                  )
Interim Director, Pension               )
   Benefit Guaranty Corporation         )
                                        )
            Defendant.                  )
_____)

DEFENDANT'S STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

Pursuant to Fed. R. Civ. P. 56(e) and Local Rule 7(h),

Defendant, Vincent K. Snowbarger in his official capacity as

Interim Director of the Pension Benefit Guaranty Corporation

("PBGC" or "Defendant"), respectfully submits the following

Statement of Material Facts Not in Dispute.

1.  Plaintiff Robert T. Perry ("Perry" or "Plaintiff") is an

African American male who was employed as a GS-511-13 Auditor by

PBGC.  Amended Complaint ("Complaint"), ¶¶ 5, 8.

2.  Defendant Vincent K. Snowbarger is the Interim Director

of the PBGC, a wholly-owned United States Government corporation

established under section 4002 of the Employee Retirement Income

Security Act of 1975 ("ERISA"), 29 U.S.C. § 1302, to administer

the pension plan termination insurance program under Title IV of

ERISA.  29 U.S.C. §§ 1301-1461.

3.  Plaintiff filed two District Court civil EEO complaints

involving PBGC, Civil Action Nos. 03-2495 and 04-1996, which were

resolved by a Stipulation Of Settlement And Dismissal
("Stipulation" or "Settlement") entered by the Court November 8,
2005, a copy of the which Settlement is attached hereto as Att. A
(November 8, 2005 Stipulation Of Settlement And Dismissal);
Complaint, ¶ 9.

4.   The settlement included settlement of "all claims for
damages prior to and including the date Plaintiff signs this
Stipulation of Settlement and Dismissal" and under the terms of
the Settlement Plaintiff released the PBGC from any and all
liability for "all matters related to his employment with
Defendants up to and including the date of this Stipulation of
Settlement and Dismissal," which was November 8, 2005.  Att. A at
2; Complaint, ¶ 10.

5.   In November 2005 and May 2006, Defendant issued four
SF-50 forms to effectuate the formal Personnel Actions that were
required under ¶¶ 2(a)-(c) and (f) of the Stipulation.  Att. A at
3, ¶¶ 2a, 2b, 2c, 2f; Complaint,  ¶¶ 11-12; Att. B (Pilipovich
Affidavit), ¶ 4 and corresponding Exh. 2.  Specifically,
Defendant retroactively promoted Plaintiff to a GS-13, Step 3
auditor position without back pay, and prospectively promoted
Plainitff to a GS-13, Step 10 Auditor position for a period of
one year.  Att. B, ¶ 3.   Plaintiff was paid the GS-13, Step 10
salary until he was placed in leave without pay status on May 14,
2006, consistent with the terms of the Stipulation.  Id.

-2-

6. The Stipulation was silent as to what remarks or information could be included in, or excluded from, any of the paperwork necessary to effectuate the personnel actions required by the Stipulation. <u>See</u> Att. A; Att. B, ¶ 5.

7. As required by Paragraph 2c of the Stipulation, Defendant detailed Plaintiff to another department within PBGC. Att. A, ¶ 2c; Att. B, ¶ 3.

8. As required by Paragraph 2d of the Stipulation, Defendant paid for approximately $10,100.00 in training opportunities for Plaintiff. Att. A, ¶ 2d; Att. B, ¶ 3.

9. As required by Paragraph 2g of the Stipulation, Defendant paid Plaintiff a lump sum payment of $60,000.00. Att. A, ¶ 2g; Att. B, ¶ 3.

10. As required by Paragraph 2n of the Stipulation, Defendant provided Plaintiff with an appropriate letter of recommendation. Att. A, ¶ 2n; Att. B, ¶ 3.

11. As required by Paragraph 2p of the Stipulation, Defendant paid Plaintiff's attorney's fees in the amount of $80,000.00. Att. A, ¶ 2p; Att. B, ¶ 3.

12. As required by Paragraph 2s of the Stipulation, Defendant issued Plaintiff a "fully successful" performance appraisal for FY 2005. Att. A, ¶ 2s; Att. B, ¶ 3.

13. On December 13, 2005, Robert Perry complained via email to Rick Lattimer in the Human Resources Division ("HRD") about

-3-

language in the "Remarks" section of the SF-50's that were issued
in November 2005.  Complaint, ¶ 11; Att. B, ¶ 6 and corresponding
Exh. 3.  Mr. Lattimer responded to Plaintiff in a subsequent
email that the SF-50's were prepared so as to explain to the
Office of Personnel Management ("OPM") the manner in which
Plaintiff was promoted.  Att. B, ¶ 6 and corresponding Exh. 3.

    14.  Plaintiff responded to Mr. Lattimer's email on December
14, 2005, specifying the language he wanted removed from the
Remarks section of the November SF-50's.  Att. B, ¶ 6 and
corresponding Exh. 3.

    15.  Plaintiff's then counsel contacted the U.S. Attorney's
Office on January 4, 2006 and questioned the "Entry under
'Remarks' in SF-50s resulting from Settlement."  Att. B, ¶ 7 and
corresponding Exh. 4.  On January 5, 2006, the U.S. Attorney's
Office sent a letter to Plaintiff's counsel informing him that
the references in the Remarks section were included to protect
PBGC in the event that OPM questioned the personnel actions.
Att. B, ¶ 7 and corresponding Exh. 5.  The letter further
informed Plaintiff's counsel that in an effort to address
Plaintiff's concerns, PBGC would issue Plaintiff an SF-50 for his
Cost-of-Living Adjustment ("COLA") increase as soon as the COLA
went into effect, rather than Plaintiff having to wait a couple
of months to receive the SF-50 from Department of the Interior,
which processes PBGC's payroll.  Id.  The COLA SF-50 issued on

-4-

January 9, 2006, did not contain a reference to the Stipulation
in the Remarks section.  Att. B, ¶ 7 and corresponding Exh. 6.
At that point, if Robert Perry had to submit an SF-50 during the
application process with a potential employer, the COLA SF-50
would have been the one he would submit because it was the most
recently issued SF-50.  Id.

16.  In February 2006, although not required to do so by the
language of the Settlement, PBGC reissued and backdated the three
November 2005 SF-50's that Plaintiff and his counsel found
objectionable.  Att. A; Att. B, ¶ 8 and corresponding Exh. 7.
The Remarks section of the three reissued SF-50's no longer
contained a reference to the Stipulation, as requested by
Plaintiff and his counsel.  Id.

17.  As required by paragraph 2f of the Stipulation, on May
14, 2006, Plaintiff was placed in Leave Without Pay ("LWOP")
status for a period not to exceed six months.  Att. A; Complaint,
¶ 12; Att. B, ¶ 9.  To effectuate this personnel action, PBGC
issued Plaintiff an SF-50 with the codes and remarks required by
the Office of Personnel Management's "Guide to Processing
Personnel Actions," which requires the use of code 460 and the
Nature of Action to read "LWOP NTE (date)" whenever LWOP is
scheduled to exceed 30 calendar days.  Att. B, ¶ 9 and
corresponding Exh. 8.  When the Nature of  Action Code is 460,
OPM's "Guide to Processing Personnel Actions" requires the use of

-5-

specific remarks addressing service credit and FEGLI, which language was included on Plaintiff's LWOP SF-50.  Id.

18.  On June 7, 2005, Plaintiff sent an email to various members of PBGC upper management, including the Executive Director, EEO Manager, and Human Resources Director.  Att. B,  ¶ 12 and corresponding Exh. 11.  Plaintiff's email complained that certain flyers had been circulated within PBGC that Plaintiff felt might incite others to take "untold actions against [him]."  Id.

19.  The flyers followed a representational election held by the Federal Labor Relations Authority in February 2005, wherein the National Association of Governmental Employees ("NAGE") prevailed over the Independent Union of Pension Employees.  Att. B, ¶ 11.

20.  On February 2, 2005, a new Executive Board of NAGE Local R3-77 was sworn in, including Plaintiff as Acting Secretary/Treasurer, Richard "Dick" Petta as President, and Dwayne Jeffers as Vice-President At Large.  Att. B, ¶ 11.

21.  The flyers that were disseminated following the union elections were critical of PBGC management and NAGE officials, including Plaintiff.  Att. B, ¶ 11.

22.  HRD Director Pilipovich responded to Plaintiff's June 7, 2005 email on June 8, 2005.  Att. B, ¶ 12 and corresponding Exh. 11.  Ms. Pilipovich  informed Plaintiff that there would be

an investigation of Plaintiff's complaint.  Id.  Two PBGC
employees, Ricardo Silva, HRD Specialist, and Ray Forster,
attorney, met with Plaintiff to investigate Plaintiff's June 7,
2005 complaint.  Att. B, ¶ 12.

23.  While PBGC investigated Plaintiff's June 7, 2005
complaint, Plaintiff was allowed to work from home for a period
of time.  Att. B, ¶ 13.  On June 16, 2005, PBGC sent an email to
all PBGC employees and contractors regarding its commitment to
providing a workplace free from violence and harassment.  Id. and
corresponding Exh. 12.

24.  On September 28, 2005, Plaintiff contacted PBGC's EEO
Office to request EEO counseling.  Att. C (Rixene Hicks
Affidavit), ¶ 3 and corresponding Exh. 1.  PBGC employee Dwayne
Jeffers was Plaintiff's representative.  Id., ¶ 6.  Dwayne
Jeffers is an African American male.  Att. D (Jeffers' Complaint
filed in, Civil Action No. 03-1762 (D.D.C.)), ¶ 6.

25.  On September 28, 2005, Dwayne Jeffers contacted PBGC's
EEO Office to request EEO counseling regarding an EEO complaint
that was similar in nature to the one raised by Plaintiff.  Att.
C, ¶ 9.  Plaintiff was Mr. Jeffers' representative.  Id.

26.  On October 21, 2005, Plaintiff sent his EEO counselor
an email message providing documents related to his EEO
complaint.  Included within his email, Plaintiff stated that his
complaint "consists of PBGC's willingness to permit management

-7-

and employees to commit retaliatory acts against [him] without taking appropriate actions to curtail or stop [his] workplace harassment and threats of workplace violence." Att. C, ¶ 4 and corresponding Exh. 3.

27. On October 31, 2005, Plaintiff sent an email to various PBGC management officials complaining that he had received what he alleged to be another harassing email. Att. B, ¶ 14 and corresponding Ex. 13. On November 2, 2005, HRD Director Pilipovich issued a memorandum to Plaintiff informing him that PBGC had retained a law firm, Littler Mendelson, P.C., to complete PBGC's investigation into Plaintiff's June 2005 complaint. Id. Ms. Pilipovich's memorandum informed Plaintiff that the investigation concerned "complaints made to HRD, not complaints which are or may be in the informal or formal EEO process." Id.

28. On November 4, 2005, Plaintiff sent an email to his EEO counselor, Rixene Hicks, informing her that he was withdrawing the EEO complaint he initiated on September 28, 2005, and discussed in his October 21, 2005 email message to Ms. Hicks. Att. C, ¶ 8 and corresponding Exh. 6.

29. On December 22, 2005, PBGC offered to resolve Dwayne Jeffers' September 28, 2005 informal EEO complaint by allowing Mr. Jeffers to work from PBGC's remote location in Kingstowne, Virginia. Att. C, ¶ 9 and corresponding Exh. 7; Complaint, ¶ 17.

-8-

Mr. Jeffers rejected PBGC's offer of resolution, and Rixene Hicks issued Mr. Jeffers a Notice regarding his right to file a formal EEO complaint on December 30, 2005. Att. C, ¶ 9 and corresponding Exh. 8.

30. The same December 22, 2005 offer to resolve Dwayne Jeffers' September 28, 2005 informal EEO complaint was not extended to Plaintiff. Att. C, ¶ 10 and corresponding Exh. 6; Complaint, ¶ 18. Indeed, Plaintiff did not have an EEO complaint pending on December 22, 2005. Att. A; Att. C, ¶ 10; Att. E (Steven Weiss Affidavit), ¶ 4.

31. Plaintiff initially sought counseling for his EEO Complaint 06-04 on January 5, 2006. Att. E, ¶ 4 and corresponding Exh. 2. Plaintiff's formal EEO Complaint 06-04 dated February 2, 2006 alleged race and sex discrimination and retaliation by PBGC through: (1) inappropriate language in the SF-50's issued in November 2005; (2) hostile work environment by PBGC employees Stuart Bernsen, Valda Johnson, and Rhonda Baird, who Plaintiff alleged distributed flyers and emails about Plaintiff; and (3) disparate treatment when Plaintiff was not offered the same opportunity for flexiplace that was offered to Plaintiff's representative, Dwayne Jeffers. Att. E, ¶ 4 and corresponding Exhs. 1 and 2; Complaint, ¶¶ 1, 11, 15-18.

32. Plaintiff's formal EEO Complaint 06-04 did not identify "color" as a basis for the complaint. Att. E, ¶ 4 and

-9-

corresponding Exh. 1.

33. Among the documents Plaintiff submitted in support of his EEO Complaint 06-04, Plaintiff included several flyers and hundreds of emails.  Att. E, ¶ 8.

34. Various of the flyers Plaintiff submitted in support of his EEO Complaint 06-04 do not mention Plaintiff.  Att. E, ¶ 8.

35. Of the flyers Plaintiff submitted in support of his EEO Complaint 06-04, all but two of the flyers naming Plaintiff were disseminated in May and June of 2005.  Att. E, ¶ 11; Att. B, ¶ 11 and corresponding Exh. 10.  Of the two flyers not disseminated in May/June 2005 that Plaintiff submitted in support of his EEO Complaint 06-04, one was disseminated on November 8, 2005, and the other was disseminated on November 9, 2005.  Att. E, ¶ 11 and corresponding Exhs. 4 and 5.

36. The flyer disseminated on November 8, 2005, which was entitled "NAGE Ordered to Pay $2.2 Million to Union Member," references Plaintiff, Dwayne Jeffers, and Dick Petta in the last paragraph, which reads in pertinent part, "And look what NAGE local has done.  Petta, Perry and Jeffers bad mouth other employees and rat on them to PBGC management to get people into trouble.  NAGE needs to go."  Att. E, ¶ 11 and corresponding Exh. 4.

37. The flyer disseminated on November 9, 2005, which was entitled "Belt - Petta Stop New Benefits for Employees;

-10-

Management and NAGE Prepare for Cuts," references Plaintiff, Dwayne Jeffers and Dick Petta in two paragraphs that read in pertinent part, "As for the so-called union - Dick Petta, Robert Perry and Dwayne Jeffers - they have sat back and let management do as it pleases", and "It is not that Dick Petta, Robert Perry and Dwayne Jeffers are in over their heads and are clueless.  The problem is that management was dedicated all along to stopping a new collective bargaining agreement, and Petta, Perry and Jeffers helped them."  Att. E, ¶ 11 and corresponding Exh. 5.

38.   In support of his EEO Complaint 06-04, Plaintiff submitted eleven email messages from Rhonda Baird that were sent to Plaintiff after November 8, 2005.  Att. E, ¶ 12 and corresponding Exh. 6.  Most of the emails were sent to multiple recipients, and most of them referenced union related matters.  Id.

39.   In support of his EEO Complaint 06-04, Plaintiff submitted no emails post-dating November 8, 2005 from Valda Johnson or Stuart Bernsen to Plaintiff.  Att. E, ¶ 13.

40.   Following the completion of the investigation conducted by Littler Mendelson, P.C. into the complaints raised by Plaintiff and Dwayne Jeffers, on February 16, 2006, HRD Director Pilipovich sent Plaintiff a memorandum explaining the results of the investigation and the Agency's determinations.  Att. B, ¶ 15 and corresponding Exh. 15.  Ms. Pilipovich's memorandum correctly

-11-

explained that PBGC had determined that the flyers and emails
about which Plaintiff and Dwayne Jeffers complained did not
violate any PBGC policies or directives, did not pose a safety
threat, and they fell within the scope of protected activity
under Federal law governing labor relations in the federal
sector.  Id.

41.  Plaintiff initially sought counseling for the claims in
his EEO Complaint 06-11 on March 15, 2006.  Att. E, ¶ 15 and
corresponding Exh. 9.  Plaintiff's formal EEO Complaint 06-11,
dated April 18, 2006, alleged race and sex discrimination and
retaliation by PBGC when HRD Director Michele Pilipovich issued
the February 16, 2006 memorandum regarding Plaintiff's complaints
about flyers and emails by PBGC employees Stuart Bernsen, Valda
Johnson, and Rhonda Baird.  Att. E, ¶ 15 and corresponding Exh.
7; Complaint, ¶¶ 1, 15-16.  Plaintiff's formal EEO Complaint
06-11 did not identify "color" as a basis for the complaint.
Att. E, ¶ 15 and corresponding Exh. 7.

42.  Plaintiff initially sought counseling for the claims in
his EEO Complaint 06-18 on May 10, 2006.  Att. E, ¶ 15 and
corresponding Exh. 9.  Plaintiff's formal EEO Complaint 06-18,
dated July 24, 2006, alleged race and sex discrimination and
retaliation by PBGC through: (1) inappropriate language in the
SF-50 issued May 14, 2006 when Plaintiff went into leave without
pay status; and (2) dismissal of Plaintiff's formal EEO Complaint

-12-

06-04 on May 3, 2006.  Att. E, ¶ 15 and corresponding Exh. 8.

Plaintiff's formal EEO Complaint 06-18 did not identify "color"

as a basis for the complaint.  Att. E, ¶ 15 and corresponding

Exh. 8.

Respectfully submitted,

_____
JEFFREY A. TAYLOR, DC Bar #498610
United States Attorney


_____
RUDOLPH CONTRERAS, DC Bar #434122
Assistant United States Attorney


_____
W. MARK NEBEKER, DC Bar #396739
Assistant United States Attorney

Agency Counsel:
JUDITH STARR
General Counsel
PHILIP R. HERTZ
Deputy General Counsel
JAY A. RESNICK
Assistant General Counsel
ROBIN S. HORNING
Attorney
MARGARET E. DRAKE
Attorney
PENSION BENEFIT GUARANTY CORPORATION
1200 K Street, N.W.
Washington, DC  20005-4026
(202) 326-4000

-13-

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that service of the foregoing Defendant's Motion To Dismiss Or, In The Alternative, For Summary Judgment, supporting memorandum, statement of material facts and a proposed Order has been made through the Court's electronic transmission system on this 20th day of February, 2007.

_____
W. MARK NEBEKER, DC Bar # 396739
Assistant United States Attorney
Civil Division
555 4th Street, N.W.
Washington, DC  20530
(202) 514-7230