# Glossary

| Witness or Person Referred to: | Designation: |
|---|---|
| Stuart Bernsen | A |
| Laura Rosenberg | B |
| Donna Pentak | C |
| Robert Perry | D |
| Todd Nickens | E |
| Delarse Montgomery | F |
| Robin Horning | G |
| Holli Jaffe | H |
| Diana Lavik | I |
| Elizabeth Baker | J |
| Valda Johnson | K |
| George Williams | L |
| Nosette Smith | M |
| Richard Latimer | N |
| William Beyer | O |
| Stanley Hecht | P |
| Karen Esser | Q |
| Debra West | R |
| Jay Resneck | S |
| Israel Goldowitz | T |
| Michael Miller | U |
| Tim Callaghan | V |
| Philip Hertz | W |
| John Paliga | X |
| Charles Finke | Y |
| Jeffery Cohen | Z |
| Stacy Williams | AA |
| Sharon Barbee Fletcher | BB |
| Richardo Silva | CC |
| John Hemphill | DD |

## IN THE MATTER OF ARBITRATION

### Between

**National Association of Government Employees, Local R3-77,**

**FMCS Case No. 03-08992**
Supervisory Misconduct

**and**

Robert T. Moore
Arbitrator

**Pension Benefit Guaranty Corporation.**

## DECISION AND AWARD
## ON AGENCY LIABILITY

**Presenting and Briefing Case:**

For the Grievant:

    Rhonda Baird, Esq.        <u>Pro se</u>
    Dwayne Jeffers             NAGE Local R3-77 Representative

For the Pension Benefit Guaranty Corp. (PBGC, Agency or Management):

    Ray M. Forster, Esq.        Office of General Counsel
    Karen Rapaport Esser, Esq.   Office of General Counsel

### Issues Presented

**Issue 1.** Whether the Agency, through the actions of Mr. X on November 13, 2002, violated any provisions of the parties' Labor Agreement, internal rules, regulations or policies of the Agency, or of the laws, rules or regulations of the United States, and if so, what should the remedy or remedies be?

**Issue 2.** Whether the Agency, through the actions and/or inactions of the General Counsel and the Office of General Counsel or other components of the Agency, in response to the grievant's complaint about Mr. X's conduct on November 13, 2002, failed to comply with or violated any Labor Agreement provisions, internal rules, regulations or policies of the Agency, or of the laws, rules or regulations of the United States, and if so, what should the remedy or remedies be?

## Statutes and Labor Agreement provisions in Issue

The statutory and Labor Agreement provisions and other rules, regulations, and policies of the PBGC and other government agencies on which the grievant relies or which otherwise are important to the issues raised, will be quoted as necessary in the body of this Decision.

## Facts

**Background and Chronology of Events**: The grievant is a black female, born in Trinidad-Tobago, employed by the PBSC as a GS 14 General Attorney in its Office of the General Counsel (OGC). Her employment began in August, 1997. When she advanced to GS 13, it was the result of a settlement with the General Counsel of an informal EEO complaint she had made about the lack of her keeping pace with the promotions of other, similarly situated attorneys who were white and male.

In April and June, 2002, she had testified for the Union in an arbitration challenging the Agency's practice of assigning labor relations and personnel management to positions in the Agency's internal EEO complaint resolution procedures (the EEO Structure Grievance). The outcome of that arbitration was favorable to the Union and resulted in a reshuffle of personnel and a general overhaul of the structure of the EEO complaint investigation and resolution structure with regard to who does what and reports to whom.

The grievant also filed a formal written EEO complaint on October 3, 2002 with the PBGC. In it she alleged she had been discriminated against on the basis of her race, sex, national origin and because of her participation in protected Union and EEO activities.

As an OGC attorney, the grievant dealt with complex legal issues raised in the enforcement and implementation of the statute designed by Congress to protect and, where necessary, provide a safety-net scale of substitute payments for fixed benefit pension plans which fall into default. The areas of law involved include tax, bankruptcy, pension, and labor relations. Like all attorneys who appear in court, provide in-house advice and counsel, and must interact with attorneys representing outside interests, it was important that she have team working skills, effective communication capabilities, and the ability and willingness to accept and carry out instructions.

Prior to her job performance ratings prepared in October, 2003, the grievant had always been highly rated on these requirements of her job, as well as found to be a pleasant worker, receptive to instruction and eager to improve her job performance. She was not considered to be overly emotional or irrational by her peers or supervisors.

Her present supervisor, Mr. Y, testified that her interactions with others had always been direct, clear and appropriate for the circumstance.

**The November 13, 2002 Incident**: Within the PBGC is the Corporate Finance and Negotiations Department (CFND), staffed primarily by non-attorneys who undertake the financial analyses of pension plans to determine their funded level and prospects of continued soundness. To every CFND case, an attorney from the OGC is assigned to provide legal assistance when thought necessary by the CFND. The grievant had sought assignment to CFND cases, and the first assignment she received was to the TRW case.

TRW was a company with multiple operations, owed by Northrop Grumman. The automotive products portion of TRW was being sold by Grumman through a leveraged buyout with a third organization providing the financing loan to the purchasing group. The portion of TRW being spun off had an underfunded pension liability and the PBGC's concern was with the potential adverse impact the considerable debt that was being assumed by the purchasers could have on that pension liability.

On short notice, a meeting was scheduled for November 13, 2002 between the CFND and representatives of Northrop Grumman, TRW, the purchasers, and the financing group. The CFND official responsible for the TRW transactions and its pension liability ramifications notified the grievant of the meeting and requested her attendance. This being her first CFND meeting with outside representatives, the grievant would ordinarily have been accompanied by her first line supervisor, Mr. Y. However, Mr. Y was not available because of a prior out-of-office commitment.

To address such situations, the OGC has a "buddy system" among its first line supervisors. When an attorney needs assistance from their regular supervisor, but that supervisor is not available, they rely on their regular supervisor's designated "buddy." In this instance, Mr. Y's "buddy" was Mr. X. When the grievant received notice from the CFND that she was wanted for a TRW meeting the next day, she forwarded the message to her second line supervisor, Mr. Z, who forwarded it to Mr. X, advising the grievant that he had done so.

In response, the grievant sent Mr. X materials related to the TRW case and asked him to contact her if he had any questions or wanted to discuss the case or the upcoming meeting. He did not respond in advance of the next day's meeting, at which she and he were the first to arrive. While waiting in the conference room, they may have exchanged pleasantries, but nothing of substance about the TRW matter or about Mr. X's expectations concerning the conduct of the meeting. The meeting itself went according to script. It was conducted by the lead CFND financial analyst responsible for the TRW matter. The Grievant and Mr. X were not active participants, but rather they

- 4 -

were spectators on standby should a legal issue arise.

During the meeting, a woman entered the room and spoke to Mr. X briefly. Soon thereafter, Mr. X left the meeting without telling the grievant whether or not he would return. His departure was at a key point in the discussion. The grievant recorded what occurred after Mr. X left because she was unsure when, and if, he would return. When Mr. X returned about 10 minutes later, the grievant facilitated his return to the discussion by sharing with him the information that he missed but which she had written down on a note pad. She passed her notes to him.

A legal issue arose during the meeting. The CFND wanted access to certain records of TRW and the other company, as well as from the investor group slated to finance the buyout of the spun-off operations of TRW. As evidently the custom in cases of this nature, the outside parties were agreeable to providing the requested materials, but because some were of a proprietary nature or otherwise not of public record, they requested a "confidentiality agreement" that would assure that the materials provided would not be disclosed beyond the Agency and those within it who had a need to know their content.

Since this was a customary request of companies whose restructuring had become a matter of PBGC interest, the CFND personnel agreed to the request. In fact, the subject of confidentiality agreements was so routine, that the PBGC had developed a computer "template" that provided a fill-in the blanks format into which the name of the company or group was entered as well as other specific information. The grievant was aware of this, and that since the specific information needed to fill in the blanks was known by CFND personnel, it would be they who would create the initial draft of the agreement and submit it to her for review before it was signed and sent to the outside parties who had requested it.

When all the substantive matters slated to be discussed had been disposed of, the meeting concluded and the participants stood up and began collecting their papers and putting on their coats. There was handshaking and the exchange of small talk between the PBGC personnel and the departing visitors. The grievant shook hands with the visitor who had been seated next to her, and then Mr. X entered into a conversation with perhaps the same visitor about someone they knew in common. As most of the visitors left the conference room, so too did the grievant. In fact, she was the first out of the room. Among other things, after a two hour meeting, she needed to visit the ladies room.

Feeling that she had discharged her duties at the meeting and knowing what her follow-up role would be, the grievant headed first for the restroom, and then back to her office. She did not first ask leave of Mr. X, her acting supervisor, or of the CFND

official who had presided over the meeting, but simply went on her way.

Mr. X was not pleased with the grievant's abrupt departure without asking his permission to do so. He revealed his annoyance with her apparent disrespect shown that day during the arbitration hearing of the resulting grievance over what occurred between the two of them within 15 or 20 minutes of the grievant's departure from the meeting room. While being questioned by her, he upbraided her in response to her question, "So I got up when others are getting up?," by declaring matter-of-factually in his first sentence, and then irritably in his second and third, that:

> Well, what struck me is the fact that other folks were mostly just kind of talking as they were getting up from their chairs, and you seem to have a purpose, something that you were leaving for. You didn't say anything to me and I don't remember you saying anything to anyone else. You just got up and left the room it seemed like at a pretty rapid pace.

There was another cause for Mr. X's irritation. He had attended many CFND meetings of the same nature as that just concluded. He was aware of the frequent practice for CFND and OGC personnel to linger while the outsiders cleared the room, and thereafter have a post-meeting conference to assure who was going to do what in the way of follow-up and who would do the reviewing of the product, etc. This being the grievant's first CFND meeting, she was unaware of this custom. Mr. X did not know of her ignorance, but seems to have accepted that she was electing to ignore the custom in her haste to leave.[1]

When the post-meeting conference concluded, Mr. X went to the grievant's office with the dual purposes of addressing her effrontery in leaving the conference room with nary a word to him, and also satisfying himself that she understood her follow-up responsibility for reviewing, with a quick turn around, the CFND draft of the confidentiality agreement.

When Mr. X arrived at the open door of the grievant's office he saw she was on the telephone. She was listening to a message left by a distraught PBGC employee who had called the grievant in the grievant's capacity as an EEO counselor. The grievant was seated facing the wall against which her desk was pushed, but swivelled toward him, holding up her index finger indicating that she would be off the phone in a moment.

Mr. X testified that he remembered being left "waiting in the doorway for some time" before the grievant hung up. From his demeanor and the tone of his words, it

---

[1] A lead CFND participant in the TRW meeting confirmed, when later interviewed about the incident, that Mr. X appeared not to be happy about the grievant's leaving the meeting when she did.

was clear that he resented this forced wait at the time, and still resented it more than a year and a half later when recounting the incident during this arbitration. Undoubtedly, the wait contributed further to Mr. X's mounting frustration with the grievant's conduct and manner.

After the grievant hung up, Mr. X vented his displeasure with her abrupt departure from the CFND conference room by angrily accusing her of leaving the meeting before it ended, and specifically saying that her actions were unprofessional. He also said, "I do not appreciate your attitude," and further stated that, "I would never accept your behavior." Mr. X also told [the grievant] that he would report her conduct to Mr. Y, her supervisor. Only after this opening salvo did Mr. X informed the grievant of his post-meeting discussions with the CFND employees.[2]

Knowing nothing about the custom of OGC and CFND personnel holding a post-meeting conference, and feeling that she knew her responsibility for reviewing the confidentiality agreement which she understood would be prepared by CFND using the approved template, the grievant believed that she had been free to leave the conference room in the stream of departing outsiders without first seeking the leave of her superior.

Initially, the grievant was simply startled by Mr. X's accusations of impropriety and lack of professionalism. But quickly she too became angry and forcefully denied his charge that she had left the meeting before it ended. She attempted to explain that she did not leave before the meeting was over, and that she intended to follow-up with the CFND before she left her office for the day. She also told him she didn't understand or appreciate his accusations, especially those questioning her professional conduct.

The temperature of the confrontation continued to rise as Mr. X responded by telling the grievant that by arguing, "you're bordering on insubordination." This escalation from a charge of simply leaving the meeting too early to a suggestion that she was on the edge of being insubordinate was not left unaddressed by the grievant. She shot back that she was not being insubordinate, but had the right to defend herself when accused of unprofessional conduct, and now, insubordination.

As for these opening charges, denials, and countercharges, there were no serious, or at least no material, differences between Mr. X's and the grievant's accounts. However, as to what occurred next, their accounts diverged.

---

[2] Mr. X testified that he could not recall which subject he took up first with the grievant after she hung up her phone, but the Agency maintained in its brief that it was his concern about a speedy follow through on the confidentiality agreement. However, I find that uppermost on his mind was his perception of the grievant's rudeness in departing the CFND meeting without his leave, and this was the first subject he broached.

In her written statements and testimony, the grievant consistently maintained that after asserting her right to mount a verbal defense of her conduct and professionalism, and to claim a lack of any intent to be insubordinate by doing so, Mr. X "left her office doorway and came into her office, stood within arm's length of [her] and said, 'you better not push it.'" On the other hand, initially, Mr. X gave statements to Agency EEO and HR personnel in which he maintained that he had never left the doorway to the grievant's office. However, by the time Mr. X testified, he had come first to admit he may have taken a step into her office, then that maybe it had been two or three steps. But he insisted in his testimony that he never was closer than five feet from her.

To get a sense of why the parties so intensively argued over this issue and over the production of Agency documents and notes reflecting when and what Mr. X had said in prior statements about his physical proximity to the grievant, I asked for a "view" of the grievant's office in the company of the parties. What I found was that to call the grievant's work space an "office" was a generous use of the word. It was approximately 11' 4" by 10' or roughly the size of a large office building elevator car, and like such, windowless. For lack of room to orient the grievant's desk otherwise, such as to have it face the door as would be normal, it was fronted against the left wall. Her desk chair when in use, but pushed back as it would be in conversing with someone in the doorway, would be in the center of the small room.

As for Mr. X's movements, the convincing evidence was that he did not remain in the doorway. Mr. E, whose office was a short way down the narrow hallway from that of the grievant's, testified he "heard a loud conversation" and recognized the grievant's voice but not that of the male. So, he looked down the hallway and saw no one, but continued hearing both loud voices. A few minutes latter, he saw that the male voice had been that of Mr. X because Mr. X passed Mr. E's office as he left, still directing comments to or at the grievant. There was also Mr. U, a fellow Assistant General Counsel of the same rank and with the same general duties of Mr. X. He happened down the hallway during the altercation, heard it going on, but did not find Mr. X standing outside the grievant's office.

Having established that Mr. X entered the grievant's office, and considering that he may have taken a step or two inside, it was noted that a single, normal stride would have placed Mr. X within five feet of the grievant's chair, and with a step or two more, he would have been towering over her had she sat. Thus, her further account related in her subsequent grievance, that she "stood up from her chair because she was uncomfortable with Mr. [X]'s tone of voice and proximity," is found credible and more persuasive than that of Mr. X. To take it one step further, so to speak, it is clear from the claustrophobic nature of the windowless confines of the space, Mr. X's agitated advance

FMCS Case No. 03-08992
NAGE R33-77/PBGC

toward her was physically threatening.[3]

But, because their discourse did not end there, the physical proximity of Mr. X to the grievant became yet more threatening. With him now in her tiny office, she again asserted that she was not being insubordinate, but trying to answer his accusations. Rather than accept this explanation and back away, Mr. X moved closer and angrily repeated several times in her face, "keep pushing it." Only then did he turn and walk out of her office, but as he did so he told her it was "over." Not only was this the last thing the grievant heard Mr. X utter, but so too was it the last thing that Mr. E heard him say as he came down the hallway and past Mr. E's office door.

In testifying, Mr. X appeared to be a quiet mannered man, but as already noted, capable of flashes of anger when confronting the grievant's charges. Further evidence that Mr. X carried a grudge over the November 13, 2002 encounter with the grievant and her subsequent complaint to the General Counsel about it, was an e-mail he sent Mr. Y eleven months after the incident, but shortly before the end of the grievant's annual performance appraisal or rating period. As "buddies" who oversaw each other's attorneys when one of them was absent, they exchanged their observations and impressions of each other's attorneys prior to their ratings. Mr. X's October 15, 2003 e-mail read:

> Turnabout is fair play, right? Your folks were likewise pleasant and self-sufficient with one noted exception, [the grievant]. Her performance in the [TRW] case in the area of following-up with the client [CFND] and accepting and responding appropriately to supervisory feedback was absolutely unacceptable. We should talk about how that will be reflected in her [performance appraisal], as I didn't and still don't care for her over-the-top reaction.

From the text, and the evidence on the question as a whole, what was being referred to by Mr. X in both the statement that "turnabout is fair play, right?," and his use of the phrase, "her over-the-top reaction," were the grievant's complaint to the General Counsel about his and hers November 13 encounter, in which complaint, as well as in her subsequent grievance, she asked that Mr. X be disciplined for his discourtesy and threatening conduct.[4]

---

[3]  Rejected is any suggestion by Mr. X or the Agency that the grievant may have been the aggressor and have taken a "step or two" toward Mr. X. Having seen and heard both witnesses, the grievant's account is the more plausible in all respects.

[4]  As it was, Mr. Y did not act on Mr. X's recommendation, knowing that what had happened between Mr. X and the grievant was in dispute. Nevertheless, in important categories, Mr. Y rated her

FMCS Case No. 03-08992
NAGE R33-77/PBGC

**The Grievant's Complaint and the Initial OGC Response in the Absence of the General Counsel**: November 13, 2002 was a Wednesday. Shortly after the incident with Mr. X, and while growing ever more emotionally distraught and angry, the grievant fired off an e-mail to the General Counsel at 5:33 PM which stated:

> I am going to make this brief because I am too emotional to do much more right now. [Mr. X] just accused me of leaving a meeting before it was over implying that I shirked my professional responsibilities because I did not determine who would be responsible for preparing and review a confidentiality agreement. When I defended myself against his allegations, I was accused of bordering on insubordination. Needless to say[,] our conversation went downhill from there. The meeting in question ran over an hour after my designated departure time[,] but being the professional I am, I stayed until the meeting ended (though [Mr. X] seems to have a different definition of when a meeting ends). [Mr. General Counsel], I respectfully request a meeting to discuss this when I have the emotional restraint to address [Mr. X]'s attack without emotion. FYI, I am of course going to consider my options of instituting a grievance or EEO counseling over this matter. Thank you.

The next morning, having learned that the General Counsel had not been in the office the previous evening and was not expected back before the week ended, the grievant redirected the e-mail at 7:28 AM to Mr. T, who had been designated to act as General Counsel in the interim. Mr. T was not part of upper OGC management, but because all those who were had accompanied the General Counsel to the off-site meeting, the mantle of authority had fallen on Mr. T, a "highly unusual" occurrence. In the organization of the OGC, Mr. T was at the same GS15 level as Messrs Y and X.

For the benefit of Mr. T, the grievant included the following explanation with her forwarded e-mail:

> [Mr. T], I am forwarding the message below to you in your capacity as acting General Counsel for the next 2 days. As you may know, [Mr. Y] is out of the office this week and I have an untenable situation of having to

---

lower than she had been rated in her prior performance appraisals. The grievant admitted that her job performance during the year following the November 13, 2002 incident had been lower and less praise-worthy, but felt it was caused by the emotional trauma of the incident and the subsequent refusal of the General Counsel and the OGC to take seriously her complaint about it, as well as the mishandling of the eventual investigations by the Human Resource Department (HRD) after she had made her complaint against Mr. X a subject of the present grievance.

interact with [Mr. X], [Mr. Y]'s buddy, when [Mr. X] has expressed such clear animosity and unprofessional conduct in his interaction with me yesterday afternoon. Please be advised that I have invoked my right to EEO counseling about this matter and have also inquired about the process of pursuing claims under the workplace harassment policy and professional courtesy directive. [Mr.T], I came in today with the intent to do my job to the best of my ability but I am unable to put yesterday's incident out of my mind and act as if it has not had a severe impact on me. I just wanted to ensure I informed the head of my department of this situation so that it could be dealt with expeditiously. Thank you.

Mr. T did not communicate with the grievant during the day, Thursday, and after sending her 7:28 AM e-mail, she spent the rest of it performing her follow-up with the CFND concerning the confidentiality agreement. This including reviewing her work with Mr. X over a question about who should sign the document for the PBGC in light of the unavailability of both the General Counsel and the Head of the CFND. They avoided any direct contact or interaction by e-mailing messages back and forth, some of which from Mr. X the grievant thought at the time were unnecessary nitpicking.[5]

The next morning, Friday, November 15, 2002, she conveyed her displeasure with both Mr. T's silence and Mr. X's review of her work with a 7:01 AM e-mail to Mr. T:

[Mr. T], despite my request yesterday, it appears that nothing has been done to neutralize the situation [Mr. X] instigated on Wednesday. OGC's failure to take any action despite my request resulted in me having to stay in the office until after 7 p.m. last night because, in my opinion, [Mr. X] deliberately inflated a simple task with the intent to continue his harassment. I tried to follow his dictate [so as] to avoid any further conflict with him, but you have the responsibility for upholding and enforcing PBGC's workplace harassment policy and professional courtesy directive and should act to stop this situation now.

Today, I am asking again for something to be done about this situation. I do not believe that you understand the severity of the emotional distress this incident has cause me so let me tell you I have been unable to turn [Mr. X]'s conduct off in my mind since Wednesday when he attacked me! So, at a minimum, please assign another supervisor to cover on my cases so that [Mr. X] cannot continue this pattern of behavior. If nothing is

---

[5] This is a grievance claim against Mr. X's conduct which the grievant appears to have abandoned in favor of concentrating on the more dramatic events of November 13 and the inadequacies of the OGC and HRD responses to that incident.

FMCS Case No. 03-08992
NAGE R33-77/PBGC

- 11 -

done, I will have no choice but to take this issue to upper management.

Please provide me with a direct response to this reasonable request as soon as you can. Thank you.

Then, at 10:34 AM, having learned that her regular supervisor had returned, the grievant advised Mr. T by an e-mail message as follows:

[Mr. T], Mr. Y is in today so the issue of who I would report to is resolved but I still would like a response regarding the incident. Thank you.

At 11:54 AM the same day, Friday, Mr. T sent the following information by e-mail to the grievant in response to her string of messages:

I understand [the General Counsel] expects to return to the office this afternoon. You may be able to see him then.

Also getting a "cc" of this last message, as well as the earlier portions of the e-mail string, either in their "mail boxes" or immediately, were Messrs X and Y, the grievant's second line supervisor, Mr. Z, and the Union's chief steward, Mr. A. Some time during the morning, Mr. T had happened upon Mr. A, who asked Mr. T if he had responded to the grievant's request for a meeting.

At 11:57 AM, the grievant replied to Mr. T with the following:

[Mr. T], I am sending this e-mail to address what may be a coincidence, but it seemed curious to me that you and [Mr. X] would be meeting with two labor management attorneys present, along with my supervisor [Mr. Y]. I know God has a sense of humor, but since I am concerned, I must raise my concern to all involved about the likelihood that the 'meeting' was a discussion about the situation I asked for your assistance with. Despite the failure of OGC to do so in the past, I expect OGC to come to the table in fairness to me and not just to [Mr. X].

PS. Isn't this a coincident that so shortly after the meeting you responded with a message you could have sent to me before. Hmm....

Besides the others now joined as recipients of copies of the string of e-mails, the grievant added Mr. M, an EEO counselor to whom the grievant had gone for advice.

Just as the grievant alleged in her last e-mail, sometime Friday after 10:00 AM, Mr. T had met with his colleagues and co-equal supervisors, Mr. X and Mr. Y, to find out

what all the e-mails from the grievant were about. Most likely prompted by his encounter with Mr. A and the reasonable assumption that the Union would soon become involved, Mr. T decided he wanted Agency labor relations people in the meeting, and so, Mr. S, and maybe another attorney, attended.[6]

After hearing Mr. X's account of the incident, and whatever Mr. Y knew, and with the advice of Mr. S, and perhaps after a telephone conversation with the absent General Counsel, Mr. T concluded that the matter could safely wait a few more hours for the arrival of the General Counsel.

### Return of the General Counsel and His November 15, 2002 Inquiries:

While still away, the General Counsel was advised by Mr. T or Mr. Z about the grievant's e-mails and what either of them then knew about her incident with Mr. X. With this advance information, he returned to his office in mid-afternoon, November 15, 2002 to learn more about the incident. Either from reading the grievant's e-mail declaration to Mr. T that she was pursuing her EEO option, or because Mr. T told him of his encounter with Mr. A, the Chief Steward of Local R3-77, or perhaps both, the General Counsel understood that the incident between the grievant and Mr. X was certain for either a full EEO investigation or a full grievance-response inquiry.

According to his testimony, because of this, the General Counsel saw his initial responsibility to be "to assess the degree and the nature of the problem that had taken place, and to see whether any kind of immediate Management action was necessary." He never intended his "inquiry" to be of the scope or thoroughness of either the EEO or the grievance investigations he expected would follow.

The General Counsel first met with Mr. X to get his version of events. No written record was made of what the General Counsel asked Mr. X or what Mr. X had to say. However, the General Counsel made sure there was a written account prepared of his meeting with the grievant. He asked Mr. S, who was in attendance, to memorialize what occurred when he met with the grievant and her representative, Mr. A, because, as he characterized it in his testimony, it had been a "conflagration." Mr. S, the Agency's Assistant General Counsel for Labor Relations matters, had probably been asked to

---

[6] The grievant was infuriated that this meeting was convened by Mr. T without his having spoken to her, or heard her version, as was apparent from her testimony:

> I was on the third floor, outside [Mr. X]'s office, [when] out pops [Mr. S], assistant general counsel for labor management [affairs], [Mr. Y], and [Mr. T]. -- Nobody had ever contacted [me], but there's this big meeting that's just breaking up inside [Mr. X]'s office. I know it to be nothing else other than a discussion of the complaint I made. This is two days after. Nobody has responded to me yet.

- 13 -

accompany the General Counsel because Mr. A would be there.

The memo written by Mr. S, in the form of an e-mail addressed to four members of the Agency's Labor Relations staff, recounted:

[The General Counsel] and I met with [the grievant] and her rep, [Mr. A] from 4 to 4:30. [The grievant] was very upset, used a very loud and aggressive manner. At one point [the General Counsel] asked her to stop pointing her finger in his face. At another point, [Mr. A] grabbed her and asked her to please come out of the room and talk to him. She did and came back in, and said, [']well, that is why I have a rep,['] and said in a calmer manner, she wants: 1) to be there when [the General Counsel] interviews [Mr. X]; 2) she has gone the EEO route on this; 3) she expects him to investigate and enforce the courtesy directive.

She felt [Mr. X] was discourteous. He failed to call her or respond to her e-mail before the meeting w/ CFND. He should have asked her what was up, instead of accusing her of leaving the meeting. He should not have gotten one foot away from her in the confrontation. He shouldn't have accused her of insubordination. She wanted [the General Counsel] to say she shouldn't have to work with [Mr. X] anymore. [The General Counsel] said she doesn't get to pick her supe[rvisor], and she has had many problems with sup[ervisor]s. She got very upset at that comment and demanded [that the General Counsel] explain -- he did, [naming Mr. X, Ms. R, and Mr. Z]. [The General Counsel] made no promises, though he did say he was 'investigating' by talking to both her and [Mr. X]. [The General Counsel] also implied that since she had chosen the EEO route, that it would go that way.

[The General Counsel] asked her why she had sent the msg to CFND, and that question clearly upset her.

[The grievant] also said how upset she was that [Mr. T] never responded to her message. She said she is upset and 'cant get [Mr. X] out of her head.'

[The grievant] also made a point of how upset she was about the meeting that I [Mr. S] had attended. She claimed she was [nearby] to deliver a paper [to another office], and stayed there a few minutes. She claimed that [Mr. V] walked out of the meeting, though he wasn't there.

FMCS Case No. 03-08992
NAGE R33-77/PBGC

The grievant's first written account of her version of the November 15 meeting with the General Counsel was in her December 9, 2002 Step-2 grievance and recited:

> When [the grievant] finally met with the General Counsel on the afternoon of November 15, 2002[, h]e had apparently already met with [Mr. X], and before [the grievant] finished relating her version of the incident, he proceeded to tell her she had violated 'OGC protocol' in her conduct at the November 13 [CFND] meeting. With a sneer and a smirk on his face, noticed by both [the grievant] and her representative, the General Counsel told [the grievant] she had problems working with supervisors and he could think of three such supervisors. When [she] pressed him to name the supervisors she had 'problems' working with, he named the two supervisors named in her EEO complaint and Mr. [X] -- blaming [the grievant] for the improper actions of OGC supervisors. [The grievant] repeated her request for the General Counsel to conduct an investigation of the incident pursuant to the Professional Courtesy directive.

In their direct testimony and during cross examination, the grievant and the General Counsel provided further details. The meeting had been held in the General Counsel's conference room. There was an elongated, oval conference table. The grievant and Mr. A sat next to each other on one side, at a tapered end. The General Counsel sat directly across from the grievant where the table's width was between 24 and 30 inches. Mr. S sat directly across from Mr. A at a point where the table was wider.

Exactly when the finger wagging took place is not clear, but for sure, the incident did take place. The grievant's testimony suggested that she was angry when she arrived at the meeting, and became more so as it progressed:

> I was emotional. I was emotional throughout the whole proceeding. I had been devastated by the incident [with Mr. X]. I had been in tears for the prior two days. I was just - I was - if you want to call it very emotional, I don't know how you characterize it, but everybody who - that's why some of these witnesses are important. They'll tell you what my emotional state was. I was very emotional.
>
> So I'm more animated and I'm a little hyper, because frankly, I've just experienced this thing a couple of days ago. Nobody has addressed it formally in my management structure, and this is my first opportunity to speak about it. I'm animatedly recounting what I said to [Mr. M, an EEO counselor], but as you can tell from these [arbitration] proceedings, I speak with my hands all the time. I am by nature animated, . . .

FMCS Case No. 03-08992
<u>NAGE R33-77/PBGC</u>

Efforts were made during the hearing to demonstrate or reenact the grievant's gestures with little success. The General Counsel testified that he did not feel physically threatened by her gestures, but simply thought they were rude and inappropriate. Both agreed the grievant remained seated during the exchange, and the grievant insisted that the width of the table was such that she could not have reached him across it.

From it all, it is certain that the grievant leaned forward on her elbows, wagged her finger back and forth within 12 inches of the General Counsel's nose, and that the gesture was intended by her to emphasize the sternness of the lecture she gave him when she felt:

> [The General Counsel] didn't seem to be exhibiting what I would expect of a professional of his [rank and position], so what I did instead, I tried to get as much of that story out as I could because this is critical to me right now. I can't function in that environment, and unless something is done, there's no way I could work in this place.
>
> *       *       *
>
> As I'm emotional at that time, animatedly speaking to him, out of nowhere he says something like, 'don't point your finger at me. Don't point your finger at me.'
>
> *       *       *
>
> The obligation [to investigate and take action on my complaint against Mr. X] I'm owed by [the General Counsel], and I'm trying to communicate this to [him].

The finger pointing and waving could also have been triggered by one of three comments of the General Counsel. The first occurred after he invited her to tell him what had happened on November 13, and upon hearing her say she had left the meeting, but before she could explain why she thought the meeting had ended (everyone standing, papers gathered, putting coats on, and CFND participant removing an obstacle in her pathway to the door, etc.), he stated, "you violated OGC protocol." Then, after hearing her version of the encounter with Mr. X in her office, he declared that she seemed to have "a problem with supervisors," and finally, his conclusion that the incident had been something to the effect of no more than "a communications failure."

There was something else that may have caused, or at least enhanced the vigor of the grievant's emotional display. According to her and Mr. A, throughout the meeting, both the General Counsel and Mr. S often responded to the grievant's assertions concerning Mr. X's conduct with indulgent smiles, sneers, and smirks.

FMCS Case No. 03-08992
NAGE R33-77/PBGC

It's concluded that what the grievant insists were demeaning smiles and smirks during their November 15 meeting were in fact the General Counsel's attempts to defuse the grievant's highly charged emotional confrontation with him. Among other reasons for her heightened emotional state, the grievant thought a meeting should have occurred the day before with Mr. T, especially after she became aware that Mr. T had met with Mr. X, and for sure heard his version of events.

### The Investigations:

As the General Counsel was to pass on to OGC and Human Resources (HRD) staff who would become involved, he had concluded that the November 13 incident between Mr. X and the grievant was but a breakdown in communications, and for that reason, he took no further action and made no further inquiries.

Neither did any HRD personnel or the OGC legal staff responsible for labor relations and personnel. Both were fully aware of the grievant's complaint against Mr. X. Besides a briefing received on the morning of December 15 from Mr. T when he had met with Mr. X, Mr. Y and Mr. S, one of the recipients of Mr. S's e-mail with his account of the General Counsel's November 15 meeting with the grievant was Mr. N.

At the time, Mr. N was managing the HRD's office responsible for Management's investigations of grievances and other complaints. He had also seen the e-mails sent the day earlier by the grievant to Mr. T, so he had some background. However, for the moment, Mr. N choose to sit on what he knew.

Only when the grievant filed her written Step-2 grievance on Monday, December 9, 2002, did Management take seriously her complaint about Mr. X.[7] Its allegations included a specific recitation of her account of Mr. X once he arrived outside her office door:

> About 15 minutes after the [CFND] meeting ended, Mr. [X] came to [the grievant]'s office and stood in her open doorway -- there is no prece-

---

[7] Probably both OGC and HRD recognized a grievance was coming. On December 3, 2002, Mr. F, a union steward, sent the General Counsel an e-mail with a last ditch plea:

> On November 15, 2002, [the grievant] met with you to discuss an informal complaint regarding an incident that took place in OGC on November 13, 2002. To date, a response has not been received regarding your course of action.

> As her newly elected union representative [replacing Mr. A], I would like to meet with you to see if a resolution can be reached ASAP so as to avoid potential reoccurrence that would be unhealthy for [the grievant].

dent of Mr. [X] ever coming to [the grievant]'s office. [The grievant] was checking her voice messages when he arrived. [The grievant] hung up the phone to give Mr. [X] her undivided attention.

Mr. [X] accused [the grievant] of leaving the meeting before it ended, and specifically said that her actions were unprofessional. He also said, 'I do not appreciate your attitude,' and he further stated that, ' I would never accept your behavior.' Mr. [X] also told [the grievant] that he would report her conduct to her supervisor. He then informed her of his discussion with the CFND employees after the meeting. After her initial startled denial of his charge that she left the meeting before it ended, [the grievant] allowed Mr. [X] to finish speaking before she attempted to explain that she did not leave before the meeting ended, that she intended to follow-up with the client, and she did not intend to leave for the evening before fulfilling her responsibilities and she did not understand or appreciate his accusations.

Because [the grievant] defended herself, Mr. [X], who appeared to be very angry for reasons unknown to [the grievant], said, 'you're bordering on insubordination.' To [the grievant], insubordination is a very serious offense and could not be left unaddressed. [The grievant] told Mr. [X] that she was not being insubordinate, but felt she had the right to defend herself when she is accused of insubordination and unprofessional conduct. Mr. [X] was not interested in [the grievant]'s point of view. As [the grievant] attempted to defend herself, Mr. [X] left her office doorway and came into her office, stood within arm's length of [the grievant] and said, 'you better not push it.' [The grievant] stood up from her chair because she was uncomfortable with Mr. [X]'s tone of voice and proximity.

[The grievant] told Mr. [X] that she had shown him respect and requested that he give her the same respect. [The grievant], who was visibly distraught and upset by Mr. [X]'s action, nevertheless sought to convey to Mr. [X] that she was not being insubordinate, but simply trying to explain herself against his accusations. Mr. [X] repeated several times, 'keep pushing it,' in [the grievant]'s face when he turned and walked out of her office and told her it was 'over.' While Mr. [X] was in her office, [the grievant] observed Assistant General Counsel [U] walking by her office door; he probably heard some of the interaction between Mr. [X] and [the grievant].

After the incident, [the grievant] was stunned and extremely upset by Mr. [X]'s actions; she stayed in her office trying to understand why Mr.

FMCS Case No. 03-08992
NAGE R33-77/PBGC

[X] had attacked her and what she could do to get someone to stop the rabid hostility expressed by Mr. [X]'s actions. Paralegal [E] came by her office and asked if she was okay.

In addition to the grievance's initial focus on Mr. X's conduct, was the complaint against what the grievat saw as the derelictions of responsibilities by the General Counsel on November 15. Although the grievance contained similar dereliction of duty charges against Mr. T, that did not seem to trigger the same degree of concern for Mr. N as those aimed at the General Counsel.

In response, Mr. N launched two investigations that would produce two reports. Both investigations would cover the same ground and were conducted simultaneously by a single investigator, Ms. P from HRD, assisted by Ms. Q, a labor relations attorney from the General Law Section of the OGC. Even with considerable testimony on the subject from both Mr. N and Ms. P, no satisfactory explanation was provided by either for why two separate investigations were necessary, much less how they could be kept separate.

But the sequence of their assignments to Ms. P reflected their relative importance to Mr. N. According to Ms. P, the first assignment given to her by Mr. N was to conduct what the Agency's witnesses referred to as the "Management Investigation." Mr. N explained its purpose:

[A]s I understood it, [the General Counsel] interviewed both [the grievant and Mr. X] and came to the conclusion that this was, I believe a 'communications failure' is the way he termed it. That [Mr. X] and [the grievant] had had words with each other, but it was no more than that. Just a communications failure and no further action was warranted by him or any one else in the Agency.

[The grievant] was obviously dissatisfied with that response and continued to press forward [by filing her grievance], and her concerns that this was not being adequately addressed. And so I wanted to make sure that there wasn't more to it. That in his anxiousness to quickly get to the heart of things, that [the General Counsel] hadn't overlooked anything.

**The Management Investigation** had a priority over any OGC and HRD concerns about the Step-2 grievance. According to Ms. P, it was during the week of December 9, 2002 that Mr. N came to her and orally assigned her to conduct Management's Investigation. He told her no more than that the grievant had alleged that Mr. X had violated the Professional Courtesy Directive. When she asked him, "What kind of allegations?", Mr. N said, "It was just the way he talked to her. But, you need to go and

FMCS Case No. 03-08992
NAGE R33-77/PBGC

investigate it." He made it obvious that it was urgent for her to resolve.

For reasons never explained by the Agency, Mr. N did not give Ms. P a copy of the Step-2 grievance when he gave her his initial instructions and responded to her questions. It was not until the end of the week (she thought, "maybe around the 11th"), after she had decided on who she thought were key witnesses and had scheduled their interviews, that Ms. P was given a copy of the grievance.

Because she understood that the Management Investigation came first, she put the grievance aside and ignored its recitation of the grievant's version of her encounter with Mr. X on November 13, her e-mail requests sent on November 14 and 15 to Mr. T for assistance, and her version of the meeting with the General Counsel on the after-noon of the 15th. But, Ms. P had a copy of Mr. S's account of the November 15 meeting which she read and relied on.

Ergo, as Ms. P set out to investigate, she knew the General Counsel had pro-nounced the November 13 incident to have been only a "communications failure," and that at the November 15 meeting, the grievant was highly emotional and had rudely shaken her finger in his face. Consciously or not, Ms. P understood that the objective of the Management Investigation was to substantiate the General Counsel's conclusion about the November 13 incident.

Ms. P was the perfect investigator for this undertaking. Her testimony and gen-eral demeanor revealed her to be an honest and conscientious, but also very naive and far from a hard nosed gatherer of facts. Perhaps the problem with her suitability for her immediate assignment lay in her prior employment. Before joining the PBGC, she spent a number of years as an HR specialist with the US Postal Service (USPS). That organiza-tion has subscribed to a feel-good approach to resolving conflicts between supervisors and subordinates "through empowerment and recognition." In sum, the approach starts and ends with the proposition that all conflicts are caused by "failures in communi-cation," never by an abuse of power by a supervisor, the insubordination of a worker, or the just plain meanspirited personality of one or the other.

Ms P's lengthy testimony was surreal. No matter what the scenario or hypotheti-cal situation posed, including ones that closely matched what has already been conclud-ed actually occurred between the grievant and Mr. X on November 13, her conclusion was always "mutual fault" resulting from a simple "failure to communicate." Her refusal to accept that, just maybe, one participant could be solely blamed for an altercation, assured no chance of an objective investigation. The "failure to communicate" conclu-sion was hard wired in Ms. P's brain.

If that were not enough, her investigation was hobbled by time constraints. Be-

FMCS Case No. 03-08992
NAGE R33-77/PBGC

cause it was December, as part of her regular duties Ms. P had PBGC-wide, end-of-year performance awards to prepare, and she had scheduled her own annual leave for December 19 through the 31st. But mainly she was rushed because she "remembered [the Management Investigation] was given [her by Mr. N] in a very urgent manner, that it needed to be looked into swiftly." These pressures further assured a perfunctory inquiry destined to find nothing casting doubt on the General Counsel's conclusion that the November 13 incident had been no more than a "failure of communication."

The interview with Mr. X was a joint effort of Ms. P and Ms. Q, with Ms. Q serving as scribe, and Ms. P as questioner. It was conducted on December 12. The written product was sketchy at best, and useless as a recording of what Mr. X might have said about his physical movements in or near the grievant's office. However, Ms. P recalled that he had said that he had remained at all times in the doorway to the grievant's office, without crossing the threshold.

This was important to Ms. P and shaped the conclusions she was to draw about what occurred with Mr. X and the grievant on November 13. Specifically, she testified:

> When I interviewed [Mr. X], he mentioned he was standing at [the grie-vant's] doorway and that conversation took place there and, to me, that is a whole lot different than [Mr. X] actually stepping in and being inside [the grievant's] office. You know? And I think when somebody is saying things like, 'keep pushing.' I think where you are standing, the proximity, all those things, they play into the mix.

As she recognized during her testimony, and clearly for the first time in her life, that had she read the Step-2 grievance carefully and "caught the allegations" that Mr. X was in the grievant's office, and "in her face," with his voice raised and threatening, then, asking and answering her own questions, she said, "Okey. Do I think this is work-place violence? It may border on it."

As it was, having not studied the grievance, Ms. P never interviewed Mr. E who would have placed Mr. X inside the grievant's office with both him and her speaking in loud, angry voices. Likewise, she was blissfully unaware, or unable to connect, that the grievance identified Mr. U as walking by while Mr. X was in the grievant's office, not in the hallway.

As a result, she never got to the analytical point of questioning Mr. X's version of events and realizing that, perhaps, his conduct might have "bordered" on violations of the Agency's Workplace Violence Policy," or was at least a clear violation of the Profes-sional Courtesy Directive. Of course, to reach such conclusions would have required her to reject her simplistic understanding of human relations in which all shouting

matches are but "failures of communication," no matter which side throws the first verbal punch.

Ms. P never interviewed the grievant.  Ms. Q told her the grievant had a union representative, Mr. F, with whom she should make arrangements.  Probably Ms. P first contacted Mr. F by phone on December 12 or 13, after she and Ms. Q had interviewed Mr. X.  In the course of their first contacts, Mr. F advised Ms. P that the grievant remained too emotional over what had happened to consent to a face-to-face interview.

By Monday, December 16, 2002, Ms. P and Mr. F were conducting business by e-mail with the following going back and forth:

From P to F, Monday, 12/16/2002 at 4:30 PM:

> This confirms our conversation today that [the grievant] declined our investigative interview [request] regarding the alleged incident that occurred on November 13, 2002.  You conveyed to me that [the grievant] believes there is sufficient information regarding the allegation of November 13 in the Step-2 grievance.

From F to P, Tuesday, 12/17/2002 at 10:11 AM:

> Let's be clear about that the investigative interview you proposed stems strictly from HRD's involvement, and [the grievant] declination to be a party [to] the proposed [Management] investigation neither affects nor has any bearing on her pending Step Two grievance.  You stated to me the investigative interview was not related to the grievance, and that HRD has a concern when they are made aware of such an incident [as] described in [the] grievance.  Also, HRD was provided a copy (or original) of the grievance by [the General Counsel].

From P to F, Tuesday, 12/17/2002 at 10:30 AM:

> This investigation stems from [the grievant's] allegations -- It is not related to the step-2 grievance.

From F to P, Tuesday, 12/17/2002 at 10:42 AM:

> Then, I would hope you/HRD will continue with the investigation.  For the record, [the grievant] is still too emotionally charged from this incident, the continuing subjection of a tense environment, and the handling thereof by management to relate or discuss the matter.  Again, I offer to you or [Ms.

FMCS Case No. 03-08992
NAGE R33-77/PBGC

Q], if there are any concerns or questions, I am available to be a conduit to obtain the answers from [the grievant].

If you desire further clarification, please call me.

In her testimony, Ms. P indicated that she had not been unsympathetic to the grievant's reason for declining an interview and had hoped that with a bit more time she might change her mind. But there are things she did not do in the meantime that are baffling. She still did not read the grievance, learn what she could from it, and take advantage of Mr. F's familiarity with the grievant's version of events by asking him what he knew or understood. She did not share with him what her understanding of the facts were from her and Ms. Q's interview of Mr. X, and even if that might be an unrealistic thing to expect her to do, she still did not act like a determined investigator by prodding and probing Mr. F for information and leads to other sources.

While there is no excuse for Ms. P's continued refusal to carefully read what any reasonable person would consider a key document, it is understandable that she might not have been satisfied had she read it. A good investigator would have wanted a chance to sit down with the grievant and go over her written grievance line by line so she could be asked follow-up questions, like, "What do you mean when you say 'thus and so?'"

However, this possible refinement in investigative techniques never was reached because of Ms. P's amazing testimony as to why she ignored the grievance while time still remained to salvage the investigation before her report of results was due. It was punctuated with questioning by everyone in the hearing room except the court reporter, often with a question being a simple, incredulous, "what?" Her testimony was to the effect that written statements by complainants were either required, forbidden, or optional, depending upon the type of complaint, and who it was against.

As for the fate of the grievant's complaint, the upshot of Ms. P's testimony was that her written statement, evidently because it was contained in a grievance, but perhaps because it was a complaint against a supervisor (it was unclear which, if either), was an unacceptable substitute for an interview as a matter of some sort of unwritten HRD policy. And, to enforce that prohibition, declining to be interviewed caused the nitty-gritty of the grievant's complaint to be ignored in the Management Investigation.

This is what Ms. P did when writing her Management Investigation report. She ignored the grievant's version and relied on Mr. X's version of events on November 13, and statements from those who described the grievant's emotions and conduct on November 15 in front of the General Counsel. However, before she could finish her report, time ran out and she left on leave, not to return until after New Year's, 2003.

When she returned, Ms. P worked with Ms. Q in finalizing the report, and on January 7, 2003, she delivered it to Mr. N.  Its title and relevant text were:

> ### Management's Investigation of [the grievant's] November 13, 2002 Complaint Concerning [Mr. X]
>
> *        *        *
>
> [The grievant made her complaint by e-mail to [the General Counsel] at 5:33 p.m. on November 13, 2002.  In that e-mail, she briefly explained what had transpired with [Mr. X] and requested a meeting with [the General Counsel] to discuss the matter. [The General Counsel] was off-site attending PBGC's Leadership Conference at this time. [Mr. T] was serving as acting General Counsel. . .  While still at the conference, [the General Counsel] learned generally that there had been an incident between [the Grievant] and [Mr. X], but he did not learn specific details as to what had transpired.
>
> [The General Counsel] returned to the office at approximately 2:30 p.m. on Friday, November 15, 2002, which was earlier than he had planned, so that he could speak directly with [the grievant] and [Mr. X] before close of business on that day.  Shortly after he arrived, he ran into [Mr. X] in the hall while en route to [Mr. T.]'s office.  He asked [Mr. X] if he could meet with him as soon as he was done meeting with [Mr. T].  [Mr. X] waited for [the General Counsel] in the hall while he was in [Mr. T]'s office with the door closed. [The General Counsel] and [Mr. X] then walked to [the General Counsel]'s office.  [The General Counsel] asked [Mr. X] to explain what had happened on November 13th, and he listened to what [Mr. X] had to say.
>
> [The General Counsel] e-mailed [the grievant] at 3:15 p.m. on November 15th to let her know that he would be available to meet with her at 4:00 p.m. that same afternoon. [The grievant] replied by e-mail that she would like to meet with him and that she would be bringing a 'representative.'
>
> The meeting commenced as scheduled at 4:00 p.m. that date and was attended by [the General Counsel], [the grievant], [Mr. A], and [Mr. S].  It lasted approximately thirty minutes.  [The grievant] explained her view of what happened. [The General Counsel] listened and then commented that it appeared to be a communications failure. [The General Counsel]'s comment seemed to upset [the grievant]; she became loud and began aggressively pointing her finger at [the General Counsel].  At one point, [Mr. A] asked that she leave the conference room and speak with him. [The

grievant] ignored [Mr. A], and she continued addressing [the General Counsel] in a loud and aggressive manner. At [Mr. A]'s continued insistence, [the grievant] finally agreed to adjourn and meet with him. When they returned a few moments later, [the grievant] appeared to have regained some composure. She smiled and commented, 'I guess that is why it is good to bring a representative to meetings like this.' She requested that [the General Counsel] interview [Mr. X], and enforce PBGC's courtesy directive. She also informed [the General Counsel] that she had decided to pursue this matter through the EEO process. After the meeting concluded, [the General Counsel] asked [Mr. S] to briefly summarize what had transpired. He did so by e-mail that same evening.

At [the General Counsel]'s request, we sought to interview all of the relevant witnesses to determine if any other facts might be pertinent to [the grievant]'s allegations. We interviewed the following people:

> [Mr. X]
> [Mr. T]
> [the General Counsel]
> [Mr. Y]
> [Mr. S]
> [Ms. B]

[The grievant] declined to be interviewed, indicating that she believed that she had provided sufficient information concerning the November 13, 2002 incident in connection with her Step-2 grievance. On December 18, 2002, [the grievant] provided us with copies of e-mail messages to review in connection with the investigation.

Based upon our interviews with the above individuals, the information provided by [the grievant], and review of the relevant of the documents, we concluded that (1) Management performed a timely and adequate investigation of this matter on November 15, 2002, (2) Management correctly concluded that [Mr. X] did not violate the Professional Courtesy directive and/or any other Agency policy or directive, and (3) Management correctly concluded that the incident between [the grievant] and [Mr. X] was a communication failure that did not warrant any action by Management.

**The Grievance Investigation** also had time restraints. Under the Labor Agreement, a Step-2 answer was due before Ms. P returned, so Ms. Q wrote it. While Ms. P struggled with keeping her Management Investigation separate from the Grievance In-

vestigation, and felt she'd done so by just not reading the grievance, Ms. Q should have had no problem with following the road map to relevant facts laid out in the grievance.

Nevertheless, Ms. Q's Step-2 response relied only on the limited information that she and Ms. P had collected before Ms. P left on leave. She conducted no additional interviews. She did not meet with either Mr. E or Mr. U, who might have cast doubt on clearing Mr. X of any blame for the emotional trauma suffered by the grievant on November 13, the effects of which spilled over into her meeting with the General Counsel.

On December 30, 2002, the Agency's Step-2 answer was filed, denying all aspects of the grievance and exonerating Mr. X, the General Counsel, and the OGC, of any misconduct. On the cental issue of what had happened on November 13, it stated:

> In any workplace it is inevitable that disputes, disagreement and communications failures well occur. [The grievant] and [Mr. X] had a disagreement and a communication failure on November 13th concerning the CFND meeting. I find that, while perhaps the conversation about which [the grievant] complains could have been handled more diplomatically by both parties, [Mr. X] did not violate the Professional Courtesy Directive (PM 30-2). I also find that [Mr. X] did not violate the Policy on Workplace Violence, the Policy on Workplace Harassment, and/or any provision of the CBA. I have not found any facts to suggest that [Mr. X] communicated a threat of physical harm or in any way harassed [the grievant] during their conversation on November 13th.[8]

**Agency Investigations of Other Misconduct Complaints.**

The OGC and HRD handling of the grievant's complaints against Mr. X did not reflect the investigative competency and thoroughness which they have brought to bear where misconduct has been alleged against employees active in Local R3-77 affairs.

**The Complaint of Ms. G Against Mr. A.**  On Wednesday, March 6, 2002, Mr. A in his capacity as the Local R3-77 representative in an EEO matter went to the office of Ms. G, the Agency's labor relations attorney responsible as his opposite number. His purpose was to deliver documents relevant to the case. Ms. G was on the telephone, talking to her mother. While still on the phone, she called to Mr. A to come in and drop off the papers. He entered, gave her the documents and asked her to sign an acknowledgment of receipt. She declined and told him to write on his copy that she acknowl-

---

[a] When Ms. P returned from leave to write her Management Investigation report she had Ms. Q's Step-2 answer, which served to preclude her from coming to any conclusions at odds with Ms. Q's denial, should she have had any inclination to do so.

edged hand delivery.

Mr A refused and insisted on her signing the acknowledgment, at which point she told Mr. A to leave.  According to her, Mr. A responded that he found her tone "nasty, hostile and belligerent."  After telling him twice more to leave, she claimed he said something to the effect that he too would become "mean and nasty," and according to her, when he left he did so with a slam of the door to her office.

The next day, Thursday, March 7, Ms. G wrote a memorandum to the General Counsel reporting her encounter with Mr. A, which the General Counsel gave to Mr. O, a Deputy General Counsel, with a request that he investigate Ms. G's allegations against Mr. A.  This Mr. O did, starting with an interview of Ms. G, which he conducted in the familiar surroundings of her office the next Monday, March 11.

His next interview was of Mr. A.  It was not conducted in as accommodating or amicable a setting.  Instead of going to Mr. A's office, he summonsed Mr. A to his office where he double-teamed Mr. A by questioning him in the presence of the Director of HRD, who assisted "in the interview and took copious notes."  Defensively, Mr. A asserted his <u>Weingarten</u> rights and asked for a postponement of the interview until his preferred union representative was available.   At this point, the Deputy General Counsel further established the tone of the confrontation when, according to his investigation report, he:

> suggested that [Mr. A] had no shortage of available representatives to call upon, that he had had ample time to arrange for one of them to be at this meeting, [and w]e informed him that his refusal to answer questions could result in disciplinary action.

> [Mr. A] then placed a small tape recorder on the table and started recording.  Both I and [the Director of HRD] ordered him to turn it off, that the interview was not to be taped.

In the interview that followed, Mr. A denied "demanding" a written receipt.  When Ms. G asked that he just note that he had hand delivered the documents, he recalled that "her tone was nasty, hostile, and belligerent towards me," and that when she asked him to leave, he did so by "backing out of her office into the hallway."  He would not tell, absent being ordered to, what he recalled saying to Ms. G when she refused to give a signed receipt.  The Mr. O then ordered that he divulge what he recalled, which was:

> When she refused to receipt a copy, I was truly baffled and flabbergasted because never in my experience at the PBGC has anyone refused the

courtesy of taking a second to receipt a document relating to labor relation or other representational matters.

Detecting that Mr. A had said that he had "backed out of her office," and had "made no gestures or arm movements other [than] to hold on to other documents and to close the door," with no admission that he "slammed" the door, Mr. O took the next logical investigative step.  Since Ms. G said she had been talking on the phone to her mother and had the phone in her hand while Mr. A was in her office, he interviewed Ms. G's mother as to what she heard.  She told him she had not heard any of the conversation with Mr. A, but she had heard the door slam, and when Ms. G came back on the line, she recognized "how upset she sounded."

With this information in hand, Mr. O wrote and sent his report to the General Counsel on March 20, 2002 in which he concluded;

> While the recollections of [Ms. G] and [Mr. A] differ, [Ms. G's mother] lends significant credibility to her daughter's perception of having been verbally abused, whatever words were actual used. . .  In any event, it seems clear that he had to be told to leave [Ms. G]'s office three times before he left, and then he left with a slam of the office door.

Two weeks after the report, the boom fell on Mr. A when on April 4, 2002, he was served with a Proposed Letter of Reprimand for violating the Professional Courtesy Directive by his discourteous conduct directed at Ms. G.  On May 10, the Letter of Reprimand was made final.

**Mr. A and His Political Attacks on Mr. H and Others Union and Management Officials**.  The Agency's disapproving view of Mr. A's conduct had earlier origins.  During a late 1990's wave of discontent and infighting within the membership ranks of what is now NAGE Local R3-77, Mr. A was an outsider challenging the leadership of the Local when the Local's affiliation was with the NTEU.

When one of the insiders, Mr. H, apparently arranged at R3-77 expense, to include a woman, who later become his wife, in a delegation attending a Union conference in San Diego, Mr. A printed and posted a "darling honey" ditty around and about PBGC work areas where R3-77 members would see it.  It was pointed in its assessment of the real romantic purpose of Ms. I's inclusion.

Without a formal investigation, but on pretty much self-evident material, the General Counsel struck with a sexual harassment and workplace disruption counseling memorandum to Mr. A, condemning his inappropriately, widely broadcasted political attack on Mr. H.

In another of Mr. A's challenges to Mr. H's leadership of the Local, he referred to that leadership as "illegitimate" in another flyer widely circulated within the Agency to R3-77 members.  In response, Mr. A was admonished by Management for his "distasteful remarks.."  He was also admonished and required to make an apology for distasteful remarks he made in other anti-union leadership flyers, referring to some as Nazis when some were Jewish and offended by the remarks, and in objecting evidently to HRD involvement or partiality in the internal union disputes and jockeying then underway, referred to some the OGC and HRD personnel as anti-union and in other more disrespectful terms.  In each case, the OGC and HRD investigation was swift and decisive, and the admonishment issued without delay.

As a result of Mr. A's efforts, R3-77 affiliation with the NTEU was terminated and the NAGE assumed the parent role.  By both his testimony and especially his demeanor, the assumption of Mr. A and Ms. K to leadership roles in the reconstituted R3-77 was not welcomed by the OGC and HRD.  Labor relations went from rocky to hostile as Mr. A and Ms. K withdrew R3-77 from any "partership" cooperation with Management.

**Complaint of Ms. J Against Mr. D.**  During the most recent period of R3-77 turmoil, a sexual harassment allegation was made by one officer against another.  It was not a complaint made to the PBGC, but one filed with the then R3-77 President, Ms. K, alleging a violation of a Union Bylaw provision against discrimination.  It was politically driven as evidenced by where and when it was filed.

The accused was Mr. D, an R3-77 activist who had served as a Vice President and Steward during periods when he was among the "ins," but who was then among the "outs."  As a Steward, Mr. D participated in the EEO Structure arbitration which resulted in the Award that spurred the reorganization of the Agency's EEO lines of responsibilities and command.  He also had pending a Title VII suit against the PBGC with, among others, a charge of retaliation against him by the HRD.

The harassment complainant was Ms. J, who like Mr. D, was also an "in" and "out" officer of R3-77, depending upon the prevailing political winds.  At the time of the incident in question, she and Mr. D were in opposite camps.  Specifically, Ms. J was Secretary of R3-77 and a confederate of Mr. A and Ms. K while Mr. D was among the challengers seeking their removal.  In any event, Ms. J alleged to President K, that Mr. D had made inappropriate sexual comments and remarks to her.

The volume of charges of impropriety and skullduggery being exchanged between the current "ins" and "outs" of R3-77 reached a point that the national office of NAGE placed R3-77 under emergency trusteeship and removed Ms. K, Ms. J, Mr. A and the rest of its then current "in" officers from office.

FMCS Case No. 03-08992
<u>NAGE R33-77/PBGC</u>

The ousted officers challenged the trusteeship and their removals by filing suit in the US District Court for DC. In connection with this suit, the internal files of R3-77 ended up lodged in the US courthouse, and nestled in them was a copy of Ms. J's complain. It was not long after the files had arrived at the court that the OGC and HRD learned of this potential gold mine of useful espionage.

It was Mr. W who directed the file search. At that time, he was the Deputy General Counsel responsible for supervising arbitration and other adversarial contests with R3-77, as well as maintaining a general top-level oversight of PBGC's relations with R3-77.[9] As Mr. W put it with regard to the turn of fate presented by the R3-77 trusteeship litigation, "we usually don't have access to [these] materials," [so], "you would have to be crazy not to take advantage of what you can learn from what is going on in the internal union thing." And, since neither Mr. W nor Mr. N, with whom he consulted, were crazy, Mr. W dispatched one of his attorneys to the courthouse with instruction to dig through the R3-77 file and retrieve whatever might be useful, now or in the future.

What all was obtained from the caches of R3-77 documents is not of record, but one item she brought back to Mr. W on December 17 was Ms. J's complaint to the now unseated president of R3-77 against Mr. D. Mr. W took it and turned it over to a private law firm in the business of conducting investigations for management. The firm's specialty seems to have been fact gathering in EEO matters.

The firm's investigation of Mr. D was exhaustive, and coercive. Mr. D was threatened by his supervisor with firing if he didn't "talk." Other interviewees made known their beliefs that Ms. J's complaint was part of the vicious internecine feud going on at the time among R3-77 officers. To overcome their reluctance to have anything to do with the investigation, they had to be told first by Agency letters, and then by the outside attorney, that their participation was not optional, but they would be disciplined for lack of cooperation if they refused. As for Ms. J, she made clear that she had not wanted a PBGC investigation, but intended the matter to be processed under Union Bylaws.

The investigation was also one-sided. None of the potentially exonerating witnesses Mr. D requested be interviewed were contacted. Besides reemphasizing the political nature of Ms. J's charge, they would have portrayed Mr. D not as the perpetrator, but as the victim of harassment leveled at him by Ms. K, Mr. A and Ms. J. On the other hand, with the intent of seeing the investigation expanded beyond Ms. J's complaint, the OGC gave names of other women to the investigating attorney with sugges-

---

[9] For some time, "in" and "out" R3-77 officers had held a dim view of Mr. W. Going back to Mr. A's troubles, among the flyers and ditties for which he was censored, was a flyer that called Mr. W a "union buster," and it from Mr. W's testimony, it is safe to say that little love was lost between him and most of the ousted officers of R3-77.

FMCS Case No. 03-08992
NAGE R33-77/PBGC

- 30 -

tions they be interviewed in search of further damaging accusations against Mr. D.

In the end, and despite the effort,[10] the fruit of the investigation was a non-griev-able memo counseling Mr. D against sexual harassment and ordering him to attended sexual sensitivity training, a copy of which was placed in his personnel file. Mr. D felt the memo, and placing it in his file, were unfair and retaliatory in light of the political agenda behind Ms. J's complaint. He felt he had been "stigmatized."

To add to what he felt was an injury, when he asked to see the investigative file on which the counseling memo was based, the then HRD Director denied the request, telling Mr. D, "that she would forward [his] request to the department in the Agency that handles FOIA requests, [and] that [his] request would go through that process. And until this arbitration forced the disclosure of the information compiled against him, Mr. D had not seen the file he requested.

**Ms. K and the Agency's and Union's Institutional Grievances**. On June 1, 2001, the arbitrator in the EEO Structure arbitration entered an initial Award finding:

> There can be no doubt that the Agency operated its EEO program in a manner that was not totally in compliance with the requirements articulated in the EEOC's regulations and the revised MD 110. It has recently acted to eliminate its conflicts. This is commendable and applaudable. However, the Arbitrator denies the Agency's motion to dismiss the Union's grievance. The Agency shall draft a plan to remove the conflict and submit it to the Union and to the Arbitrator within ninety (90) days . . .

Ms. K supported the grievance and testified against the way the PBGC was discharging its EEO responsibilities. After the EEO Structure Award was entered, an incident took place that had nothing to do with the Agency's EEO system, but concerned a disagreement between Ms. K and Mr. CC, a member of the HRD staff who dealt with R3-77 over day-to-day matters.

The dispute seems to have involved the conditions of a particular renovated work area to which the R3-77 Steward [Mr. F] was to be assigned. Ms. K sent an e-mail message to Mr. CC about the dispute that prompted the Director of HRD to respond with an institutional grievance filed on June 20, 2001 in the name of the Agency against Ms. K. The grievance stated:

---

[10]    According to Mr. W, this firm had been used for three or so other PBGC investigations. If the resulting report spawn by Ms. J's complaint is representative, its approximate 225 pages of materials generated at attorney fee rates had to cost the PBGC a pretty penny.

to stop coming in or near her work space. [Ms. AA] thinks someone told him to stop bothering her or that she did not appreciate his behavior, because he left her alone for a while, and in October, 2003, she states that he sort of apologized for his behavior toward her. Finally, [Ms. AA] stated that she also witnessed [Mr. D] gaze at women in an inappropriate way.

If the outside attorney had confronted Mr. D with these accusations from the lips of Ms. AA, Mr. D would have said something to the effect, "Hold on! I'm not the one making advances with sexually explicit suggestions. Take a look in the PBGC interoffice e-mail files and see what she's sent me." What the outside attorney would have found was a video clip sent to Mr. D by Ms. AA, entitled, "Grandma's Doggy Style," along with a lame joke on, "why condoms come in boxes of 3, 6 and 12."

It seems, however, Mr. D was not allowed to give the outside attorney a response to Ms. AA's charges. There is no mention of it in his investigative report, nor is there a second interview of Mr. D among the attached interviews of PBGC employees. But, if Mr. D's complaint about Ms. AA did not come to the attention of the PBGC hierarchy by way of the outside investigation report, he assured that it got before them when in January, 2004, he sent his accusation, with the video clip and condom joke attached, by e-mail to most of Management, including the General Counsel and Agency's EEO personnel.

The lack of OGC and HRD interest in Ms. AA's conduct was not adequately explained by Agency witnesses. In its brief it seeks to draw a distinction between Mr. D not telling Ms. AA to "stop" sending nasty jokes while Ms. J alleged she told Mr. D to "stop" bothering her. Still, as will be discussed further, the lack of action on Mr. D's complaint runs counter to the Agency's alleged "no tolerance" for sexual harassment, and policy to be proactive and launch an investigation without waiting for a complaint to be filed.

More than a year later, there is no evidence that any Agency action against Ms. AA had been taken on the basis of Mr. D's submitted materials.

## Discussion

The grievance presents four separate complaints. The first concerns the conduct of Mr. X on November 13, 2002. The other three are over the receptions and treatments given the grievant's complaints about that conduct, first by Mr. T on November 14 and 15, then by the General Counsel on the afternoon of November 15, and finally, by members of the OGC and HRD after she filed her grievance on December 9. By that time she had added complaints against the General Counsel and the OGC and HRD.

**Issue 1** focuses on the November 13, 2002 CFND meeting and the conduct of both the grievant and Mr. X in the hour or less after the TRW participants had left. The action started with the grievant's abrupt departure from the CFND meeting without seeking Mr. X's permission, or at least making sure that he saw what she was doing and had the opportunity to ask, tell, or signal her to wait.

The grievant shouldn't have done that. Whether a matter of decorum, propriety, etiquette, or given some other label, a subordinate attending a meeting with a superior should not leave the room ahead of the superior without having either been dismissed or sought and obtained leave to depart. This is especially so in circumstances like those surrounding the CFND meeting with outside parties.

Although she accurately understood the perfunctory, fill-in-the-blanks routine of the confidentiality agreement and her role to review the CFND draft, she should have hung around to be certain that her understanding meshed with that of Mr. X. In addition, the meeting lasted two hours. Other matters besides the confidentiality agreement must have been discussed. This was the grievant's first CFND meeting, and something may have been mentioned, the importance or significance of which she missed. If a sensitive subject came up that had legal implications for the CFND participants, they may not have wanted to openly "flag" it with the outside visitors present, but have wanted to reserve discussion until they left.

There is no suggestion that such a situation actually arose. However, the grievant was there to serve her CFND "clients," and as a "professional" matter, she should not have left the room without waiting until she could speak privately with those clients to ascertain that they had no concerns about anything else that had transpired during the discussions with the TRW representatives.

As for why the grievant left so quickly, there is no evidence that she intended a slight toward either her CFND clients or Mr. X. Rather, she acted out of ignorance and lack of experience as to her expected conduct, with her intent being to visit the ladies' room, return to her office, set in motion her follow-up responsibilities, call it a day, and go home. She lives in a Washington suburb and is dependent upon a series of rides and a train trip to get back and forth. She wanted to contact her rides and tell them she would be late, or be missing her pickup all together. While some of her CFND clients were surprised by her hasty departure, none thought it was an intended affront.

The same cannot be said for Mr. X. He felt affronted, it angered him, and when he arrived at the grievant's office he was ready not just for a session of emphatic supervision intended to correct a minor etiquette impropriety and ensure that the grievant understood her professional responsibilities owed the CFND clients, but for a round of abusive verbal combat.

As a result, he missed an opportunity to have a productive discussion with the grievant along the line of the explanation just given of the proper "do's and dont's" of an attorney during and following a meeting such as the TRW meeting. Admittedly, with her persistent and adamant denials of any improprieties, the grievant may also have jinxed any prospects of productively absorbing the fine points of proper etiquette for a junior participant at a business meeting.

Either or both of them, but especially Mr. X, would have done well to have taken a step back, smiled graciously, and ended the pugnacious exchanges of "you did" and "I didn't." He was the supervisor and should have recognized with the first signs of the grievant's anger that he needed to suppress his own and deferred to another day the lecture he was aching to give. He should have seen the situation was spiraling out of control and politely attempted to defuse it by dropping any further discussion of her abrupt departure.

But these hindsight observations on effective and ineffective supervision are neither here nor there. The issue is whether Mr. X's conduct was motivated by the grievant's race, sex, or national origin, or because she had testified in the EEO Structure arbitration or filed an EEO complaint. It was the grievant's burden to establish that one or more of those prohibited bases lay behind his outburst.

She failed to carry that burden. There was no persuasive evidence that Mr. X held prejudices against blacks, females, or non-US born individuals. From what the record reveals, Mr. X would have followed to his office and chastised any white male subordinate attorney who abruptly left the room after the apparent conclusion of a discussion without first seeking Mr. X's acquiescence. The testimony was that Mr. X was a stricter, more directing, and more "lecturing" supervisor than Mr. Y. As such, he would not have taken kindly to "back talk" from any subordinate, especially such as that he got from the grievant with her insistent contradictions of his assertions that she had left the meeting early. In short, there was nothing that demonstrated, or even suggested, that on November 13, 2002 Mr. X was acting out of character.

Unquestionably, the grievant is a member of each of the protected classes she claims, and that a rude, unpleasant, even frightening, experience was inflicted upon her by Mr. X. But these two sets of facts alone will not raise an inference that an unlawful motivation lurked behind Mr. X's conduct. The grievant's own conduct in leaving the conference room without permission, though not intended to be rude or disrespectful, was nevertheless inappropriate and provided a more compelling explanation for Mr. X's overly harsh, unbecoming, and counterproductive reaction. It outweighs the fact that he and she are of different races, sex and national origins, or that she had testified in a matter which was not shown to have had any effect upon him, or that she had filed an EEO complaint that was only in the most general sense directed at him as a member of

employees that is polite and considerate of others.  <u>Courtesy</u> means the practice, day in and day out, of good manners.

Mr. X violated the Directive's purpose of assuring civility and politeness among PBGC employees in their internal and external dealings with other humans.  His intemperate chastisement of his temporary subordinate over her failure to seek his permission before leaving the CFND conference room, and perhaps more important, his refusal to hear, digest or accept her explanation for her timing, fell not only short of good manners and respect, but kept him from learning that her impropriety was innocently committed.  This bit of knowledge might have nipped in the bud the fiasco that followed.

Being too mad to see, much less seize this chance to stem the grievant's ever more emphatic denials, Mr. X kept upping the ante of incivility and disrespect being shown between them.  Countering with accusations of "unprofessional" conduct, "never accept[ing] your behavior," lack of appreciation of her "attitude," and for the grievant, his ultimate insult, declaring her adamant refusals to acknowledge her <u>faux pas</u> in leaving the CFND meeting ahead of him, as "bordering on insubordination," was neither civil nor respectful.

Mr. X could have ended the confrontation while standing in the threshold.  After hearing the grievant's insistence that she understood and would discharge her responsibilities to follow-up with the confidentiality agreement, Mr. X could have called it a day, recognizing that the morning would bring plenty of time to oversee her efforts.  If he had done so, it would have ended the confrontation.  Then only his breaches in politeness and mutual respect up to that point would be in issue.

Instead he proceeded to cross the threshold of both her office and the PBGC Policy on Workplace Violence.  While Mr. X never physically hit the grievant, or said he was about to, the Policy doesn't require either for a violation of its prohibition, since:

> In addition to actual physical aggression, such behavior can include oral or written statements, gestures or expressions that communicate a threat of physical harm.

When Mr. X took one, two or three steps into the grievant's office and saw her rise from her seat, with her back close to the wall of her small office, it should have been obvious to him that she was in genuine fright.  He should have immediately stopped and backed off physically, verbally and vocally.

If he had returned to the doorway, there might be a basis for considering whether the grievant's fright was objectively reasonable or not, and thus whether the consequence of his actions up to when he backed away were inadvertent and lacking in

intent so as to spare him from having violated the policy. But any ambiguity about his intent was resolved against him when he did not back off, but proceeded in growing agitation to advance further on the grievant while scolding her to "keep pushing it."

On the other hand, Mr. X did not violated the Agency's "EEO Message on Work-place Harassment" under the facts the grievant established. Its title alone shows its aim was the prevention of harassment based on those motivating factors proscribed by sta-tute, and its text is true to predictable form with one exception:

> PBGC's EEO Policy provides for a work environment free from all forms of discrimination, including sexual harassment and harassment on the basis of race, color, gender, national origin, religion, sexual orientation, age, or disability. Harassment is unwelcome verbal or physical conduct that creates an intimidating, hostile, or offensive work environment, interferes with the individual's work performance, or otherwise adversely affects employment opportunities.

Each prohibited basis for harassment listed above shields a protected class of persons under either Title VII, the ADA, or the ADEA, except for "sexual orientation." However, the specific inclusion of sexual orientation, and the absence of any class which can be construed to cover a supervisor's harassment of an employee over job perfor-mance issues, makes it impossible to conclude that the document embraces Mr. X's phy-sically threatening, verbal harassment of the grievant.[12]

Besides, in cases such as that of Mr. X's conduct on November 13, the Agency's policies on Professional Courtesy and Workplace Violence adequately cover situations where a supervisor's determination to impose his will on an employee exceeds the bounds of civility to the point of intimidation. In the present case, finding violation of the two other Agency's policies is enough for this arbitration without stretching the "EEO Message on Workplace Harassment," into yet a second Agency code of civility.

In sum, Mr. X's November 13 "harassment" of the grievant was not shown by her to have been because of her race, sex, color or national origin, much less on the basis of

---

[12]  The policy statement's declaration of assuring a "work environment free from all forms of discrimination" cannot be used to reach the grievant's objective of holding Mr. X responsible for engag-ing in a prohibited form of harassment. First of all, "harassment" is an elastic term which if not boxed in would easily include every disagreement between an employee and a supervisor about which the em-ployee felt strongly that an unfairness had occurred. No employer without statutory compulsion would knowingly adopt a policy which effectively injects higher management into any of those kinds of disa-greements if the unhappy employee alleges "harassment." It would cripple direct, constructive super-vision, as well as teamwork among employees. The concern is not hypothetical since testimony in the present arbitration suggests the word was freely tossed about in the PBGC.

her sexual orientation, age or handicap status. Rather, it was an overblown example of his management style, consistent with his reputation as a stricter, more directing super-visor.

**Issue 2** concerns all that followed after Mr. X's November 13 chastisement of the grievant, and specifically:

> Whether the Agency, through the actions and/or inactions of the General Coun-sel and the Office of General Counsel or other components of the Agency, in response to the grievant's complaint about Mr. X's conduct on November 13, 2002, failed to comply with or violated any Labor Agreement provisions, internal rules, regulations or policies of the Agency, or of the laws, rules or regulations of the United States, and if so, what should the remedy or remedies be?

During her opening statement, the grievant summed up her claims and feelings against the OGC and HRD when she answered the questions of what she meant by her just uttered allegation of a PBGC "cover up." Her explanation was:

> [Mr. X]'s misconduct. [Mr. X] advanced on me after we had a clear break-down in communication, threatening me, telling me, 'you keep pushing me,' gets in my face, causes me to stand out of my chair, intimidates me, and then lies about it. That's the bottom line. If [Mr. X] had told the truth and PBGC had done something about this, they would have alleviated a great deal of pain and stress for me. Instead, PBGC from day one has been covering this up.

"Cover up" may be too strong a phase, but if there were violations of the Labor Agreement and applicable statutes, they occurred during one or more of the three stages through which the grievant's complaint against Mr. X advanced. The first stage was Mr. T's handling of her e-mails of November 13, 14 and 15, 2002, when he was acting in place of the General Counsel. The second was the General Counsel's handling of the grievant's complaint before, during and after his November 15 meeting with her, and the third, and most time consuming in terms of testimony and documentation, was the handling of her complaint by the OGC and HRD, and why it differed from those in other cases, especially the Professional Courtesy violation Ms. G charged Mr. A with committing.

### Mr. T's Response to the Grievant's e-mail Requests for Action.

No fault can be found with Mr. T's handling of the situation which he was con-fronted by the grievant's string of e-mail messages and pleas. He is a GS-15 supervisory attorney, the same rank and pay level as Mr. X and Mr. Y. In the federal service, this is

not a rank generally considered to be at a Management level with hiring or firing authority.  Ordinarily, like his colleagues, he oversees from four to six junior attorneys and may have a total staff of 10.

But, because all higher ranking members of the OGC were attending an offsite Agency conference, Mr. T was tapped to serve as the General Counsel during the three day absence of his superiors (November 13, 14, and 15, 2002).  He had served in this capacity before, and understood his responsibility was to take care of those things which could not await the return of the General Counsel, such as signing letters, briefs, and perhaps, the TRW confidentiality agreement, which were under deadlines for mailing or filing.

It would be a fallacy to view Mr. T as having been left to perform the full scope of the duties and responsibilities of the General Counsel.  Rather, what was expected of him when a situation arose, whether in the realm of papers to be signed, funds to be expended, or personnel disputes to be resolved, was that he would investigate and decide whether the matter needed immediate action, or could or should wait.  Probably the more out of the ordinary routine a matter was, or the greater the significance of acting, the greater the reason to err on the side of waiting for the boss to return.

On November 14, 2002, as was his practice, Mr. T arrived at the Agency just before 9:00 AM, and when shortly thereafter he checked his e-mail, he found the grievant's 7:28 AM e-mail to him to which she attached her 5:33 PM e-mail to the General Counsel sent the previous evening.  Neither e-mail asked for an immediate meeting.  To the contrary, the e-mail to the General Counsel stated that she was "too emotional to do much more right now" than to briefly state the facts of her encounter with Mr. X and nature of his accusations, and to "respectfully request a meeting to discuss this <u>when I have the emotional restraint</u> to address [Mr. X]'s attack without emotion (emphasis added)."

Likewise, the covering e-mail addressed to Mr. T declared its purpose to be, "I just want to ensure I informed the head of my department [the OGC] of this situation so that it could be dealt with expeditiously."  It did assert that, "I have an untenable situation of having to interact with [Mr. X], [Mr. Y]'s buddy, when [Mr. X] has expressed such clear animosity and unprofessional conduct in his interaction with me yesterday afternoon," but it also declared that, "I have invoked my right to EEO counseling about this matter and have also inquired about the process of pursuing claims under the workplace harassment policy and professional courtesy directive."

Thus, during the first 24 hours following the November 13 incident, Mr. T had been placed on notice by the grievant that the incident had occurred, that she felt Mr. X's conduct was harassing and discourteous, that when she believed she had sufficient

control over her emotions to meet with the General Counsel about what had happened, she wished to do so, and by implication, she would notify the General Counsel when she felt she had that control. She also had given him notice that she had taken her complaint to the Agency's EEO office.

There was nothing alarming in these November 14 messages. Only on November 15 can it be fairly said that Mr. T was placed on notice that he had a storm on his hands. When he arrived for work that day, he found the grievant's 7:01 AM e-mail waiting him. It contained her first demands made specifically of him. This second-day-after-the-incident e-mail was that which said:

> [Mr. T], despite my request yesterday, it appears that nothing has been done to neutralize the situation [Mr. X] instigated on Wednesday. OGC's failure to take any action despite my request resulted in me having to stay in the office until after 7 p.m. last night because, in my opinion, [Mr. X] deliberately inflated a simple task with the intent to continue his harassment. I tried to follow his dictate to avoid any further conflict with him but you have the responsibility for upholding and enforcing PBGC's workplace harassment policy and professional courtesy directive and should act to stop this situation now.

> Today, I am asking again for something to be done about this situation. I do not believe that you understand the severity of the emotional distress this incident has cause me so let me tell you I have been unable to turn [Mr. X]'s conduct off in my mind since Wednesday when he attacked me! So, at a minimum, please assign another supervisor to cover on my cases so that [Mr. X] cannot continue this pattern of behavior. If nothing is done, I will have no choice but to take this issue to upper management.

> Please provide me with a direct response to this reasonable request as soon as you can. Thank you.

At 10:34 AM, the urgency of this 7:01 AM e-mail was dampened when the grievant sent Mr. T another e-mail advising him that her most immediate concern, that of continuing to work under Mr. X's supervision, had been solved. "Mr. Y is in today so the issue of who I would report to is resolved, but I still would like a response regarding the incident."

Whether reacting to that last message from the grievant, or out of curiosity, Mr. T met with Mr. X, Mr. Y, and Mr. S, where, after sharing the e-mails, his first question might simply have been, "What is this all about?" In response, he would have heard Mr. X's versions of the events of November 13, and that on November 14, he and the grie-

vant had managed their reviews of the TRW confidentiality agreement by e-mail. Most important, Mr. T would have been assured Mr. X and the grievant were not in danger of any immediate further contact. He also would have heard whatever Mr. Y could report on what the grievant had told him, and perhaps, about her current emotional state.[13]

At some point that Friday morning, Mr. T also learned that the General Counsel had decided to return to his office around noon, rather than at the end of the day or the following Monday. In part, his change in plans was decided when the General Counsel learned that an incident had occurred between the grievant and Mr. X.

Mr. T, having determined that there was no immediate threat to life or limb, that Mr. X and the grievant would be kept separated, and that the General Counsel would be present within the hour, decided that he should make no further inquiries in response to the grievant's e-mails, but await the arrival of the General Counsel. To cool down the grievant whose initial e-mail of the morning had been emotional and demanding, he sent her an e-mail at 11:51 AM, "I understand that [the General Counsel] expects to return to the office this afternoon. You may be able to see him then."

In taking the course he did, Mr. T properly discharged his duties as the temporary caretaker of the OGC. For a GS15 supervisor, his cool assessment of the situation and attempt at a calming response to the grievant's requests were exemplary and worthy of admirable note on his annual performance rating. What the grievant seemed to demand of Mr. T, and it was not completely clear even with her last e-mails on November 15, was that Mr. T initiate an HRD or OGC investigation of the November 13 conduct of Mr. X, a fellow GS 15 supervisor. Even if he had the authority to do so, once he satisfied himself there was no dire threat to anything more than the grievant's impatience, it would be understandable if he concluded that he simply was not paid enough to step into what by now he knew was going to be an emotionally charged "he said/she said" dispute, especially since the man who was paid to handle this sort of stuff was due back shortly.

As for any other reason being behind his restrained vigor in pursuing an immediate resolution of her allegations against Mr. X, the grievant failed to carry her burden of proving that he was motivated for any reason violating Title VII or the Civil Service Re-

---

[13] At points in Mr. T's testimony, there were suggestions that his meeting with Mr. X, Mr. Y,Mr. S, and others, occurred on Thursday, November 14, or that he met alone with Mr. X that day, in advance of holding the larger meeting on the 15th. However, I find that the e-mail traffic and Mr.T's testimony as a whole establish that only one meeting took place, and it was on the morning of November 15. But, if Mr. T also met with Mr. X the day before, it would have mostly likely been then that he first asked, "What is this about?" and gotten Mr.X's version of events. If so, then the larger meeting on November 15, when Mr. T had the grievant's latest e-mails in hand, may have been to obtain the other participants' advice on, "What should I do now?" Either way, Mr. T would have acted properly.

FMCS Case No. 03-08992
<u>NAGE R33-77/PBGC</u>

form Act. There was no direct evidence that Mr. T gave any consideration to the grievant's race, sex, national origin, or prior engagement in protected EEO or union activities. Nor is an inference of discrimination raised.

Despite some of the testimony of a black paralegal, no propensity was established on the part of Mr. T to not impose discipline when the complaining employee is a black female. Similarly, the decisiveness with which he may have handled other squabbles and disagreements between employees under his direct day-to-day supervision has no bearing on how, as the caretaker of the OGC with but hours to go in that role, he "should" have handled the grievant's complaint against Mr. X. That he may have acted more quickly with cases involving his immediate subordinates does not turn the caution he showed in dealing with the grievant's complaint into evidence that he had a prohibited bias against the grievant.

Even harder to find in the record is evidence to support the proposition that Mr. T harbored an intent to retaliate against the grievant because of her prior testimony in the EEO Structure arbitration. His testimony disclosed no real knowledge about that case, and the grievant presented no convincing evidence why he should have known, or even cared, about it or the resulting changes in the Agency's EEO structure. There is no evidence that its outcome even remotely affected his normal duties, or his discharge of his infrequent and short term stints acting for the General Counsel. Thus, the grievant laid no factual basis for her rather extreme argument that:

> The failure of PBGC officials to grant [her] any relief, including the simple request to [be required to] report to another supervisor (instead of [Mr. X] when her supervisor [ ] was out of the office was malicious and sadistic in manner and indicates an intent to retaliate against [the grievant] because it was patently obvious that it would lead to continued distress for [the grievant]. PBGC, therefore, violated [the Labor Agreement] in its treatment of [the grievant] after her [EEO Structure arbitration] testimony.

Since it was only Mr. T who had received the grievant's request to be relieved of Mr. X's supervision, it was he she called "malicious and sadistic," an allegation so at variance with the evidence that it must be considered to have been unthinkingly made. To find that the grievant's testimony in that arbitration motivated Mr. T to either ignore the grievant's complaint as an act of callousness, or purposefully taken in order to inflict further emotional punishment, would require finding that at the meeting held with Mr. X, Mr. Y, Mr. S, and Mr. Z during the morning of November 15, Mr. T was dragged into a conspiracy to do so.

It is too much to swallow when remembering the grievant's 10:34 AM e-mail of that date telling him, "Mr. Y is in today so the issue of who I would report to is resolved."

And even if the circumstances leading up to Mr. T actions and inactions were seen as raising a prima facie case of unlawful motivation, the evidence and reasoning supporting a legitimate basis for Mr. T's handling of the grievant's complaint is overwhelming.

As for the suggestion that the grievant's October 3, 2002 EEO complaint served as motivation for Mr. T's conduct, that too is far fetched. Although the EEO complaint was broadly leveled at the whole of OGC supervision, Mr. T was not singled out as an instrument of unlawful discrimination, and since she was not one of the attorneys Mr. T permanently supervised, the elements of relief she sought in her EEO complaint were unlikely to have any disturbing effect upon him.

The supervisor immediately above and between Mr. X (as well as Mr. Y) and the General Counsel is Mr. Z, a named antagonist in her EEO complaint. But again, no conspiracy is proved by Mr. T's inclusion of Mr. Z in the November 15 meeting with Messrs. X, Y and S to determine "what to do now," and from which Mr. T left with his decision to leave it to the General Counsel to respond to the grievant's insistence on action, and if the General Counsel's response was not to her satisfaction, to let the General Counsel take the heated protest her latest e-mails indicated would follow.

### The General Counsel's November 15, 2002 Meeting with the Grievant.

When the General Counsel arrived back, he first met with Mr. T who certainly showed him the grievant's e-mails, and most likely shared with him his suspicions that she would be emotional when he met with her. The insistent and demanding tone of the e-mails, especially the 7:01 AM one of that morning, was not consistent with the General Counsel's prior experiences with the grievant, and should have forewarned him that he was going to have to deal with her emotional difficulty in coping with Mr. X's treatment of her, whether or not that treatment had been faulty. He also should have appreciated that she was agitated over the lack of a response from him or Mr. T, and thus her ire and distrust would also be directed toward him and Mr. T.

The combination of the grievant's e-mail messages and Mr. T's forecast may have been why the General Counsel decided to interview Mr. X first. Besides claiming his own blamelessness in his version of events, Mr. X most likely painted a picture of the grievant being emotional and irrational on November 13. Still, even if the General Counsel was surprised by her emotional state, once he saw she was not the calm and collected attorney he had known before, it might have helped keep their encounter a business-like collecting of her version of the events of November 13 by not interrupting her while she was giving her account. It also might have helped if he had appreciated how carefully he needed to frame the messages he sought to convey so as to not further inflame her emotions.

But, it's hard to judge whether those efforts would have appeased the grievant. Her fury at being ignored through the whole of the 14th, and until close to noon on the 15th, and then recognizing in the first minutes of the meeting that she was not being interviewed ahead of Mr. X, probably could not have been contained, despite no reasoned basis for the grievant's fury.

As explained in finding Mr. T's conduct reasonable, her first e-mail on the night of the incident asked to meet with the General Counsel. Even when she learned he was unavailable, she did not request a meeting with Mr. T as an alternative. Rather, she simply told Mr. T that the reason for forwarding a copy of the previous e-mail to him was because, "I just wanted to ensure I informed the head of my department of this situation so that it could be dealt with expeditiously." This was not a demand for either an immediate meeting or immediate action, even though she insisted in the e-mail that she had an "untenable situation" in working with Mr. X.

Only the next morning did she clarify that by "expeditiously" she meant that "then and there" she had expected Mr. T to find her a new substitute supervisor. But, by the time Mr. T had read this new e-mail, including its additional allegation of harassing extra work on the confidentiality agreement which had held her in the office until after 7:00 PM, he received her 10:34 AM e-mail advising that Mr. Y had returned so that continuing to work under Mr. X was no longer a pressing issue. This was followed shortly by Mr. T's receipt of the news that the General Counsel would be back in his office about noon, of which development he informed the grievant at 11:54 AM with the advice that she might have her requested meeting with him that afternoon.

As for the General Counsel's interviewing Mr. X before her, it was a reasonable thing to do. The General Counsel arrived knowing he was faced with an accusation of misconduct against one of his subordinate supervisors. After reading the grievant's last e-mails, including that of 11:57 AM complaining about Mr. T's meeting with Mr. X, et al., he also knew the grievant was likely to be in a heightened state of emotions. Accordingly, it was reasonable to expect him to first obtain Mr. X's version.

As for the General Counsel's conduct at the meeting, putting aside that he should not have interrupted the grievant's recital of her complaint, his statements which she found objectionable were not incorrect, just not artfully or sensitively, or even sensibly stated. Topping her list in chronological order was his declaration, made after hearing her explain why she thought the CFND meeting was over, that she had "violated OGC protocol."

Whether his reference was to the common sense proposition that a subordinate does not leave a meeting without consent, or to the unbeknownst to her at the time practice of OGC attorneys not to immediately leave a CFND meeting, he was correct.

Had she been calmer, which admittedly would have been difficult in light of Mr. X's actions and her perception of OGC indifference to its impact on her psyche, he might have provided an explanation of his comment. Nevertheless, the comment itself was neither inaccurate nor inappropriate, when coming from her ultimate OGC superior.

His comment about the grievant's having problems with her supervisors was only slightly off the mark. She had protested the promotional practices of Ms. R, her prior supervisor without first discussing her concerns with her, and she had singled out Mr. Z, her second line supervisor, in her EEO complaint, and now she had made accusation against Mr. X. These complaints made within a four year period (1999 - 2002) would have been out of the ordinary unless the OGC was out of control, a situation not depicted by the evidence as extending beyond those in the OGC responsible for labor relations, a matter to be pursued shortly. So, the General Counsel's suggestion the grievant and her attitude may have been the cause of friction, was not totally out of place.

Only the General Counsel's reluctance to name the specific supervisors who he thought the grievant had trouble working with can be called into question. It left the impression with the grievant that she had never been able to accept supervision. Yet, at the hearing, he had to admit that she had worked with a variety of other supervisors without complaint from her or them. However, on November 15 he did not limit his concerns to her experiences with those three, with result that the grievant immediately jumped to the conclusion that his comment was a broader disparaging assessment of her acceptance of authority. Feeling that this was both unfair and shifted blame from Mr. X to her, the grievant's already intense emotional state became even tighter.

The grievant wanted a promise from the General Counsel of immediate disciplinary action against Mr. X, and if not obtained, at least an acceptance of the seriousness of her charges and a clear indication that they would not be dropped. The death knell for her objective was rung when the General Counsel told her he had concluded that what had happen was no more than a "communications failure." This comment was premature and had consequences beyond the grievant's immediate outrage.

Whether he or Mr. S actually smirked, or otherwise purposefully displayed discourteous reactions to what the grievant had to say, is hard to judge. The General Counsel responded to the grievant's examinations at arbitration without attempting a "poker face." Rather, when things got heated, he tended to react with a smile. If mad at him, his smile might be interpreted as a smirk when it actually was an attempt to spread oil on troubled waters. Occasionally, his grin appeared a good natured, "you're not going to get me ruffled," signal to the grievant, but without the flash of anger or personal disdain Mr. X had a tendency to display. Mr. S's facial expressions left no lasting impression which might cast light on the issue of whether he smirked at this meeting, though it was more likely that he did than did the General Counsel.

As with any disputed fact, the burden of proof was on the grievant on this issue, and this one was not proved. Though both she and Mr. A were certain that the General Counsel and Mr. S greeted what the grievant said and argued with smirks and other derision, at least with regard to the General Counsel, it is too easy to imagine that they misinterpreted his response. Admittedly, it's a close call in light of his undisputed tendency to interrupt her presentation, as well as Mr. A's assertions that it was a common practice of the General Counsel to smirk when dealing with the Union. Still, it seems unlikely that in facing seriously contentious situations it was the General Counsel's practice to respond snidely.

Besides, the crucial issue is whether the General Counsel's refusal to provide the relief the grievant sought, or his conduct during the meeting, were motivated by unlawful race, sex or national origin discrimination, or because of her previous protected union or EEO activities. That is, did he violate Title VII, the CSRA, or another statute?

There was no direct evidence of race, sex or national origin bias on the part of the General Counsel, and any indirect evidence was scant at best.[14] That he is a white male, while the grievant is a black female born in Trinidad-Tobago, does not raise an inference of unlawful discrimination. Even if it did, it is refuted by his prior action in promoting the grievant to GS13, retroactively and with back pay, after she questioned her being out of step with white attorneys similarly situated. That voluntary remedial

---

[14] In evidence are statistics reflecting the race and sex composition of OGC employees, as well as testimony about its minority recruitment efforts. However, raw percentages tell little. To establish a Griggs v. Duke Power inference of discrimination with statistical evidence, a more demanding showing must be made. Using attorney hires, what is needed are data reflecting what nondiscriminatory attorney hiring would be expected to produce at the PBGC, all other variables being equal, compared against the actual makeup of its attorney workforce. If there is a difference between the expected and the actual, that difference must be either "statistically significant" (generally, less than 20% (1 in 5) chance of occurring randomly), or fail the less demanding "80% rule of thumb" endorsed by the Uniform Testing Guidelines, 29 CFR 1607. Neither 'beyond chance' showing can be made with the grievant's agency by agency data because they are insufficient to work with statistically. Among other things, there is no base number for each agency's total attorney workforce, just the female and minority percentages of whatever that number is. That base number is key since if it is low, say only 20 attorneys in total, the percentages can grow or shrink by 5% due to the presents or lack of a single individual. That is why conclusions are rarely drawn in medical studies, or even political polling, without using hundreds of participants to reduce, among other statistical instabilities, the "measure of error." Furthermore, variables affecting "actual" numbers are rarely equal. The problems facing government agencies, with their salary limitations, in recruiting qualified minority candidates in competition with the private sector are well known. Even as between government agencies there are other variables, not the least is the subject matter with which an agency's attorneys deal. The contrast shown in the grievant's exhibit between the 23.51% black attorney composition of the EEOC and the 8.03% at the SEC (the agency with the closest "overall" workforce of the same size as the EEOC) may be an example of "subject matter effect." If so, before the SEC can be pronounced not to be a nondiscriminatory attorney hiring agency, that variable would have to be accounted for.

FMCS Case No. 03-08992
NAGE R33-77/PBGC

action, and his later participation in efforts to resolve her EEO complaint alleging an unlawful hostile work environment, together refute her claim that he improperly acted because of her personal EEO activities.

The more serious charge is that his dismissive action at his November 15 meeting with the grievant was motivated by her having testified in the arbitration of the Union's challenge to the structure of the Agency's EEO apparatus. The issue before the arbitrator there had been whether the Agency had failed to "provide an independent and neutral EEO function for the fair and impartial processing of EEO complaints in violation of 29 CFR §1614(a)(2), and [Labor Agreement] sections 4.1, 5.1, 5.2 and 5.7." In a nutshell, the Agency's problem was that the investigation and resolution of EEO complaints were too intertwined, personnel-wise, with other functions of the OGC and HRD that might bear on an EEO complaint.

On June 1, 2002, the arbitrator in that case sustained the grievance, and directed that the Agency's EEO functions be restructured. The restructuring effort progressed slowly, and a further hearing was held in April, 2002 to resolve lingering disputes between the parties. It was during this later hearing that the grievant testified for the Union. According to the Union's post-hearing brief, her testimony was to the effect that she had "concluded there was no way that the EEO process could protect her confidentiality, and [therefore] she feared her job would be at risk and she would face retaliation if she even raised EEO issues informally."

It appears that sometime after August 31, 2002, and within reasonable proximity to the November 13, 2002 incident between the grievant and Mr. X, and the November 15, 2002 meeting between her and the General Counsel, a final EEO restructuring was agreed upon. The immediate effect on the General Counsel was that he was designated the "EEO Neutral Attorney," and according to the Agency's description provided in its August 30, 2002 post-hearing arbitration brief, this meant:

> The General Counsel himself, and [another] GS15 attorney working directly for the General Counsel, serve as the Agency's EEO neutral Attorneys. Neither attorney executes or advises the Agency on personnel actions. Likewise, they do not represent the Agency in adversarial EEO proceedings. Legal representation and advice concerning disciplinary action, labor relations, and adversarial EEO proceedings are handled by the General Law and Operations Group under the direction of Deputy General Counsel, [Mr. W]. Moreover, having the General Counsel serve as the EEO Neutral Attorney eliminates the possibility that the Agency's litigators will improperly sway the Neutral Attorney. The General Counsel is the senior attorney in the Agency. Its litigators are junior to him and would, therefore, have no authority to force the General Counsel to take a

particular position to the detriment of an EEO complainant.

After judging his demeanor and candor as a witness, the General Counsel is found to be a reasonable, emotionally stable person. For that reason, it is impossible to accept without corroborating evidence that either his role as the EEO Neutral Attorney, or his isolation from the General Law and Operations attorneys pursuing adversarial matters, were so resented by him as to motivate him to retaliate against the grievant because she had testified about her misgivings over the previous EEO structure. This conclusion is not altered by the grievant's argument that the restructuring of his OGC was "forced" upon the General Counsel by the arbitration.

It just does not make sense. First, the General Counsel must have agreed to and signed-off on the arrangement, including his role in the new EEO scheme, and there was no evidence he was either reluctant to do so, or that he was annoyed by it. Second, with the flood of steel industry, airline and other major bankruptcies with their untold millions in underfunded pension liability, and with the PBGC dwindling reserves with which to meet its responsibility to affected pensioners, the restructuring of Agency EEO functions has got to be such a minor concern as to cause him "not to give a whit," much less to be so disturbed about it he would seek vengeance on the grievant.

Put another way, it is not enough to just establish that (1) the grievant had testified in the matter, (2) the resolution of which affected the General Counsel, and (3) that within a reasonable time thereafter, he refused to take actions which she requested of him, or to even take her complaint about Mr. X as seriously as she thought it deserved. To carry her burden of proof, the grievant needed evidence that the General Counsel viewed the restructuring of the Agency's EEO functions as something like the momentous event which she saw.[15] Without such a showing, it cannot be fairly inferred that his later dismissive treatment of her request and complaint was motivated by her combined EEO and union protected activity, rather than his unbiased assessment of the gravity of the incident between her and Mr. X.

Finally, the grievant's claim that what is commonly known as the "Whistleblower Protection Act" was violated by the General Counsel is rejected. The grievant's reporting of the rude and threatening conduct of Mr. X simply is not the whistle blowing conduct Congress intended to protect by severe penalties against the retaliator and

---

[15] Had the arbitration's effect on the General Counsel been consequential (a reduction in pay, a loss of prestige, a cause of ridicule, or even simply being moved to a new, smaller office, or one without a window), it would have raised an arguable inference of a connection. But, where the adverse effect, if any, is so trivial, something more is needed for the grievant to carry her burden. She could have met that burden had the General Counsel expressed in writing or orally his resentment over the restructuring, or perhaps even shown an annoyance or a peevishness. But, there was no such evidence.

extensive remedial recoveries for the victim. Otherwise, every dispute between a subordinate and a superior at an agency would produce a potential "federal case" under that Act's "abuse of authority" provision if the supervisor did not immediately act on the subordinate's complaint, no matter how minor. Similarly, her testifying against the Agency's previous EEO structure does not constitute the whistle blowing envision by Congress.

The General Counsel can only be found "guilty" of violating the non-statutorily based Professional Courtesy Directive. He should not have interrupted the grievant, but heard out her complaint, and he should not have prematurely pronounce her encounter with Mr. X to be no more than a "communications failure."

### The OGC and HRD Investigations, Generally.

Once the Step-2 Grievance was filed and it was clear that the grievant's complaint against Mr. X was not going to go away, Mr. N made sure nothing which would contradict the General Counsel's judgment was likely to come out of the two, inescapably intertwined investigations he set in motions. It was not hard to accomplish.

Rather than farm out the Management and Grievance Investigations to a hard-nosed, no holds barred, investigator as had been done in tracking down each sexually offensive utterance to slip out of the mouth of Mr. D, or to use the thoughtful and analytical talents of Mr. O who had so skillfully nailed Mr. A for rudely challenging Ms. G's refusal to receipt the service of papers, Mr. N appointed Ms. P. With her firmly held belief that a "failure to communicate" was the one-size-fits-all answer to conflicts in human relations, she was a perfect fit, almost certain to validate the General Counsel's conclusion about the cause of the November 13 incident.

To remove any doubt about a favorable outcome, he charged Ms. Q with over-seeing Ms. P, and together, he and Ms. Q assured that Ms. P's fact gathering would be jumbled and misdirected by their instructions that (1) she was undertaking two separate investigations, the paths of which were not to cross or become commingled, and (2) she was to complete the Management Investigation first, and with haste.

In a sense, their failures to direct Ms. P were as crippling to her efforts as were their misdirections. Never did Mr. N or Ms. Q tell Ms. P to focus on the confrontation between the grievant and Mr. X. They never explained that her starting point was the Step-2 grievance with its detailed allegations. They never clarified that if Mr. X did no wrong, then the General Counsel's "communications failure" conclusion would be accurate, as would be an OGC-HRD determination that the grievance was without merit. It was all a single ball of wax, but one which they made sure she would never come to realize.

FMCS Case No. 03-08992
<u>NAGE R33-77/PBGC</u>

Just as important was the flip side of the same November 13 coin. Ms. P was never made to understand that if Mr. X violated the Agency's Professional Courtesy Directive and Workplace Violence Policy, then the General Counsel and HRD needed to know that so the matter could be dealt with and the grievance resolved without further embarrassment or costs. While Ms. P believed she was totally objective in her investigations, it was only because she could not understand that the instructions, guidance, and advice she received from Mr. N and Mr. Q were always tilted towards the desired results of exonerating the General Counsel specifically, and Mr. X necessarily.

Ms. P was not a knowing member of a nefarious contrivance to frustrate the grievant's quest for vindication. Instead, her trusting nature and acceptance of whatever she heard at face value, while not qualities looked for in an investigator, were ones welcomed and exploited by Mr. N and Ms. Q. And if she strayed from her myopic ignorance of the Step-2 grievance before she had cleared the General Counsel of any misjudgement about Mr. X's conduct, there was Mr. N or Ms. Q to shepherd her back to her tunnel-vision mind-set that differences between supervisors and subordinates always result from "communications failures."

Specifically, the following two incidents during Ms. P's struggles with her dual assignments raise an inference that the OGC and HRD never intended, nor wanted, Ms. P to get the facts straight on what took place on November 13 in the grievant's office.

<u>First</u>. When Ms. Q and Ms. P jointly interviewed Mr. X on December 12, Ms. Q did not have Ms. P question him using the written grievance as her scripted prompts. This is clear from Mr. X's responses recorded by Ms. Q. Although in Ms. Q's summary report form, they revealed he was not asked specific, probing questions, but served up soft, open ended questions that allowed him to lay out his version of the encounter with only such follow-up questions as fine tuned his description of the grievant's emotionally charged responses to his "instructive feedback."

If Ms. P had been dependent on her own wits before facing Mr. X, her lack of preparedness would have been predictable. But, she had the combined wits of herself and Ms. Q, and they had to have met in advance of interviewing Mr. X to agree on their procedure of Ms. P asking questions and Ms. Q scribbling down responses. From this conclusion, what is attention grabbing is that Ms. Q, who certainly had read the grievance and recognized that it provided the details underlying the oral complaint the grievant had made to the General Counsel, did not provide or discuss with Ms. P specific questions for Mr. X.

Nowhere is there evidence that Ms. P and Ms. Q held a skull session to review the grievance, sentence by sentence, and as it built to its climax with Mr. X in the grievant's office and she on her feet, with a word by word analysis. The results of the interview

simply confirm that these customary and expected steps were never taken to prepare Ms. P for an effective interrogation of Mr. X which would leave him no wiggle room, nor allow him to escape follow-up questions that could pin him on inconsistencies between his version and the grievant's.

Since Ms. P was left unprepared to ask Mr. X to respond to each of the grievant's accusations, it never crossed her mind after hearing him say he had remained at the threshold without ever stepping into the grievant's office, to bore in with follow-up questions, infused with scepticism. She didn't know enough from a brief glance at the grievance to ask him with insistence on a plausible answer for how he could have remained in the doorway while the grievant alleged that when she defended against his charge of "bordering on insubordination," he "left her office doorway and came into her office, stood within arm's length of [her] and said 'you better not push it?'"

If she had asked this obvious follow-up questions, Mr. X would have been forced to fess up, or call the grievant a liar. If the latter, the issue of his and her truthfulness would have been brought to the fore. Then, Mr. E and Mr. U, identified in the grievance as around or about the area at the time, would obviously need to be interviewed for possible resolution.

Ms. P's lapse in diligence was to be expected. It was one of her qualities Mr. N must have had in mind in selecting her for the sensitive assignment of conducting the Management Investigation. But, this is not the end of the story of the lapses surrounding Mr. X's interview.

Ms. P was simply not out of the same mold as the outside attorney unleashed on Mr. D, nor did she have the analytical powers or perseverance of Mr. O when resolving inconsistences in vying accounts of antagonists. Ms. Q is another matter. During her attendance at the hearing of this arbitration, her reactions to the testimony of the grievant and her witnesses showed she had a no nonsense tenacity to match them all, with no more lack of ability to spot a potential lie than Mr. O showed in spotting the absence of door slamming in Mr. A account of his departure from Ms. G's office. Yet, Ms. Q was sitting in the same room, heard the same stood-the-doorway response from Mr. X, was not barred from piping up, but from all that is known in the record, remained mute.

This lack of questioning by either Ms. P or Ms. Q, beyond that necessary to affirm the conclusion that the incident was but another case of a "failure of communications" between a supervisor and a subordinate, and that the grievant had been highly emotional, and thus untrustworthy in her grievance account, is suspicious. It is so far out of the norm of what would reasonably be expected with a serious investigation as to force the conclusion that it was purposeful, and not solely the result of Ms. P's inexperience or naivety. After all, Ms. Q was there not only to take notes, but as Ms. P explained, had

been assigned "from the get-go" by the OGC to assist, and by implication of their GS difference, to guide Ms. P.

Second. Unexplained is the December 17 e-mail traffic between Ms. P and Mr. F when, at 10:11 AM, Mr. F told her that, "HRD was provided a copy of the grievance by [the General Counsel]." Nineteen minutes later, at 10:30 AM, Ms. P responded; "This investigation stems from [the grievant's] allegations -- It is not related to the step-2 grievance."

That response, with its 19 minute lag, was strange. As conscientious as Ms. P was about keeping her investigations separate, during that 19 minute interval, she must have gone to Ms. Q or Mr. N with Mr. F's e-mail insistence that she look at the grievance, and asked one or both for guidance, and gotten it. With an alertness for peculiarities already heightened, and with Ms. P's testimony that she coordinated with Ms. Q in preparing her final report, it would be highly unusual if Ms. P's 10:30 AM response to Mr. F's message was formulated by her alone.

Instead, Ms. P had help in preparing an e-mail designed to send an implied message. Either Ms. Q or Mr. N suggested to Ms. P, though she may not have recognized the implication, that she tell Mr. F, in effect, that if the grievant expected the Agency to pursue her complaint against Mr. X, she must submit to a face-to-face interview, knowing that the message would at least further aggravate the grievant, and could, if she continued to decline a direct interview, solidify a basis for closing the investigation with a conclusion based solely on Mr. X's version of events. Just such a result is what Mr. N testified would follow,[16]

**The Management Investigation** was a farce, never intended to truly explore whether Mr. X had violated the Professional Courtesy Directive, much less the Workplace Violence Policy. Were either violation discovered, the General Counsel would have been placed in the embarrassing position of having to retract his shoot-from-the-hip conclusion that the grievant's complaint had grown out of no more than a "communication failure." No principal player from the OGC or HRD wanted to see that happen.

---

[16] The burden to conduct a competent investigation of the grievant's complaint was on the OGC and HRD, and they are held to account for what occurred. But the grievant is not without fault. As horrific as she thought the experience with Mr. X, and as disappointing as Mr. T's and the General Counsel's responses may have been, that they remained emotional blocks to her cooperation with Ms. P a month later is out of the ordinary, and played into the hands of those who wanted the General Counsel's assessment of her incident with Mr. X affirmed. Ms. P showed herself to be without an ulterior motive. A frank and cooperative discussion with Ms. P might have opened her eyes to the importance of Mr. E and Mr. U. That, in turn, might have prompted the realization Ms. P would not have until she was a witness in this arbitration, that Mr. X's conduct "bordered on" violations of Agency's courtesy and violence policies.

This is ironic. By the directness of his testimony and his general demeanor, the General Counsel left the impression of a man who would have had no problem admitting he had made a mistake. Nevertheless, others in the OGC (Messrs N, S and Ms. Q) and HRD (Ms. P, as she understood her mission) felt it was their responsibility to protect him from being confronted with any facts that would call for that admission.

**The Grievance Investigation** fell to Ms. Q to complete. It too was an inexcusable farce, but especially so because it could have been spared that judgement. With the federal Christmas holiday subtracted out, she had seven work days to add flesh to the bare bones of information she and Ms. P had gathered. However, Ms. Q's Step-2 response makes clear that with Ms. P's departure, Ms. Q put the brakes on her own inquisitive mind.

Unlike the Management Investigation, where Ms. P was coddled into feeling the allegations in the grievance were no substitute for the grievant relating them orally, in no way could Ms. Q ignore the grievant's detailed account of Mr. X's confrontation with her on November 13; how Mr. X had advanced into her office, grown so close to her that she rose from her chair to receive, face to face, his threatening and repeated, "keep pushing it." Surely Ms. Q recognized that Mr. X's statement made to her and Ms. P, that he had not left the doorway, did not square with the grievant's account.

Ms. Q was experienced in checking facts and formulating Agency responses to grievances, and it is unimaginable she set the grievance aside as had Ms. P. Rather, from shortly after it was filed on December 9, she must have had a copy, closely read and digested its allegations, and recognized that the central issue was whether Mr. X got too close to the grievant and been too threatening in his words, tone, and the volume of his voice. She couldn't have missed that the grievant identified Mr. E and Mr. U in the vicinity of the incident, and that they should be interviewed.

Ms. Q's failure to undertake interviewing Mr. E and Mr. U could only have been intentional, there being no evidence that they too were on leave. Due to his illness at the time of the hearing, Mr. U was unavailable for cross examination and his testimony was stipulated, but Mr. E took the stand and no questions were asked to place him out of Ms. Q's reach as she composed the Step-2 response. She did not have any of the naivete or trusting nature of Ms. P, but a well trained scepticism and eye for inconsistencies and conflicts in witnesses' accounts. Only if made not to dig deeper into the facts of November 13 incident can her failure be explained. And, since Mr. N was in immediate command, he is held responsible.

But, there are more reasons for holding the top ranks of the OGC and HRD labor relations hierarchy responsible for the farce played out in this arbitration. It is understandable that the Management Investigation ended with Ms. P's report, but no reason

was presented or argued as to why the Grievance Investigation was terminated with the Step-2 response, except that it was unworthy of the persistence of the investigation previously conducted to substantiate Ms. G's similar, but less serious charge of discourtesy directed against Mr. A.

Reasons and opportunities abounded for investigating the grievance further. The Union rejected the General Counsel's Step-2 denial, and advanced the grievance to Step-3, and later to this arbitration. At each step, nothing prevented the Agency from appreciating the obvious; the Union and grievant would rely on Mr. E and Mr. U to put the lie to any testimony from Mr. X in line with Ms. P's recollection that he said he never left the doorway or entered the grievant's office.

Without perceiving the situation facing them, Mr. N, Ms. Q, and the rest of the OGC and HRD staff, sailed off toward arbitration with nothing new to cause them to rethink the General Counsel's characterization of the incident as a "conversation," rather than the loud verbal commotion Mr. E and Mr. U overheard, or more critically, the General Counsel's certainty that there were no "facts to suggest that [Mr. X] communicated a threat," when both would have circumstantially placed Mr. X inside her office while shouting (a fair characterization of "raised voices," or "loud conversation" when uttered in that small space) was heard.

As it was, only during the discovery phase of the grievant's Title VII "hostile work environment" suit that morphed out of her September 2002 EEO complaint was "bingo" heard by Agency counsel, signaling that not everything jibed. It could not be missed that despite why Mr. N said he directed Ms. P to undertake Management Investigation ("I wanted to make sure that there wasn't more to it, [and that in his anxiousness to quickly get to the heart of things, [the General Counsel] hadn't overlooked anything"), and despite the reassuring reports produced by Ms. P and Ms. Q, by golly, some things of consequence were overlooked.

For purposes of this arbitration, this late realization of the obvious is important only as a further demonstration of the sloppiness and inadequacy of the Management and Grievance Investigations, and to highlight the question, why the shortcomings of the OGC and HRD efforts?[17]  The answer is complex, but in the end, clear.

---

[17]  What is not important here, played no part in deciding the issues, and was not recognized but upon reflecting back on the prolonged hearing and what was suggested by the reaction of participants in the arbitration and the overall "feel" generated by the testimony of both parties' witnesses, is the belated impression left that had the OGC and HRD gathered the facts prior to District Court discovery, and had those with the power to call the shots acted reasonably, the issues in this arbitration would have been settled, sparing the expense of 13 days of hearing and untold days of preparation and brief writing by both sides.

FMCS Case No. 03-08992
NAGE R33-77/PBGC

## Contrasts in Agency Investigations

**The Ground Rules:** Throughout its brief the Agency states and restates the claim that any questioning of the underlying Agency policy or reasoning for the priorities it set in terms of time, energy, costs and resulting intensity assigned or devoted to different employee complaints is out of arbitral bounds. Ever concerned about the Supreme Court's "strict employer liability" pronouncements in Burlington Industries, Inc. v. Ellert, 524 US 742, at 765 (1998) and Faragher v. Boca Raton, 524 US 775 at 807 (1998), it specifically notes that it is "an Arbitrator's job to interpret the [Labor Agreement], Agency policies and EEO law, [and] not to change them by imposing some new standard for 'non-sexual harassment' complaints not indicating immediate need for intervention."

With but one exception, the limitations on arbitral jurisdiction argued for by the Agency will be observed, and its adopted policies and procedures on when, where and how it devotes its investigative resources, or the actions it takes in response to the results, will not be placed in issue. They will be treated as protected "Management Rights" under 5 USC§7106(a)(2)(B), "to assign work, to make determinations with respect to contracting out, and to determine the personnel by which agency operations shall be conducted."

What is properly in issue in here is whether the Agency has consistently applied its adopted policies. Even the small exception which will be taken to the Agency's reading of Ellerth and Faragher involves a question of consistency, if not a plainly proper arbitral construction of the law.

**The Investigation of Ms. G's Complaint Against Mr. A.** The Directive on Professional Courtesy has no set procedures for investigating complaints. Rather, as it explains in its brief, the Agency practice is an ad hoc one based on experience that shows, "while some incidents are not serious enough to investigate, others [are]." It is the impossibility of objectively finding any reasons why the incident between the grievant and Mr. X was "not serious enough to investigate," but that involving Ms. G and

---

But, by the time the court discovery revelation uncovered the deficiencies of the OGC and HRD investigations, attitudes among OGC and HRD personnel toward the grievant and her complaints against Mr. X, the General Counsel, and now, them, were hardened. There is no evidence the Executive Director or the General Counsel were told of these developments, nor is there reason for any evidence on that point to be here. It's immaterial what motivates a party to push on to arbitration. Nor is it material that those within the OGC and HRD who thought more rationally, were either without authority to stop the less-clear thinking from pushing ahead, or were simply shouted down. Also of no account is that for the vindictive among the OGC and HRD staffs, who knew the costs of the fight to the Agency would be a taxpayer burden and not their's personally, there was the realization that NAGE had left the grievant to her own means, and that her own tenacity would cost her one way or another.

FMCS Case No. 03-08992
NAGE R33-77/PBGC

Mr. A was, putting biases aside.

Both Ms. G and the grievant sought redress under the Professional Courtesy Directive, expecting meaningful responses from the OGC and HRD, but their complaints were processed and disposed of quite differently. One complainant was speedily vindicated, while the other was left in further distress. At no point did OGC and HRD treat the grievant's complaint as seriously as was Ms. G's. The contrast was marked. Of all the investigations of misconduct, including those of sexual harassment, none was a more impressive demonstration of OGC and HRD investigative knowhow and resourcefulness than Mr. O's investigation into the behavior of Mr. A. Nothing in the arbitral record exceeded it. It was at the top of the effectiveness scale.

At the bottom of the scale was Ms. P's investigation of Mr. X. The Agency made no attempt to show it had ever undertaken an investigation of an employee complaint that equaled the missed cues, incompetency, and general bungling that occurred with regard to the initiation and conduct of that investigation. It was without peer. According to the Agency, the differences in what it took the complainants to get the two investigations launched, the brain power the OCG and HRD assigned to each, the instructions or guidance given, and the tenacity of pursuit, can be explained by the difference in reputations of Mr. A, whose volatile nature had generated complaints, and Mr. X, who had never before been accused of an impropriety.

But the reputation difference goes only so far. It's a valid explanation for the delay in grasping the seriousness of the grievant's charges against Mr. X, while having assumed that the charge against Mr. A was seriously based. The initial "forum invoked by the complainants" was the same. Both the grievant and Ms. G took their complaints directly to the General Counsel; Ms. G by memo, the grievant by e-mail and at the November 15 meeting. In large part because of the reputations of the accused, the General Counsel responded differently.

Without interviewing Ms. G, he immediately directed Mr. O to investigate her complaint. After reading the grievant's e-mail messages and meeting with her to hear her complaint against Mr. X, he did nothing. He did not direct any of his staff or the HRD to determine the facts because, beside the likely influences Mr. X's untarnished record had on him, as well as version of events he got from Mr. X prior to hearing the grievant's account, in the words of the Agency's brief:

> [The General Counsel] handled the [the grievant's allegations] in a low key manner. He offered a legitimate justification for his approach, namely that he did not share [the grievant]'s view that the matter was a serious infraction; rather in his view, after listening to both sides, he concluded that it was a simple communications failure.

While the grievant adamantly argues in her brief to the contrary, up to this point, and until she filed her written grievance, this difference in the General Counsel's response and that of the OGC and HRD staffs were understandable. This is so even if the grievant's emotional and animated recitation of the events of November 13 and her dissatisfaction with the lack of OGC response on November 14 and 15, can be seen as out-of-the-ordinary for her and thus suggestive that Mr. X's conduct was out-of-the-ordinary for him.

But, once the grievant's step-2 grievance was in hand, acceptable excuses for treating the two complaints differently to the detriment of the grievant's stop, and a search for pretext begins. The seriousness of the grievant's allegations couldn't be missed by Mr. N, though he could detect the flourish of Mr. A's skillful hand in its wording and immediately suspected exaggerations. It was still time to drop subjective determinations, and move to as equally an objective, hard-nose inquiry as that Mr. O conducted.

That did not happen. Instead, Mr. N assigned the confusing dual Management and Grievance Investigations to Ms. P, predetermining their outcome by imparting to her that the General Counsel had pronounced the matter a "communication failure." He knew she was more a mediator or employee relations pacifier than an investigator suited to ferret out the facts of a contentious encounter between two employees. He welcomed her mind set going in and trusted that it would not be dislodged by an investigative curiosity to read the actual grievance and pursue the leads suggested before she finished her reports. Never would similar expectations have been held for Mr. O or any other rational investigator.

Throughout this arbitration, the Agency proclaimed OGC and HRD policy to be that a "detailed and formal disciplinary investigations [will] not begin without some prima facie indicator that the result could likely lead to discipline, so as to warrant the greater expenditure of time and resources for the formality and writing required." Ms. G's complaint against Mr. A was judged as warranting "the greater expenditure of time and resources for the formality and writing required" by the report Mr. O produced. If the explicit and implicit standards of the policy were applied to the grievant's written grievance, her complaint would have more than justified the full-court-press investigation that Ms. G's complaint received, including a winning shot comparable to the interview of Ms. G's mother.

The differences between the incidents are what made the grievant's experience with Mr. X more serious than that between Ms. G and Mr. A. By any measure of plain rudeness, Mr. X beat out Mr. A repeatedly. Contrary to the Agency's assertion that Mr. A "<u>barged</u> into her office while [Ms. G] was on the phone with her mother," uninvited, the evidence reveals no such thing.

First of all, Ms. G never alleged that Mr. A "barged" into her office. In her complaint to the General Counsel, she related a peaceful, business like prelude to the incident she complained about:

> I was in my office with the door closed. I was on the telephone. There was a knock at my door, and I called out, "Come in." [Mr. A] opened the door and entered my office. I was still on the telephone and was holding the receiver in my hand. [Mr. A] handed me some correspondence in an EEO case we are currently handling. I took the letter from him and said, "Thank You."

Furthermore, the meticulously developed facts of Mr. O's step by step reconstruction of the confrontation also established that while on the phone, Ms. G "called out for [Mr. A] to come in" to her office to drop off the papers he had.

On the other hand, the grievance is clear that Mr. X was never asked to "come in," or otherwise get any closer to the grievant than her office door's threshold. It related that when Mr. X arrived and found the grievant on the telephone, she held up her hand with the index finger raised, signaling to him that she would be off the phone in a minute. But, there is no evidence that once she hung up, the grievant invited Mr. X to enter her office. Rather, since at that point Mr.X surprised the grievant with his angry accusation that she had left "the meeting before it ended," it's inconceivable that she would have asked him to draw closer with his loudly stated allegations. That he did angrily advance on her can justifiably be characterized as "barging."

Of course, no evidence of Mr. X's "barging" was developed by Ms. P and Ms. Q since they accepted unquestioningly Mr. X's assurance that he had not entered the grievant's office. Had it been questioned and his deception discovered, he would have had to answer why he entered her office rather than stay in the doorway. And whatever he answered, a question would linger. Ms. P and Ms. Q knew the grievant's office was so small that a discussion would only be conducted with the visitor standing at the threshold.

The differences in rudeness went further. Ms. G did not assert that Mr. A delivered a tirade directly in Ms. G's face, while the grievant specifically made that allegation against Mr. X. Also, Ms. G did not claim that Mr. A's utterances caused her any fright, while the grievant related in her Step-2 grievance that she was frightened by Mr. X's "keep pushing" tirade and close proximity. Certainly, an allegation of "frighteningly rude conduct" would be judged by any objective observer as exceeding the allegation of "simple rudeness" which met the OGC and HRD policy standard of "some prima facie indicator that the result could likely lead to discipline."

In so far as being an "indicator" of the seriousness of the grievant's complaint, any objective observer would find more important than differences in degrees of rudeness, the difference in the participants' relationship.  Mr. X was the grievant's superior, while neither Mr. A nor Ms G was subordinate to the other.  In his open salvo of accusations, Mr. X had an advantage over the grievant's freedom to fire back, not enjoyed by Mr. A over Ms. G.

Both Mr. A and Ms. G were well seasoned labor relation advocates, with skins toughened by their previous emotional and angry encounters which likely were more intense than anything disclosed by Mr. O's investigation of their fracas over the service of documents.  Rougher exchanges of invectives and rude behavior by both sides occurred during the hearing in the present case than anythhing alleged by Ms. G or described by Mr. O in his report.[18]

On the other hand, the grievant was a temporary subordinate of Mr. X and had no reason to have developed a comparable thick skin off which Mr. X's verbal assault could be expected to bounce without leaving abrasions.  Unlikely Mr. A's snarls and barks which were well known to Ms. G, the grievant had no reason to expect any lack of civility from Mr. X.  She hardly knew the man, and certainly not in the context of the ever present hostilities of PBGC labor relations.

There are other causes for doubting the reasons offered up for not treating the grievant's complaint as "serious."  Putting aside the finding in this arbitration that Mr. X violated the Agency's Policy on Workplace Violence, there were allegations in the grievance which should have been treated at least as "aggravating circumstances," enhancing the "prima facie indicators" of a violation of the less serious Professional Courtesy Directive, which was all the grievant wanted enforced when she met with the General Counsel.  That was the message sent to Mr. N by Mr. S in his e-mail memo immediately following the November 15 meeting.  He wrote, "she expects him [the General Counsel] to enforce the courtesy directive."

However, Mr. S's e-mail related some of the specifics of the grievant's allegations made to the General Counsel, like, "He should not have gotten one foot away from her in the confrontation."  And, on December 9, Mr. N got the written grievance with the full "specifics."  Among them were the grievant's accusation that after Mr. X entered her office and approached so close that she stood up because he had made her "uncomfortable with [his] tone of voice and proximity," and rendered her "visibly distraught and

---

[18] Always free of hearing room rudeness and scowls were Mr. Forster for Management and Mr. Jeffers for the Union, both of whom remained gentlemen and calming influences throughout. They bear no guilt for the conduct of their associates, most of whom would advance their careers by learning to smile in facing their adversaries.

upset." As Ms. P was to recognize on the stand after reading the allegations carefully, the grievant had been saying that Mr. X violated her "personal space," and for Ms. P, that made it "a more serious matter," and took the incident beyond the bounds of a simple "communications failure."

This recognition must have come immediately to Mr. N and Ms. Q. No excuses were even attempted for their missing the "prima facie indicators" of an alleged incident of rude behavior with extenuating circumstances of inappropriate physical conduct. Unlike Ms. P, they knew that among their concerns was going to be the "superior/subordinate" relationship of Mr. X and the grievant. They could not have failed to. Their combined experience and above average common sense would have failed them if they thought that any outside observer would ignore or discount it. Perhaps those qualities did fail them, but more likely they decided to rough and bluff it out should it reach the point of outside scrutiny.

Otherwise, before launching the OGC and HRD investigations, Mr. N and Ms. Q needed to make sure Ms. P understood that it was important whether Mr. X did or did not get as close to the grievant as she alleged, especially so because of their differences in rank, and she should not be satisfied with a simple denial from Mr. X without interviewing Mr. E and Mr. U, who the grievant alleged were in the area and may have seen or heard the ruckus.

Ms. P knew the difference was there, but because she received no worthwhile guidance from Mr. N or Ms. Q, she accepted Mr. X's assurance that he had spoken to her from the hallway, and had not crossed the threshold of her office. As a result, Ms. P could not picture anything untoward happening when he spoke to the grievant.

The Agency's justification for the differences in the competency and thoroughness of the two investigations was Mr. A's reputation for rudeness in dealing with Management representatives and anyone else who crossed him. His treatment of Ms. G simply presented a long overdue opportunity for Management to pounce. As it inadvertently explains in its brief, Mr. A had long been presenting himself as a target, but rarely being caught sufficiently far across the misconduct line to warrant discipline:

> While additional seriousness was given to complaints received about [Mr. A], several of the complaints were not deemed serious enough to investigate, others were investigated without further action, and several led to apologies [by Mr. A] and promises not to repeat misconduct, a warning, and a reprimand which he did not challenge.

The Agency's irritation with Mr. A is understandable. His testimony showed he enjoys the reaction he gets out of Management with the tart darts he can fling when

FMCS Case No. 03-08992
NAGE R33-77/PBGC

zealously pursuing the interests of bargaining unit members. But, the "he deserved it" aspect of the Agency's argument cannot obscure that nothing in the way of an objective analysis was made of the grievant's complaint to judge its potential seriousness, or if it was, the response was steps to ensure that an investigation minimized the seriousness.

In short, it is not enough that Mr. A had a track record of alleged overbearing conduct such as to regularly provoke a "here we go again" reaction with the OGC and HRD staffs, while Mr. X had only a reputation of being demanding and lecturing as a supervisor. The difference in their "usual personalities" does not explain away the the lack of seriousness given by the OGC and HRD once they had the specifics of the Step-2 grievance.

If this arbitration did not involve retaliation claims, it could end with the finding that the difference in the intensity of pursuit of the grievant's complaint and Ms. G's was because the target in one was a supervisor, and the target in the other was a pain-in-the-neck R3-77 steward. Fortifying that conclusion would be that the grievant's complaint was not the only case where inappropriate supervisor conduct was ignored or brushed over by the OGC and HRD.

When it comes to ignoring a supervisor's egregious conduct, nothing beats the kitten give-away poster created by Mr L, for which sexual harassment of a subordinate, the Agency took no action against him; no reprimand or counseling memo to mar his personnel file, but instead he walked away scot-free. Not only was that result remarkable as another case of how a serious complaint against a supervisor was treated, but it takes the wind out of the Agency's Ellerth and Faragher arguments which it repeatedly made in its brief and through testimony, as justification for the marked disparity between the investigative resources devoted to the grievant's complaint and those used where the conduct complained could be classified as sexual harassment.

In a recent discussion in 20 The Labor Lawyer 177 (2004) on Labor and Employment Law Decisions of the Supreme Court, devoted to last term's decision in Pennsylvania State Police v. Suder, 124 S.Ct. 2342 (2004), the effects on employers of the holdings in Ellerth and Faragher were nicely summarized:

> Where harassment results from a supervisor's official action, the employer bears a greater degree of responsibility because it empowered its 'agent to make economic decisions affecting [ ] employees under his control.'

> \*       \*       \*

> On the other hand, when a supervisor engages in harassing behavior that involves no official employment action, strict liability for the employer is less appropriate. So, for example, if a supervisor harasses an employee

FMCS Case No. 03-08992
- 63 -    NAGE R33-77/PBGC

through unwelcome verbal or physical conduct, the supervisor is engaging
in acts 'which might be the same acts a co-employee would commit
[where] the supervisor's status [would] make little difference. Further,
since the employer observes no objective signal in the change in terms
and conditions of employment in such circumstances, it has less opportun-
ity to countermand the harassing behavior. In this context, accordingly,
the employer should be liable only if the victim reported the offensive
conduct and provided the employer's anti-harassment policy a chance to
correct the problem.

Two points need to be made as they relate to the present case. First, the supe-
rior/subordinate relationship, which Ellerth and Faragher warned could give rise to
strict liability for the Agency, existed between Mr. L and Ms. I. Second, the incident
came to the attention of the OGC and HRD in 2000, two years after the 1998 decisions
in Ellerth and Faragher. These two points refute much, and weaken the rest of the
Agency's answer to the disparity in its disciplinary treatment of Mr. L and Mr. D. The
answer was:

the complaint made against [Mr. L] occurred some ten years before it was
discovered by Management, had been long resolved by an apology made
by [Mr. L], and had not been raised again by [Ms. I].

Even if the record supported, which it doesn't, the idea that the "incident" took
place way before Ellerth and Farragher, sexual harassment by a supervisor of a subor-
dinate should be of the highest concern to the PBGC, no matter when it occurred. One
would especially think so since (1) complaints about Mr. L's conduct with Ms. I on that
occasion continued to be raised after Ellerth and Farragher, and (2) strictest of strict lia-
bility flows from that involving supervisory misconduct when the employer is on notice.

But that the natural inference is that nothing was done before or after Ellerth and
Faragher because the subject of possible discipline or counseling would have been a
supervisor, is not the only thing that is important. Also important is that the Agency's
assertion that Ellerth and Farragher justified its inquisition of Mr. D on the basis of Ms.
J's complaint, and that it had nothing to do with his being an R3-77 activist, is refuted.

The reason the Agency's file on the case of Ms. J's complaint against Mr. D was
placed in evidence was the contribution it, and the accompanying tale of how the OGC
and HRD came to possess that sexual harassment complaint,[19] made to the evidence of

---

[19] In defense of its digging in the internal files of R3-77 and finding the complaint, the Agency
argues that once in the possession of the District Court, they became public records open to perusal and
copying by anyone and thus, the digging for intelligence on players within the fractious R3-77 was "law-

files. The Agency's antagonists had been swept away by the national office of NAGE. Ms. K, Mr. A, and Mr. D were stripped of their power to bring annoying grievances, and under the emergency trusteeship, the trustee had pulled the rug from under the grievant in this case, leaving her to her own wits and purse to go forward, as well as doing the same to other grievants. What more could the OGC and HRD have wanted?

The answer apparent from the testimony and demeanor of Management's witnesses is that they relished the prospects of never seeing R3-77 reemerge as the pesky organization it had been with its leadership in the hands of Ms. K, Mr. A, or even Mr. D. And if more discrediting material in the R3-77 files could be found, so the better. Its disclosure might even promote a decertification drive in the unit. In any event, it could sow further discord in the ranks.

Mr. W did not provide the specifics of what he hoped his agent would "learn from what is going on in the internal union thing." If he intended a simple "fishing expedition," then with a threatened inference of a union animus being made clear to the Agency, it needed to draw from him convincing proof that his motives had nothing to do with seeking to cripple R3-77. This, the Agency failed to do. Instead, the inference was reinforced that Mr. W's agent was sent to find what dirt she could that might be useful. That gathering such documents was "lawful" in the sense that it was not a theft,[19] does not carry the day in dispelling the inference of union animus.

But there is more to this matter. The assignment of the grievant's Step-2 grievance as the second of a confusing pair of in-house investigations, was nothing like the decisive action of the OGC and HRD in immediately contracting-out Ms. J's complaint for thorough development and prosecution. To explain the difference, the Agency invoked its anxiety over potential Farragher and Ellerth liability. Since the holdings in those cases arose from incidents of sexual harassment, as a policy matter, the Agency gives sexual harassment complaints the highest investigative priority in terms of speed, costs and other assets. No other type of complaint, it argues, warrants equal treatment.[20]

---

[19]   In defense of its digging in the internal files of R3-77 and finding the complaint, the Agency argues that once in the possession of the District Court, they became public records open to perusal and copying by anyone and thus, the digging for intelligence on players within the fractious R3-77 was "lawful." Whether or not it would pass muster with the FLRA if challenged as a U L P is not an issue here, just a fascinating question.

[20]   Of course, without going further, the treatment the OGC and HRD gave to Mr. D's complaint against Ms. AA over her e-mails containing the "Grandma's Doggy Style" video clip and a tasteless joke with sexual references, which was ignored, casts doubt on the fidelity of the Agency's concern over Farragher and Ellerth.

FMCS Case No. 03-08992
<u>NAGE R3-77/PBGC</u>

As the Agency explains, since the grievant's complaint was not a sexual harassment complaint, it got lesser attention and a less competently conducted investigation. In fact, it argues in its brief that she was lucky she got what she got:

> [The grievant] was not, by virtue of any law, policy, or contract provision, entitled to an HRD/Management investigation, yet such an investigation was done, not out of any duty owed to [the grievant], but as part of Management's independent duty to the Agency to investigate and minimize potential liability.

It's hard to know what in this statement to address and what simply to ignore. It contains both errors and admissions (not omissions, but admissions). On the matter of no "law, policy, or contract provision" requiring any investigation, the statutes the grievant seeks relief under, Title VII and the CSRA, place a burden on the employer to provide a workplace free of those practices and conduct they declare unlawful. Compliance, if it is to work, is dependent upon thorough, good faith investigations of employee complaints of violations.

Similarly, the Agency's Professional Courtesy Directive and Workplace Violence Policy would be meaningless if allegations of violations were ignored or incompetently investigated. Absent a "polite conduct" police and a "violence intervention" squad patrolling the hallways and eavesdropping on the offices and conference rooms of the PBGC, enforcement of these Agency policies is dependent upon the Agency's responsiveness to complaints.

But, enough of these aspects of the statement. What is more intriguing is its assertion that the investigation which the grievant's complaint received was not intended to determine whether she was entitled to an apology from Mr. X, or some other acknowledgment that she had been rudely treated, any one of which would probably have satisfied the grievant. Rather, the basis was to "minimize potential liability." What this suggests and what the testimony of Mr. W and others confirm, is that the Management Investigation was only undertaken to satisfy the compulsive concern that whatever took place between Mr. X and the grievant, the Agency was not open to <u>Farragher</u> and <u>Ellerth</u> sexual harassment liability.

Without directly questioning that obsession, it will simply be pointed out that the Court never said or suggested in <u>Farragher</u> or <u>Ellerth</u> that other classes of complaint were less susceptible to strict liability. Before <u>Farragher</u> and <u>Ellerth</u>, workplace violence was near the top, if not on top, of the list of strict liability concerns for employers.

It's true that few workplace violence cases have involved supervisor aggression or physical retaliation against a subordinate. But that is not a reason to dismiss the

FMCS Case No. 03-08992
<u>NAGE R3-77/PBGC</u>

possibility of the occurrence. That relationship could easily translate into "strict liability" should the supervisor strike out during a future confrontation, especially with the Agency on notice through a grievance that the supervisor had earlier become excessively angry and placed himself a bit too close to a subordinate while ranting.

The grievant laid out a "prima face" case of the violation of the Workplace Violence Policy, which the thorough fact finding of this arbitration has established. This is not intended as a hindsight judgement, but simply a confirmation that in this instance, where there was smoke in the grievance, there was fire in the facts. The smoke was there. Available to Mr. N and all others in the OGC and HRD before Ms. P and Ms. Q set out on their quests were the written allegation that:

> As [the grievant] attempted to defend herself [against Mr. X's accusations], Mr. X left her office doorway and came into her office, stood within arm's length of [the grievant] and said, 'you better not push it.' [The grievant] stood up from her chair because she was uncomfortable with [Mr. X]'s tone of voice and proximity.

> [The grievant] told [Mr. X] that she had shown him respect and requested that he give her the same respect. [The grievant], who was visibly distraught and upset by [Mr. X]'s actions, nevertheless sought to convey to [Mr. X] that she was not being insubordinate, but simply trying to explain herself against his accusations. [Mr. X] repeated several times 'keep pushing it,' in [the grievant]'s face then he turned and walked out of her office and told her it was 'over.'..    After the incident, [the grievant] was stunned and extremely upset by [Mr. X]'s actions; . . .

This was notice that Mr. X was being charged with becoming excessively angry and having gotten too close to a subordinate while venting that anger. It could not have escaped Mr. N, that the allegations against Mr. X were more serious that the General Counsel believed. But at this point, December 9 or 10, when Mr. X had not been interviewed, Mr. N cannot be faulted for deciding to commit no more resources to the dual investigations than Ms P and Ms. Q.

Because of the importance Mr. N placed on the Management Investigation, Ms. P and Ms. Q kept him advised of developments as they progressed with their fact finding. Certainly, he was keenly interested in Mr. X's version of events. So, Ms. P and Ms. Q must have reported what Mr. X had said about not entering the grievant's office and how that conflicted with the grievance statement of events. Even if Ms. P missed the conflict because she had not read the grievance, and even in the completely unlikely event Ms. Q had missed it, Mr. N was too smart not to noted the problem, and <u>Farragher</u> and <u>Ellerth</u> cannot serve as an excuse for his ignoring it.

This judgment has nothing to do with questioning the Agency policy of giving the highest priority to sexual harassment complaints when it comes to committing investigation resources. It recognizes the Management right, at its peril, to give sexual harassment complaints a higher priority than either Courtesy Directive, or even Workplace Violence Policy complaints. But that policy does not provide a <u>carte blanc</u> excuse for relegating the grievant's complaint with its clear indication that a workplace violence incident was being alleged to the bottom tier of priority when Ms. G's similar complaint came to rest much closer to the <u>Farragher</u> and <u>Ellerth</u> tier at the top. An objective assessment certainly did not warrant the Agency assessment that the grievant was lucky it got any attention at all.

It was up to Mr. N to decided which resources to match against the seriousness of a complaint. In the absence of guidance within either the Professional Courtesy Directive or the Workplace Violence Policy, it was within his discretion as to whether to bring in an outside investigator with the persuasive features used in the investigation of Mr. D, or something considerably less.

The grievant never called for, and there is nothing in the evidence to suggest that the high powered approach taken with Mr. D was needed with the grievant's complaint despite its potential of exposing the Agency to liability. Rather, what was called for was an investigation as effective as that undertaken by Mr. O in response to Ms. G's complaint of rudeness on the part of Mr. A. This does not mean that Mr. O needed to be called into service.

Mr. N could have accomplished the same degree of effectiveness simply by exercising closer supervision of Ms. P and Ms. Q. As their direct supervisor, it was Mr. N's responsibility upon learning on, or shortly after, December 12 that Mr. X was maintaining that he never entered the grievant's office, to straighten out the fumbling and bungling in the thinking of Ms. P about what was clearly before her, and get into her head that this was a serious matter, and that Mr. E and Mr. U needed to be interviewed to see if they could cast light on which of the two antagonists was "mistaken."

The first chance was not the only chance Mr. N had to straighten out Ms. P and Ms. Q. When the grievant refused a face-to-face interview on December 16, it was Mr. N's responsibility to get Ms. P and Ms. Q to focus on the written grievance as the only available alternative. If acting in good faith, he would have again pointed to its reference to Mr. E and Mr. U and emphasized the need to followed up on its. Even though had Mr. E and Mr. U only seen Mr. X standing in the hallway speaking loudly to the grievant in her office, that would not have cleared Mr. X of the grievants charge since she conceded in her grievance that Mr. X started his berating of her while still at her office threshold, but if they placed him in her office, there would be a concern that Mr. N should have wanted to know about. Instead, Ms. P was told to hold the line and tell

FMCS Case No. 03-08992
NAGE R3-77/PBGC

the grievant's representative that, in effect, a face-to-face interview or no resolution of her complaint, and on December 17, to refuse the representative's offer to convey Ms. P's or Ms. Q's questions and the grievant's answers back and forth.

There certainly must have been further opportunities for Mr. N to provide guidance as things progressed, but the last opportunity at the investigation stage would have been when he got Ms. P's report and Ms. Q's Step-2 response, both relying on the grievant's lack of cooperation as the basic justification for accepting Mr. X's version of events. Without requiring interviews of Mr. E and Mr. U, Mr. N was allowing the investigations to terminate and the potential liability of the Agency to await exposure in arbitration. No matter that the investigations were "done, not out of any duty owed to [the grievant], but as part of Management's independent duty to the Agency to investigate and minimize liability," they failed to satisfy either reason. His letting Ms. P's report and Ms. Q's response to go forward to the General Counsel raises the question fundamental to this grievance. Why did he do it?

Farragher and Ellerth cannot explain away Mr. N lack of supervision. What the evidence established was that the grievant's complaint got drawn into the web of OGC and HRD hostility toward Local R3-77 officers and their protected union activities.

The hostility of some members of the OGC and HrD toward the now deposed officers of R3-77 and their activities, and the disdain, mistrust, and wariness felt by the former R3-77 members toward those OGC and HRD personnel, were evident without testimony or documents. They permeated the hearing room, the atmosphere of which would figuratively swing from icy cold to heated anger with rarely a pause at civility when antagonists were present. And, when there were verbal exchanges, they were sharp. On and off the record, accusations of lying, slander, and libel freely flew with the grievant an active participant.[21]

These impressions were not dispelled by the testimony of the witnesses called by the vying sides. Laid bare were the perceived aggravations of one or the unfairness of the other.

The "hard" evidence of the OGC and HRD animus toward R3-77 in the form of discipline and other actions and non-actions taken by Management served to confirm the impressions. But, among the incidents discussed in the findings of fact, there was one involving Mr. N which removed any doubt about the lengths to which the OGC and HRD would go with their hostility. The incident is also important here in explaining why

---

[21] It was close to a tossup as to who had the greater emotional investment in this case, the grievant or an attorney from the OGC. Figuratively speaking, when both were present, often only claps of thunder were missing from the lighting flashes of negative regards exchanged between them.

the OGC and HRD were retaliating against the grievant in their handling of her complaint against Mr. X.

The matter was that of Ms. K and the Agency's Institutional Grievances. By reason of proximity in time (three weeks) and Ms. K being the target of the Agency's unusual action of posting throughout the building its inflammatory grievance against her, it established that the OGC and HRD, and of those who testified, especially Mr. W and Mr. N, harbored a collective grudge over the loss to R3-77 of the EEO Structure arbitration. This was not a grudge held by the General Counsel. His testimony was convincing. He was unfazed by the arbitration and general above the fray. But Mr. W and Mr. N were not.

From the grievance's inception to its conclusion Ms. K, as President of R3-77, supported the grievance and testified against the way the PBGC discharged its EEO responsibilities, as did the grievant. And, recall that when Ms. K enquired by e-mail as to who had authorized the posting of the Agency's institutional grievance throughout the Agency, it was Mr. N who took credit on behalf of the OGC and HRD by replying, "We posted the institutional grievance on the PBGC bulletin Boards."

Mr. N's hostility toward the Union, and that of Mr. W expressed in both his testimony and his actions, go to whether there was an unlawful motive behind the general lack of competency in the OGC and HRD dual Investigations, and specifically behind the Mr. N's failure to direct a self-apparent follow-up of the grievant's complaint against Mr. X. The evidence of the mental sharpness and investigative acumen of Mr. N preclude finding inadvertent oversights on his part as the reason for the failure to run to ground with independent witnesses, the issue as to which of the competing versions of the event was closest to the truth. His failure to supervise and direct was purposeful.

Mr. N on his own or with the help of Ms. Q, intentionally confused both Ms. P and the grievant as to the purpose of Ms. P's efforts, and encouraged (in the sense of never discouraging) Ms. P's natural predilection to find the root cause of human conflicts to be "failures in communications," while never encouraging her to read the grievance or assisting her in understanding that some of its allegations, if true, would indicate Mr. X's words and actions crossed the line into impermissible conduct under the Profession Conduct Directive and, more troubling, the Agency's Workplace Violence Policy.

That the incompleteness and incompetence of the two investigations were by design does not render them, or the reasons behind the design, unlawful if the objectives were no more than to paper over the General Counsel's poor judgment and to pass back to the grievant her burden to prove her account of the November 13 incident as her grievance passed to the next step toward arbitration. These are not statutorily

prohibited bases for overseeing, and even assuring a defective investigation of the grievant's complaint against Mr. X.

On the other hand, if added to the mix of motives was an intent to thwart the grievant because of her race, sex or national origin, and but for it there would have been a quick resolution of her complaint with a forced apology from Mr. X for his breach of courtesy, then a violation of Title VII would have occurred.

That, however, was not a motive the grievant proved. She failed to carry her burden of establishing even a prima facie case that the handling of her complaint against Mr. X by Mr. N, or the OGC and HRD in general, was because of her race, sex or national origin. Where she did carry her burden was in establishing a prima facie indication that Mr. N and the OGC and HRD treated the investigation of her complaint differently from the way Ms. G's complaint against Mr. A was handled because of her participation as a witness in the EEO Structure arbitration at Mr. A's behest.

That is, while the grievant did not prove that she was unlawfully discriminated against on the basis of her race, sex, color or national origin, those were not the only arrows in her quiver. Her grievance also alleges that all that befell her in the treatment of her complaint was because of her protected EEO and union activity in testifying in the EEO Structure arbitration and her later EEO complaint against an alleged hostile work environment. She failed to prove that such retaliation were motives for either Mr. X's objectionable conduct, Mr. T's unobjectionable conduct, or the General Counsel's quick rebuff of her complaint.

However, she and the testimony of witnesses for both sides, and accompanying exhibits, established that the failure of Mr. N and the OGC and HRD to undertake with the grievant's complaint anything near the thoroughly competent investigation of Ms. G's complaint against Mr. A violated 5 USC §7116(a). Piece by interlocking piece, the evidence fell together, as did the law.

First, as to whether 5 USC §7116(a) has a place in this arbitration, Issue 2 encompasses any law of the United States and poses the question whether a violation has occurred. It asks:

Whether the Agency, through the actions and/or inactions of the General Counsel and the Office of General Counsel or other components of the Agency, in response to the grievant's complaint about Mr. X's conduct on November 13, 2002, failed to comply with or violated any Labor Agreement provisions, internal rules, regulations or policies of the Agency, or the laws, rules or regulations of the United States, and if so, what should the remedy or remedies be?

Second, as for the reach of 5 USC §7116(a), in relevant part, with emphasis added, it provides:

> For the purposes of this chapter [71], it shall be an unfair labor practice for an agency ---
>
> (1) to interfere with, restrain, or coerce any employee in the exercise by the employee of any right under this chapter;
>
> (2) to encourage or discourage membership in any labor organization by discriminating in connection with hiring, tenure, promotion, or other conditions of employment;
>
> *       *       *
>
> (4) to discipline or otherwise discriminate against an employee because the employee has filed a complaint, affidavit, or petition, or has given any information or testimony under this chapter [71].

Third, §§7116(a) has been regularly invoked before the Federal Labor Relations Authority (FLRA), their primary, but not exclusive, enforcer. Arbitration is also a forum of enforcement under §7116(d), which provision the grievant invoked.[22] However, to keep arbitration awards consistent with FLRA rulings, Congress subjected arbitrators' ULP awards to FLRA review.

For that reason, arbitrators are bound by the guidance the FLRA has provided, and the most relevant with regards to the shifting burdens of proof in the present case is Letterkenny Army Depot and Int'l. Brotherhood of Police Officers, 35 FLRA 113 (1990). However, there is an important difference between Letterkenny and one aspect of this grievance which the Agency disingenuously fails to recognize in its arguments. Letterkenny was a §7116(a)(2) case. That provision makes it a ULP when an agency action serves:

> to encourage or discourage membership in any labor organization by

---

[22] Prior to deciding the issues ruled on in the June 2, 2004 Jurisdictional Award in this arbitration, the parties were asked to submit all of the grievant's administrative appeal filings. No ULP appeals appeared in the bundle, and it was §7121(d) which was the primary "election" provision of the Title 71 which received scrutiny because of the grievant's many EEO complaints. Still, because as the testimony and documents submitted at the hearing kept flowing in, it became obvious that serious ULP issues were surfacing. For that reason, the parties were asked to include in their post-hearing briefs the ULP facts and law. Neither party has raised any §7116(d) questions, so under the broad sweep of Issue 2, ULPs, or at least ULP type legal considerations, are treated as open to scrutiny.

FMCS Case No. 03-08992
NAGE R3-77/PBGC

discriminating in connection with hiring, tenure, promotion, or other conditions of employment.

On the other hand, while §7116(a)(2) is in play here by force of the grievant's allegations, she also relies on §7116(a)(4), which seems most relevant. It makes it a ULP:

> to discipline or <u>otherwise discriminate against</u> an employee because the employee has filed a complaint, affidavit, or petition, or has given any information or testimony under this chapter [71].

In <u>Letterkenny</u>, the Authority was specifically and only addressing an alleged §7116(a)(2) situation where the "discrimination" must be tied to "hiring, tenure, promotion, or other conditions of employment." It was not a §7116(4) retaliation case. By its terms, §7116(a)(4) recognizes that "discrimination" as the chosen instrument of retaliation for having filed "a complaint, affidavit, or petition, or [ ] given any information or testimony," will rarely be confined to "hiring, tenure, promotion, or other conditions of employment."[23] Less restrictive language is found in §7116(a)(4) appears designed to cover retaliation through discrimination against an employee for his or her protected activity no matter the sundry forms that discrimination might take.

And, by the context of its placement, "discrimination" as used in §7116(a)(4) must simply means being "treated different from" the treatment accorded employees not engaged in protected activity. In the case here, §7116(a)(4) covers such "discrimination," <u>inter alia</u>, as the difference in the treatment given by Mr. N and the OGC and HRD to the grievant as opposed to that accorded Ms. G when both had complaints of breaches of the Agency's Professional Courtesy Directive, with the tilt in seriousness of the alleged misconduct going to the grievant's complaint.

But having said that, despite the difference in the wording of §7116(a)(4), <u>Letterkenny</u> will be followed in identifying the stages of the shifting burden of proof, and in sifting through the evidence to determine whether the appropriate degree of persuasiveness has been met.

---

[23] This is said without certainty as to how the Authority construes the §7116(a)(2) phrase, "condition of employment," which subject to certain exceptions not applicable here, 5 USC §7103(a)(14) defines to mean, "personnel policies, practices, and matters, whether established by rule, regulation, or otherwise, affecting working conditions." This appears broad enough to cover the Agency's Professional Conduct and Workplace Violence Policies as "personnel policies . . . established by rule . . . or otherwise, affecting working conditions," here being courtesy and workplace safety "conditions."

First to be recognized is that "the burden of proof always rests with the [grievant],"[24] and that it must be satisfied by a "preponderance of the evidence." She also is required to start the process by establishing that (1) she had "engaged in protected activity," and (2) "such activity was a motivating factor in the Agency's treatment of [her] in connection with [the handling of her complaint against Mr. X]."

The grievant's "protected activity" of testifying against the Agency in the EEO Structure arbitration was established by her own testimony and that of witnesses for both sides, but also it was acknowledged by the Agency when Mr. N cited her and her testimony by name in the August 2002 Agency brief filed in that arbitration. She also established that her testimony was behind the discriminatory actions of Mr. N and the OGC and HRD in frustrating any possibility of an effective investigation of her grievance. The evidence on this point is complicated, involving as it does, Mr. A.

In the eyes of Mr. S, the grievant was contaminated by her association with Mr. A. Particularly clear from his tone of voice and general demeanor in responding to questions from the grievant, was the resentment he felt toward her reliance on Mr. A to assist in making her November 15 demands on the General Counsel to investigate Mr. X under the Professional Courtesy Directive. Mr. S had been present at the meeting and undoubtably had read the Step-2 grievance's unflattering characterization of his conduct that day.

Seeing the degree of ire in Mr. S's testimony was at first a surprise,[25] but when considered in the context of other witness testimony and documents in evidence, the reason for it became clear. It was because the grievant had been one of the witnesses relied on by Mr. A in presenting the Union's evidence in the EEO Structure arbitration. Mr. S, high in the labor relations structure, and Mr. N's immediate supervisor, "knew [about her testimony in that arbitration] long before [the] November 15 [meeting]." Mr. N, as "senior counsel" responsible for defending the Agency in that arbitration, had kept

---

[24] Letterkenny arrived before the Authority by means of the §7116(d) statutory optional route of the aggrieved employee convincing the FLRA General Counsel to be his or her champion, rather than going it on his or her own through the parties' negotiated grievance as has occurred here. For that reason, the Authority addressed the "parties" before it as the "General Counsel" and the "Respondent." Henceforth in this decision, the brackets will be dropped from quotes when "grievant" is substituted for "General Counsel" and "Agency" for "Respondent."

[25] Mr. S's open hostility toward the grievant during his cross examination became a matter of such obstruction that he had to be told, "frankly, [Mr. S] I don't understand why you are so hostile toward her questions," and shortly thereafter, both he and the grievant had to be warned, "I don't want the witness fighting with the questioner or the questioner fighting with the witness. I just want both of you to get on with it [the cross examination]." No witness wore his hostility toward the grievant and Mr. A on their sleeve more prominently than Mr. S.

him advised.

For Mr. N, it was the two-way-street nature of the relationship that fueled his hostility toward the grievant and her grievance. It was he who detected in its wording the hallmarks of Mr. A's drafting skills, revealing to him the grievant's reliance on Mr. A, and of course, having been an addressee on Mr. S's e-mail account of the November 15 meeting with the General Counsel, he knew of Mr. A's presence. This mutual reliance of the grievant and Mr. A, especially in filing of her Step-2 grievance, was recognized from top down among the staffs of the OGC and HRD, especially in the ranks of the labor relations attorneys.

However, to lock in motive, the grievant had the burden of establishing a reasonably close proximity in time between her protected activity and the retaliatory discrimination of Mr. N and the OGC and HRD. She carried this burden. Contrary to an argument advanced by the Agency, the proximity in time of the EEO Structure arbitration and the grievant's December 9, 2002 Step-2 grievance, which initiated the OGC and HRD investigations, was more than sufficiently close to meet the "circumstances" element of a prima facie showing.[26]

The grievant's testimony in the EEO Structure arbitration was on April 9 and 17, 2002, during the remedy stage of the arbitration, and it was in his August 30, 2002 brief to the arbitrator on remedy that Mr. N referred to the grievant's testimony:

> Finally, you heard from one --- and only one --- employee who claimed she did not use PBGC's EEO program out of concerns for the absence of confidentiality and reprisal. Yet her concerns do not hold up under scrutiny. With those alleged concerns in mind, she chose to speak [about her GS-13 promotion delay] to her department director, the General Counsel, directly, outside any statutory framework.

Within five months of his disparaging assessment of the grievant's testimony in a case which he lost, Mr. N had her grievance protesting Mr. X's conduct on November 13 and the General Counsel's "communications failure" judgment. By December 11, no doubt with the participation of Mr. S, who had become emotionally involved because of his resentment of the grievant and Mr. A's involvement, Mr. N made his selection of the investigation team which purposefully bore no resemblance in quality to the investi-

---

[26] Only with twinkles in their eyes could those responsible for the Agency's brief have staked out the grievant's 1999 meeting with the General Counsel about her GS-13 promotion as the starting point in measuring "reasonable proximity." Otherwise, the assertion that "a three year gap between the time [the grievant] first engaged in protected activity and the November, 2002 incident and investigation about which she complains," is a line of reasoning they expected only a dimwit to adopt.

FMCS Case No. 03-08992
NAGE R3-77/PBGC

gative resources previously unleashed on Mr. A who faced Ms. G's less serious com-
plaint invoking the Professional Courtesy Directive. He did so despite the grievance
including both alleged Professional Courtesy and Workplace Violence breaches, and Mr.
S's clear understanding of the implication of the grievant's declaration to the General
Counsel, which he had recorded in his e-mail summary of their meeting, that, "[Mr. X]
should not have gotten one foot from her in the confrontation," as well as the implica-
tions of an angry superior/subordinate encounter, including Mr. A's responsibility "to but
a damper on the situation." That was a short enough time span to hold that the grievant
established by a preponderance of the evidence each element of the ULP retaliation
motive.

Under Letterkenny, even though the grievant "made [her] 'prima facie' showing,
the Agency will not be found to have violated [§7116(a)(4)] if the Agency [has] demon-
strate[d], by a preponderance of the evidence, that (1) there was a legitimate justifica-
tion for its action; and (2) the same action would have been taken even in the absence
of protected activity."

The first burden placed by Letterkenny on the Agency is to demonstrate "there
was a legitimate justification for its action." The key word in assessing the Agency's
success is the word "legitimate." Any justification for discriminating against the grie-
vant's complaint and in favor of Ms. G's must have been "legitimate," a word that goes
beyond just not being unlawful, but also being "valid," or even, "fair."[27]

The only asserted Agency justification for differentiating between the complaints
was the OGC and HRD perceptions that Mr. A deserved anything that could be proved
against him, while Mr. X had no record comparable (or at all) to Mr. A's of alleged or
proven rudeness. That might be a legitimate consideration had the validity of both
complaints been proved, and in considering Douglas, or Douglas-like factors, disparate
penalties had resulted.

But when a non-frivolous complaint with recitation of details has been filed, it's
another thing. To relegate that complaint to an incompetent and manipulated investi-

---

[27] Beside the common sense meaning of "legitimate," there is the meaning of "legitimate" un-
der the parties' Labor Agreement. The Labor Agreement is the "law" between the parties. In Section
55.6 of the Arbitration Procedures set out in the Agreement, the parties declare they "are strongly in
favor of resolving employee complaints at the lowest organizational level [at which the complaint is
presented]." In furtherance of that objectives, and recognizing Management's frequent need for time
beyond that otherwise provided by the Procedures in order to conduct a fully responsive investigation of
the facts, another provision of Section 55.6 extends the time limits where "the supervisor needs further
information to respond" and the parties "agree a later date is appropriate." By implication, these provi-
sions recognize that a purposefully less than competent investigation of a complaint violates the Labor
Agreement, and in that sense is "not legitimate" even if the phrase equates only with "unlawful."

gation with exonerating results for the accused all but preordained, while having assign-
ed the quick wit and savvy of Mr. O to Ms. G's complaint to assure Mr. A was brought
down a notch or two, is an Agency "action" the asserted "justification" for which fails the
legitimacy test. And, the lack of its legitimacy is enhanced by the absence from Ms. G's
encounter with Mr. A of any aggravating circumstances or considerations comparable in
seriousness to those surrounding and made a part of the grievant's experience in her
encounter with Mr. X.

    The conclusion that the Agency failed to "demonstrate, by a preponderance of
the evidence" that there was a legitimate justification for its action is based on all the pro
and con evidence surrounding the Agency's asserted motive, including the summarized
history of complaints about Mr. A contained in an appendix to its brief, but nothing
more. Under Letterkenny, more must be considered:

> If, in response to a prima facie case established by the grievant, the Agen-
> cy offers evidence, it is necessary to determine whether the Agency's
> rebuts the grievant's prima facie showing. This determination is made on
> the basis of the entire record, including any evidence the grievant offered
> in rebuttal to the Agency's showing (emphasis added).

    Arguably, at the first, or "legitimate justification" step, of the two-step burden
placed by Letterkenny on the Agency, the search of "the entire record" would be limit-
ed to finding additional evidence supporting the legitimacy of the "justification" advanc-
ed by the Agency for how grievant's complaint was handled. If so, the record as a
whole discloses that, as between Mr. A and Mr. X, when they were watched and listen-
ed to during their testimony, Mr. A exceeded Mr. X in his tendency to irritate, be argu-
mentative and hair-splitting. And, other witnesses on the question testified to the same
effect about Mr. A and his propensities. But it all fell short of decisively adding enough
to validate the Agency's claimed "legitimate" justification for its action.

    The failure of the Agency to successfully rise to the challenge of the first step of its
Letterkenny burdens might excuse consideration of what is ordinarily the second step
question of whether "the same action would have been taken even in the absence of
protected activity?" However, ignoring the question and its answer, which is "yes,"
would miss why the "non-legitimacy" of the Agency's asserted justification is further
established.

    Besides the record as a whole showing the grievant had not proved a Title VII
prohibited basis for the OGC and HRD treatment of her grievance, it also showed that
just as likely as not, had the complainant been a white, native born male, without any
history of protected activity, the reactions of Mr. N and the OGC and HRD would have
been the same; protect the General Counsel from his pronouncement of a "commun-

ications failure," and send Ms. P forth to do so by finding "facts" consistent with her mind-set.

That is, the testimony of Mr. S and Mr. N, including the "body language" component of their demeanor, established that if confronted by a complaint under the same circumstances and with the same issues as those presented and raised by the grievant, without regard to the complaint's protected activity or complete lack thereof, Mr. N and the OCG/ HRD would have circled the wagons and dispatched Ms. P, no matter what. That, however, is a reaction (motive) that cannot be called "legitimate," no matter how the term is used. And, to accept this likely reaction as appropriate proof under the second step of the <u>Letterkenny</u> burden on the Agency that "the same action would have been taken even in the absence of protected activity," would hardly be what the Authority expects <u>Letterkenny</u> to produce. It would place members of Management (such as the General Counsel) and supervision (such as Mr. X) above Agency policies otherwise applicable to all.[28]

Perhaps relying on its "legitimate justification" argument to carry it through both steps of its <u>Letterkenny</u> burden, the Agency's brief points to no evidence in the record which would compel the conclusion that the same second class response to the grievant's complaint against Mr. X "would been taken even in the absence of the protected activity." To do so would require evidence that the investigation of Mr. X's alleged conduct was not without peers at the bottom of the competency scale, but lumped there with it were equally incompetent investigations of other misconduct complaints that had not made the preferential treatment cut under the OGC and HRD policy that a "detailed and formal disciplinary investigations [will] not begin without some prima facie indicator that the result could likely lead to discipline, so as to warrant the greater expenditure of time and resources for the formality and writing required."

Instead, only first class investigations, mostly of R3-77 activists such as those undertaken into the conduct of Mr. A and Mr. D, are in the record. There are plenty of misconduct complaints that fell off the scale all together, such as the ones against Ms.

---

[28] There was no other situation like that of the grievant's, where the General Counsel's premature dismissal of her complaint against Mr. X as stemming from a "communications failure" had the effect of shielding Mr. X from a serious investigation. This effect was unintended by the General Counsel whose testimony was of a sincere expectation that her complaint against Mr. X would receive a full and fair airing through either the EEO or grievance procedure, whichever she opted. The matter has been raised because the record as a whole revealed a OGC and HRD attitude that suggested that no complaint of a nature like the grievant's which came from the lower ranks of PBGC employees would have been pursued vigorously. This triggered the imagination of a novel way an agency could arguably carry its <u>Letterkenny</u>, "same action" burden. It also made apparent that besides their unlawful retaliation motive, the Management and Grievance Investigations had another overriding, non-legitimate, motive that doomed the grievant's complaint on its December 9 arrival as a Step-2 grievance in the OGC and HRD.

FMCS Case No. 03-08992
NAGE R3-77/PBGC

AA, Mr. L, and those persons listed by Mr. D as alleged political blackmailers, all judged by the OGC and HRD as not warranting investigations. But no investigations were offered that got the same second class treatment which Mr. N directed and Ms. P and Ms. Q provided. Despite Ms. P's referring in her testimony to her past experience of finding a "failure in communications" as the root cause of conflict, none of her PBGC investigative product to that effect was presented by the Agency in its defense. That left only the first class investigation of Ms. G's complaint against Mr. A with which to compare the OGC and HRD investigation of Mr. X's alleged misconduct.

In terms of "mixed motive" and "pretext," there seems no need to catagorize this case as being one or the other. However, if Letterkenny dictates that a determination be made, this would not be a "mixed motive" case. "In a 'mixed motive' case, both lawful and unlawful reasons (motives) for the Agency's actions have been established."[29] In the present case, what eliminates a "mixed motive" classification is the Agency's failure to establish any lawful motive for its different treatment of the grievant's complaint as compared to its handling of Ms. G's complaint.

For that reason, this case most resembles a "pretext" case as defined in Letterkenny where the Authority stated: "In a 'pretext' case a motive asserted by the Agency to be lawful is found to be unlawful (pretextual)." Due to the more serious nature and further aggravating circumstances surrounding the charges made against Mr. X compared to those made against Mr. A, the motive asserted by the PBGC (Mr. A had long been found by the OGC and HRD to be short on manners in tense situations, while no such perception of Mr. X had been established) was a pretext for the difference in the treatment of the two complaints.

Recognizing the ultimate burden of proving by a preponderance of the evidence that the Agency violated 5 USC §7116(a)(4) rested with the grievant, and considering it a hard one to bear, the record as a whole established that she carried her burden.

However, before concluding that no further violation of §7116(a) is to be found, it appears there is one. It is compelled by §7116(a)(1), which makes it a ULP:

> (1) to interfere with, restrain, or coerce any employee in the
> exercise by the employee of any right under this chapter;

The event is disclosed and documented in the record, but neither party addressed it in its brief as a ULP, nor was the perpetrator, Mr.X, motivated to retaliate against

---

[29] It is a standard relatively easily applied in a disciplinary case where there is a legitimate motive for a five day suspension (e.g. third time caught sleeping on the job after prior written warnings), and a non-legitimate reason (annoying union steward).

the grievant because of her protected EEO Structure arbitration testimony, since he knew nothing of it and was unaffected by it.

The incident in question occurred when Mr. X responded to Mr. Y's inquiry about the performance of his employees while under the temporary supervision of Mr. X. The information was specifically sought by Mr. Y to assist him in preparing the annual performance appraisals of his employees. By e-mail, Mr. X advised:

> Turnabout is fair play, right? Your folks were likewise pleasant and self-sufficient with one noted exception, [the grievant]. Her performance in the [TRW] case in the area of following-up with the client [CFND] and accepting and responding appropriately to supervisory feedback was absolutely unacceptable. We should talk about how that will be reflected in her [performance appraisal], as I didn't and still don't care for her over-the-top reaction.

As discussed earlier in the course of determining Mr. X's "temperament," the text of the e-mail, and evidence on the question as a whole, established that his statement, "turnabout is fair play, right?," and the phrase, "her over-the-top reaction," referred not only to the grievant's November 13 - 15 complaints to the General Counsel, but also her subsequent grievance in which she asked that Mr. X be disciplined for his discourtesy and threatening conduct.

Mr. Y did not take any action against the grievant based on Mr. X's assessment, but that is not required for the message to be a ULP. As a general matter, a true "no, no" among ULP conduct is to reference a protected activity, such as here, the filing of a grievance, as a negative consideration in an employee's job performance appraisal.

However, there is no per se Authority condemnation, nor is the affected employee's reaction determinative, although here the grievant introduced Mr. X's e-mail in part for the "chilling effect" she claimed it had on her because of her continuing concern at the time it was sent that Mr. X's statements of "keep pushing it," his pledge to report her conduct to Mr. Y, and his parting shot, "it's over," all referencing the frail prospects, as she understood them, of her continued PBGC employment.

Rather, in 1990 the Authority cleared the air when in EEOC, Jackson Area Office and National Council of EEOC Locals 216, AFGE Local 3599, 34 FLRA 928, 932-33, it stated the proper test to be: "whether, under the circumstances, the statement could reasonably tend to interfere with, restrain or coerce employees in exercising their rights under the Statute."

Applying that test here, an employee regularly or temporarily under the supervision of Mr. X, knowing of his reaction to the filing of a grievance against him, could "reasonably tend" to be "restrained" in the exercise of his or her right to file a grievance over any matter which was liable to place a burden on Mr. X, or heaven forbid, irritate him. Accordingly, the Agency will be held to have violated §7116(a) as a result of Mr. X's e-mail, especially with its venomous tone.

As for Labor Agreement violations tied in with the Agency's ULP conduct, besides its violation of Article 55 which has already been noted, there are three other Labor Agreement violations committed by the Agency in the OGC and HRD handling of the grievant's complaint against Mr. X. First, by force of the findings that the OGC and HRD was retaliating against the grievant because of her statutorily protected activity of testifying in the EEO Structure arbitration, necessarily, it also violated Article 2, Section 2.1, which in material part states:

> Section 2.1 . . . Employees who have relevant information concerning any matter for which remedial relief is available under this Agreement will, in seeking resolution of such matter, be assured freedom from restraint, interference, coercion, discrimination, intimidation or reprisal.

Second, the Agency has violated its explicit and implied pledges in the Agreement to evenhandedly enforce its policies, rules, and directives. Specifically, by its failure to take seriously the grievant's claim made in her grievance that Mr. X's conduct violated the Agency's Workplace Violence Policy, it ignored that Policy's declaration that "all reports of incidents will be taken seriously and will be dealt with appropriately," thereby violating at least Sections 42.1(A): "The Employer will provide a safe and healthy work environment for employees," and 42.2, "employees are encouraged to inform the Employer of any unsafe or unhealthy practice."

Third, by discriminating against the grievant in the design and execution of the investigation of the her complaint, which among other claims alleged violations of Title VII and retaliation for engaging in protected activities, the Agency violated Article 5, Section 5.7, which provides:

> Section 5.7 Any employee seeking to file [an EEO] complaint shall be free from restraint, coercion, interference, reprisal or further discrimination. . .

### Title VII Defense and Claims

As counterintuitive as it seems, the Agency's argument that the grievant's Title VII claims are barred in this arbitration needs to be addressed first.

**The Agency's Title VII Defense**.  After the hearing in this arbitration ended, the grievant move for and was granted a voluntary dismissal with prejudice of her Title VII suit in District Court.  The Agency argues that her voluntary action bars any further pursuit in this arbitration of the grievant's allegations of unlawful Title VII discrimination. Specifically, it urges that:

> The Judge's Order in the civil action operates as an adjudication on the merits in PBGC's favor on [the grievant]'s Title VII claims.  And, consistent with its [previous] Motion to Dismiss this arbitration, PBGC preserves its argument that, as a matter of law, the events of November 13, 2003, and PBGC''s response thereto, were covered by the district court complaint, and by discovery and PBGC's Summary Judgment Motion in that action, and thus were adjudicated in PBGC's favor as part and parcel of the Judge's Order dismissing the case with Prejudice.  Accordingly, although non-Title VII issues remain in this arbitration proceeding, PBGC submits that [the grievant]'s voluntary dismissal with prejudice of her district court discrimination complaint, precludes a finding of discrimination or reprisal in violation of Title VII on the facts alleged here.

Since arbitral jurisdiction can be questioned at any time, the Agency will not be taken to task for presenting its same underlying argument a second time when a turn of events presented the opportunity.  But, like with its first presentation, the second try is also rejected for lack of merit.  As was explained in the June 2, 2004 Decision on Arbitral Jurisdiction, whether the parties or the arbitrator like it or not, 5 USC §7121(d) set the rules, and the sequence in which the grievant filed her various EEO complaints and her grievance determined the outcome.

The §7121(d) rules are simple.  An employee with a complaint over an EEO "matter" which can be processed either through the Agency's statutory EEO procedures or through the negotiated grievance procedure, can elect one or the other route, but not both over the "same matter;" and when both are attempted, the first forum to get a written and signed complaint or grievance has exclusive jurisdiction over that "matter."

Relevant to the Agency's argument, the sequence of filing began with the grievant's written and signed, October 3, 2002 EEO complaint filed with the Agency's EEO Office, for which she later got a right to sue letter or other authorization to take it to District Court without further ado within the Agency.  Subsequent to the filing of that EEO complaint, the November 13, 2002 incident with Mr. X occurred, as did the General Counsel's and the OGC and HRD responses to that incident.  Upset with Mr. X's conduct and dissatisfied with the responses thereto, the grievant elected to complain about those "matters" by filing her written and signed, December 9, 2002, Step-2 grievance on which this arbitration is predicated.

Next in the order of her filings, on December 11, the grievant ignored the §7121 (d) prohibition against a double filing, and two days after filing her Step-2 grievance, filed an EEO complaint with the intent to tack on to her October 3 EEO complaint the November 13 incident with Mr. X and the November 14 and 15 handling of her complaint about Mr. X by Mr. T and the General Counsel, as further examples of the "hostile work environment" she had claimed in her September 3 EEO complaint. Then, to top it off, the grievant raised the "matters" of Mr. X, the General Counsel, et al., in the District Court, and under the liberal discovery allowed by the Federal Rules of Civil Procedure, proceeded to take the depositions of Mr. X and others to develop, in effect, her case in this arbitration.

In the Decision on Arbitral Jurisdiction, jurisdiction over the "matters" of Mr. X's conduct and the General Counsel's response thereto, and thereafter the OGC and HRD responses to both, were found to lie solely in the present forum of arbitration. This was so because, sequentially, the conduct and actions grieved occurred after the grievant's October 3, 2002 EEO complaint with its "hostile work environment" claim and were not embraced by or brought into the orbit of that earlier claim which was based on pre-October 3 events involving different people, different conduct and actions, different facts, etc. In short, jurisdiction did not lie with the District Court under the definitions given "matter" in Facha v. Cisneros, 914 F.Supp. 1142 (E.D.Pa. 1996) and Dept. of Treasury, Oxon Hill and NTEU, Chapter 65, 56 FLRA 292 (2000), which cases were found most persuasive.[30]

In conference with the parties prior to the issuance of the Decision on Arbitral Jurisdiction, the Agency's exasperation with what was going on in the District Court discovery process were sympathetically heard. However, in the Decision the Agency was told:

> Although an issue solely to be decided by the District Court in the litigation before it, and not by this arbitrator, it follows from what is decided here that §7121(d) also means there is no jurisdiction in that court to pass on the merits of the grievant's claims arising from the November 13,

---

[30] As an aside, during the hearing on the merits a document surfaced demonstrating the all around utility which the Agency found in §7121(d). On January 16, 2003, when Mr. M, an Agency EEO investigator sough to pursue his investigation of the grievant's informal EEO complaint to determine the facts about what occurred on November 13, 2002 between her and Mr. X, Mr. P, Senior Counsel to the Principal Deputy General Counsel, sent him an e-mail blocking him from interviewing any witnesses. Mr. P's asserted basis was that the grievant had first filed a written grievance over the matter, and under the Labor Agreement, which tracks the provisions of §7121(d), the EEO complaint Mr. M was handling was a nullity. Mr. P took this position before the Agency asserted one to the contrary in this arbitration, and then in the District Court, back to that raised by Mr. P with Mr. M, , all intended to block a determination of the grievant's complaints against Mr. X, et al., on their merits in any neutral forum.

2002 incident with Mr. X, or from the General Counsel's response.

*        *        *

As for the Agency's concern that it is being forced to defend against the November 13 and 15, 2002 incidents both here and in the ongoing discovery phase of the grievant's Title VII suit, there is nothing that can be done here about that. By shutting out any intent the grievant might have had to inject into this arbitration matters covered by her October 3, 2002 EEO complaint, and limiting the purposes to which even the mention of an event preceding that date involving her and Mr. X or the General Counsel can be used, all in the way of "protective orders" an arbitrator has authority to grant have now been issued [by me].

The Agency has raised in the District Court the issue of the force and effect of §7121(d) on the litigation before it, and it is in that forum that the Agency should seek such protective order or other measures based on §7121(d) it deems necessary and appropriate to shut the grievant off from those of her discovery activities the Agency finds objectionable. It is certainly not for an arbitrator to interfere in that litigation, much less to dictate what the District Court can allow in the course of discovery and later consider in the case before it.

Thus, since under §7121(d) the District Court never had jurisdiction over the Title VII issues raised in this arbitration, the dismissal of the grievant's Title VII action with prejudice in that forum does not disturb the jurisdiction had here, including that had over her Title VII claims based on Mr.X's conduct and the General Counsel's response to it, as well as based on the OGC and HRD handling of the investigations of her grievance.

**The Grievant's Title VII Claims**. In mounting her Title VII assault in this arbitration, the grievant spared only her religion as a basis for alleged discrimination by Mr. X, Mr. T, the General Counsel, and the OGC and HRD. As is, all but one of her Title VII claims have been denied because the grievant failed to carry her burdens of persuasion and proof to even the prima facie level with regard to her race, sex, color, or national origin. Even with the remaining claim of retaliation for protected EEO activity, Mr. X, Mr T. and the General Counsel have been cleared for lack of evidence that their actions were motivated by an invective determination to respond to either her EEC complaint or her earlier testimony in the EEO Structure arbitration. That leaves Mr. N, Mr. W. Mr. S, and others in the OGC and HRD, with the remaining questions of whether they violated 42 USC §2000e-3(a), which in its application to the Agency as an "employer" provides:

FMCS Case No. 03-08992
NAGE R3-77/PBGC

It shall be an unlawful employment practice for an employer to discrimi-
nate against any employee [ ] because he has opposed any practice made
an unlawful employment practice by this subchapter [2000e], or because
he has made a charge, testified, assisted, or participated in any manner in
an investigation, proceeding, or hearing under this subchapter.

The fact questions posed by §2000e-3(a) are answered as they were in the discus-
sion of ULPs. Not surprising, what the FLRA set out in Letterkenny on the shifting bur-
den of proof in ULP's cases closely parallels that set out for intentional Title VII discrimi-
nation by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 US 792, 802
(1973). As in Letterkenny, the McDonnell Douglas burden is first on the grievant (or
complainant, or plaintiff) to establish a prima facie case of protected class membership,
and that he or she was treated differently than a non-member of the protected class for
no discernable reason other than the unlawful discriminatory motive charged. If a
prima facie case is made, the burden shifts to the Agency "to articulate some legitimate,
nondiscriminatory reason for the [action, or inaction, taken against the complainant].

As already found:

1. The grievant testified for Mr. A in the EEO Structure arbitration;

2. That testimony was resented by the OGC and HRD, and especially by Mr. S
and Mr. N who lost the EEO Structure arbitration case. That resentment was likely
enhanced by the grievant's later reliance on Mr. A to assist her in presenting her com-
plaint against Mr. X to the General Counsel;

3. When the grievant presented her complaint against Mr. X, and the failures of
the General Counsel and the OGC and HRD to respond to that complaint as a formal
Stp-2 grievance in order to force an investigation, Mr. N assigned Ms. P and Ms. Q,
knowing it would bear no resemblance to the competence and effectiveness of the
investigation of Ms. G's complaint against Mr. A;

4. The close "temporal proximity" between the grievant's testimony, most
recently referenced in the Agency's August 30, 2002 brief filed in the EEO Structure
arbitration and Mr. N's assignment of Ms. P and Ms. Q to investigate the grievant's
grievance, established a nexus between the two, establishing a prima facie case of
retaliation;

5. The Agency asserted what it claimed was a "legitimate justification" for the
disparity in the quality and effectiveness of the two investigations;

6. The Agency's asserted reason was a pretext intended to mask the real, non-

legitimate motive of retaliation or reprisal for the grievant's protected union activity of testifying in the EEO Structure arbitration;[31] and,

     7. By a preponderance of the evidence, the grievant established a ULP had been committed by the Agency.

     By carrying her ultimate <u>Letterkenny</u> burden of proof, so too did the grievant carry her <u>McDonnell Douglas</u> factual burden. See, <u>Dept. of Commerce, Patent and Trademark Office and NTEU Chapter 243</u>, 52 FLRA 358 (1996), involving an EEO grievance taken to arbitration which had proof issues similar to those raised here and in which the Authority applied <u>McDonnell Douglas</u>.

     That leaves two questions of law. The first is whether the grievant's protected §7116(a) union activity of testifying in the EEO Structure arbitration also qualifies as protected 42 USC §2000e-3(a) Title VII activity. The answer is in the affirmative. The grievant's testimony in the EEO Structure arbitration was about her fear to file an EEO complaint with the Agency. Under regulations making Title VII applicable to federal employment, an initial filing with the alleged discriminating Agency is required to perfect a complaint over which either the EEOC or the courts will later have jurisdiction.

     The PBGC practice of structuring and manning its EEO complaint processing procedures in a manner so related to its labor and employee relations apparatus as to make employees fearful of that initial filing, was a "practice made an unlawful employment practice by [§2000e]" through its implementing regulations. Thus, the grievant's testimony was an action taken by her in opposition to the practice.

     As the Award in that arbitration states, the purpose of the grievance was to force the Agency to comply with 29 CFR Part 1614. Compliance with those regulations, and the further implementing Management Directives issued by the EEOC, is mandatory for the PBGC, and noncompliance by the PBGC was tantamount to noncompliance with Title VII. But even if her and the arbitral analysis of the law was and is incorrect, retaliation for providing testimony in a proceeding over the matter is a §2000e-3(a) protected activity. That's to say, the grievant was engaged in a Title VII protected activity when she "testified, assisted, [and] participated . . . [in a] proceeding, or hearing under this

---

[31] Just as with <u>Letterkenny</u>, it was recognized in assessing the evidence that the Agency "need not persuade the [arbitrator] that it was actually motivated by the proffered reasons, [but that] it is sufficient if the [Agency's] evidence raises a genuine issue of fact as to whether it discriminated against [the grievant]." <u>Texas Department of Community Affairs v. Burdine</u>, 450 US 248, 254-55 (1981).

subchapter [2000e of Title VII]."[32]

     The last remaining question is whether discrimination in the form of treating the grievant's complaint disadvantageously when compared with the treatment accorded Ms. G's complaint against Mr. A is discrimination under §2000e-3(a). Here too, the answer is, "yes." To start with, unlike much of the rest of Title VII which subsections are confined "discrimination" to that in hiring, discharging, and matters of "compensation, terms, conditions, or privileges of employment," for example in §2000e-2, §2000e-3(a) is unrestricted. On its face, and by its plain language, it bars any kind or type of discrimination when motivated by retaliation.

     But, because that discrimination could be ever so trivial, its boundaries are confined to something of reasonable substance. That does not mean at the "liability" stage the grievant need to have shown she suffered statutorily recoverable damages, just that an illegal act under Title VII occurred. In its Compliance Manual, the EEOC rejects the limits such as argued for by the PBGC, and takes the position that an "adverse action" taken against a complaining party such as the grievant "need not qualify as 'ultimate employment actions' or materially affect the terms or conditions of employment to constitute retaliation." Quite rightly, beyond the immediate effect on the grievant of an act of illegal reprisal, there must be a concern based on the statute's "complaint filing" reliance on enforcement. Much like the FLRA in its treatment of §7116(a) ULPs, the Commission has recognized that for Title VII to be effective:

> The statutory retaliation clauses prohibit any adverse treatment that is based on a retaliatory motive and is reasonably liable to deter the charging party or others from engaging in protected activity. Of course, petty slights and trivial annoyances are not actionable, as they are not likely to deter protected activity. More significant retaliatory treatment, however, can be challenged regardless of the level of harm [to the grievant].

     Of Title VII's prohibited areas of discrimination, courts have looked to §2000e -2's prohibition against an employer's discriminating with respect to an employee's "terms, conditions, or privileges of employment,' with emphasis on the "privileges of employment" aspect. In Hishon v. King & Spalding, 467 US 69, 74-5 (1984), the Court explained the breadth of the "privilege of employment" prohibition:

---

[32] Eliminated as a retaliatory motive is the grievant's October 3, 2002 EEO complaint over a hostile work environment. Mr. S convincingly testified that he knew nothing about it at the time of her December 9, 2002 grievance, and there was no evidence that notice of it had emerged from the Agency's EEO process to the attention of Mr. N or anyone else in the OGC or HRD of consequence, by December 11 when Mr. N decided to cripple the investigation of the grievant's complaint by assigning Ms. P and Ms. Q, and giving Ms. P his misleading instructions.

An employer may provide its employees with many benefits that it is under no obligation to furnish by express or implied contract. Such a benefit, though not a contractual right of employment, may qualify as a 'privilege' of employment under Title VII. A benefit that is part and parcel of the employment relationship may not be doled out in a discriminatory fashion, even if the employer would be free under the employment contract simply not to provide the benefit at all. Those benefits that comprise the 'incidents of employment,' S. Rep. No. 867, 88th Cong. 2d Sess., 11 (1964) or that form 'an aspect of the relationship between the employer and employees..' Chemical & Alkali Workers v. Pittsburgh Plate Glass Co., 404 US 157, 178 (1971), may not be afforded in a manner contrary to Title VII. [footnotes omitted]

An example of a privilege of PBGC employment might be found in the enhanced security measure it takes by locking its restrooms. The "privilege" is a key. If the grievant was denied a key in retaliation for her EEO Structure testimony, that would be an adverse action that would meet the Hishon test. Even though she would be allowed to use the bathrooms as sanitation and health laws dictate, she would be relegated to the status of a visitor, such as an arbitrator, who must beg to borrow a key from a privileged employee, or wait at the restroom door for the appearance of such an employee and "breach security" by a surreptitious entry on their heals.

This dependency on others in order to get into a bathroom, would not likely be treated as a "petty slight or trivial annoyance" by the EEOC and the courts in a Title VII retaliation case, or as such by the FLRA in a ULP case of reprisal for protected union activity. While other employees might initially find the plight of the grievant's "keyless" state comical, its chilling effect would quickly set in if the prospect of filing their own Title VII or ULP charge, or engaging in any other protected activity, was their substitution in her place.

For any of the forums mentioned to find this key-denial action as too insignificant to violate an anti-retaliation provision of a statute entrusted to its enforcement would require rejecting the idea that the whole reason for the provision was to ensure "unfettered access to statutory remedial mechanisms," and to ignore that no matter the degree or quality of harm to the grievant, "retaliation harms the public interest by deterring others from engaging in what Congress has designated in various statutes [the NLRA, FLSA, etc.] as protected activity." Robinson v. Shell Oil Co., ___ US ___, 117 S.Ct. 843, 848 (1997).

So too would the primary purpose of 5 USC §2000e-3(a) have to be ignored if the OGC and HRD action taken with regard to the grievant's complaint against Mr. X in retaliation for her protected activity in the EEO Structure arbitration were discounted in

this arbitration. The chilling effect not only on her but any other employee who might be called on to testify against the Agency in an EEO related proceeding before an EEOC AJ or an arbitrator is self evident. To paraphrase the FLRA in EEOC, Jackson Area Office, "under the circumstances, the [action would] reasonably tend to interfere with, restrain or coerce employees in exercising their rights under the Statute."

Of course, in Hishon, the plaintiff alleged sex discrimination when she was not advanced from "associate" attorney to "partner" by her employing law firm. This adverse action was arguably more severe in its consequence for her than was the OGC and HRD action of relegating the grievant's complaint to a level of investigation and follow-through designed to assure it would go nowhere. But on the other hand, because Hishon was not a retaliation case, it lacked the broader statutory policy considerations of cases which are, and therein lies the reason why its explanation of what can constitute a "privilege of employment" is all the more relevant here.

There is another difference between there and here. There, as the Court's discussion disclosed, Hishon lacked the strength of evidence to establish more than an implied "privilege" of employment. Here, the evidence established an explicit "privilege" of employment. As already noted, the Agency's Workplace Violence Policy pledged that "all reports of incidents will be taken seriously and will be dealt with appropriately." The pledge in the Profession Courtesy Directive was almost as explicit, "PBGC will not tolerate discourteous behavior and other forms of incivility which constitute unprofessional behavior and unacceptable conduct."

## Award

On the basis of the foregoing findings of fact and the conclusions of law drawn from the parties' Labor Agreement and statutes of the United States:

**Issue 1**, the grievance against **the conduct of Mr. X** on November 13, 2002 during his confrontation with the grievant over her abrupt departure from the TRW meeting and her failure to attend the OGC/CFND post-meeting conference is **granted** in so far as Mr. X is found to have violated the **PBGC Professional Courtesy Directive**, and the **PBGC Workplace Violence Policy**, the appropriate applications of which can be sought through the grievance procedures of the Labor Agreement as construed here.

**Issue 1**, the grievance against the **conduct of Mr. X** on November 13, 2002 during his confrontation with the grievant over her abrupt departure from the TRW meeting and thus her failing to attend the OGC/CFND post-meeting conference, is **denied** in so far as Mr. X is found not to have violated **Title VII** of the Civil Rights Act of 1964 as amended (42 USC §2000e-16).

**Issue 2**, the grievance against the **conduct of Mr. T** on November 14 and 15, 2002 concerning the e-mail complaints and requests he received from the grievant while he was service in the place of the General Counsel is **denied** in its entirety because Mr. T is found not to have violated **Title VII** of the Civil Rights Act of 1964 as amended (42 USC §2000e-16), the **Civil Service Reform Act** (5 USC §7116), or any provision of the parties' **Labor Agreement**.

**Issue 2**, the grievance against the **conduct of the General Counsel** on November 15, 2002 during the meeting he held with the grievant is **granted** in that he is found to have violated the <u>**PBGC Professional Courtesy Directive**</u>, the enforcement of which can be sought through the grievance procedures of the **Labor Agreement**.

**Issue 2**, the grievance against the **response of the General Counsel** on November 15, 2002 to the e-mail complaints and requests he received from the grievant before and during the meeting he held with the grievant is **denied** in that he is found not to have violated **Title VII** of the Civil Rights Act of 1964 as amended (42 USC §2000e-16), the **Civil Service Reform Act** (5 USC §7116), or any provision of the **Labor Agreement**.

**Issue 2**, the grievance against the **conduct and actions of the Office of General Counsel and the Human Resource Department of the PBGC** following the filing of the Step-2 grievance by the grievant on December 9, 2002 is **granted** in that they, and thereby the Agency, are found to have violated the **Civil Service Reform Act** (5 USC §7116), and **Title VII**, since the evidence was that they were aware of the grievant's protected activity of testifying in the EEO Structure arbitration, which was over the Agency's compliance with implementing regulations of Title VII, as applicable to it, and retaliated against her because of it in violation of both statutes.

## <u>Remedies</u>

Up to the point of this Decision on Agency Liability, this arbitration has been limited to the question of "liability," with the grievant halted from making any more than a minimal showing that she suffered emotional and physical effects from the discriminatory treatment she received from the OCR and HRD which have required medical and other professional attention. By advance agreement of the parties, the arbitration was bifurcated with the present liability stage being decided in advance of any consideration of what remedies, if any, are available.

This is consistent with the common practice in federal sector arbitration, and has been approved by the FLRA numerous times. It is also common in Title VII retaliation cases within that sector to note that "the question of statutory violation and appropriate statutory remedy are conceptually distinct. An illegal act of discrimination -- whether

based on race or some other factor such as a motive for reprisal -- is a wrong in itself under Title VII, regardless of whether that wrong would warrant an award of [damages]." Smith v. Secretary of the Navy, 659 F.2d 1113, 1120 (DC Cir. 1981).

By separate letter orders and rulings, the parties will be given conference, briefing, document submission, and hearing schedules and dates as determined necessary and appropriate for the rapid and more economical resolution of the final stages of this arbitration.

### Retained Jurisdiction

For purposes of allowable correction of typographical, nonmaterial factual and mathematical errors (especially in reference to the coded identifications of persons), and for purposes of deciding the Remedial Stages of this arbitration, jurisdiction is retained.

**DONE**, this 26th day of April, 2005.


Robert T. Moore
Arbitrator