*See pages 29-38*

IN THE MATTER OF: )
)
National Association of Government )
Employees , Local R3-77 )
           Union )
   and )    FMCS Case No. 000707-12746-A
)
Pension Benefit Guaranty Corporation, )
       Agency )
)

## APPEARANCES

**For the Union**
Edward J. Smith, Esq.
Washington D.C. Regional Counsel
National Association of Government Employees

Assisted by - Stuart Bernsen, Esq.
      Executive Vice President Local
      and Chief Steward

**For the Agency**
Richard M. Lattimer, Jr., Esq.
Senior Counsel
Pension Benefit Guaranty Corporation

Assisted By - Ray Forster, Esq.
      Office of General Counsel
      Pension Benefit Guaranty Corporation

**IMPARTIAL ARBITRATOR**
Gloria Johnson, Esq.

## ARBITRATOR'S DECISION

## I.   INTRODUCTION

The instant case involves an institutional grievance filed on April 21, 2000, by National

Association of Government Employees (hereinafter, NAGE, Union), against Pension Benefit

Guaranty Corporation (hereinafter, PBGC, Management, or Agency) challenging PBGC's

alleged failure to "provide an independent and neutral EEO function for the fair and impartial

processing of EEO complaints in violation of 29 CFR §1614(a)(2) and the collective bargaining agreement sections 4.1, 5.1, 5.2 and 5.7."

A hearing was conducted in the matter by the undersigned Arbitrator at the Agency's facility in Washington, D.C., on January 11, 12 and February 27, 2001. Both parties were given a full and fair opportunity to submit documentary evidence, oral testimony and post hearing briefs.

After the second day of hearing, the Agency filed a motion to dismiss (dated February 14, 2001). The Union did not respond in writing, prior to the hearing. It made oral representations during the February 27, 2001 hearing and indicated it would provide a written response at the time post hearing briefs were submitted. At the time the Union responded to the Agency's motion to dismiss, it also filed a motion to compel the production of documents that it had previously requested on December 18, 2000. The Union maintains that documents produced by the Agency during the hearing were insufficient. Further, the Union claimed that Management continues to violate the requirement that EEO be an independent function and in the event the Arbitrator should find that the revised system still does not meet the parameters required under EEOC MD110, then - the Union has the right to receive documents that show : 1. The Agency's EEO program violates EEOC regulations and  2. To establish remedial entitlement, if any.  In that regard, the Arbitrator was asked by the Agency to keep the record open in the event the motion to dismiss is denied and the Union's Motion to Compel is granted; i.e., to allow the Agency additional time to amend the record.

The parties elected to file post-hearing briefs. They were timely received by the Arbitrator.

## II.    RELEVANT FACTS

The background and grievance procedure were set forth in stipulations executed by the

parties on January 12, 2000, which is incorporated herein by reference.

## III.    ISSUE

Did the agency fail to provide an independent and neutral EEO function for the fair and impartial processing of EEO complaints in violation of 29CFR, and sections 4.1,5.1, 5.2 and 5.7 of the collective bargaining agreement ?  If so, what is the appropriate remedy?

## IV.    PRELIMINARY MATTERS - PROCEDURAL ISSUES

As preliminary matters the Arbitrator will decide the Agency's Motion to Dismiss and the Union's Motion to Compel the Production of Documents.

### A.    AGENCY'S POSITION

A Motion to Dismiss was filed February 15, 2001 by PBGC challenging the arbitrability of the grievance on the basis that it was:

a.    Untimely filed

b.    Waived

c.    Collaterally estopped and

d.    Moot

The Agency argued that it did not file the motion to dismiss prior to the hearing, because Management did not understand until the Union clarified (during the hearing) that it is not claiming a specific harm, rather employees were harmed by the chilling effect of Management's failure to separate its EEO function.  Management asserted that the Union's grievance should be dismissed as timely and failing to properly raise issues.   Additionally, Management pointed out that assuming *arguendo* that the EEO functions previously were not maintained separately, the new organizational structure makes the Union's argument moot.

Further the Agency argued that the Union can not challenge the structure of the EEO

program prior to April 7, 2000; i.e., ten (10) days before the date of the institutional grievance. The Agency argued also argued that the Union (Local R3-77) has no standing to challenge matters that existed in the EEO program for several years that were previously not challenged by the predecessor Union (NTEU). Specifically, the Agency argued that the structure of the EEO complaints adjudication system and the process of handling the complaints was a "condition of employment" over which a Union waives its right to bargain; if it does not notify an Agency pursuant to 5 USC§7102(2) when it becomes aware of a change in working conditions.

Agency Management argued that NTEU represented PBGC's employees when the EEO complaints adjudication system was created. That is the same structure that existed in April 2000, when the Union (NAGE) filed its institutional grievance. Management further argues that its EEO program was created pursuant to a 1992 corporate directive. Allegedly, the predecessor union NTEU did not challenge the EEO structure during its 1995 negotiations with PBGC. Thus, since the 1992 EEO Directive existed at the time NTEU completed its negotiations with PBGC, arguably they ratified the EEO Directive when they ratified the 1995 collective bargaining agreement. Since NTEU did not challenge the EEO system, the Agency contends the successor Union NAGE is precluded from challenging the program. Management further argued that NTEU and not NAGE had authority to challenge the EEO structure as it existed prior to April, 2000. The Agency stated, "To allow Local R3-77 to challenge the Corporation's EEO structure years after it had been put in place would undermine the stability inherent in the federal-sector-labor-management relations process and thwart Congress' purpose in enacting the Federal Service Labor Management Relations Statute"[1].

PBGC argued that it has changed its structure such that it is currently in compliance with

---

[1]PBGC Motion to Dismiss dated February 14, 2001; page 7

EEOC Directive MD110. However, it asserted that each individual employee complainant who previously filed an EEO complaint could have raised the current challenge regarding the neutrality of the EEO program. Those employees were represented in their EEO matters by either the predecessor NTEU, or the current Union NAGE. Thus, the Agency contends NAGE is collaterally estopped from attempting to raise an argument it could have raised during the initial processing of those previously filed individual complaints. The Agency seeks to stop the Union from asking an Arbitrator review their members-employees' closed EEO complaints.

## B.     UNION'S POSITION

NAGE responded in writing to the Agency's February 14, 2001 motion to dismiss on April 13, 2001; arguing that the Employer violated the collective bargaining agreement when it violated a government regulation. The Union pointed out that it had responded verbally to the motion to dismiss on the third day of hearing - February 27, 2001. The Union further argued that when the Agency responded to the merits of the grievance on May 15, 2000, it had an opportunity to raise the arbitrability or grievability issue, but rather actually advised the Union of its right to move forward with arbitration.

The Union argued that the parties' grievance procedure does not set time limits for presenting the defense of grievability, however, as the moving party the Agency was required to raise the issue of grievability prior to the invocation of arbitration. It is argued that this limit would fairly and timely provide the Union an opportunity to amend the grievance and thereby correct minor issues or defects. NAGE argued that allowing the Agency to raise the issue of grievability after the commencement of the hearing, in effect wasted Union resources and potentially deprived them of a meaningful hearing on the merits of the dispute. In the instant case, the Agency did not just wait until the commencement of the hearing, it actually did not

raise the issue until the middle of the hearing.  Moreover, the Union argued that Management

violated the parties' agreement (Article 55) when it failed to provide written notification of the

grievability challenge, ie., prior to the arbitration hearing.  Sending a motion to dismiss as the

first written notification to the Union regarding  Management's grievability challenge is alleged

to be a violation of Article 55.  This violation according to the Union should preclude

Management from raising grievability as an issue.  The Union argued that Management had an

opportunity to raise the question of grievability at several earlier stages of the procedure; E.g.,

when EEO Director Seal responded to the grievance on May 15, 2000.  The Union further argued

that Management acknowledged that the Union had reserved its right to pursue its institutional

grievance through the various processing stages.

      In essence the Union argued that Management waived its right to challenge the

arbitrability  and grievability because at the time the EEO complaints manager was moved from

the Human Resources Department, the Agency recognized the Union's right to present the

grievance and invoke arbitration in a series of e-mails.  Management did not at any time indicate

to NAGE that it was necessary to "invoke bargaining rights." [2]  Thus, the Union states that

Management waived its right to challenge grievability so late in the procedure.

      NAGE argued the Agency is required to adhere to government-wide regulations

promulgated by the EEOC in its Management Directive 110.  Failure to adhere to the regulations

should be considered a violation of the parties' agreement which specifically states a grievance is

any violation or misapplication of "...any law, rule or regulation affecting employment."[3]

      In the instant case, the Union maintains that  it did not receive any written notification of

---

[2] Opposition to Agency's Motion to Dismiss unnumbered page 5.

[3] Page 5 of the Union's Opposition to Agency's Motion to Dismiss.

the Agency's challenge regarding grievability. The Union states it is entitled to notification at a time when it can inexpensively amend the grievance. The Union also maintains that the grievance was timely filed, in that it was filed within ten (10) days after they "became aware" that Agency Management was in violation of EEOC MD110.

Some of the revised portions of EEOC MD110 became effective November 1999. However, the Union states it was not aware of this November 1999 language change and the Agency's alleged violations until sometime within the ten (10) days prior to the time that it filed the institutional grievance. NAGE argued that any doubt regarding timeliness should be decided in the Union's favor ; i.e., in favor of arbitrability. Further the Union inferred that their grievance was continuing in nature and " is arbitrable as a threshold matter".[4]  The Union stated :

> The issue of whether NAGE had an opportunity or right to bargain over the Agency's policy is not relevant here...NAGE challenged the Agency's assignment of numerous individual nonbargaining unit employees to duties of a nature that compromise its requirement to act independently in EEO matters."

Thus, the Union maintains that it is *not* involved in a situation that involved "terms and conditions" of its members employment; a matter that would be the subject of bargaining; rather it is a matter of impermissible activity by non bargaining unit employees.

The Union asserts that its limited right to negotiate the impact and effects of a management policy concerning EEO as well as the decision to enforce that right is separate and apart from the Union's right to file a grievance in this case. The union pointed out that the FLRA has dismissed unfair labor practices (ULPs) that were found to be covered by the language in the parties' collective bargaining agreement[5] . The Union also pointed out that the matter of the

---

[4] Page 7 of the Union's Opposition to Agency's Motion to Dismiss.

[5] Citing Department of Health and Human Services, Social Security v. AFGE, 47 FLRA _____ (No.96)(1993).

Agency EEO program violating the EEOC regulations probably would have disqualified to be heard by the FLRA, because this matter is covered by Article 5 of the parties' collective bargaining agreement which requires the Agency to adhere to federal laws and regulations and provides another mechanism for resolution of a problem.   If the Agency had refused to bargain over the issue (of the neutrality of the Agency's EEO program), even if the FLRA found that transfer of the EEO manager triggered a Union's right to bargain, any unfair labor practice claim probably would have been dismissed pursuant to the "covered doctrine".

C.    **Arbitrator's Decision On Preliminary Matters**

When EEOC Management Directive (MD) 110, was revised effective November 1999, a number of the changes were widely publicized.   However, comparison of the 1992 and 1999 EEOC MD110 shows that the EEO Manager was always intended and required to be an independent, neutral function.   In fact, the introduction to Chapter 1 of the 1992 MD-110 states in relevant part, "...the agency shall appoint a Director of Equal Employment Opportunity, who shall be **under the immediate supervision of the agency head. 29 CFR§1614.102(b)(3)**" (Emphasis added)(See Joint Exhibit 1B).

The Arbitrator is not impressed with the Union's argument that it did not know there was conflict in the EEO manager's position until April, 2000 - or that it violated Federal regulations. However, absent the introduction of evidence that disproves this allegation, the Arbitrator has decided to accept the statement as true.   There was substantial publicity about the revisions to the regulations as 29 CFR§1614 which perhaps operated to call the attention of many organizations and individuals to the corresponding changes in the EEOC MD-110.   Thus, the Arbitrator accepts the veracity of the Union's allegation that it became aware of violations on or about ten (10) days prior to April 21, 2000; the day it filed the institutional grievance.

1.    **Motion to Dismiss**

In its Motion to Dismiss dated February 14, 2001, Management offered an explanation;

regarding why such a motion was filed after two days of hearing.  Primarily, Management states:

> This motion is appropriate at this time because the union clarified its position during the
> two days of hearing that it is not alleging specific harm, but is rather claiming that the
> perception of a conflict of interest has harmed employees generally.  Until clarification
> occurred, the Corporation did not fully understand the Union's case and was therefore not
> in a position to bring this motion...As clarified at the hearing, through these citations
> Local R3-77 is really complaining that the Corporation is violating the EEOC's
> Management Directive 110, Chapter I, section III.

The record does not show any evidence that Management sought clarification of the issue and

was denied said clarification prior to the hearing.  There are no memoranda or pleadings seeking

clarification of the issue.  The Arbitrator is not impressed with the stated reason advanced for the

delay in requesting a motion to dismiss after two days of hearing.  A review of the institutional

grievance dated May 15, 2000, specifically shows it is based upon and grounded in the Union's

contention that PBGC is allegedly violating 29 CFR§1614, the collective bargaining agreement

and EEOC MD110.

Although the grievance included language from Section I of the EEOC MD-110, it is

clear on its face that the grievance is not limited to Section I of the MD-110; which discusses the

issue of conflict.  However, the grievance clearly states that the violation for which a remedy is

sought is that the Employer has failed to "provide for the prompt, fair and impartial processing of

complaints" in accordance 29 CFR§1614 and the instructions contained in EEOC MD110.  The

grievance points out "EEOC Management Directive 110 requires the PBGC to appoint an

independent Director of Equal Employment Opportunity ...The EEOC Directive **also** provides:

Agencies must avoid conflicts of positions or conflicts of interest as well as the appearance of

such conflicts..." (Emphasis added)

- 9 -

NAGE cites section 29 CRF §1614(a)(2) and collective bargaining agreement Sections 4.1, 5.1, 5.2 and 5.7. The grievance does not specifically cite section III, "EEO Director Independent Authority and Reporting Relationships", but it clearly provides notice to the Agency that the issue that is the topic of the complaint is based on Management's alleged failure to adhere to the requirements of EEOC MD110, i.e., as it relates to the issue of managing the PBGC EEO program in a neutral environment. The grievance states clearly that "...PBGC does not provide an independent, impartial and neutral EEO program. The same officials and individuals and organizational components responsible for executing and advising on personnel actions also are responsible for managing, advising and overseeing the EEO pre-complaint processes..." Further, the grievance challenges the independence of the EEO Director. It specifically stated "It is improper for the EEO Director to also serve in the CMO role"

This Arbitrator finds it clear on the face of the grievance, that the Union sought compliance with 29CFR§1614 and MD110. Although specific language was cited from Section I of the MD110, there is no doubt that full compliance is sought with other relevant portions of 29CFR§1614 and EEOC-MD110. It states the Union seeks compliance with 29CFR§1614 and MD110 which requires the Agency to appoint an independent EEO Director. The fact that language is inserted in the grievance that is lifted from Section I of the MD110 does not limit the grievance to that section. The grievance states that it attacks an EEO processing system containing alleged conflict. Thus, the grievance would include relevant portions of MD110 and 29 CFR §1614 that relate to fixing what is wrong with the system for processing EEO complaints; as it relates to creating an independent function. Management can not be allowed to prevail on a defense that the grievance should be dismissed because at the hearing they were "surprised". The clear reading of the grievance would provide reasonable notice that the Union sought elimination of alleged conflict in compliance with relevant statutes and regulations.

- 10 -

Clearly, the Union was challenging *inter alia* the fact that the EEO Director did not report to the Agency head. The Union unambiguously stated it was contesting the failure to provide an independent and neutral system for the fair impartial processing of EEO complaints. Notwithstanding, NAGE sought compliance with 29CFR and the EEOC-MD110. Thus, the reporting relationship of everyone involved in the EEO processing system logically was under consideration and would be dissected to determine follows for full resolution of this grievance. Moreover the Agency responded that it was *inter alia,* "...reviewing our internal EEO processes and policies to make sure they comply with EEOC's new regulation and directive."

It is noteworthy that the section of EEOC's regulations that requires that there be no conflict in the role of the EEO manager is also found in the 1992 MD110. Thus, EEOC did not change its regulations substantially in 1999[6]. The 1992 version of Chapter 1 of the EEO-MD110 states the EEO Director must have independent authority and agencies must avoid conflicts of position or conflicts of interest and should not be involved in executing or advising on personnel actions . Section I introduction states that in order for the Agency to implement an appropriate program, "...the agency shall appoint a Director of Equal Employment Opportunity, who shall be under the immediate supervision of the agency head.29C.F.R.§1614.102(b)(3)." (See Joint Exhibit 1B). The 1999 MD110 merely expands upon and provides examples of conflict; i.e., "intrusion on the investigations and upon deliberations of EEO complaints" by agency representatives, or an office responsible for defending the agency has always been seen as a conflict.

In its motion to dismiss the Agency essentially claimed it did not realize the Union was

---

[6]Both the 1992 and 1999 version of MD-110 required the agencies to avoid conflicts. Both 1992 and 1999 EEOCMD-110 required that the EEO Director report directly to the Agency head.

complaining about MD 110, Cha       ums in which to seek a resolution.  For

position during the two days of h       ptions.  In so choosing the

that the perception of a conflict        a showing that some other

clarification occurred, the Corpo

therefore not in a position to bri       a claimant to

at the hearing that the Union wa       lations

violation of MD-110 Chapter 1.

have independent authority and

Federal agencies shall place the

the agency. By placing the EE(

importance of equal employme

challenges three specific Agency functions violate EEOC MD-

that careful reading of the Union's grievance makes it clear that the Union is requesting

compliance with EEOC MD-110 and 29 CFR §1614 which would include the three positions as

well as the MD 110 (Chapter 1 Section III) provision which Management sets forth in its

motion.

     Management argued that the issues raised by the Union's institutional grievance is moot,

because its reorganization of the EEO complaint processing system has remedied any potential

problems regarding three challenged positions.  Management contends that John Seal is currently

acting as Executive Director and as EEO Director.  Previously he acted as EEO Director and

Chief Management Officer with responsibility of the Human Resources Department.  The

Agency argues that because Mr. Seal is no longer directly involved in Human Resource the

Union's argument is moot.  A second area of concern to the Union was the fact that Ms. Mackey

had a dual responsibility for Human Resources and as manger of EEO.  The Agency argued that

moving her out of Human Resources Departi                ⌐ums in which to seek a resolution.  For

conflicting roles. The third area of concern re              ⌐ptions.  In so choosing the

advice in EEO matters as well as representing                    ⌐ a showing that some other

Management points out that two months befoi

formalized, creating a position of Senior Coun                        ⌐ a claimant to

would be a separate function from acting as EE                        ⌐lations

　　　Management contends the Union's insti

allege any specific harm.  The arbitrator does nc

the EEO system is not in compliance with a Fed⌐

EEOC, an agency authorized by the United State⌐ Congress to enforce statutes  in the federal

sector relating to employment discrimination.  The changes implemented  by Management do not

necessarily make the grievance moot.  There has been no showing that the changes as they

currently exist are in complete compliance with 29 CFR§1614 and the MD-110.  Moreover, the

Union points out there are remaining areas that are yet seen as conflicting.

　　　The Agency argued that the institutional grievance is untimely, because it seeks to remedy

an alleged harm or violation that occurred more than ten (10) days before the grievance was filed.

The Arbitrator finds the grievance was timely filed; in that the Union bases this threshold issue

on the fact that it did not become aware of the violation until ten (10) days prior to the date the

grievance was filed.  Notwithstanding, the Arbitrator's authority to decide the issues herein is

derived from the parties' agreement.  That Agreement provides that a grievance must be filed in

10 days of the occurrence or upon realization /becoming aware of the occurrence.  Absent a

finding of continuing violation, any entitlement to a remedy may also be restricted by the

confines of the collective bargaining agreement.  This is not to say that the remedy will be

restricted to a ten (10) day period prior to the filing of the grievance.  However, it can not span a

ten (10) year period. The Union had other options and forums in which to seek a resolution. For various stated reasons, it chose not to exercise those alternative options. In so choosing the grievance option, it is restricted by the confines of the contract; absent a showing that some other principle operates to extend the breadth of the allowable remedy.

The Agency points out that very few remedial statues and regulations allow a claimant to "reach back" several years and bring forth claims for previous allegations of harm and violations that were not addressed several years ago. In this case, Management argues that the individual EEO claimants had opportunities to raise the issue of alleged conflict in the EEO system and non-compliance with 29 CFR§1614. Management contends that each employee not only had an opportunity to raise the issue of conflict, but so did the NAGE and its predecessor (NTEU) as representatives of employees who filed individual EEO complaints. The Union counter argued that it was not alerted to the peril of this conflict and its chilling affect until EEOC revised its regulation (and MD 110) and made this clear. Consequently, the Union filed within ten (10) days of becoming aware of the alleged violation. As stated above, the Arbitrator will not disturb or negate the Union's uncontroverted allegation.

Management also argues that " Local R3-77 has arbitrarily chosen 1990 as the date on which this allegedly harmful practice began..." Thus the Union states that when section 55.2.A of the NTEU -PBGC collective bargaining agreement is read togther with section 55.7.B of the agreement it mandates that the Union may only submit a grievance within ten (10) days of the occurrence of the act, or within ten days after the Union became of the alleged violation. The Arbitrator finds the contract limits the ability to file complaints that either happened (or that grievant became aware of) ten (10) days prior to the complaint being filed. However, the Arbitrator finds the scope of any proposed remedy to which the Union may be entitled is not limited to events that occurred in that ten day period. It is possible that an event discovered in

that ten (10) day period may have occurred more than ten (10) days  preceding the date the Union

filed the April 21, 2000 institutional grievance.

The Arbitrator finds the Union's institutional grievance was timely filed within ten days

of NAGE officials becoming aware of the revisions to 29 CFR§1614 and the resulting changes to

EEOC MD110 and management's non-compliance therewith. This fact has not been

controverted.   On the other hand, the Arbitrator finds no basis for requiring the Agency to

provide documentation and information reaching as far back as 1990.  The Arbitrator will

provide more detail regrading the question of requiring documents (or a remedy) that encompass

the period that spans 1990 to 2001; a later portion of the analysis will address this issue.

The parties have asked the Arbitrator to conduct a separate hearing on the issue of the

remedy.  Perhaps the operative date can be clarified at that time. The Arbitrator has concern

regarding the Union's contention that the grievance is "continuing" in nature.  This has not been

proven on the record.  The Union has failed to show that it should be allowed to reach back

indefinitely to reopen the cases involving EEO complaints that have been processed previously

through the system.  Moreover, to propose that EEO complainants who allegedly *would have

filed* EEO complaints but for the alleged chilling effect (created by the conflict of interest

inherent  in PBGC's EEO processing system) requires more specific evidence that has been

shown to the Arbitrator to date.

The purpose of the revisions to the MD 110 and 29 CFR§1614 was not to "open the flood

gates" and create a cause of action for a multitude of potential litigants. Taken to its most

ridiculous extreme, this would allow people who would have filed charges ten or twenty years

ago to now step forward and flood Federal agencies with EEO complaints previously not filed

because of actual or perceived conflict.

On the other hand, the Arbitrator is not impressed with Management's argument that NAGE cannot challenge an issue that was not previously challenged by the predecessor union (NTEU). There is a statutory duty of fair representation. A successor Union cannot be compelled to stick its head in the sand and ignore statutory or regularity violations essentially because its ousted predecessor failed or refused to seek a remedy. Thus, the Arbitrator finds the Union's standing to challenge prior acts (i.e, done during the administration of a predecessor union) is derived from *inter alia,* it statutory duty of fair representation. There was substantial testimony presented on the record that the prior Union was voted out of the office based on a pervasive perception that the Union was involved in alleged retaliatory measures that allegedly resulted in two employees losing their positions.

Under oath, Valda Johnson testified that two employees were allegedly fired when they filed EEO complaints. She testified that employees throughout the Agency rumored that the predecessor unit had cooperated with Management to get them out of office. Allegedly this precipitated a petition to decertify that union.

Management argued that the EEO processing system is a " term and condition" of employment. According to Management, "Once NAGE became aware of an actual or a potential change in working conditions, it was obligated to notify the Agency of its intent to invoke its bargaining rights pursuant to 5 U.S.C.§7102 (2), or it waived its right to bargain. Further Management maintains that when the EEO structure was implemented in the Agency in September 1992, NTEU did not negotiate with the Agency about the structure of the EEO program. Thus, the successor Union (NAGE) allegedly has no standing to challenge an EEO program that NTEU (the predecessor Union) waived its right to challenge. The Arbitrator is also not impressed with Management's argument that an EEO complaint processing system is a term

- 16 -

or condition of employment. The adjudication of EEO complaints through a system that is neutral and fair is a regulatory or statutory right. It affects not only PBGC employees ( union and non union) but it also reaches outside PBGC's borders; for example to the general population of employment applicants. Moreover, the neutrality and structure of an EEO adjudication system is not a "change in working conditions" over which a union can waive the rights of employees. Theoretically, PBGC and NAGE could not bargain, for example, to eliminate the EEO complaint system, or agree to reduce the time prescribed in 29 CFR§1614 from 45 days to ten (10) days or three (3) days in which to contact an EEO counselor.

Prohibitions about potential conflict between EEO processing and adversarial systems in Human Resources did not become effective for the first time November 1999. Conflict has *always* been prohibited in the EEO processing system. The fact that NAGE did not address alleged violations of (MD 110 and 29 CFR) on the day after winning the election, or when the EEO portion of the collective bargaining agreement was negotiated, does not extinguish the Union's standing now to raise non compliance as an issue, or to challenge the alleged violation when it became aware of it through clarification language; i.e., when the EEOC issued in its revised MD 110.

Management also points out that on October 26 ,2000 when the current Union Vice President, Stuart Burnsen sent an email to Human Resources Director Sharren Flecther, he acquiesced to a change in the EEO complaint processing structure ( moving the EEO Manager from Human Resources to the Chief Management Office) the Union " acquiesced without bargaining[7] Management argued that the failure to invoke negotiations at the time of the alleged

---

[7] See Management's motion to dismiss dated February 14, 2001

change in "condition of employment" waved the Union's right to thereafter challenge the EEO

complaint processing structure.  Management pointed out that the parties, (PPGC and NAGE

Local, Capitol RC77)  have engaged in collective bargaining since October 1999, and have

reached agreement on an EEO article.  However, during these negotiations, the successor Union

did not raise concerns about the conflict of interest.  The Arbitrator has considered Management's

contention that the Union "slept its rights" or " waved its right to negotiate".  However,

Management has not provided evidence to dissuade the Arbitrator regarding the veracity of the

Union's contention that it challenged the issue by filing an institutional grievance within ten (10)

days after it became aware.

Another argument raised by Management in support of it's motion to dismiss, is the

current Union is collaterally estopped from challenging the affect of the alleged conflict in

PBGC's complaint processing system.  The Arbitrator does not agree.  In conclusion, the

Arbitrator does not find that PBGC's revision of the system makes the institutional grievance

moot.  Nor does she agree that NAGE lacks standing, because a predecessor union which

reportedly was ousted by a vote of "no confidence" from the members it represented, failed to

raise a challenge. The Arbitrator does not subscribe to Management's argument that allowing a

Union "...to challenge the Corporation's  EEO structure years after it had been put in place would

undermine the stability inherent in the Federal-Sector-Labor -Management relations  process and

thwart Congress' purpose in enacting the Federal Service Labor-Management Relations Statue".

To subscribe to such a practice would preclude a union from challenging any prior practice

subsequently discovered to be a violation of law. The Arbitrator does not determine that there is

an unlimited right to bring forth previously resolved cases, or matters that arose five (5) or ten

(10) years ago.  However, the Arbitrator finds the Union had a right under the contract to

challenge the alleged conflicts in the EEO system.

The Arbitrator is not persuaded by Management's argument wherein the Agency contends the Union's allegations have failed to allege any specific harm.  There is substantial testimony and documentation showing the chilling effect created by the conflict.  It is undisputed that employees were called or e-mailed and asked to allow an Agency attorney to sit in on the EEO investigative interview; to be conducted by a neutral contract investigator.  Moreover, there was testimony that employees allegedly lost their jobs in reprisal for filing EEO complaints. The Arbitrator does not find the complaint was too unspecific.  There is no evidence documenting how many employees dropped their complaints or simply refused to file.  However, it can not be said that there was no allegation or evidence of specific injury.

2.      **Motion to Compel Production of Documents**

Management maintains that the Union's document request would require the Agency to produce "...every EEO-related document it generated or acquired in a 10-year period .... this is both unreasonable and unnecessary."  The Arbitrator reviewed the request for production of documents and agrees with the Agency.  Many items requested are overly broad.  For example, item 12 seeks "...each and every Labor Management Relations computer file or database."  As well as the names of persons who had access, since 1993. Item 8 seeks "all documents that identify any management official, supervisor attorney, employee" other than a witness or complainant who participated in any way in any in any EEO matter, in the pre-complaint or investigatory phase since 1990".

In its response, to the Union's request for documents, the Agency basically refused to provide documents that were dated prior to April 7, 2000; i.e., approximately ten (10) business days prior to the date that the grievance was filed.  The Arbitrator finds that the Union may not

be entitled to a remedy that reaches as far back as 1990; however, the Agency can not limit the Union's access to information for such a narrow period as ten (10) days before the date of the institutional grievance. As the right of action may be limited by the terms of the contract, there is no indication that the Union must be restricted to information that relates only to that ten (10) day period.

The Agency asserts that the only two issues in the case are whether its EEO complaints processing structure creates a conflict of interest and if so, whether during the relevant period anyone was harmed by those conflicts. According to Management if the Arbitrator finds in favor of the Union and the matter moves to the remedial stage the Union should be compelled to show a "particularized need"; i.e., state with specificity why it needs the requested document, and show that it is needed in order to adequately represent its members. Management also points out that the collective bargaining agreement section 59.1, required that the Union discuss the request before formalizing it in writing. Notwithstanding, Management contends it has given the Union position descriptions, mission statements and had planned to discuss the Union's need at a pre-hearing conference. There is no explanation as to why that pre-hearing conference did not happen; well in advance of the hearing date. No pre-hearing request was made by either party. Nonetheless, the Agency asserts that need was obviated by the Union having approached Management at the hearing to suggest that the parties execute stipulations to expedite the hearing.

The Agency contends that the Union has gotten everything it expressed that it needed. However, the Arbitrator finds the fact the Union was compelled to file a motion to compel shows it does not agree that it got everything it needed. Accordingly, the Union is hereby instructed to draft a revised document request which takes into consideration items it was presented at the

hearing. The Arbitrator also requires an explanation regarding the date or age of the document; i.e. why a particular date was selected. For example, some of the requests are for documents dated as far back as 1990. This entitlement should be explained. The Union must convince the Arbitrator of why the matter should be considered continuing, so as to warrant documents to span several years; as opposed to ten (10) days prior to filing the grievance as the Agency contends. While the Arbitrator will not restrict the documents to having no date prior to April 7, 2000, without further information, she does not find that without further explanation, the Union is entitled to receive documents as far back as 1990.

It is noteworthy that the Agency refused to provide documents that preceded April 7, 2000; i.e., ten (10) working days before the date of the institutional grievance. NAGE has elected to use the contract as the mechanism for bringing the instant action. As the Agency pointed out, the Union had alternative options[8] and could have used some other mechanism to address the problem which possibly may have given a wider span for the operative dates. By using the collective bargaining agreement, the Union has stated it did not become aware of the alleged violation until ten (10) business days before April 21, 2000. There is nothing currently in evidence that convinces the Arbitrator that ten (10) years of data is required to determine that there was a violation, or that a proposed remedy should encompass a ten year period; in the event a violation is determined to exist.

Having determined that the matter is arbitrable and grievable, the Arbitrator will now turn her attention to the substantive matters presented by the parties.

---

[8] For example the Union could have had discussions during contract negotiations while the EEO section of the new contract was being formulated, or it could have filed and unfair labor practice (ULP), or it could have invoked the right to bargain upon the Agency's creation of changes to the EEO program.

## V.  POSITIONS OF THE PARTIES

**A.    THE UNION'S POSITION**

The Union argued that the Agency's location of its EEO function within the Chief Management Office or the Human Resource Department violates EEOC regulations and MD 110 which requires that the process be neutral and independent.  They argue that PBCG's EEO structure for handling complaints does not provide adequate separation or independence. According to the Union, John Seal, the EEO Director is not independent, because he also serves as the Chief Management Officer. Thus, he is responsible for an office that executes and provides advice on personnel actions, as well as oversees the EEO complaint and pre-complaint processing. The Union maintains that the January 2001 relocation of functions (taken from Human Resources and placing the EEO manager under the Chief Management Officer) is inconsequential. In fact, the Union stated it finds this less palatable, because it places everything directly under Chief Manager John Seal.

It is well established that an EEO official can not serve as a neutral, if he is acting in a representational capacity.  The Chief Management Office is involved advising and representing managers who have been accused of discriminatory practices.  It also overseas personnel actions and processes EEO complaints.  John Seal allegedly signs EEO documents as " Chief Management Officer", as opposed to " Director of EEO".  Thus, the Union argues that in order to reach the level of independence required to comply with MD 110, the Agency's Director of EEO and the entire EEO program should be completely separated from the Chief Management Office.

The Union's second substantive argument related to the location of the office providing legal advice regarding the EEO function; in relationship to the office providing Agency representation.  The Union maintains that the 1999 amendment to the EEOC MD110 requires

that the office providing legal advice to the EEO office (or EEO program) must be totally

separate and apart from the office that represents or defends the Agency.  It further asserts that

Agency employees or officials who advise the Agency on personnel actions cannot be the same

employees or officials who advise on processing EEO complaints and administer the pre-

complaint program.  The Union challenged the Agency having placed both EEO advice and the

representational functions in the Office of General Counsel.  That office both advices on

personnel matters and represents the Agency in grievances, arbitrations and in court.  The union

argued that the Agency's " Chinese wall" or " imaginary wall" failed to meet the requirements of

EEOC MD110.  Further, the Union points out Management failed to submit documentary

evidence to support the existence of a "Chinese Wall".

According to the Union, Deputy General Counsel Hertz not only supervises attorneys

who do EEO work, he also supervises that group of attorneys who handle labor relations and

personnel.  He receives status reports from all of them and they in turn have full access to shared

computer files that contain personnel as well as EEO and litigation material.

The Union also challenges that Senior Counsel Lattimer cannot possibly be neutral, since

he currently serves as the lead representative in labor relations and personnel matters.  They

maintain that " it is improper if an attorney ' who represented the agency in an equal employment

hearing to have authority to approve decisions with respect to resolution in the same or related

cases'" .  The Union also argues that it is improper for a "member of the office where the

representative  is employed have the legal sufficiency function with respect to cases in which a

colleague served as agency representative."[9]  Thus ,the Union challenged the inherent conflict in

_____

[9] Citing EEOC MD-110, Chapter 1, III.

the Office of General Counsel's responsibility. They complain that senior counsel Lattimer

advices on the EEO program at the same time that he serves as lead advocate against the Union

(and its employee members) on personnel and labor relations matters. He also represents the

Agency in cases brought before the EEOC and therefore has a dual responsibility that makes it

impossible for one to view him as a neutral. Assuming *arguendo* that an imaginary wall were

possible or actually existed in the Office of General Counsel, the Union argues it would violate

the MD 110, because the EEOC requires not only that the functions be independent but also that

there be distance and separation. The Union argues that these two functions cannot be physically

located in the same office. They point to MD 110 chapter 1, III which states in relevant part "

impartiality or appearance of impartiality is undermined where **members of the office** where the

representative is employed have the legal sufficiency function with respect to case in which a

colleague served as agency representative"( emphasis  added)

The Union asked the Arbitrator for an eight (8) part remedy; to require the Agency:

1.    To provide an independent EEO function.

2.    To locate the EEO function in a department that does not advise or represent the Agency

in the areas of personnel, labor relations, or any representational or adversarial capacity in

EEO cases; such as the Chief Management Office,  Human Resources Department, Office

of General Counsel or the General Law and Operations Group.

3.    To disallow the EEO Director (or anyone in his chain of command) to also serve as the

Chief Management Officer.

4.    To ensure that the Chief Management Officer (or anyone in his chain of command) can

not serve as an EEO official.

5.    To ensure that any attorney who has a role in advising the EEO program (and EEO

officials) cannot be assigned to or located in the Office of General Counsel (OGC) or its

sub-offices or be in the chain of command of the General Counsel (GC) or the Deputy

GC for General Law and Operations Group.

6.    To provide separate offices[10] for the EEO function by doing one of the following:

a.    Move the General Law and Operations Group to Human Resources or the Chief

Management Office.

b.    Move one or more attorneys from OCG to the EEO Office.

c.    In the event a full time legal position in EEO is not feasible, then alternatively to

arrange for legal advice for the EEO program to be provided by another Agency.

7.    To order the Agency to propose a plan to create an independent EEO function; upon

completion, meet with the union to present and discuss the plan; give the union thirty (30)

days to review and comment on the proposal.  In the event that the plan is deemed

unacceptable in any way to the union, then the parties will jointly request the Arbitrator to

issue a final order.

8.    The Union asks that the Agency be required to post public notices advertising their

alleged failure to implement an independent EEO function.  In addition, the Union

requests that the Agency be required to distribute memoranda to employees describing

Management's violations and explaining what remedies will be implemented. Said

notices would be approved by the Union.

B.    **THE AGENCY'S POSITION**

In response to the Union's substantive arguments, Agency Management contended that

this case is not properly before the Arbitrator and should be dismissed on the bases that are stated

---

[10] The office providing legal advice to the EEO should be separate and distinct from the
offices that provides advice and legal representation on labor relations and personnel matters.

above[11]. In the Arbitrator's examination of the preliminary matters above, she reviewed and discussed the major aspects of the Agency's motion to dismiss argument. The Arbitrator will not repeat all of the Agency's arguments set forth above in her disposition of the motion to dismiss. Basically, the Agency challenged the instant grievance as untimely, waived, collaterally estopped, and moot. The Agency has requested that it be given additional time to supplement the record, in the event the Arbitrator does not grant its motion to dismiss the Union's grievance.

Management argued that the continuing violation theory used by the Union was not appropriate or applicable in the instant case. Agency Management contends that on cross examination Mr. Bernsen admitted that the NAGE Local Union could have, (but chose not) to bargain over the issue of the Agency's newly installed EEO structure. Management urged the Arbitrator to find that the situation presented in the institutional grievance did not qualify as a continuing violation. Citing FLRA authority, Management stated the principle of continuing violation:

> ...injures the stability of collective bargaining relationships because enforceable rights and obligations of the parties are allowed to remain an open question indefinitely... A party has an interest in being able to conclude that its actions have passed without challenge and is therefore, able to act accordingly.[12]

Management urged that it could present a hardship, on the Agency if the Arbitrator allowed the Union to request documentation as far back as 1990. Agency Management urged that the Union had reasonable alternatives such as, the Union could have invoked the right to bargain when PBGC changed the EEO complaint processing structure. In addition, Management maintains that the Union could have raised the issue of a conflict in the EEO

---

[11] See the Agency's argument set forth in the preceding section on the motion to dismiss.

[12] Equal Employment Opportunity Commission and A.F.G.E., Local 3637, 53 F.L.R.A. 487(1997), 1997 WL 617909(F.L.R.A.) citing A&L Underground, 302 N.L.R.B. 467, 468 (1991).

processing system in conjunction with each individuals' complaint whom it represented.  Further, Management maintains that if the Union wanted to challenge the structure of PBGC's EEO complaint processing system, they should have done so by raising the issue at the bargaining table during the ongoing negotiations between PBGC and NAGE as they attempted to reach a contract agreement.

With respect to the Union's argument that the matter is a continuing violation, Management asserts that it would be unreasonable to allow the Union to reach back for eight or more years to gather documentation to support the institutional grievance; in that "...no hardship exists that would justify applying the continuing violation theory." [13]  Further, Management challenged the Union's request for documents as unduly burdensome, unreasonable, and unfounded.  The Agency urged the Arbitrator to require the Union to demonstrate a "particularized need" by stating with specificity why the requested information is needed, and that it is needed to adequately represent its members.

According to the Agency, any remedy granted by the Arbitrator should be governed by whether anyone was harmed by conflicts within the Agency's EEO complaint processing structure, during the relevant time period.   Management urged the Arbitrator to find that it had already reasonably complied with the request for documents when it provided position descriptions, mission and function statements, organizational charts and entered stipulations regarding the duties of persons whom the Union challenged as having a conflict of interest.

Moreover, the Agency stated it has fully complied with the requirements of EEOC MD-110, which directs the Agency to: 1. Ensure that the EEO Director reports directly to the head of the Agency;  2.  Avoid conflicts of positions or conflicts of interest and the appearance of conflict.  The Agency stated it has separated the fact-finding and internal EEO decision-making

---

[13]Post hearing brief page 5.

functions from advocacy functions by using a "Chinese Wall" in its Office of General Counsel; a

system wherein one attorney is assigned to advise the EEO Director on legal sufficiency,

acceptance and dismissal matters which is the neutral fact finding function, and a totally separate

and different attorney is assigned to represent the Agency as an advocate. The Agency pointed

out that one of the reasons it created a Senior Counsel position in February 2000, was to

formalize the distinction between advocate and neutral functions in the Office of General

Counsel.

   Management maintains that it has adequately revised its EEO structure for handling

complaints. It argued that the new structure is cleaner, but contends neither the prior or current

structure for handling EEO complaints violated the EEOC MD-110. It stated:

> Under the old system, any influence the Human Resources Department may have had was
> negated by the fact the formal complaints were managed elsewhere. The current structure
> is admittedly cleaner, but neither violated MD110....Independent, private-sector
> investigators conduct the required investigations. No conflict of interest exists."[14]

   The Agency requests that if the Arbitrator should find on behalf of the Union, then at that

time the Arbitrator would order the Agency to produce relevant documents. Management

cautioned that the Union may not be entitled to all of the documents that it requests and

suggested under 5 USC §7114 (b)(4) the Agency must provide NAGE with information 1).

Normally maintained by the Agency in the regular course of business , 2). Reasonably available

and considered to be necessary to discuss, understand, negotiate a subject that is within the scope

of the parties' collective bargaining agreement and 3). Information that does not fall in the

category of guidance, counsel, advice, or training for managers or supervisors.

   Management argues that in the normal course of business, it does not keep documents for

ten (10) years and would have to make a determination as to whether information is necessary.

---

[14]Agency's post-hearing brief dated April 13, 2001; page 9.

Management maintains that the collective bargaining agreement with the predecessor union provides an agreed upon procedure for requesting information. To the extent that NAGE is adhering to some of the provisions in that contract, it should have discussed the need for documents before issuing a formalized request.

For the positions of each employee whom the Union alleged had a conflict of interest. Management maintains the Union has already received all of the documents it requires. The Agency stated that it is in compliance with EEOC's regulations ( 29 CFR §1614 and the MD 110). It stated that any influences that the Human Resources Department may have previously had, was negated or neutralized by processing complaints outside the Human Resources Department and conducting investigations by neutral, private sector investigators .

Management argued that the Union has not met its burden of showing that the Agency's EEO complaint processing system violates the EEOC MD 110. Agency Management cautions the Arbitrator that she heard no evidence showing an actual conflict of interest. The Agency argued that no employee or expert testified (at the hearing), nor complained about PBGC's complaint processing system. Management contends that the Union has not proved that EEO counselors or employees are pressured by some higher person in the Agency; nor has it been proven that the Program Manager, EEO counselor, and the Office of General Counsel have conflicts.

## VI.    ARBITRATOR'S DECISION

The parties do not have a contract. Reportedly, they have been attempting to structure a collective bargaining agreement since 1999. The operative agreement is that which was last negotiated with a predecessor union, NTEU. Until a new agreement is negotiated, the parties have agreed to allow portions of the contract with NTEU govern their relationship. Relevant sections of the contract provide that the Agency must adhere to *inter alia,* applicable EEO laws

and regulations.   Thus, the Arbitrator finds that there has been a violation of the parties'

agreement.   There is an abundance of evidence in the record showing conflict in the Agency's

EEO system.  In the Agency's May 15, 2000, response to the institutional grievance, John Seal,

Chief Management Officer stated in relevant part:

> Ours is a small federal agency.  Yet despite its size, we have placed a **number of checks and balances** in the EEO process to ensure its neutrality and fairness.  Informal complaints are managed by Janice Mackey in the **Human Resources Department**.  Once a complaint becomes formal, Jacqueline Dickerson assumes control of the process.  Ms. Dickerson works for the Chief Management Officer and has no supervisory or organizational connection to Ms. Mackey or to the Human Resources Department.  Both Ms. Mackey and Ms. Dickerson have quick, informal access to the Director of Equal Employment Opportunity and to the Executive Director whenever they deem necessary. Additionally, we have **recently divided the responsibilities for legal advice on EEO matters prior to litigation** within the Office of the General Counsel.  **One attorney will provide advice on EEO matters prior to litigation and a different attorney will represent the Corporation in litigation**.  Rick Lattimer will handle or supervise the attorney handling pre-litigation advice and Jay Resnick will supervise the attorney litigating the complaint.  Finally, as Director of Equal Employment Opportunity, I report directly to the Executive Director. (Emphasis added).

Although collateral EEO counselors can be recruited from all over the agency, placing the

EEO counseling process physically in the Human Resources Department may present a conflict.

The Arbitrator does not make a finding that Ms. Mackey is improperly placed, but merely raises a

question for the Agency to consider as part of its process in ensuring neutrality and fairness as

well as having employees start the EEO process in a "comfortable" area that is not also given the

responsibility of handling employee actions.  The Arbitrator will order that the Agency *consider*

putting all EEO functions in a Department exclusively set up to handle formal and informal EEO

case processing.  The Arbitrator realizes this is a small agency.  Thus, even if the department has

only one person, segregating the EEO process would help to prevent much of the actual or

perceived conflict.  The Arbitrator does not order that the EEO Department be restructured to

include all EEO functions.  She does not have budget or management **information** that allows

her to fashion such a remedy.  Rather, she asks the Agency to present proposed plans to eliminate

more of the areas of conflict.  For example the Arbitrator would be interested in knowing if there is a reason why a non-collateral duty EEO counselor could not be physically housed in the EEO Department; in lieu of Human Resources.  The Agency should present its plan to the Arbitrator within ninety (90) days of its receipt of this decision.  Upon receipt of this decision, the parties should schedule a teleconference with the Arbitrator to discuss due dates for the completion of the proposed reorganization plan as well as for the submission of other documents the Agency indicated it would like to submit in the event the Arbitrator should not grant its motion to dismiss.        It is noteworthy the Union asked that it be allowed to comment on the proposed Agency EEO reorganization.  This may be helpful, but Union comments will not binding on the Agency nor the Arbitrator.

In the Agency's May 15, 2000, response to the institutional grievance, John Seal, Chief Management Officer stated Rick Lattimer would serve as Senior Counsel and provide advice on EEO matters prior to litigation.  However, Mr. Lattimer appeared before the Arbitrator as lead defense counsel for the Agency.  His position was that of advocate; wherein he took a firm adversarial position against the Union and the PBGC employees it represents.  Numerous undisputed exhibits show evidence that Senior Counsel is not a neutral position.  Union exhibit 19, a settlement agreement signed by Mr. Lattimer, provided a stay of proposed removal of an employee and also resolved an informal EEO complaint containing a request for disability accommodation.  Additionally, Union Exhibit 11, shows that the Office of General Counsel (OGC) is involved in " Labor/ Personnel/ EEO" wherein there is concurrence between Senior Counsel and other sections of OGC.  On the other hand, Management and Program Analyst Jackie Dickerson testified that she consults Mr. Lattimer for a determination of whether an EEO complainant has properly established a *prima facie* case.  This represents a conflict.

Another conflict in the EEO system was gleaned from the resume of Philip Hertz (Union

Exhibit 21) which states that he supervises teams of attorneys in areas of personnel law, labor relations and EEO. In addition, he supervises the Office of General Counsel budget. Thus, there are numerous conflicts shown with the Offices of General Counsel and Senior Counsel. The Arbitrator is concerned that employees will be deterred from using the EEO system, if the very people they have to turn to for administrative resolutions in the informal and formal process will be the same ones sitting across the table in an arbitration, or in a hearing before an administrative law judge at the EEOC. This is a situation EEOC sought to prevent in promulgating the sections of Management Directive MD110 which prohibit conflict in federal agencies' EEO processing systems .

An affidavit executed by Amy Briggs, personnel management specialist employed in the Agency's Human Resources Department showed that she was advising an EEO investigator and that she was involved in the processing of an employee's request for disability accommodation. The affidavit of Andrea Schneider also shows that during the taking of her March 1999 affidavit (as part of an EEO case), Mr. Lattimer was on the telephone serving as counsel, as she was interviewed. Thus, the Union's concerns are well founded. It is not enough that counsel for EEO matters in the pre-litigation stage not appear in court. If he is going to request to sit in on formal stage investigations, employees' interviews and be involved in the informal stages of EEO cases, he will not be viewed as a neutral, because he also meets the employees and their union representatives on adversarial grounds, during arbitrations and before administrative law judges at the EEOC.

The Arbitrator questions the process of Agency counsel requesting to be present during employee interviews. The Arbitrator has met and respects Mr. Lattimer as a professional attorney. She does not question his personal integrity nor the sincerity of his commitment to conducting his EEO functions in an atmosphere of fairness and neutrality. However, there is

inherent conflict written into his job description. No matter how well intended or unintentional the purpose of the exercise may be, it appears to present an unwarranted opportunity to intimidate employees when an Agency attorney sits in the room while they talk to a neutral contract investigator, irrespective of whether the employee is a complainant, responsible management official or a fact witness. An attorney who is not representing the affiant, should not be in the room, unless he is voluntarily invited. This is not only a conflict, it is an interference with the EEO process.

There was undisputed testimony during the arbitration hearing by Union President Valda Johnson, that Agency Attorney Lattimer asked to sit in the room while she was interviewed (by an outside contractor/ investigator) regarding the EEO complaint of a PBGC employee. The Arbitrator finds there would be a chilling effect on an affiant in an EEO investigation, if an Agency attorney who also gets involved in adversarial matters against employees insisted upon or expressed the need to remain in the room during the interview of employee witnesses. Moreover, if that attorney (or his supervisor) also represents the Agency against employees during EEOC hearings, or against the employee's union during arbitrations, clearly he is not considered a neutral and will undoubtedly hinder the employees' free access to the EEO process. Employees may be inhibited in their use of, or free access to the EEO process, if the lawyer they are likely to oppose at an EEOC hearing or in arbitration will sit in on his interview with the EEO investigator, or give advice to the EEO counselor. Valda Johnson testified that she received a series of e-mails asking if Attorney Lattimer could be present while the investigator interviewed her. She testified that she felt Attorney Lattimer's asking to attend the EEO interview was a "form of harassment". Ms. Valda Johnson points out that both before and after the alleged reorganization creating the Office of Senior Counsel, as management representative, Mr. Lattimer sits across the table from the Union as it represents employees in labor management

negotiations. He is not considered an EEO neutral, but rather presents an adversarial image in his ancillary labor relations role.

The EEO investigation interview is not considered the same as a fact-finding or hearing where the employee expects no privacy. Although the employee is advised that he or she will not be accorded confidentiality, most of them expect the interview process to be done in an atmosphere where they are accorded due privacy to state what they wish without having the "accused" looking at them. Moreover, employee-affiants are generally given the opportunity to review and revise their affidavits before they become part of the record. Having a Management official or attorney present in the room is not only unduly restrictive and intimidating, it deprives the employee of the opportunity to review and revise his statements before management has an opportunity to review it. This undoubtedly creates an unwarranted chilling effect and violates relevant portions of 29CFR as well as EEOC MD-110 which require that the record be developed in an impartial atmosphere. The Commission's regulations at 29 CFR§1614.108(b) requires the Agency to "...develop an *impartial* and appropriate factual record upon which to make findings on the claims raised by the written complaint." (Emphasis added). Additionally, 29 CFR §1614.102 (a)(2) states the Agency must "[P]rovide for the prompt, fair and impartial processing of complaints..." in accordance with 29CFR and the EEOC's directives. Although the testimony of EEO fact witnesses is not confidential, they should be provided with an atmosphere free of intimidation and retaliation in which to freely express opinions and give information.

The Union urges the Arbitrator to fashion a remedy which requires the Agency to provide separate offices to avoid conflict; E.g., one to provide legal representations in labor relations and personnel matters and another separate entity to provide legal advice on EEO matters. It also suggested that the General Law and Operations Group be moved to Human Resource Department or the Chief Management Office. Further, they suggest that since the EEO function should be

moved from the Office of Chief Management, one or more attorneys should be moved from the

office of General Counsel to work directly with the EEO program.  Further, if a full time

attorney position is not feasible, it is suggested that the Agency procure legal advice from another

Agency.  The Arbitrator is not familiar with the Agency's structure and therefore will not instruct

the Agency where particular functions should be placed.  However, the Arbitrator will order that

the Agency comply with the Commission's requirements to avoid and eliminate conflict.  The

Agency will be allowed reasonable opportunity to provide the Arbitrator with restructuring

information that allows them to revise their EEO processing system as easily and economically

as possible; and without undue disruption to the conduct of its work and the completion of its

mission.

　　　　Another substantive argument raised by the Union is that the Agency allegedly violates

EEOC regulations and MD 110 by assigning EEO and personnel responsibilities to the same

Agency officials and attorneys and locating them in the offices that are responsible for personnel

matters.  Specifically, the Union states it is improper for John Seal to serve both as EEO Director

and Chief Management Officer.  The Union maintains that there are references in the file which

indicate that John Seal's position may have had (and possibly retains) some vestiges of conflict.

He signed a step three grievance on October 6, 2000.  It is not clear whether this was before or

after the agency reorganization and change in reporting functions which was implemented to

comply with 29 CFR §1614 and MD-110.  Additionally, there is an exhibit showing John Seal

signed an EEO settlement agreement dated October 12, 2000.  Management and Program Analyst

Jackie Dickerson testified that she sends copies of acceptance letters to Mr Seal.

　　　　The Union maintains that this arrangement violates the MD 110, because there is no

independence and distance between EEO representatives and those offices which are responsible

for defending the Agency against EEO complaints.  This area of contention was not clear to the

Arbitrator on the record. As was pointed out in the hearing, in a small agency, it is impossible to have no conflict whatsoever. If the EEO manager reports to the head of the agency, does not the head of the agency have responsibility for all aspects of the operations; including EEO, labor relations, personnel and budget?

## CONCLUSION

The Arbitrator finds that substantial deference must be accorded to EEOC as the Agency empowered to promulgate regulations and management directives that guide Federal agencies in the area of matters involving employment discrimination and the processing of EEO complaints. Based on the Arbitrator's review of the regulations, there is conflict in PBGC EEO processing system. The Agency shall draft a plan to remove the conflict and submit it to the Union and to the Arbitrator within ninety (90) days of their receipt of this decision. The parties shall meet the Arbitrator at a mutually acceptable date no later than October 30, 2001 to conclude the hearing.

The Arbitrator acknowledges the concept of "continuing violation" proposed by the Union. This is commonly held to be applicable to situations in which in lieu of a single isolated act or an individual transaction, there is an act, situation, or occurrence that is repeated over a number of days or for an extensive period of time. Many Arbitrators consider each day a new occurrence and permit the filing of a grievance at any time. However, the remedy (which is usually back pay) is generally limited to the time specified in the agreement for filing grievances. (See How Arbitration Works, Elkouri page 153). In employment discrimination cases, the concept of continuing violations may encompass situations which last for several years; as the Union apparently alleges here with their request for documents back to 1990. As stated above, the Arbitrator is not convinced that there is any legitimate, compelling interest to be served by requiring the production of documents back to 1990. In fact, most documents are **not** required to

be retained for ten (10) years.  The Union is hereby instructed to review their request for

production of documents in light of the documents it received at the hearing and submit a revised

request; to delete those documents it has already received.   Thereafter, the Agency and the

Arbitrator should be served with a revised request.  Ten (10) days after receipt of the revised

request for production of documents, the Agency shall serve the Union and the Arbitrator with its

written objections, if any.  The Arbitrator will be available for a conference call with the parties

after the written objections are filed.  The Agency shall use reasonable efforts to comply with the

revised document request within twenty (20) days thereafter.

There has been no showing that the Union is entitled to a remedy that extends back to

1990.  Consequently, the Union must convince the Arbitrator why documents are needed from

1990.  There can be no doubt that there have been violations (of the contract and the EEOC

MD110), in that there have been areas of conflict in the Agency's EEO processing system.  The

Agency testified that most, if not all of those prior problems and violations have been remedied

by their recent reorganization or realignment of EEO functions.  As requested, the Arbitrator will

give the Agency an opportunity to supplement the record to show *inter alia*, how it has added

adequate safeguards.


## AWARD

There can be no doubt that the Agency operated its EEO program in an manner that was

not totally in compliance with the requirements articulated in the EEOC's regulations and the

revised MD 110.  It has recently acted to eliminate its conflicts.  This is commendable and

applaudable.  However, the Arbitrator denies the Agency's motion to dismiss the Union's

grievance.  The Agency shall draft a plan to remove the conflict and submit it to the Union and to

the Arbitrator within ninety (90) days of their receipt of this decision.  The parties shall meet the

Arbitrator at a mutually acceptable date; no later than October 30, 2001; to conclude the hearing.

As stated above the Union must revise and re-serve its document request.  The Agency has ten

(10) days after receipt of the revised document request to file written objections.  The parties will

schedule a conference call with the Arbitrator to discuss the issues raised in the Agency's written

objections, if any.

   As requested, the record remains open for the parties to submit additional documentation.

A hearing on the issue of continuing violation and remedy shall be conducted on or before

October 30, 2001.  The Arbitrator retains jurisdiction in the matter of the grievance filed herein.


Washington, D.C.
June 1, 2001

Gloria Johnson, Arbitrator