## Glossary

Witness or Person Referred to:

| Witness or Person Referred to: | Designation: |
|---|---|
| Stuart Bernsen | A |
| Laura Rosenberg | B |
| Donna Pentak | C |
| Robert Perry | D |
| Todd Nickens | E |
| Delarse Montgomery | F |
| Robin Horning | G |
| Holli Jaffe | H |
| Diana Lavik | I |
| Elizabeth Baker | J |
| Valda Johnson | K |
| George Williams | L |
| Nosette Smith | M |
| Richard Latimer | N |
| William Beyer | O |
| Stanley Hecht | P |
| Karen Esser | Q |
| Debra West | R |
| Jay Resneck | S |
| Israel Goldowitz | T |
| Michael Miller | U |
| Tim Callaghan | V |
| Philip Hertz | W |
| John Paliga | X |
| Charles Finke | Y |
| Jeffery Cohen | Z |
| Stacy Williams | AA |
| Sharon Barbee Fletcher | BB |
| Richardo Silva | CC |
| John Hemphill | DD |

## IN THE MATTER OF ARBITRATION

### Between

**National Association of Government
Employees, Local R3-77,**

**FMCS Case No. 03-08992**
Supervisory Misconduct

**and**

Robert T. Moore
Arbitrator

**Pension Benefit Guaranty Corporation.**

## DECISION AND AWARD
## ON  AGENCY LIABILITY

**Presenting and Briefing Case:**

For the Grievant:

    Rhonda Baird, Esq.
    Dwayne Jeffers

Pro se
NAGE Local R3-77 Representative

For the Pension Benefit Guaranty Corp. (PBGC, Agency or Management):

    Ray M. Forster, Esq.
    Karen Rapaport Esser, Esq.

Office of General Counsel
Office of General Counsel

### Issues Presented

    **Issue 1.**  Whether the Agency, through the actions of Mr. X on November 13, 2002, violated any provisions of the parties' Labor Agreement, internal rules, regulations or policies of the Agency, or of the laws, rules or regulations of the United States, and if so, what should the remedy or remedies be?

    **Issue 2.**  Whether the Agency, through the actions and/or inactions of the General Counsel and the Office of General Counsel or other components of the Agency, in response to the grievant's complaint about Mr. X's conduct on November 13, 2002, failed to comply with or violated any Labor Agreement provisions, internal rules, regulations or policies of the Agency, or of the laws, rules or regulations of the United States, and if so, what should the remedy or remedies be?

FMCS Case No. 03-08992
NAGE R33-77/PBGC

## Statutes and Labor Agreement provisions in Issue

The statutory and Labor Agreement provisions and other rules, regulations, and policies of the PBGC and other government agencies on which the grievant relies or which otherwise are important to the issues raised, will be quoted as necessary in the body of this Decision.

## Facts

**Background and Chronology of Events:** The grievant is a black female, born in Trinidad-Tobago, employed by the PBSC as a GS 14 General Attorney in its Office of the General Counsel (OGC). Her employment began in August, 1997. When she advanced to GS 13, it was the result of a settlement with the General Counsel of an informal EEO complaint she had made about the lack of her keeping pace with the promotions of other, similarly situated attorneys who were white and male.

In April and June, 2002, she had testified for the Union in an arbitration challenging the Agency's practice of assigning labor relations and personnel management to positions in the Agency's internal EEO complaint resolution procedures (the EEO Structure Grievance). The outcome of that arbitration was favorable to the Union and resulted in a reshuffle of personnel and a general overhaul of the structure of the EEO complaint investigation and resolution structure with regard to who does what and reports to whom.

The grievant also filed a formal written EEO complaint on October 3, 2002 with the PBGC. In it she alleged she had been discriminated against on the basis of her race, sex, national origin and because of her participation in protected Union and EEO activities.

As an OGC attorney, the grievant dealt with complex legal issues raised in the enforcement and implementation of the statute designed by Congress to protect and, where necessary, provide a safety-net scale of substitute payments for fixed benefit pension plans which fall into default. The areas of law involved include tax, bankruptcy, pension, and labor relations. Like all attorneys who appear in court, provide in-house advice and counsel, and must interact with attorneys representing outside interests, it was important that she have team working skills, effective communication capabilities, and the ability and willingness to accept and carry out instructions.

Prior to her job performance ratings prepared in October, 2003, the grievant had always been highly rated on these requirements of her job, as well as found to be a pleasant worker, receptive to instruction and eager to improve her job performance. She was not considered to be overly emotional or irrational by her peers or supervisors.

Her present supervisor, Mr. Y, testified that her interactions with others had always been direct, clear and appropriate for the circumstance.

**The November 13, 2002 Incident**: Within the PBGC is the Corporate Finance and Negotiations Department (CFND), staffed primarily by non-attorneys who undertake the financial analyses of pension plans to determine their funded level and prospects of continued soundness. To every CFND case, an attorney from the OGC is assigned to provide legal assistance when thought necessary by the CFND. The grievant had sought assignment to CFND cases, and the first assignment she received was to the TRW case.

TRW was a company with multiple operations, owed by Northrop Grumman. The automotive products portion of TRW was being sold by Grumman through a leveraged buyout with a third organization providing the financing loan to the purchasing group. The portion of TRW being spun off had an underfunded pension liability and the PBGC's concern was with the potential adverse impact the considerable debt that was being assumed by the purchasers could have on that pension liability.

On short notice, a meeting was scheduled for November 13, 2002 between the CFND and representatives of Northrop Grumman, TRW, the purchasers, and the financing group. The CFND official responsible for the TRW transactions and its pension liability ramifications notified the grievant of the meeting and requested her attendance. This being her first CFND meeting with outside representatives, the grievant would ordinarily have been accompanied by her first line supervisor, Mr. Y. However, Mr. Y was not available because of a prior out-of-office commitment.

To address such situations, the OGC has a "buddy system" among its first line supervisors. When an attorney needs assistance from their regular supervisor, but that supervisor is not available, they rely on their regular supervisor's designated "buddy." In this instance, Mr. Y's "buddy" was Mr. X. When the grievant received notice from the CFND that she was wanted for a TRW meeting the next day, she forwarded the message to her second line supervisor, Mr. Z, who forwarded it to Mr. X, advising the grievant that he had done so.

In response, the grievant sent Mr. X materials related to the TRW case and asked him to contact her if he had any questions or wanted to discuss the case or the upcoming meeting. He did not respond in advance of the next day's meeting, at which she and he were the first to arrive. While waiting in the conference room, they may have exchanged pleasantries, but nothing of substance about the TRW matter or about Mr. X's expectations concerning the conduct of the meeting. The meeting itself went according to script. It was conducted by the lead CFND financial analyst responsible for the TRW matter. The Grievant and Mr. X were not active participants, but rather they

- 4 -

were spectators on standby should a legal issue arise.

During the meeting, a woman entered the room and spoke to Mr. X briefly. Soon thereafter, Mr. X left the meeting without telling the grievant whether or not he would return. His departure was at a key point in the discussion. The grievant recorded what occurred after Mr. X left because she was unsure when, and if, he would return. When Mr. X returned about 10 minutes later, the grievant facilitated his return to the discussion by sharing with him the information that he missed but which she had written down on a note pad. She passed her notes to him.

A legal issue arose during the meeting. The CFND wanted access to certain records of TRW and the other company, as well as from the investor group slated to finance the buyout of the spun-off operations of TRW. As evidently the custom in cases of this nature, the outside parties were agreeable to providing the requested materials, but because some were of a proprietary nature or otherwise not of public record, they requested a "confidentiality agreement" that would assure that the materials provided would not be disclosed beyond the Agency and those within it who had a need to know their content.

Since this was a customary request of companies whose restructuring had be-come a matter of PBGC interest, the CFND personnel agreed to the request. In fact, the subject of confidentiality agreements was so routine, that the PBGC had developed a computer "template" that provided a fill-in the blanks format into which the name of the company or group was entered as well as other specific information. The grievant was aware of this, and that since the specific information needed to fill in the blanks was known by CFND personnel, it would be they who would create the initial draft of the agreement and submit it to her for review before it was signed and sent to the outside parties who had requested it.

When all the substantive matters slated to be discussed had been disposed of, the meeting concluded and the participants stood up and began collecting their papers and putting on their coats. There was handshaking and the exchange of small talk between the PBGC personnel and the departing visitors. The grievant shook hands with the visitor who had been seated next to her, and then Mr. X entered into a conversation with perhaps the same visitor about someone they knew in common. As most of the visitors left the conference room, so too did the grievant. In fact, she was the first out of the room. Among other things, after a two hour meeting, she needed to visit the ladies room.

Feeling that she had discharged her duties at the meeting and knowing what her follow-up role would be, the grievant headed first for the restroom, and then back to her office. She did not first ask leave of Mr. X, her acting supervisor, or of the CFND

official who had presided over the meeting, but simply went on her way.

Mr. X was not pleased with the grievant's abrupt departure without asking his permission to do so. He revealed his annoyance with her apparent disrespect shown that day during the arbitration hearing of the resulting grievance over what occurred between the two of them within 15 or 20 minutes of the grievant's departure from the meeting room. While being questioned by her, he upbraided her in response to her question, "So I got up when others are getting up?," by declaring matter-of-factually in his first sentence, and then irritably in his second and third, that:

> Well, what struck me is the fact that other folks were mostly just kind of talking as they were getting up from their chairs, and you seem to have a purpose, something that you were leaving for. You didn't say anything to me and I don't remember you saying anything to anyone else. You just got up and left the room it seemed like at a pretty rapid pace.

There was another cause for Mr. X's irritation. He had attended many CFND meetings of the same nature as that just concluded. He was aware of the frequent practice for CFND and OGC personnel to linger while the outsiders cleared the room, and thereafter have a post-meeting conference to assure who was going to do what in the way of follow-up and who would do the reviewing of the product, etc. This being the grievant's first CFND meeting, she was unaware of this custom. Mr. X did not know of her ignorance, but seems to have accepted that she was electing to ignore the custom in her haste to leave.[1]

When the post-meeting conference concluded, Mr. X went to the grievant's office with the dual purposes of addressing her effrontery in leaving the conference room with nary a word to him, and also satisfying himself that she understood her follow-up responsibility for reviewing, with a quick turn around, the CFND draft of the confidentiality agreement.

When Mr. X arrived at the open door of the grievant's office he saw she was on the telephone. She was listening to a message left by a distraught PBGC employee who had called the grievant in the grievant's capacity as an EEO counselor. The grievant was seated facing the wall against which her desk was pushed, but swivelled toward him, holding up her index finger indicating that she would be off the phone in a moment.

Mr. X testified that he remembered being left "waiting in the doorway for some time" before the grievant hung up. From his demeanor and the tone of his words, it

---

[1] A lead CFND participant in the TRW meeting confirmed, when later interviewed about the incident, that Mr. X appeared not to be happy about the grievant's leaving the meeting when she did.

was clear that he resented this forced wait at the time, and still resented it more than a year and a half later when recounting the incident during this arbitration. Undoubtedly, the wait contributed further to Mr. X's mounting frustration with the grievant's conduct and manner.

After the grievant hung up, Mr. X vented his displeasure with her abrupt departure from the CFND conference room by angrily accusing her of leaving the meeting before it ended, and specifically saying that her actions were unprofessional. He also said, "I do not appreciate your attitude," and further stated that, "I would never accept your behavior." Mr. X also told [the grievant] that he would report her conduct to Mr. Y, her supervisor. Only after this opening salvo did Mr. X informed the grievant of his post-meeting discussions with the CFND employees.[2]

Knowing nothing about the custom of OGC and CFND personnel holding a post-meeting conference, and feeling that she knew her responsibility for reviewing the confidentiality agreement which she understood would be prepared by CFND using the approved template, the grievant believed that she had been free to leave the conference room in the stream of departing outsiders without first seeking the leave of her superior.

Initially, the grievant was simply startled by Mr. X's accusations of impropriety and lack of professionalism. But quickly she too became angry and forcefully denied his charge that she had left the meeting before it ended. She attempted to explain that she did not leave before the meeting was over, and that she intended to follow-up with the CFND before she left her office for the day. She also told him she didn't understand or appreciate his accusations, especially those questioning her professional conduct.

The temperature of the confrontation continued to rise as Mr. X responded by telling the grievant that by arguing, "you're bordering on insubordination." This escalation from a charge of simply leaving the meeting too early to a suggestion that she was on the edge of being insubordinate was not left unaddressed by the grievant. She shot back that she was not being insubordinate, but had the right to defend herself when accused of unprofessional conduct, and now, insubordination.

As for these opening charges, denials, and countercharges, there were no serious, or at least no material, differences between Mr. X's and the grievant's accounts. However, as to what occurred next, their accounts diverged.

---

[2] Mr. X testified that he could not recall which subject he took up first with the grievant after she hung up her phone, but the Agency maintained in its brief that it was his concern about a speedy follow through on the confidentiality agreement. However, I find that uppermost on his mind was his perception of the grievant's rudeness in departing the CFND meeting without his leave, and this was the first subject he broached.

In her written statements and testimony, the grievant consistently maintained that after asserting her right to mount a verbal defense of her conduct and professionalism, and to claim a lack of any intent to be insubordinate by doing so, Mr. X "left her office doorway and came into her office, stood within arm's length of [her] and said, 'you better not push it.'" On the other hand, initially, Mr. X gave statements to Agency EEO and HR personnel in which he maintained that he had never left the doorway to the grievant's office. However, by the time Mr. X testified, he had come first to admit he may have taken a step into her office, then that maybe it had been two or three steps. But he insisted in his testimony that he never was closer than five feet from her.

To get a sense of why the parties so intensively argued over this issue and over the production of Agency documents and notes reflecting when and what Mr. X had said in prior statements about his physical proximity to the grievant, I asked for a "view" of the grievant's office in the company of the parties. What I found was that to call the grievant's work space an "office" was a generous use of the word. It was approximately 11' 4" by 10' or roughly the size of a large office building elevator car, and like such, windowless. For lack of room to orient the grievant's desk otherwise, such as to have it face the door as would be normal, it was fronted against the left wall. Her desk chair when in use, but pushed back as it would be in conversing with someone in the doorway, would be in the center of the small room.

As for Mr. X's movements, the convincing evidence was that he did not remain in the doorway. Mr. E, whose office was a short way down the narrow hallway from that of the grievant's, testified he "heard a loud conversation" and recognized the grievant's voice but not that of the male. So, he looked down the hallway and saw no one, but continued hearing both loud voices. A few minutes latter, he saw that the male voice had been that of Mr. X because Mr. X passed Mr. E's office as he left, still directing comments to or at the grievant. There was also Mr. U, a fellow Assistant General Counsel of the same rank and with the same general duties of Mr. X. He happened down the hallway during the altercation, heard it going on, but did not find Mr. X standing outside the grievant's office.

Having established that Mr. X entered the grievant's office, and considering that he may have taken a step or two inside, it was noted that a single, normal stride would have placed Mr. X within five feet of the grievant's chair, and with a step or two more, he would have been towering over her had she sat. Thus, her further account related in her subsequent grievance, that she "stood up from her chair because she was uncomfortable with Mr. [X]'s tone of voice and proximity," is found credible and more persuasive than that of Mr. X. To take it one step further, so to speak, it is clear from the claustrophobic nature of the windowless confines of the space, Mr. X's agitated advance

toward her was physically threatening.[3]

But, because their discourse did not end there, the physical proximity of Mr. X to the grievant became yet more threatening. With him now in her tiny office, she again asserted that she was not being insubordinate, but trying to answer his accusations. Rather than accept this explanation and back away, Mr. X moved closer and angrily repeated several times in her face, "keep pushing it." Only then did he turn and walk out of her office, but as he did so he told her it was "over." Not only was this the last thing the grievant heard Mr. X utter, but so too was it the last thing that Mr. E heard him say as he came down the hallway and past Mr. E's office door.

In testifying, Mr. X appeared to be a quiet mannered man, but as already noted, capable of flashes of anger when confronting the grievant's charges. Further evidence that Mr. X carried a grudge over the November 13, 2002 encounter with the grievant and her subsequent complaint to the General Counsel about it, was an e-mail he sent Mr. Y eleven months after the incident, but shortly before the end of the grievant's annual performance appraisal or rating period. As "buddies" who oversaw each other's attorneys when one of them was absent, they exchanged their observations and impressions of each other's attorneys prior to their ratings. Mr. X's October 15, 2003 e-mail read:

> Turnabout is fair play, right? Your folks were likewise pleasant and self-sufficient with one noted exception, [the grievant]. Her performance in the [TRW] case in the area of following-up with the client [CFND] and accepting and responding appropriately to supervisory feedback was absolutely unacceptable. We should talk about how that will be reflected in her [performance appraisal], as I didn't and still don't care for her over-the-top reaction.

From the text, and the evidence on the question as a whole, what was being referred to by Mr. X in both the statement that "turnabout is fair play, right?," and his use of the phrase, "her over-the-top reaction," were the grievant's complaint to the General Counsel about his and hers November 13 encounter, in which complaint, as well as in her subsequent grievance, she asked that Mr. X be disciplined for his discourtesy and threatening conduct.[4]

---

[3]  Rejected is any suggestion by Mr. X or the Agency that the grievant may have been the aggressor and have taken a "step or two" toward Mr. X. Having seen and heard both witnesses, the grievant's account is the more plausible in all respects.

[4]  As it was, Mr. Y did not act on Mr. X's recommendation, knowing that what had happened between Mr. X and the grievant was in dispute. Nevertheless, in important categories, Mr. Y rated her

FMCS Case No. 03-08992
<u>NAGE R33-77/PBGC</u>

**The Grievant's Complaint and the Initial OGC Response in the Absence of the General Counsel**: November 13, 2002 was a Wednesday. Shortly after the incident with Mr. X, and while growing ever more emotionally distraught and angry, the grievant fired off an e-mail to the General Counsel at 5:33 PM which stated:

> I am going to make this brief because I am too emotional to do much more right now. [Mr. X] just accused me of leaving a meeting before it was over implying that I shirked my professional responsibilities because I did not determine who would be responsible for preparing and review a confidentiality agreement. When I defended myself against his allegations, I was accused of bordering on insubordination. Needless to say[,] our conversation went downhill from there. The meeting in question ran over an hour after my designated departure time[,] but being the professional I am, I stayed until the meeting ended (though [Mr. X] seems to have a different definition of when a meeting ends). [Mr. General Counsel], I respectfully request a meeting to discuss this when I have the emotional restraint to address [Mr. X]'s attack without emotion. FYI, I am of course going to consider my options of instituting a grievance or EEO counseling over this matter. Thank you.

The next morning, having learned that the General Counsel had not been in the office the previous evening and was not expected back before the week ended, the grievant redirected the e-mail at 7:28 AM to Mr. T, who had been designated to act as General Counsel in the interim. Mr. T was not part of upper OGC management, but because all those who were had accompanied the General Counsel to the off-site meeting, the mantle of authority had fallen on Mr. T, a "highly unusual" occurrence. In the organization of the OGC, Mr. T was at the same GS15 level as Messrs Y and X.

For the benefit of Mr. T, the grievant included the following explanation with her forwarded e-mail:

> [Mr. T], I am forwarding the message below to you in your capacity as acting General Counsel for the next 2 days. As you may know, [Mr. Y] is out of the office this week and I have an untenable situation of having to

---

lower than she had been rated in her prior performance appraisals. The grievant admitted that her job performance during the year following the November 13, 2002 incident had been lower and less praise-worthy, but felt it was caused by the emotional trauma of the incident and the subsequent refusal of the General Counsel and the OGC to take seriously her complaint about it, as well as the mishandling of the eventual investigations by the Human Resource Department (HRD) after she had made her complaint against Mr. X a subject of the present grievance.

FMCS Case No. 03-08992
NAGE R33-77/PBGC

interact with [Mr. X], [Mr. Y]'s buddy, when [Mr. X] has expressed such clear animosity and unprofessional conduct in his interaction with me yesterday afternoon. Please be advised that I have invoked my right to EEO counseling about this matter and have also inquired about the process of pursuing claims under the workplace harassment policy and professional courtesy directive. [Mr.T], I came in today with the intent to do my job to the best of my ability but I am unable to put yesterday's incident out of my mind and act as if it has not had a severe impact on me. I just wanted to ensure I informed the head of my department of this situation so that it could be dealt with expeditiously. Thank you.

Mr. T did not communicate with the grievant during the day, Thursday, and after sending her 7:28 AM e-mail, she spent the rest of it performing her follow-up with the CFND concerning the confidentiality agreement. This including reviewing her work with Mr. X over a question about who should sign the document for the PBGC in light of the unavailability of both the General Counsel and the Head of the CFND. They avoided any direct contact or interaction by e-mailing messages back and forth, some of which from Mr. X the grievant thought at the time were unnecessary nitpicking.[5]

The next morning, Friday, November 15, 2002, she conveyed her displeasure with both Mr. T's silence and Mr. X's review of her work with a 7:01 AM e-mail to Mr. T:

[Mr. T], despite my request yesterday, it appears that nothing has been done to neutralize the situation [Mr. X] instigated on Wednesday. OGC's failure to take any action despite my request resulted in me having to stay in the office until after 7 p.m. last night because, in my opinion, [Mr. X] deliberately inflated a simple task with the intent to continue his harassment. I tried to follow his dictate [so as] to avoid any further conflict with him, but you have the responsibility for upholding and enforcing PBGC's workplace harassment policy and professional courtesy directive and should act to stop this situation now.

Today, I am asking again for something to be done about this situation. I do not believe that you understand the severity of the emotional distress this incident has cause me so let me tell you I have been unable to turn [Mr. X]'s conduct off in my mind since Wednesday when he attacked me! So, at a minimum, please assign another supervisor to cover on my cases so that [Mr. X] cannot continue this pattern of behavior. If nothing is

---

[5] This is a grievance claim against Mr. X's conduct which the grievant appears to have abandoned in favor of concentrating on the more dramatic events of November 13 and the inadequacies of the OGC and HRD responses to that incident.

FMCS Case No. 03-08992
NAGE R33-77/PBGC

done, I will have no choice but to take this issue to upper management.

Please provide me with a direct response to this reasonable request as soon as you can. Thank you.

Then, at 10:34 AM, having learned that her regular supervisor had returned, the grievant advised Mr. T by an e-mail message as follows:

[Mr. T], Mr. Y is in today so the issue of who I would report to is resolved but I still would like a response regarding the incident. Thank you.

At 11:54 AM the same day, Friday, Mr. T sent the following information by e-mail to the grievant in response to her string of messages:

I understand [the General Counsel] expects to return to the office this afternoon. You may be able to see him then.

Also getting a "cc" of this last message, as well as the earlier portions of the e-mail string, either in their "mail boxes" or immediately, were Messrs X and Y, the grievant's second line supervisor, Mr. Z, and the Union's chief steward, Mr. A. Some time during the morning, Mr. T had happened upon Mr. A, who asked Mr. T if he had responded to the grievant's request for a meeting.

At 11:57 AM, the grievant replied to Mr. T with the following:

[Mr. T], I am sending this e-mail to address what may be a coincidence, but it seemed curious to me that you and [Mr. X] would be meeting with two labor management attorneys present, along with my supervisor [Mr. Y]. I know God has a sense of humor, but since I am concerned, I must raise my concern to all involved about the likelihood that the 'meeting' was a discussion about the situation I asked for your assistance with. Despite the failure of OGC to do so in the past, I expect OGC to come to the table in fairness to me and not just to [Mr. X].

PS. Isn't this a coincident that so shortly after the meeting you responded with a message you could have sent to me before. Hmm....

Besides the others now joined as recipients of copies of the string of e-mails, the grievant added Mr. M, an EEO counselor to whom the grievant had gone for advice.

Just as the grievant alleged in her last e-mail, sometime Friday after 10:00 AM, Mr. T had met with his colleagues and co-equal supervisors, Mr. X and Mr. Y, to find out

what all the e-mails from the grievant were about. Most likely prompted by his encounter with Mr. A and the reasonable assumption that the Union would soon become involved, Mr. T decided he wanted Agency labor relations people in the meeting, and so, Mr. S, and maybe another attorney, attended.[6]

After hearing Mr. X's account of the incident, and whatever Mr. Y knew, and with the advice of Mr. S, and perhaps after a telephone conversation with the absent General Counsel, Mr. T concluded that the matter could safely wait a few more hours for the arrival of the General Counsel.

### Return of the General Counsel and His November 15, 2002 Inquiries:

While still away, the General Counsel was advised by Mr. T or Mr. Z about the grievant's e-mails and what either of them then knew about her incident with Mr. X. With this advance information, he returned to his office in mid-afternoon, November 15, 2002 to learn more about the incident. Either from reading the grievant's e-mail declaration to Mr. T that she was pursuing her EEO option, or because Mr. T told him of his encounter with Mr. A, the Chief Steward of Local R3-77, or perhaps both, the General Counsel understood that the incident between the grievant and Mr. X was certain for either a full EEO investigation or a full grievance-response inquiry.

According to his testimony, because of this, the General Counsel saw his initial responsibility to be "to assess the degree and the nature of the problem that had taken place, and to see whether any kind of immediate Management action was necessary." He never intended his "inquiry" to be of the scope or thoroughness of either the EEO or the grievance investigations he expected would follow.

The General Counsel first met with Mr. X to get his version of events. No written record was made of what the General Counsel asked Mr. X or what Mr. X had to say. However, the General Counsel made sure there was a written account prepared of his meeting with the grievant. He asked Mr. S, who was in attendance, to memorialize what occurred when he met with the grievant and her representative, Mr. A, because, as he characterized it in his testimony, it had been a "conflagration." Mr. S, the Agency's Assistant General Counsel for Labor Relations matters, had probably been asked to

---

[6] The grievant was infuriated that this meeting was convened by Mr. T without his having spoken to her, or heard her version, as was apparent from her testimony:

I was on the third floor, outside [Mr. X]'s office, [when] out pops [Mr. S], assistant general counsel for labor management [affairs], [Mr. Y], and [Mr. T]. -- Nobody had ever contacted [me], but there's this big meeting that's just breaking up inside [Mr. X]'s office. I know it to be nothing else other than a discussion of the complaint I made. This is two days after. Nobody has responded to me yet.

FMCS Case No. 03-08992
NAGE R33-77/PBGC

- 13 -

accompany the General Counsel because Mr. A would be there.

The memo written by Mr. S, in the form of an e-mail addressed to four members of the Agency's Labor Relations staff, recounted:

[The General Counsel] and I met with [the grievant] and her rep, [Mr. A] from 4 to 4:30. [The grievant] was very upset, used a very loud and aggres-sive manner. At one point [the General Counsel] asked her to stop point-ing her finger in his face. At another point, [Mr. A] grabbed her and asked her to please come out of the room and talk to him. She did and came back in, and said, [']well, that is why I have a rep,['] and said in a calmer manner, she wants: 1) to be there when [the General Counsel] interviews [Mr. X]; 2) she has gone the EEO route on this; 3) she expects him to inves-tigate and enforce the courtesy directive.

She felt [Mr. X] was discourteous. He failed to call her or respond to her e-mail before the meeting w/ CFND. He should have asked her what was up, instead of accusing her of leaving the meeting. He should not have gotten one foot away from her in the confrontation. He shouldn't have accused her of insubordination. She wanted [the General Counsel] to say she shouldn't have to work with [Mr. X] anymore. [The General Counsel] said she doesn't get to pick her supe[rvisor], and she has had many prob-lems with sup[ervisor]s. She got very upset at that comment and demand-ed [that the General Counsel] explain -- he did, [naming Mr. X, Ms. R, and Mr. Z]. [The General Counsel] made no promises, though he did say he was 'investigating' by talking to both her and [Mr. X]. [The General Coun-sel] also implied that since she had chosen the EEO route, that it would go that way.

[The General Counsel] asked her why she had sent the msg to CFND, and that question clearly upset her.

[The grievant] also said how upset she was that [Mr. T] never responded to her message. She said she is upset and 'cant get [Mr. X] out of her head.'

[The grievant] also made a point of how upset she was about the meeting that I [Mr. S] had attended. She claimed she was [nearby] to deliver a paper [to another office], and stayed there a few minutes. She claimed that [Mr. V] walked out of the meeting, though he wasn't there.

The grievant's first written account of her version of the November 15 meeting with the General Counsel was in her December 9, 2002 Step-2 grievance and recited:

> When [the grievant] finally met with the General Counsel on the afternoon of November 15, 2002[, h]e had apparently already met with [Mr. X], and before [the grievant] finished relating her version of the incident, he proceeded to tell her she had violated 'OGC protocol' in her conduct at the November 13 [CFND] meeting. With a sneer and a smirk on his face, noticed by both [the grievant] and her representative, the General Counsel told [the grievant] she had problems working with supervisors and he could think of three such supervisors. When [she] pressed him to name the supervisors she had 'problems' working with, he named the two supervisors named in her EEO complaint and Mr. [X] -- blaming [the grievant] for the improper actions of OGC supervisors. [The grievant] repeated her request for the General Counsel to conduct an investigation of the incident pursuant to the Professional Courtesy directive.

In their direct testimony and during cross examination, the grievant and the General Counsel provided further details. The meeting had been held in the General Counsel's conference room. There was an elongated, oval conference table. The grievant and Mr. A sat next to each other on one side, at a tapered end. The General Counsel sat directly across from the grievant where the table's width was between 24 and 30 inches. Mr. S sat directly across from Mr. A at a point where the table was wider.

Exactly when the finger wagging took place is not clear, but for sure, the incident did take place. The grievant's testimony suggested that she was angry when she arrived at the meeting, and became more so as it progressed:

> I was emotional. I was emotional throughout the whole proceeding. I had been devastated by the incident [with Mr. X]. I had been in tears for the prior two days. I was just - I was - if you want to call it very emotional, I don't know how you characterize it, but everybody who - that's why some of these witnesses are important. They'll tell you what my emotional state was. I was very emotional.

> So I'm more animated and I'm a little hyper, because frankly, I've just experienced this thing a couple of days ago. Nobody has addressed it formally in my management structure, and this is my first opportunity to speak about it. I'm animatedly recounting what I said to [Mr. M, an EEO counselor], but as you can tell from these [arbitration] proceedings, I speak with my hands all the time. I am by nature animated, . . .

Efforts were made during the hearing to demonstrate or reenact the grievant's gestures with little success. The General Counsel testified that he did not feel physically threatened by her gestures, but simply thought they were rude and inappropriate. Both agreed the grievant remained seated during the exchange, and the grievant insisted that the width of the table was such that she could not have reached him across it.

From it all, it is certain that the grievant leaned forward on her elbows, wagged her finger back and forth within 12 inches of the General Counsel's nose, and that the gesture was intended by her to emphasize the sternness of the lecture she gave him when she felt:

> [The General Counsel] didn't seem to be exhibiting what I would expect of a professional of his [rank and position], so what I did instead, I tried to get as much of that story out as I could because this is critical to me right now. I can't function in that environment, and unless something is done, there's no way I could work in this place.

*          *          *

> As I'm emotional at that time, animatedly speaking to him, out of nowhere he says something like, 'don't point your finger at me. Don't point your finger at me.'

*          *          *

> The obligation [to investigate and take action on my complaint against Mr. X] I'm owed by [the General Counsel], and I'm trying to communicate this to [him].

The finger pointing and waving could also have been triggered by one of three comments of the General Counsel. The first occurred after he invited her to tell him what had happened on November 13, and upon hearing her say she had left the meeting, but before she could explain why she thought the meeting had ended (everyone standing, papers gathered, putting coats on, and CFND participant removing an obstacle in her pathway to the door, etc.), he stated, "you violated OGC protocol." Then, after hearing her version of the encounter with Mr. X in her office, he declared that she seemed to have "a problem with supervisors," and finally, his conclusion that the incident had been something to the effect of no more than "a communications failure."

There was something else that may have caused, or at least enhanced the vigor of the grievant's emotional display. According to her and Mr. A, throughout the meeting, both the General Counsel and Mr. S often responded to the grievant's assertions concerning Mr. X's conduct with indulgent smiles, sneers, and smirks.

- 16 -

It's concluded that what the grievant insists were demeaning smiles and smirks during their November 15 meeting were in fact the General Counsel's attempts to defuse the grievant's highly charged emotional confrontation with him.  Among other reasons for her heightened emotional state, the grievant thought a meeting should have occurred the day before with Mr. T, especially after she became aware that Mr. T had met with Mr. X, and for sure heard his version of events.

### The Investigations:

As the General Counsel was to pass on to OGC and Human Resources (HRD) staff who would become involved, he had concluded that the November 13 incident between Mr. X and the grievant was but a breakdown in communications, and for that reason, he took no further action and made no further inquiries.

Neither did any HRD personnel or the OGC legal staff responsible for labor relations and personnel.  Both were fully aware of the grievant's complaint against Mr. X. Besides a briefing received on the morning of December 15 from Mr. T when he had met with Mr. X, Mr. Y and Mr. S, one of the recipients of Mr. S's e-mail with his account of the General Counsel's November 15 meeting with the grievant was Mr. N.

At the time, Mr. N was managing the HRD's office responsible for Management's investigations of grievances and other complaints.  He had also seen the e-mails sent the day earlier by the grievant to Mr. T, so he had some background.  However, for the moment, Mr. N choose to sit on what he knew.

Only when the grievant filed her written Step-2 grievance on Monday, December 9, 2002, did Management take seriously her complaint about Mr. X.[7]  Its allegations included a specific recitation of her account of Mr. X once he arrived outside her office door:

> About 15 minutes after the [CFND] meeting ended, Mr. [X] came to [the grievant]'s office and stood in her open doorway -- there is no prece-

---

[7]  Probably both OGC and HRD recognized a grievance was coming. On December 3, 2002, Mr. F, a union steward, sent the General Counsel an e-mail with a last ditch plea:

> On November 15, 2002, [the grievant] met with you to discuss an informal complaint regarding an incident that took place in OGC on November 13, 2002.  To date, a response has not been received regarding your course of action.

> As her newly elected union representative [replacing Mr. A], I would like to meet with you to see if a resolution can be reached ASAP so as to avoid potential reoccurrence that would be unhealthy for [the grievant].

dent of Mr. [X] ever coming to [the grievant]'s office. [The grievant] was checking her voice messages when he arrived. [The grievant] hung up the phone to give Mr. [X] her undivided attention.

Mr. [X] accused [the grievant] of leaving the meeting before it ended, and specifically said that her actions were unprofessional. He also said, 'I do not appreciate your attitude,' and he further stated that, ' I would never accept your behavior.' Mr. [X] also told [the grievant] that he would report her conduct to her supervisor. He then informed her of his discussion with the CFND employees after the meeting. After her initial startled denial of his charge that she left the meeting before it ended, [the grievant] allowed Mr. [X] to finish speaking before she attempted to explain that she did not leave before the meeting ended, that she intended to follow-up with the client, and she did not intend to leave for the evening before fulfilling her responsibilities and she did not understand or appreciate his accusations.

Because [the grievant] defended herself, Mr. [X], who appeared to be very angry for reasons unknown to [the grievant], said, 'you're bordering on insubordination.' To [the grievant], insubordination is a very serious offense and could not be left unaddressed. [The grievant] told Mr. [X] that she was not being insubordinate, but felt she had the right to defend herself when she is accused of insubordination and unprofessional conduct. Mr. [X] was not interested in [the grievant]'s point of view. As [the grievant] attempted to defend herself, Mr. [X] left her office doorway and came into her office, stood within arm's length of [the grievant] and said, 'you better not push it.' [The grievant] stood up from her chair because she was uncomfortable with Mr. [X]'s tone of voice and proximity.

[The grievant] told Mr. [X] that she had shown him respect and requested that he give her the same respect. [The grievant], who was visibly distraught and upset by Mr. [X]'s action, nevertheless sought to convey to Mr. [X] that she was not being insubordinate, but simply trying to explain herself against his accusations. Mr. [X] repeated several times, 'keep pushing it,' in [the grievant]'s face when he turned and walked out of her office and told her it was 'over.' While Mr. [X] was in her office, [the grievant] observed Assistant General Counsel [U] walking by her office door; he probably heard some of the interaction between Mr. [X] and [the grievant].

After the incident, [the grievant] was stunned and extremely upset by Mr. [X]'s actions; she stayed in her office trying to understand why Mr.

[X] had attacked her and what she could do to get someone to stop the rabid hostility expressed by Mr. [X]'s actions. Paralegal [E] came by her office and asked if she was okay.

In addition to the grievance's initial focus on Mr. X's conduct, was the complaint against what the grievat saw as the derelictions of responsibilities by the General Counsel on November 15. Although the grievance contained similar dereliction of duty charges against Mr. T, that did not seem to trigger the same degree of concern for Mr. N as those aimed at the General Counsel.

In response, Mr. N launched two investigations that would produce two reports. Both investigations would cover the same ground and were conducted simultaneously by a single investigator, Ms. P from HRD, assisted by Ms. Q, a labor relations attorney from the General Law Section of the OGC. Even with considerable testimony on the subject from both Mr. N and Ms. P, no satisfactory explanation was provided by either for why two separate investigations were necessary, much less how they could be kept separate.

But the sequence of their assignments to Ms. P reflected their relative importance to Mr. N. According to Ms. P, the first assignment given to her by Mr. N was to conduct what the Agency's witnesses referred to as the "Management Investigation." Mr. N explained its purpose:

> [A]s I understood it, [the General Counsel] interviewed both [the grievant and Mr. X] and came to the conclusion that this was, I believe a 'communications failure' is the way he termed it. That [Mr. X] and [the grievant] had had words with each other, but it was no more than that. Just a communications failure and no further action was warranted by him or any one else in the Agency.

> [The grievant] was obviously dissatisfied with that response and continued to press forward [by filing her grievance], and her concerns that this was not being adequately addressed. And so I wanted to make sure that there wasn't more to it. That in his anxiousness to quickly get to the heart of things, that [the General Counsel] hadn't overlooked anything.

**The Management Investigation** had a priority over any OGC and HRD concerns about the Step-2 grievance. According to Ms. P, it was during the week of December 9, 2002 that Mr. N came to her and orally assigned her to conduct Management's Investigation. He told her no more than that the grievant had alleged that Mr. X had violated the Professional Courtesy Directive. When she asked him, "What kind of allegations?", Mr. N said, "It was just the way he talked to her. But, you need to go and

- 19 -

investigate it." He made it obvious that it was urgent for her to resolve.

For reasons never explained by the Agency, Mr. N did not give Ms. P a copy of the Step-2 grievance when he gave her his initial instructions and responded to her questions. It was not until the end of the week (she thought, "maybe around the 11th"), after she had decided on who she thought were key witnesses and had scheduled their interviews, that Ms. P was given a copy of the grievance.

Because she understood that the Management Investigation came first, she put the grievance aside and ignored its recitation of the grievant's version of her encounter with Mr. X on November 13, her e-mail requests sent on November 14 and 15 to Mr. T for assistance, and her version of the meeting with the General Counsel on the afternoon of the 15th. But, Ms. P had a copy of Mr. S's account of the November 15 meeting which she read and relied on.

Ergo, as Ms. P set out to investigate, she knew the General Counsel had pronounced the November 13 incident to have been only a "communications failure," and that at the November 15 meeting, the grievant was highly emotional and had rudely shaken her finger in his face. Consciously or not, Ms. P understood that the objective of the Management Investigation was to substantiate the General Counsel's conclusion about the November 13 incident.

Ms. P was the perfect investigator for this undertaking. Her testimony and general demeanor revealed her to be an honest and conscientious, but also very naive and far from a hard nosed gatherer of facts. Perhaps the problem with her suitability for her immediate assignment lay in her prior employment. Before joining the PBGC, she spent a number of years as an HR specialist with the US Postal Service (USPS). That organization has subscribed to a feel-good approach to resolving conflicts between supervisors and subordinates "through empowerment and recognition." In sum, the approach starts and ends with the proposition that all conflicts are caused by "failures in communication," never by an abuse of power by a supervisor, the insubordination of a worker, or the just plain meanspirited personality of one or the other.

Ms P's lengthy testimony was surreal. No matter what the scenario or hypothetical situation posed, including ones that closely matched what has already been concluded actually occurred between the grievant and Mr. X on November 13, her conclusion was always "mutual fault" resulting from a simple "failure to communicate." Her refusal to accept that, just maybe, one participant could be solely blamed for an altercation, assured no chance of an objective investigation. The "failure to communicate" conclusion was hard wired in Ms. P's brain.

If that were not enough, her investigation was hobbled by time constraints. Be-

cause it was December, as part of her regular duties Ms. P had PBGC-wide, end-of-year performance awards to prepare, and she had scheduled her own annual leave for December 19 through the 31st. But mainly she was rushed because she "remembered [the Management Investigation] was given [her by Mr. N] in a very urgent manner, that it needed to be looked into swiftly." These pressures further assured a perfunctory inquiry destined to find nothing casting doubt on the General Counsel's conclusion that the November 13 incident had been no more than a "failure of communication."

The interview with Mr. X was a joint effort of Ms. P and Ms. Q, with Ms. Q serving as scribe, and Ms. P as questioner. It was conducted on December 12. The written product was sketchy at best, and useless as a recording of what Mr. X might have said about his physical movements in or near the grievant's office. However, Ms. P recalled that he had said that he had remained at all times in the doorway to the grievant's office, without crossing the threshold.

This was important to Ms. P and shaped the conclusions she was to draw about what occurred with Mr. X and the grievant on November 13. Specifically, she testified:

> When I interviewed [Mr. X], he mentioned he was standing at [the grie-vant's] doorway and that conversation took place there and, to me, that is a whole lot different than [Mr. X] actually stepping in and being inside [the grievant's] office. You know? And I think when somebody is saying things like, 'keep pushing.' I think where you are standing, the proximity, all those things, they play into the mix.

As she recognized during her testimony, and clearly for the first time in her life, that had she read the Step-2 grievance carefully and "caught the allegations" that Mr. X was in the grievant's office, and "in her face," with his voice raised and threatening, then, asking and answering her own questions, she said, "Okey. Do I think this is work-place violence? It may border on it."

As it was, having not studied the grievance, Ms. P never interviewed Mr. E who would have placed Mr. X inside the grievant's office with both him and her speaking in loud, angry voices. Likewise, she was blissfully unaware, or unable to connect, that the grievance identified Mr. U as walking by while Mr. X was in the grievant's office, not in the hallway.

As a result, she never got to the analytical point of questioning Mr. X's version of events and realizing that, perhaps, his conduct might have "bordered" on violations of the Agency's Workplace Violence Policy," or was at least a clear violation of the Profes-sional Courtesy Directive. Of course, to reach such conclusions would have required her to reject her simplistic understanding of human relations in which all shouting

FMCS Case No. 03-08992
NAGE R33-77/PBGC

matches are but "failures of communication," no matter which side throws the first verbal punch.

Ms. P never interviewed the grievant. Ms. Q told her the grievant had a union representative, Mr. F, with whom she should make arrangements. Probably Ms. P first contacted Mr. F by phone on December 12 or 13, after she and Ms. Q had interviewed Mr. X. In the course of their first contacts, Mr. F advised Ms. P that the grievant remained too emotional over what had happened to consent to a face-to-face interview.

By Monday, December 16, 2002, Ms. P and Mr. F were conducting business by e-mail with the following going back and forth:

From P to F, Monday, 12/16/2002 at 4:30 PM:

> This confirms our conversation today that [the grievant] declined our investigative interview [request] regarding the alleged incident that occurred on November 13, 2002. You conveyed to me that [the grievant] believes there is sufficient information regarding the allegation of November 13 in the Step-2 grievance.

From F to P, Tuesday, 12/17/2002 at 10:11 AM:

> Let's be clear about that the investigative interview you proposed stems strictly from HRD's involvement, and [the grievant] declination to be a party [to] the proposed [Management] investigation neither affects nor has any bearing on her pending Step Two grievance. You stated to me the investigative interview was not related to the grievance, and that HRD has a concern when they are made aware of such an incident [as] described in [the] grievance. Also, HRD was provided a copy (or original) of the grievance by [the General Counsel].

From P to F, Tuesday, 12/17/2002 at 10:30 AM:

> This investigation stems from [the grievant's] allegations -- It is not related to the step-2 grievance.

From F to P, Tuesday, 12/17/2002 at 10:42 AM:

> Then, I would hope you/HRD will continue with the investigation. For the record, [the grievant] is still too emotionally charged from this incident, the continuing subjection of a tense environment, and the handling thereof by management to relate or discuss the matter. Again, I offer to you or [Ms.

- 22 -

Q], if there are any concerns or questions, I am available to be a conduit to obtain the answers from [the grievant].

If you desire further clarification, please call me.

In her testimony, Ms. P indicated that she had not been unsympathetic to the grievant's reason for declining an interview and had hoped that with a bit more time she might change her mind. But there are things she did not do in the meantime that are baffling. She still did not read the grievance, learn what she could from it, and take advantage of Mr. F's familiarity with the grievant's version of events by asking him what he knew or understood. She did not share with him what her understanding of the facts were from her and Ms. Q's interview of Mr. X, and even if that might be an unrealistic thing to expect her to do, she still did not act like a determined investigator by prodding and probing Mr. F for information and leads to other sources.

While there is no excuse for Ms. P's continued refusal to carefully read what any reasonable person would consider a key document, it is understandable that she might not have been satisfied had she read it. A good investigator would have wanted a chance to sit down with the grievant and go over her written grievance line by line so she could be asked follow-up questions, like, "What do you mean when you say 'thus and so?'"

However, this possible refinement in investigative techniques never was reached because of Ms. P's amazing testimony as to why she ignored the grievance while time still remained to salvage the investigation before her report of results was due. It was punctuated with questioning by everyone in the hearing room except the court reporter, often with a question being a simple, incredulous, "what?" Her testimony was to the effect that written statements by complainants were either required, forbidden, or optional, depending upon the type of complaint, and who it was against.

As for the fate of the grievant's complaint, the upshot of Ms. P's testimony was that her written statement, evidently because it was contained in a grievance, but perhaps because it was a complaint against a supervisor (it was unclear which, if either), was an unacceptable substitute for an interview as a matter of some sort of unwritten HRD policy. And, to enforce that prohibition, declining to be interviewed caused the nitty-gritty of the grievant's complaint to be ignored in the Management Investigation.

This is what Ms. P did when writing her Management Investigation report. She ignored the grievant's version and relied on Mr. X's version of events on November 13, and statements from those who described the grievant's emotions and conduct on November 15 in front of the General Counsel. However, before she could finish her report, time ran out and she left on leave, not to return until after New Year's, 2003.

When she returned, Ms. P worked with Ms. Q in finalizing the report, and on January 7, 2003, she delivered it to Mr. N. Its title and relevant text were:

> Management's Investigation of [the grievant's] November 13,
> 2002 Complaint Concerning [Mr. X]

*       *       *

[The grievant made her complaint by e-mail to [the General Counsel] at 5:33 p.m. on November 13, 2002. In that e-mail, she briefly explained what had transpired with [Mr. X] and requested a meeting with [the General Counsel] to discuss the matter. [The General Counsel] was off-site attending PBGC's Leadership Conference at this time. [Mr. T] was serving as acting General Counsel. . . While still at the conference, [the General Counsel] learned generally that there had been an incident between [the Grievant] and [Mr. X], but he did not learn specific details as to what had transpired.

[The General Counsel] returned to the office at approximately 2:30 p.m. on Friday, November 15, 2002, which was earlier than he had planned, so that he could speak directly with [the grievant] and [Mr. X] before close of business on that day. Shortly after he arrived, he ran into [Mr. X] in the hall while en route to [Mr. T.]'s office. He asked [Mr. X] if he could meet with him as soon as he was done meeting with [Mr. T]. [Mr. X] waited for [the General Counsel] in the hall while he was in [Mr. T]'s office with the door closed. [The General Counsel] and [Mr. X] then walked to [the General Counsel]'s office. [The General Counsel] asked [Mr. X] to explain what had happened on November 13th, and he listened to what [Mr. X] had to say.

[The General Counsel] e-mailed [the grievant] at 3:15 p.m. on November 15th to let her know that he would be available to meet with her at 4:00 p.m. that same afternoon. [The grievant] replied by e-mail that she would like to meet with him and that she would be bringing a 'representative.'

The meeting commenced as scheduled at 4:00 p.m. that date and was attended by [the General Counsel], [the grievant], [Mr. A], and [Mr. S]. It lasted approximately thirty minutes. [The grievant] explained her view of what happened. [The General Counsel] listened and then commented that it appeared to be a communications failure. [The General Counsel]'s comment seemed to upset [the grievant]; she became loud and began aggressively pointing her finger at [the General Counsel]. At one point, [Mr. A] asked that she leave the conference room and speak with him. [The

grievant] ignored [Mr. A], and she continued addressing [the General Counsel] in a loud and aggressive manner. At [Mr. A]'s continued insistence, [the grievant] finally agreed to adjourn and meet with him. When they returned a few moments later, [the grievant] appeared to have regained some composure. She smiled and commented, 'I guess that is why it is good to bring a representative to meetings like this.' She requested that [the General Counsel] interview [Mr. X]; and enforce PBGC's courtesy directive. She also informed [the General Counsel] that she had decided to pursue this matter through the EEO process. After the meeting concluded, [the General Counsel] asked [Mr. S] to briefly summarize what had transpired. He did so by e-mail that same evening.

At [the General Counsel]'s request, we sought to interview all of the relevant witnesses to determine if any other facts might be pertinent to [the grievant]'s allegations. We interviewed the following people:

> [Mr. X]
> [Mr. T]
> [the General Counsel]
> [Mr. Y]
> [Mr. S]
> [Ms. B]

[The grievant] declined to be interviewed, indicating that she believed that she had provided sufficient information concerning the November 13, 2002 incident in connection with her Step-2 grievance. On December 18, 2002, [the grievant] provided us with copies of e-mail messages to review in connection with the investigation.

Based upon our interviews with the above individuals, the information provided by [the grievant], and review of the relevant of the documents, we concluded that (1) Management performed a timely and adequate investigation of this matter on November 15, 2002, (2) Management correctly concluded that [Mr. X] did not violate the Professional Courtesy directive and/or any other Agency policy or directive, and (3) Management correctly concluded that the incident between [the grievant] and [Mr. X] was a communication failure that did not warrant any action by Management.

**The Grievance Investigation** also had time restraints. Under the Labor Agreement, a Step-2 answer was due before Ms. P returned, so Ms. Q wrote it. While Ms. P struggled with keeping her Management Investigation separate from the Grievance In-

vestigation, and felt she'd done so by just not reading the grievance, Ms. Q should have had no problem with following the road map to relevant facts laid out in the grievance.

Nevertheless, Ms. Q's Step-2 response relied only on the limited information that she and Ms. P had collected before Ms. P left on leave. She conducted no additional interviews. She did not meet with either Mr. E or Mr. U, who might have cast doubt on clearing Mr. X of any blame for the emotional trauma suffered by the grievant on November 13, the effects of which spilled over into her meeting with the General Counsel.

On December 30, 2002, the Agency's Step-2 answer was filed, denying all aspects of the grievance and exonerating Mr. X, the General Counsel, and the OGC, of any misconduct. On the cental issue of what had happened on November 13, it stated:

> In any workplace it is inevitable that disputes, disagreement and communications failures well occur. [The grievant] and [Mr. X] had a disagreement and a communication failure on November 13th concerning the CFND meeting. I find that, while perhaps the conversation about which [the grievant] complains could have been handled more diplomatically by both parties, [Mr. X] did not violate the Professional Courtesy Directive (PM 30-2). I also find that [Mr. X] did not violate the Policy on Workplace Violence, the Policy on Workplace Harassment, and/or any provision of the CBA. I have not found any facts to suggest that [Mr. X] communicated a threat of physical harm or in any way harassed [the grievant] during their conversation on November 13th.[8]

### Agency Investigations of Other Misconduct Complaints.

The OGC and HRD handling of the grievant's complaints against Mr. X did not reflect the investigative competency and thoroughness which they have brought to bear where misconduct has been alleged against employees active in Local R3-77 affairs.

**The Complaint of Ms. G Against Mr. A**. On Wednesday, March 6, 2002, Mr. A in his capacity as the Local R3-77 representative in an EEO matter went to the office of Ms. G, the Agency's labor relations attorney responsible as his opposite number. His purpose was to deliver documents relevant to the case. Ms. G was on the telephone, talking to her mother. While still on the phone, she called to Mr. A to come in and drop off the papers. He entered, gave her the documents and asked her to sign an acknowledgment of receipt. She declined and told him to write on his copy that she acknowl-

---

[8] When Ms. P returned from leave to write her Management Investigation report she had Ms. Q's Step-2 answer, which served to preclude her from coming to any conclusions at odds with Ms. Q's denial, should she have had any inclination to do so.

FMCS Case No. 03-08992
NAGE R33-77/PBGC

edged hand delivery.

Mr A refused and insisted on her signing the acknowledgment, at which point she told Mr. A to leave. According to her, Mr. A responded that he found her tone "nasty, hostile and belligerent." After telling him twice more to leave, she claimed he said something to the effect that he too would become "mean and nasty," and according to her, when he left he did so with a slam of the door to her office.

The next day, Thursday, March 7, Ms. G wrote a memorandum to the General Counsel reporting her encounter with Mr. A, which the General Counsel gave to Mr. O, a Deputy General Counsel, with a request that he investigate Ms. G's allegations against Mr. A. This Mr. O did, starting with an interview of Ms. G, which he conducted in the familiar surroundings of her office the next Monday, March 11.

His next interview was of Mr. A. It was not conducted in as accommodating or amicable a setting. Instead of going to Mr. A's office, he summonsed Mr. A to his office where he double-teamed Mr. A by questioning him in the presence of the Director of HRD, who assisted "in the interview and took copious notes." Defensively, Mr. A asserted his Weingarten rights and asked for a postponement of the interview until his preferred union representative was available. At this point, the Deputy General Counsel further established the tone of the confrontation when, according to his investigation report, he:

> suggested that [Mr. A] had no shortage of available representatives to call upon, that he had had ample time to arrange for one of them to be at this meeting, [and w]e informed him that his refusal to answer questions could result in disciplinary action.

> [Mr. A] then placed a small tape recorder on the table and started recording. Both I and [the Director of HRD] ordered him to turn it off, that the interview was not to be taped.

In the interview that followed, Mr. A denied "demanding" a written receipt. When Ms. G asked that he just note that he had hand delivered the documents, he recalled that "her tone was nasty, hostile, and belligerent towards me," and that when she asked him to leave, he did so by "backing out of her office into the hallway." He would not tell, absent being ordered to, what he recalled saying to Ms. G when she refused to give a signed receipt. The Mr. O then ordered that he divulge what he recalled, which was:

> When she refused to receipt a copy, I was truly baffled and flabbergasted because never in my experience at the PBGC has anyone refused the