courtesy of taking a second to receipt a document relating to labor relation or other representational matters.

Detecting that Mr. A had said that he had "backed out of her office," and had "made no gestures or arm movements other [than] to hold on to other documents and to close the door," with no admission that he "slammed" the door, Mr. O took the next logical investigative step. Since Ms. G said she had been talking on the phone to her mother and had the phone in her hand while Mr. A was in her office, he interviewed Ms. G's mother as to what she heard. She told him she had not heard any of the conversation with Mr. A, but she had heard the door slam, and when Ms. G came back on the line, she recognized "how upset she sounded."

With this information in hand, Mr. O wrote and sent his report to the General Counsel on March 20, 2002 in which he concluded;

While the recollections of [Ms. G] and [Mr. A] differ, [Ms. G's mother] lends significant credibility to her daughter's perception of having been verbally abused, whatever words were actual used. . . In any event, it seems clear that he had to be told to leave [Ms. G]'s office three times before he left, and then he left with a slam of the office door.

Two weeks after the report, the boom fell on Mr. A when on April 4, 2002, he was served with a Proposed Letter of Reprimand for violating the Professional Courtesy Directive by his discourteous conduct directed at Ms. G. On May 10, the Letter of Reprimand was made final.

**Mr. A and His Political Attacks on Mr. H and Others Union and Management Officials.** The Agency's disapproving view of Mr. A's conduct had earlier origins. During a late 1990's wave of discontent and infighting within the membership ranks of what is now NAGE Local R3-77, Mr. A was an outsider challenging the leadership of the Local when the Local's affiliation was with the NTEU.

When one of the insiders, Mr. H, apparently arranged at R3-77 expense, to include a woman, who later become his wife, in a delegation attending a Union conference in San Diego, Mr. A printed and posted a "darling honey" ditty around and about PBGC work areas where R3-77 members would see it. It was pointed in its assessment of the real romantic purpose of Ms. I's inclusion.

Without a formal investigation, but on pretty much self-evident material, the General Counsel struck with a sexual harassment and workplace disruption counseling memorandum to Mr. A, condemning his inappropriately, widely broadcasted political attack on Mr. H.

In another of Mr. A's challenges to Mr. H's leadership of the Local, he referred to that leadership as "illegitimate" in another flyer widely circulated within the Agency to R3-77 members. In response, Mr. A was admonished by Management for his "distasteful remarks.." He was also admonished and required to make an apology for distasteful remarks he made in other anti-union leadership flyers, referring to some as Nazis when some were Jewish and offended by the remarks, and in objecting evidently to HRD involvement or partiality in the internal union disputes and jockeying then underway, referred to some the OGC and HRD personnel as anti-union and in other more disrespectful terms. In each case, the OGC and HRD investigation was swift and decisive, and the admonishment issued without delay.

As a result of Mr. A's efforts, R3-77 affiliation with the NTEU was terminated and the NAGE assumed the parent role. By both his testimony and especially his demeanor, the assumption of Mr. A and Ms. K to leadership roles in the reconstituted R3-77 was not welcomed by the OGC and HRD. Labor relations went from rocky to hostile as Mr. A and Ms. K withdrew R3-77 from any "partership" cooperation with Management.

**Complaint of Ms. J Against Mr. D.**  During the most recent period of R3-77 turmoil, a sexual harassment allegation was made by one officer against another. It was not a complaint made to the PBGC, but one filed with the then R3-77 President, Ms. K, alleging a violation of a Union Bylaw provision against discrimination. It was politically driven as evidenced by where and when it was filed.

The accused was Mr. D, an R3-77 activist who had served as a Vice President and Steward during periods when he was among the "ins," but who was then among the "outs." As a Steward, Mr. D had participated in the EEO Structure arbitration which resulted in the Award that spurred the reorganization of the Agency's EEO lines of responsibilities and command.  He also had pending a Title VII suit against the PBGC with, among others, a charge of retaliation against him by the HRD.

The harassment complainant was Ms. J, who like Mr. D, was also an "in" and "out" officer of R3-77, depending upon the prevailing political winds.  At the time of the incident in question, she and Mr. D were in opposite camps. Specifically, Ms. J was Secretary of R3-77 and a confederate of Mr. A and Ms. K while Mr. D was among the challengers seeking their removal.  In any event, Ms. J alleged to President K, that Mr. D had made inappropriate sexual comments and remarks to her.

The volume of charges of impropriety and skullduggery being exchanged between the current "ins" and "outs" of R3-77 reached a point that the national office of NAGE placed R3-77 under emergency trusteeship and removed Ms. K, Ms. J, Mr. A and the rest of its then current "in" officers from office.

FMCS Case No. 03-08992
NAGE R33-77/PBGC

The ousted officers challenged the trusteeship and their removals by filing suit in the US District Court for DC. In connection with this suit, the internal files of R3-77 ended up lodged in the US courthouse, and nestled in them was a copy of Ms. J's complain. It was not long after the files had arrived at the court that the OGC and HRD learned of this potential gold mine of useful espionage.

It was Mr. W who directed the file search. At that time, he was the Deputy General Counsel responsible for supervising arbitration and other adversarial contests with R3-77, as well as maintaining a general top-level oversight of PBGC's relations with R3-77.[9] As Mr. W put it with regard to the turn of fate presented by the R3-77 trusteeship litigation, "we usually don't have access to [these] materials," [so], "you would have to be crazy not to take advantage of what you can learn from what is going on in the internal union thing." And, since neither Mr. W nor Mr. N, with whom he consulted, were crazy, Mr. W dispatched one of his attorneys to the courthouse with instruction to dig through the R3-77 file and retrieve whatever might be useful, now or in the future.

What all was obtained from the caches of R3-77 documents is not of record, but one item she brought back to Mr. W on December 17 was Ms. J's complaint to the now unseated president of R3-77 against Mr. D. Mr. W took it and turned it over to a private law firm in the business of conducting investigations for management. The firm's specialty seems to have been fact gathering in EEO matters.

The firm's investigation of Mr. D was exhaustive, and coercive. Mr. D was threatened by his supervisor with firing if he didn't "talk." Other interviewees made known their beliefs that Ms. J's complaint was part of the vicious internecine feud going on at the time among R3-77 officers. To overcome their reluctance to have anything to do with the investigation, they had to be told first by Agency letters, and then by the outside attorney, that their participation was not optional, but they would be disciplined for lack of cooperation if they refused. As for Ms. J, she made clear that she had not wanted a PBGC investigation, but intended the matter to be processed under Union Bylaws.

The investigation was also one-sided. None of the potentially exonerating witnesses Mr. D requested be interviewed were contacted. Besides reemphasizing the political nature of Ms. J's charge, they would have portrayed Mr. D not as the perpetrator, but as the victim of harassment leveled at him by Ms. K, Mr. A and Ms. J. On the other hand, with the intent of seeing the investigation expanded beyond Ms. J's complaint, the OGC gave names of other women to the investigating attorney with sugges-

---

[9] For some time, "in" and "out" R3-77 officers had held a dim view of Mr. W. Going back to Mr. A's troubles, among the flyers and ditties for which he was censored, was a flyer that called Mr. W a "union buster," and it from Mr. W's testimony, it is safe to say that little love was lost between him and most of the ousted officers of R3-77.

tions they be interviewed in search of further damaging accusations against Mr. D.

In the end, and despite the effort,[10] the fruit of the investigation was a non-grievable memo counseling Mr. D against sexual harassment and ordering him to attended sexual sensitivity training, a copy of which was placed in his personnel file. Mr. D felt the memo, and placing it in his file, were unfair and retaliatory in light of the political agenda behind Ms. J's complaint. He felt he had been "stigmatized."

To add to what he felt was an injury, when he asked to see the investigative file on which the counseling memo was based, the then HRD Director denied the request, telling Mr. D, "that she would forward [his] request to the department in the Agency that handles FOIA requests, [and] that [his] request would go through that process. And until this arbitration forced the disclosure of the information compiled against him, Mr. D had not seen the file he requested.

**Ms. K and the Agency's and Union's Institutional Grievances.** On June 1, 2001, the arbitrator in the EEO Structure arbitration entered an initial Award finding:

> There can be no doubt that the Agency operated its EEO program in a manner that was not totally in compliance with the requirements articulated in the EEOC's regulations and the revised MD 110. It has recently acted to eliminate its conflicts. This is commendable and applaudable. However, the Arbitrator denies the Agency's motion to dismiss the Union's grievance. The Agency shall draft a plan to remove the conflict and submit it to the Union and to the Arbitrator within ninety (90) days . . .

Ms. K supported the grievance and testified against the way the PBGC was discharging its EEO responsibilities. After the EEO Structure Award was entered, an incident took place that had nothing to do with the Agency's EEO system, but concerned a disagreement between Ms. K and Mr. CC, a member of the HRD staff who dealt with R3-77 over day-to-day matters.

The dispute seems to have involved the conditions of a particular renovated work area to which the R3-77 Steward [Mr. F] was to be assigned. Ms. K sent an e-mail message to Mr. CC about the dispute that prompted the Director of HRD to respond with an institutional grievance filed on June 20, 2001 in the name of the Agency against Ms. K. The grievance stated:

---

[10]    According to Mr. W, this firm had been used for three or so other PBGC investigations. If the resulting report spawn by Ms. J's complaint is representative, its approximate 225 pages of materials generated at attorney fee rates had to cost the PBGC a pretty penny.

to stop coming in or near her work space. [Ms. AA] thinks someone told him to stop bothering her or that she did not appreciate his behavior, because he left her alone for a while, and in October, 2003, she states that he sort of apologized for his behavior toward her. Finally, [Ms. AA] stated that she also witnessed [Mr. D] gaze at women in an inappropriate way.

If the outside attorney had confronted Mr. D with these accusations from the lips of Ms. AA, Mr. D would have said something to the effect, "Hold on! I'm not the one making advances with sexually explicit suggestions. Take a look in the PBGC interoffice e-mail files and see what she's sent me." What the outside attorney would have found was a video clip sent to Mr. D by Ms. AA, entitled, "Grandma's Doggy Style," along with a lame joke on, "why condoms come in boxes of 3, 6 and 12."

It seems, however, Mr. D was not allowed to give the outside attorney a response to Ms. AA's charges. There is no mention of it in his investigative report, nor is there a second interview of Mr. D among the attached interviews of PBGC employees. But, if Mr. D's complaint about Ms. AA did not come to the attention of the PBGC hierarchy by way of the outside investigation report, he assured that it got before them when in January, 2004, he sent his accusation, with the video clip and condom joke attached, by e-mail to most of Management, including the General Counsel and Agency's EEO personnel.

The lack of OGC and HRD interest in Ms. AA's conduct was not adequately explained by Agency witnesses. In its brief it seeks to draw a distinction between Mr. D not telling Ms. AA to "stop" sending nasty jokes while Ms. J alleged she told Mr. D to "stop" bothering her. Still, as will be discussed further, the lack of action on Mr. D's complaint runs counter to the Agency's alleged "no tolerance" for sexual harassment, and policy to be proactive and launch an investigation without waiting for a complaint to be filed.

More than a year later, there is no evidence that any Agency action against Ms. AA had been taken on the basis of Mr. D's submitted materials.

## Discussion

The grievance presents four separate complaints. The first concerns the conduct of Mr. X on November 13, 2002. The other three are over the receptions and treatments given the grievant's complaints about that conduct, first by Mr. T on November 14 and 15, then by the General Counsel on the afternoon of November 15, and finally, by members of the OGC and HRD after she filed her grievance on December 9. By that time she had added complaints against the General Counsel and the OGC and HRD.

**Issue 1** focuses on the November 13, 2002 CFND meeting and the conduct of both the grievant and Mr. X in the hour or less after the TRW participants had left. The action started with the grievant's abrupt departure from the CFND meeting without seeking Mr. X's permission, or at least making sure that he saw what she was doing and had the opportunity to ask, tell, or signal her to wait.

The grievant shouldn't have done that. Whether a matter of decorum, propriety, etiquette, or given some other label, a subordinate attending a meeting with a superior should not leave the room ahead of the superior without having either been dismissed or sought and obtained leave to depart. This is especially so in circumstances like those surrounding the CFND meeting with outside parties.

Although she accurately understood the perfunctory, fill-in-the-blanks routine of the confidentiality agreement and her role to review the CFND draft, she should have hung around to be certain that her understanding meshed with that of Mr. X. In addition, the meeting lasted two hours. Other matters besides the confidentiality agreement must have been discussed. This was the grievant's first CFND meeting, and something may have been mentioned, the importance or significance of which she missed. If a sensitive subject came up that had legal implications for the CFND participants, they may not have wanted to openly "flag" it with the outside visitors present, but have wanted to reserve discussion until they left.

There is no suggestion that such a situation actually arose. However, the grievant was there to serve her CFND "clients," and as a "professional" matter, she should not have left the room without waiting until she could speak privately with those clients to ascertain that they had no concerns about anything else that had transpired during the discussions with the TRW representatives.

As for why the grievant left so quickly, there is no evidence that she intended a slight toward either her CFND clients or Mr. X. Rather, she acted out of ignorance and lack of experience as to her expected conduct, with her intent being to visit the ladies' room, return to her office, set in motion her follow-up responsibilities, call it a day, and go home. She lives in a Washington suburb and is dependent upon a series of rides and a train trip to get back and forth. She wanted to contact her rides and tell them she would be late, or be missing her pickup all together. While some of her CFND clients were surprised by her hasty departure, none thought it was an intended affront.

The same cannot be said for Mr. X. He felt affronted, it angered him, and when he arrived at the grievant's office he was ready not just for a session of emphatic supervision intended to correct a minor etiquette impropriety and ensure that the grievant understood her professional responsibilities owed the CFND clients, but for a round of abusive verbal combat.

FMCS Case No. 03-08992
NAGE R33-77/PBGC

As a result, he missed an opportunity to have a productive discussion with the grievant along the line of the explanation just given of the proper "do's and dont's" of an attorney during and following a meeting such as the TRW meeting. Admittedly, with her persistent and adamant denials of any improprieties, the grievant may also have jinxed any prospects of productively absorbing the fine points of proper etiquette for a junior participant at a business meeting.

Either or both of them, but especially Mr. X, would have done well to have taken a step back, smiled graciously, and ended the pugnacious exchanges of "you did" and "I didn't." He was the supervisor and should have recognized with the first signs of the grievant's anger that he needed to suppress his own and deferred to another day the lecture he was aching to give. He should have seen the situation was spiraling out of control and politely attempted to defuse it by dropping any further discussion of her abrupt departure.

But these hindsight observations on effective and ineffective supervision are neither here nor there. The issue is whether Mr. X's conduct was motivated by the grievant's race, sex, or national origin, or because she had testified in the EEO Structure arbitration or filed an EEO complaint. It was the grievant's burden to establish that one or more of those prohibited bases lay behind his outburst.

She failed to carry that burden. There was no persuasive evidence that Mr. X held prejudices against blacks, females, or non-US born individuals. From what the record reveals, Mr. X would have followed to his office and chastised any white male subordinate attorney who abruptly left the room after the apparent conclusion of a discussion without first seeking Mr. X's acquiescence. The testimony was that Mr. X was a stricter, more directing, and more "lecturing" supervisor than Mr. Y. As such, he would not have taken kindly to "back talk" from any subordinate, especially such as that he got from the grievant with her insistent contradictions of his assertions that she had left the meeting early. In short, there was nothing that demonstrated, or even suggested, that on November 13, 2002 Mr. X was acting out of character.

Unquestionably, the grievant is a member of each of the protected classes she claims, and that a rude, unpleasant, even frightening, experience was inflicted upon her by Mr. X. But these two sets of facts alone will not raise an inference that an unlawful motivation lurked behind Mr. X's conduct. The grievant's own conduct in leaving the conference room without permission, though not intended to be rude or disrespectful, was nevertheless inappropriate and provided a more compelling explanation for Mr. X's overly harsh, unbecoming, and counterproductive reaction. It outweighs the fact that he and she are of different races, sex and national origins, or that she had testified in a matter which was not shown to have had any effect upon him, or that she had filed an EEO complaint that was only in the most general sense directed at him as a member of

employees that is polite and considerate of others. <u>Courtesy</u> means the practice, day in and day out, of good manners.

Mr. X violated the Directive's purpose of assuring civility and politeness among PBGC employees in their internal and external dealings with other humans. His intemperate chastisement of his temporary subordinate over her failure to seek his permission before leaving the CFND conference room, and perhaps more important, his refusal to hear, digest or accept her explanation for her timing, fell not only short of good manners and respect, but kept him from learning that her impropriety was innocently committed. This bit of knowledge might have nipped in the bud the fiasco that followed.

Being too mad to see, much less seize this chance to stem the grievant's ever more emphatic denials, Mr. X kept upping the ante of incivility and disrespect being shown between them. Countering with accusations of "unprofessional" conduct, "never accept[ing] your behavior," lack of appreciation of her "attitude," and for the grievant, his ultimate insult, declaring her adamant refusals to acknowledge her <u>faux pas</u> in leaving the CFND meeting ahead of him, as "bordering on insubordination," was neither civil nor respectful.

Mr. X could have ended the confrontation while standing in the threshold. After hearing the grievant's insistence that she understood and would discharge her responsibilities to follow-up with the confidentiality agreement, Mr. X could have called it a day, recognizing that the morning would bring plenty of time to oversee her efforts. If he had done so, it would have ended the confrontation. Then only his breaches in politeness and mutual respect up to that point would be in issue.

Instead he proceeded to cross the threshold of both her office and the PBGC Policy on Workplace Violence. While Mr. X never physically hit the grievant, or said he was about to, the Policy doesn't require either for a violation of its prohibition, since:

In addition to actual physical aggression, such behavior can include oral or written statements, gestures or expressions that communicate a threat of physical harm.

When Mr. X took one, two or three steps into the grievant's office and saw her rise from her seat, with her back close to the wall of her small office, it should have been obvious to him that she was in genuine fright. He should have immediately stopped and backed off physically, verbally and vocally.

If he had returned to the doorway, there might be a basis for considering whether the grievant's fright was objectively reasonable or not, and thus whether the consequence of his actions up to when he backed away were inadvertent and lacking in

intent so as to spare him from having violated the policy. But any ambiguity about his intent was resolved against him when he did not back off, but proceeded in growing agitation to advance further on the grievant while scolding her to "keep pushing it."

On the other hand, Mr. X did not violated the Agency's "EEO Message on Workplace Harassment" under the facts the grievant established. Its title alone shows its aim was the prevention of harassment based on those motivating factors proscribed by statute, and its text is true to predictable form with one exception:

> PBGC's EEO Policy provides for a work environment free from all forms of discrimination, including sexual harassment and harassment on the basis of race, color, gender, national origin, religion, sexual orientation, age, or disability. Harassment is unwelcome verbal or physical conduct that creates an intimidating, hostile, or offensive work environment, interferes with the individual's work performance, or otherwise adversely affects employment opportunities.

Each prohibited basis for harassment listed above shields a protected class of persons under either Title VII, the ADA, or the ADEA, except for "sexual orientation." However, the specific inclusion of sexual orientation, and the absence of any class which can be construed to cover a supervisor's harassment of an employee over job performance issues, makes it impossible to conclude that the document embraces Mr. X's physically threatening, verbal harassment of the grievant.[12]

Besides, in cases such as that of Mr. X's conduct on November 13, the Agency's policies on Professional Courtesy and Workplace Violence adequately cover situations where a supervisor's determination to impose his will on an employee exceeds the bounds of civility to the point of intimidation. In the present case, finding violation of the two other Agency's policies is enough for this arbitration without stretching the "EEO Message on Workplace Harassment," into yet a second Agency code of civility.

In sum, Mr. X's November 13 "harassment" of the grievant was not shown by her to have been because of her race, sex, color or national origin, much less on the basis of

---

[12] The policy statement's declaration of assuring a "work environment free from all forms of discrimination" cannot be used to reach the grievant's objective of holding Mr. X responsible for engaging in a prohibited form of harassment. First of all, "harassment" is an elastic term which if not boxed in would easily include every disagreement between an employee and a supervisor about which the employee felt strongly that an unfairness had occurred. No employer without statutory compulsion would knowingly adopt a policy which effectively injects higher management into any of those kinds of disagreements if the unhappy employee alleges "harassment." It would cripple direct, constructive supervision, as well as teamwork among employees. The concern is not hypothetical since testimony in the present arbitration suggests the word was freely tossed about in the PBGC.

her sexual orientation, age or handicap status. Rather, it was an overblown example of his management style, consistent with his reputation as a stricter, more directing supervisor.

**Issue 2** concerns all that followed after Mr. X's November 13 chastisement of the grievant, and specifically:

> Whether the Agency, through the actions and/or inactions of the General Counsel and the Office of General Counsel or other components of the Agency, in response to the grievant's complaint about Mr. X's conduct on November 13, 2002, failed to comply with or violated any Labor Agreement provisions, internal rules, regulations or policies of the Agency, or of the laws, rules or regulations of the United States, and if so, what should the remedy or remedies be?

During her opening statement, the grievant summed up her claims and feelings against the OGC and HRD when she answered the questions of what she meant by her just uttered allegation of a PBGC "cover up." Her explanation was:

> [Mr. X]'s misconduct. [Mr. X] advanced on me after we had a clear breakdown in communication, threatening me, telling me, 'you keep pushing me,' gets in my face, causes me to stand out of my chair, intimidates me, and then lies about it. That's the bottom line. If [Mr. X] had told the truth and PBGC had done something about this, they would have alleviated a great deal of pain and stress for me. Instead, PBGC from day one has been covering this up.

"Cover up" may be too strong a phase, but if there were violations of the Labor Agreement and applicable statutes, they occurred during one or more of the three stages through which the grievant's complaint against Mr. X advanced. The first stage was Mr. T's handling of her e-mails of November 13, 14 and 15, 2002, when he was acting in place of the General Counsel. The second was the General Counsel's handling of the grievant's complaint before, during and after his November 15 meeting with her, and the third, and most time consuming in terms of testimony and documentation, was the handling of her complaint by the OGC and HRD, and why it differed from those in other cases, especially the Professional Courtesy violation Ms. G charged Mr. A with committing.

### Mr. T's Response to the Grievant's e-mail Requests for Action.

No fault can be found with Mr. T's handling of the situation which he was confronted by the grievant's string of e-mail messages and pleas. He is a GS-15 supervisory attorney, the same rank and pay level as Mr. X and Mr. Y. In the federal service, this is

FMCS Case No. 03-08992
·NAGE R33-77/PBGC

not a rank generally considered to be at a Management level with hiring or firing authority. Ordinarily, like his colleagues, he oversees from four to six junior attorneys and may have a total staff of 10.

But, because all higher ranking members of the OGC were attending an offsite Agency conference, Mr. T was tapped to serve as the General Counsel during the three day absence of his superiors (November 13, 14, and 15, 2002). He had served in this capacity before, and understood his responsibility was to take care of those things which could not await the return of the General Counsel, such as signing letters, briefs, and perhaps, the TRW confidentiality agreement, which were under deadlines for mailing or filing.

It would be a fallacy to view Mr. T as having been left to perform the full scope of the duties and responsibilities of the General Counsel. Rather, what was expected of him when a situation arose, whether in the realm of papers to be signed, funds to be expended, or personnel disputes to be resolved, was that he would investigate and decide whether the matter needed immediate action, or could or should wait. Probably the more out of the ordinary routine a matter was, or the greater the significance·of acting, the greater the reason to err on the side of waiting for the boss to return.

On November 14, 2002, as was his practice, Mr. T arrived·at the Agency just before 9:00 AM, and when shortly thereafter he checked his e-mail, he found the grievant's 7:28 AM e-mail to him to which she attached her 5:33 PM e-mail to the General Counsel sent the previous evening. Neither e-mail asked for an immediate meeting. To the contrary, the e-mail to the General Counsel stated that she was "too emotional to do much more right now" than to briefly state the facts of her encounter with Mr. X and nature of his accusations, and to "respectfully request a meeting to discuss this when I have the emotional restraint to address [Mr. X]'s attack without emotion (emphasis added)."

Likewise, the covering e-mail addressed to Mr. T declared its purpose to be, "I just want to ensure I informed the head of my department [the OGC] of this situation so that it could be dealt with expeditiously." It did assert that, "I have an untenable situation of having to interact with [Mr. X], [Mr. Y]'s buddy, when [Mr. X] has expressed such clear animosity and unprofessional conduct in his interaction with me yesterday afternoon," but it also declared that, "I have invoked my right to EEO counseling about this matter and have also inquired about the process of pursuing claims under the workplace harassment policy and professional courtesy directive."

Thus, during the first 24 hours following the November 13 incident, Mr. T had been placed on notice by the grievant that the incident had occurred, that she felt Mr. X's conduct was harassing and discourteous, that when she believed she had sufficient

control over her emotions to meet with the General Counsel about what had happened, she wished to do so, and by implication, she would notify the General Counsel when she felt she had that control. She also had given him notice that she had taken her complaint to the Agency's EEO office.

There was nothing alarming in these November 14 messages. Only on November 15 can it be fairly said that Mr. T was placed on notice that he had a storm on his hands. When he arrived for work that day, he found the grievant's 7:01 AM e-mail waiting him. It contained her first demands made specifically of him. This second-day-after-the-incident e-mail was that which said:

> [Mr. T], despite my request yesterday, it appears that nothing has been done to neutralize the situation [Mr. X] instigated on Wednesday. OGC's failure to take any action despite my request resulted in me having to stay in the office until after 7 p.m. last night because, in my opinion, [Mr. X] deliberately inflated a simple task with the intent to continue his harassment. I tried to follow his dictate to avoid any further conflict with him but you have the responsibility for upholding and enforcing PBGC's workplace harassment policy and professional courtesy directive and should act to stop this situation now.

> Today, I am asking again for something to be done about this situation. I do not believe that you understand the severity of the emotional distress this incident has cause me so let me tell you I have been unable to turn [Mr. X]'s conduct off in my mind since Wednesday when he attacked me! So, at a minimum, please assign another supervisor to cover on my cases so that [Mr. X] cannot continue this pattern of behavior. If nothing is done, I will have no choice but to take this issue to upper management.

> Please provide me with a direct response to this reasonable request as soon as you can. Thank you.

At 10:34 AM, the urgency of this 7:01 AM e-mail was dampened when the grievant sent Mr. T another e-mail advising him that her most immediate concern, that of continuing to work under Mr. X's supervision, had been solved. "Mr. Y is in today so the issue of who I would report to is resolved, but I still would like a response regarding the incident."

Whether reacting to that last message from the grievant, or out of curiosity, Mr. T met with Mr. X, Mr. Y, and Mr. S, where, after sharing the e-mails, his first question might simply have been, "What is this all about?" In response, he would have heard Mr. X's versions of the events of November 13, and that on November 14, he and the grie-

vant had managed their reviews of the TRW confidentiality agreement by e-mail. Most important, Mr. T would have been assured Mr. X and the grievant were not in danger of any immediate further contact. He also would have heard whatever Mr. Y could report on what the grievant had told him, and perhaps, about her current emotional state.[13]

At some point that Friday morning, Mr. T also learned that the General Counsel had decided to return to his office around noon, rather than at the end of the day or the following Monday. In part, his change in plans was decided when the General Counsel learned that an incident had occurred between the grievant and Mr. X.

Mr. T, having determined that there was no immediate threat to life or limb, that Mr. X and the grievant would be kept separated, and that the General Counsel would be present within the hour, decided that he should make no further inquiries in response to the grievant's e-mails, but await the arrival of the General Counsel.   To cool down the grievant whose initial e-mail of the morning had been emotional and demanding, he sent her an e-mail at 11:51 AM, "I understand that [the General Counsel] expects to return to the office this afternoon. You may be able to see him then."

In taking the course he did, Mr. T properly discharged his duties as the temporary caretaker of the OGC. For a GS15 supervisor, his cool assessment of the situation and attempt at a calming response to the grievant's requests were exemplary and worthy of admirable note on his annual performance rating. What the grievant seemed to de-mand of Mr. T, and it was not completely clear even with her last e-mails on November 15, was that Mr. T initiate an HRD or OGC investigation of the November 13 conduct of Mr. X, a fellow GS 15 supervisor. Even if he had the authority to do so, once he satisfied himself there was no dire threat to anything more than the grievant's impatience, it would be understandable if he concluded that he simply was not paid enough to step into what by now he knew was going to be an emotionally charged "he said/she said" dispute, especially since the man who was paid to handle this sort of stuff was due back shortly.

As for any other reason being behind his restrained vigor in pursuing an immedi-ate resolution of her allegations against Mr. X, the grievant failed to carry her burden of proving that he was motivated for any reason violating Title VII or the Civil Service Re-

---

[13] At points in Mr. T's testimony, there were suggestions that his meeting with Mr. X, Mr. Y, Mr. S, and others, occurred on Thursday, November 14, or that he met alone with Mr. X that day, in ad-vance of holding the larger meeting on the 15th. However, I find that the e-mail traffic and Mr. T's testi-mony as a whole establish that only one meeting took place, and it was on the morning of November 15. But, if Mr. T also met with Mr. X the day before, it would have mostly likely been then that he first asked, "What is this about?" and gotten Mr. X's version of events. If so, then the larger meeting on November 15, when Mr. T had the grievant's latest e-mails in hand, may have been to obtain the other participants' advice on, "What should I do now?"  Either way, Mr. T would have acted properly.

form Act. There was no direct evidence that Mr. T gave any consideration to the grievant's race, sex, national origin, or prior engagement in protected EEO or union activities. Nor is an inference of discrimination raised.

Despite some of the testimony of a black paralegal, no propensity was established on the part of Mr. T to not impose discipline when the complaining employee is a black female. Similarly, the decisiveness with which he may have handled other squabbles and disagreements between employees under his direct day-to-day supervision has no bearing on how, as the caretaker of the OGC with but hours to go in that role, he "should" have handled the grievant's complaint against Mr. X. That he may have acted more quickly with cases involving his immediate subordinates does not turn the caution he showed in dealing with the grievant's complaint into evidence that he had a prohibited bias against the grievant.

Even harder to find in the record is evidence to support the proposition that Mr. T harbored an intent to retaliate against the grievant because of her prior testimony in the EEO Structure arbitration. His testimony disclosed no real knowledge about that case, and the grievant presented no convincing evidence why he should have known, or even cared, about it or the resulting changes in the Agency's EEO structure. There is no evidence that its outcome even remotely affected his normal duties, or his discharge of his infrequent and short term stints acting for the General Counsel. Thus, the grievant laid no factual basis for her rather extreme argument that:

> The failure of PBGC officials to grant [her] any relief, including the simple request to [be required to] report to another supervisor (instead of [Mr. X] when her supervisor [ ] was out of the office was malicious and sadistic in manner and indicates an intent to retaliate against [the grievant] because it was patently obvious that it would lead to continued distress for [the grievant]. PBGC, therefore, violated [the Labor Agreement] in its treatment of [the grievant] after her [EEO Structure arbitration] testimony.

Since it was only Mr. T who had received the grievant's request to be relieved of Mr. X's supervision, it was he she called "malicious and sadistic," an allegation so at variance with the evidence that it must be considered to have been unthinkingly made. To find that the grievant's testimony in that arbitration motivated Mr. T to either ignore the grievant's complaint as an act of callousness, or purposefully taken in order to inflict further emotional punishment, would require finding that at the meeting held with Mr. X, Mr. Y, Mr. S, and Mr. Z during the morning of November 15, Mr. T was dragged into a conspiracy to do so.

It is too much to swallow when remembering the grievant's 10:34 AM e-mail of that date telling him, "Mr. Y is in today so the issue of who I would report to is resolved."

FMCS Case No. 03-08992
NAGE R33-77/PBGC

And even if the circumstances leading up to Mr. T actions and inactions were seen as raising a prima facie case of unlawful motivation, the evidence and reasoning supporting a legitimate basis for Mr. T's handling of the grievant's complaint is overwhelming.

As for the suggestion that the grievant's October 3, 2002 EEO complaint served as motivation for Mr. T's conduct, that too is far fetched. Although the EEO complaint was broadly leveled at the whole of OGC supervision, Mr. T was not singled out as an instrument of unlawful discrimination, and since she was not one of the attorneys Mr. T permanently supervised, the elements of relief she sought in her EEO complaint were unlikely to have any disturbing effect upon him.

The supervisor immediately above and between Mr. X (as well as Mr. Y) and the General Counsel is Mr. Z, a named antagonist in her EEO complaint. But again, no conspiracy is proved by Mr. T's inclusion of Mr. Z in the November 15 meeting with Messrs. X, Y and S to determine "what to do now," and from which Mr. T left with his decision to leave it to the General Counsel to respond to the grievant's insistence on action, and if the General Counsel's response was not to her satisfaction, to let the General Counsel take the heated protest her latest e-mails indicated would follow.

**The General Counsel's November 15, 2002 Meeting with the Grievant.**

When the General Counsel arrived back, he first met with Mr. T who certainly showed him the grievant's e-mails, and most likely shared with him his suspicions that she would be emotional when he met with her. The insistent and demanding tone of the e-mails, especially the 7:01 AM one of that morning, was not consistent with the General Counsel's prior experiences with the grievant, and should have forewarned him that he was going to have to deal with her emotional difficulty in coping with Mr. X's treatment of her, whether or not that treatment had been faulty. He also should have appreciated that she was agitated over the lack of a response from him or Mr. T, and thus her ire and distrust would also be directed toward him and Mr. T.

The combination of the grievant's e-mail messages and Mr. T's forecast may have been why the General Counsel decided to interview Mr. X first. Besides claiming his own blamelessness in his version of events, Mr. X most likely painted a picture of the grievant being emotional and irrational on November 13. Still, even if the General Counsel was surprised by her emotional state, once he saw she was not the calm and collected attorney he had known before, it might have helped keep their encounter a business-like collecting of her version of the events of November 13 by not interrupting her while she was giving her account. It also might have helped if he had appreciated how carefully he needed to frame the messages he sought to convey so as to not further inflame her emotions.

FMCS Case No. 03-08992
NAGE R33-77/PBGC

But, it's hard to judge whether those efforts would have appeased the grievant. Her fury at being ignored through the whole of the 14th, and until close to noon on the 15th, and then recognizing in the first minutes of the meeting that she was not being interviewed ahead of Mr. X, probably could not have been contained, despite no reasoned basis for the grievant's fury.

As explained in finding Mr. T's conduct reasonable, her first e-mail on the night of the incident asked to meet with the General Counsel. Even when she learned he was unavailable, she did not request a meeting with Mr. T as an alternative. Rather, she simply told Mr. T that the reason for forwarding a copy of the previous e-mail to him was because, "I just wanted to ensure I informed the head of my department of this situation so that it could be dealt with expeditiously." This was not a demand for either an immediate meeting or immediate action, even though she insisted in the e-mail that she had an "untenable situation" in working with Mr. X.

Only the next morning did she clarify that by "expeditiously" she meant that "then and there" she had expected Mr. T to find her a new substitute supervisor. But, by the time Mr. T had read this new e-mail, including its additional allegation of harassing extra work on the confidentiality agreement which had held her in the office until after 7:00 PM, he received her 10:34 AM e-mail advising that Mr. Y had returned so that continuing to work under Mr. X was no longer a pressing issue. This was followed shortly by Mr. T's receipt of the news that the General Counsel would be back in his office about noon, of which development he informed the grievant at 11:54 AM with the advice that she might have her requested meeting with him that afternoon.

As for the General Counsel's interviewing Mr. X before her, it was a reasonable thing to do. The General Counsel arrived knowing he was faced with an accusation of misconduct against one of his subordinate supervisors. After reading the grievant's last e-mails, including that of 11:57 AM complaining about Mr. T's meeting with Mr. X, et al., he also knew the grievant was likely to be in a heightened state of emotions. Accordingly, it was reasonable to expect him to first obtain Mr. X's version.

As for the General Counsel's conduct at the meeting, putting aside that he should not have interrupted the grievant's recital of her complaint, his statements which she found objectionable were not incorrect, just not artfully or sensitively, or even sensibly stated. Topping her list in chronological order was his declaration, made after hearing her explain why she thought the CFND meeting was over, that she had "violated OGC protocol."

Whether his reference was to the common sense proposition that a subordinate does not leave a meeting without consent, or to the unbeknownst to her at the time practice of OGC attorneys not to immediately leave a CFND meeting, he was correct.

FMCS Case No. 03-08992
<u>NAGE R33-77/PBGC</u>

Had she been calmer, which admittedly would have been difficult in light of Mr. X's actions and her perception of OGC indifference to its impact on her psyche, he might have provided an explanation of his comment. Nevertheless, the comment itself was neither inaccurate nor inappropriate, when coming from her ultimate OGC superior.

His comment about the grievant's having problems with her supervisors was only slightly off the mark. She had protested the promotional practices of Ms. R, her prior supervisor without first discussing her concerns with her, and she had singled out Mr. Z, her second line supervisor, in her EEO complaint, and now she had made accusation against Mr. X. These complaints made within a four year period (1999 - 2002) would have been out of the ordinary unless the OGC was out of control, a situation not depicted by the evidence as extending beyond those in the OGC responsible for labor relations, a matter to be pursued shortly. So, the General Counsel's suggestion the grievant and her attitude may have been the cause of friction, was not totally out of place.

Only the General Counsel's reluctance to name the specific supervisors who he thought the grievant had trouble working with can be called into question. It left the impression with the grievant that she had never been able to accept supervision. Yet, at the hearing, he had to admit that she had worked with a variety of other supervisors without complaint from her or them. However, on November 15 he did not limit his concerns to her experiences with those three, with result that the grievant immediately jumped to the conclusion that his comment was a broader disparaging assessment of her acceptance of authority. Feeling that this was both unfair and shifted blame from Mr. X to her, the grievant's already intense emotional state became even tighter.

The grievant wanted a promise from the General Counsel of immediate disciplinary action against Mr. X, and if not obtained, at least an acceptance of the seriousness of her charges and a clear indication that they would not be dropped. The death knell for her objective was rung when the General Counsel told her he had concluded that what had happen was no more than a "communications failure." This comment was premature and had consequences beyond the grievant's immediate outrage.

Whether he or Mr. S actually smirked, or otherwise purposefully displayed discourteous reactions to what the grievant had to say, is hard to judge. The General Counsel responded to the grievant's examinations at arbitration without attempting a "poker face." Rather, when things got heated, he tended to react with a smile. If mad at him, his smile might be interpreted as a smirk when it actually was an attempt to spread oil on troubled waters. Occasionally, his grin appeared a good natured, "you're not going to get me ruffled," signal to the grievant, but without the flash of anger or personal disdain Mr. X had a tendency to display. Mr. S's facial expressions left no lasting impression which might cast light on the issue of whether he smirked at this meeting, though it was more likely that he did than did the General Counsel.

FMCS Case No. 03-08992
NAGE R33-77/PBGC

As with any disputed fact, the burden of proof was on the grievant on this issue, and this one was not proved. Though both she and Mr. A were certain that the General Counsel and Mr. S greeted what the grievant said and argued with smirks and other derision, at least with regard to the General Counsel, it is too easy to imagine that they misinterpreted his response. Admittedly, it's a close call in light of his undisputed tendency to interrupt her presentation, as well as Mr. A's assertions that it was a common practice of the General Counsel to smirk when dealing with the Union. Still, it seems unlikely that in facing seriously contentious situations it was the General Counsel's practice to respond snidely.

Besides, the crucial issue is whether the General Counsel's refusal to provide the relief the grievant sought, or his conduct during the meeting, were motivated by unlawful race, sex or national origin discrimination, or because of her previous protected union or EEO activities. That is, did he violate Title VII, the CSRA, or another statute?

There was no direct evidence of race, sex or national origin bias on the part of the General Counsel, and any indirect evidence was scant at best.[14] That he is a white male, while the grievant is a black female born in Trinidad-Tobago, does not raise an inference of unlawful discrimination. Even if it did, it is refuted by his prior action in promoting the grievant to GS13, retroactively and with back pay, after she questioned her being out of step with white attorneys similarly situated. That voluntary remedial

---

[14] In evidence are statistics reflecting the race and sex composition of OGC employees, as well as testimony about its minority recruitment efforts. However, raw percentages tell little. To establish a Griggs v. Duke Power inference of discrimination with statistical evidence, a more demanding showing must be made. Using attorney hires, what is needed are data reflecting what nondiscriminatory attorney hiring would be expected to produce at the PBGC, all other variables being equal, compared against the actual makeup of its attorney workforce. If there is a difference between the expected and the actual, that difference must be either "statistically significant" (generally, less than 20% (1 in 5) chance of occurring randomly), or fail the less demanding "80% rule of thumb" endorsed by the Uniform Testing Guidelines, 29 CFR 1607. Neither 'beyond chance" showing can be made with the grievant's agency by agency data because they are insufficient to work with statistically. Among other things, there is no base number for each agency's total attorney workforce, just the female and minority percentages of whatever that number is. That base number is key since if it is low, say only 20 attorneys in total, the percentages can grow or shrink by 5% due to the presents or lack of a single individual. That is why conclusions are rarely drawn in medical studies, or even political polling, without using hundreds of participants to reduce, among other statistical instabilities, the "measure of error." Furthermore, variables affecting "actual" numbers are rarely equal. The problems facing government agencies, with their salary limitations, in recruiting qualified minority candidates in competition with the private sector are well known. Even as between government agencies there are other variables, not the least is the subject matter with which an agency's attorneys deal. The contrast shown in the grievant's exhibit between the 23.51% black attorney composition of the EEOC and the 8.03% at the SEC (the agency with the closest "overall" workforce of the same size as the EEOC) may be an example of "subject matter effect." If so, before the SEC can be pronounced not to be a nondiscriminatory attorney hiring agency, that variable would have to be accounted for.

action, and his later participation in efforts to resolve her EEO complaint alleging an unlawful hostile work environment, together refute her claim that he improperly acted because of her personal EEO activities.

The more serious charge is that his dismissive action at his November 15 meeting with the grievant was motivated by her having testified in the arbitration of the Union's challenge to the structure of the Agency's EEO apparatus. The issue before the arbitrator there had been whether the Agency had failed to "provide an independent and neutral EEO function for the fair and impartial processing of EEO complaints in violation of 29 CFR §1614(a)(2), and [Labor Agreement] sections 4.1, 5.1, 5.2 and 5.7." In a nutshell, the Agency's problem was that the investigation and resolution of EEO complaints were too intertwined, personnel-wise, with other functions of the OGC and HRD that might bear on an EEO complaint.

On June 1, 2002, the arbitrator in that case sustained the grievance, and directed that the Agency's EEO functions be restructured. The restructuring effort progressed slowly, and a further hearing was held in April, 2002 to resolve lingering disputes between the parties. It was during this later hearing that the grievant testified for the Union. According to the Union's post-hearing brief, her testimony was to the effect that she had "concluded there was no way that the EEO process could protect her confidentiality, and [therefore] she feared her job would be at risk and she would face retaliation if she even raised EEO issues informally."

It appears that sometime after August 31, 2002, and within reasonable proximity to the November 13, 2002 incident between the grievant and Mr. X, and the November 15, 2002 meeting between her and the General Counsel, a final EEO restructuring was agreed upon. The immediate effect on the General Counsel was that he was designated the "EEO Neutral Attorney," and according to the Agency's description provided in its August 30, 2002 post-hearing arbitration brief, this meant:

> The General Counsel himself, and [another] GS15 attorney working directly for the General Counsel, serve as the Agency's EEO neutral Attorneys. Neither attorney executes or advises the Agency on personnel actions. Likewise, they do not represent the Agency in adversarial EEO proceedings. Legal representation and advice concerning disciplinary action, labor relations, and adversarial EEO proceedings are handled by the General Law and Operations Group under the direction of Deputy General Counsel, [Mr. W]. Moreover, having the General Counsel serve as the EEO Neutral Attorney eliminates the possibility that the Agency's litigators will improperly sway the Neutral Attorney. The General Counsel is the senior attorney in the Agency. Its litigators are junior to him and would, therefore, have no authority to force the General Counsel to take a

- 49 -

particular position to the detriment of an EEO complainant.

After judging his demeanor and candor as a witness, the General Counsel is found to be a reasonable, emotionally stable person. For that reason, it is impossible to accept without corroborating evidence that either his role as the EEO Neutral Attorney, or his isolation from the General Law and Operations attorneys pursuing adversarial matters, were so resented by him as to motivate him to retaliate against the grievant because she had testified about her misgivings over the previous EEO structure. This conclusion is not altered by the grievant's argument that the restructuring of his OGC was "forced" upon the General Counsel by the arbitration.

It just does not make sense. First, the General Counsel must have agreed to and signed-off on the arrangement, including his role in the new EEO scheme, and there was no evidence he was either reluctant to do so, or that he was annoyed by it. Second, with the flood of steel industry, airline and other major bankruptcies with their untold millions in underfunded pension liability, and with the PBGC dwindling reserves with which to meet its responsibility to affected pensioners, the restructuring of Agency EEO functions has got to be such a minor concern as to cause him "not to give a whit," much less to be so disturbed about it he would seek vengeance on the grievant.

Put another way, it is not enough to just establish that (1) the grievant had testified in the matter, (2) the resolution of which affected the General Counsel, and (3) that within a reasonable time thereafter, he refused to take actions which she requested of him, or to even take her complaint about Mr. X as seriously as she thought it deserved. To carry her burden of proof, the grievant needed evidence that the General Counsel viewed the restructuring of the Agency's EEO functions as something like the momentous event which she saw.[15] Without such a showing, it cannot be fairly inferred that his later dismissive treatment of her request and complaint was motivated by her combined EEO and union protected activity, rather than his unbiased assessment of the gravity of the incident between her and Mr. X.

Finally, the grievant's claim that what is commonly known as the "Whistleblower Protection Act" was violated by the General Counsel is rejected. The grievant's reporting of the rude and threatening conduct of Mr. X simply is not the whistle blowing conduct Congress intended to protect by severe penalties against the retaliator and

---

[15] Had the arbitration's effect on the General Counsel been consequential (a reduction in pay, a loss of prestige, a cause of ridicule, or even simply being moved to a new, smaller office, or one without a window), it would have raised an arguable inference of a connection. But, where the adverse effect, if any, is so trivial, something more is needed for the grievant to carry her burden. She could have met that burden had the General Counsel expressed in writing or orally his resentment over the restructuring, or perhaps even shown an annoyance or a peevishness. But, there was no such evidence.

extensive remedial recoveries for the victim.  Otherwise, every dispute between a subordinate and a superior at an agency would produce a potential "federal case" under that Act's "abuse of authority" provision if the supervisor did not immediately act on the subordinate's complaint, no matter how minor.  Similarly, her testifying against the Agency's previous EEO structure does not constitute the whistle blowing envision by Congress.

The General Counsel can only be found "guilty" of violating the non-statutorily based Professional Courtesy Directive.  He should not have interrupted the grievant, but heard out her complaint, and he should not have prematurely pronounce her encounter with Mr. X to be no more than a "communications failure."

### The OGC and HRD Investigations, Generally.

Once the Step-2 Grievance was filed and it was clear that the grievant's complaint against Mr. X was not going to go away, Mr. N made sure nothing which would contradict the General Counsel's judgment was likely to come out of the two, inescapably intertwined investigations he set in motions.  It was not hard to accomplish.

Rather than farm out the Management and Grievance Investigations to a hard-nosed, no holds barred, investigator as had been done in tracking down each sexually offensive utterance to slip out of the mouth of Mr. D, or to use the thoughtful and analytical talents of Mr. O who had so skillfully nailed Mr. A for rudely challenging Ms. G's refusal to receipt the service of papers, Mr. N appointed Ms. P.  With her firmly held belief that a "failure to communicate" was the one-size-fits-all answer to conflicts in human relations, she was a perfect fit, almost certain to validate the General Counsel's conclusion about the cause of the November 13 incident.

To remove any doubt about a favorable outcome, he charged Ms. Q with overseeing Ms. P, and together, he and Ms. Q assured that Ms. P's fact gathering would be jumbled and misdirected by their instructions that (1) she was undertaking two separate investigations, the paths of which were not to cross or become commingled, and (2) she was to complete the Management Investigation first, and with haste.

In a sense, their failures to direct Ms. P were as crippling to her efforts as were their misdirections.  Never did Mr. N or Ms. Q tell Ms. P to focus on the confrontation between the grievant and Mr. X.  They never explained that her starting point was the Step-2 grievance with its detailed allegations.  They never clarified that if Mr. X did no wrong, then the General Counsel's "communications failure" conclusion would be accurate, as would be an OGC-HRD determination that the grievance was without merit.  It was all a single ball of wax, but one which they made sure she would never come to realize.

Just as important was the flip side of the same November 13 coin. Ms. P was never made to understand that if Mr. X violated the Agency's Professional Courtesy Directive and Workplace Violence Policy, then the General Counsel and HRD needed to know that so the matter could be dealt with and the grievance resolved without further embarrassment or costs. While Ms. P believed she was totally objective in her investigations, it was only because she could not understand that the instructions, guidance, and advice she received from Mr. N and Mr. Q were always tilted towards the desired results of exonerating the General Counsel specifically, and Mr. X necessarily.

Ms. P was not a knowing member of a nefarious contrivance to frustrate the grievant's quest for vindication. Instead, her trusting nature and acceptance of whatever she heard at face value, while not qualities looked for in an investigator, were ones welcomed and exploited by Mr. N and Ms. Q. And if she strayed from her myopic ignorance of the Step-2 grievance before she had cleared the General Counsel of any misjudgement about Mr. X's conduct, there was Mr. N or Ms. Q to shepherd her back to her tunnel-vision mind-set that differences between supervisors and subordinates always result from "communications failures."

Specifically, the following two incidents during Ms. P's struggles with her dual assignments raise an inference that the OGC and HRD never intended, nor wanted, Ms. P to get the facts straight on what took place on November 13 in the grievant's office.

First. When Ms. Q and Ms. P jointly interviewed Mr. X on December 12, Ms. Q did not have Ms. P question him using the written grievance as her scripted prompts. This is clear from Mr. X's responses recorded by Ms. Q. Although in Ms. Q's summary report form, they revealed he was not asked specific, probing questions, but served up soft, open ended questions that allowed him to lay out his version of the encounter with only such follow-up questions as fine tuned his description of the grievant's emotionally charged responses to his "instructive feedback."

If Ms. P had been dependent on her own wits before facing Mr. X, her lack of preparedness would have been predictable. But, she had the combined wits of herself and Ms. Q, and they had to have met in advance of interviewing Mr. X to agree on their procedure of Ms. P asking questions and Ms. Q scribbling down responses. From this conclusion, what is attention grabbing is that Ms. Q, who certainly had read the grievance and recognized that it provided the details underlying the oral complaint the grievant had made to the General Counsel, did not provide or discuss with Ms. P specific questions for Mr. X.

Nowhere is there evidence that Ms. P and Ms. Q held a skull session to review the grievance, sentence by sentence, and as it built to its climax with Mr. X in the grievant's office and she on her feet, with a word by word analysis. The results of the interview

simply confirm that these customary and expected steps were never taken to prepare Ms. P for an effective interrogation of Mr. X which would leave him no wiggle room, nor allow him to escape follow-up questions that could pin him on inconsistencies between his version and the grievant's.

Since Ms. P was left unprepared to ask Mr. X to respond to each of the grievant's accusations, it never crossed her mind after hearing him say he had remained at the threshold without ever stepping into the grievant's office, to bore in with follow-up questions, infused with scepticism. She didn't know enough from a brief glance at the grievance to ask him with insistence on a plausible answer for how he could have remained in the doorway while the grievant alleged that when she defended against his charge of "bordering on insubordination," he "left her office doorway and came into her office, stood within arm's length of [her] and said 'you better not push it?'"

If she had asked this obvious follow-up questions, Mr. X would have been forced to fess up, or call the grievant a liar. If the latter, the issue of his and her truthfulness would have been brought to the fore. Then, Mr. E and Mr. U, identified in the grievance as around or about the area at the time, would obviously need to be interviewed for possible resolution.

Ms. P's lapse in diligence was to be expected. It was one of her qualities Mr. N must have had in mind in selecting her for the sensitive assignment of conducting the Management Investigation. But, this is not the end of the story of the lapses surrounding Mr. X's interview.

Ms. P was simply not out of the same mold as the outside attorney unleashed on Mr. D, nor did she have the analytical powers or perseverance of Mr. O when resolving inconsistences in vying accounts of antagonists. Ms. Q is another matter. During her attendance at the hearing of this arbitration, her reactions to the testimony of the grievant and her witnesses showed she had a no nonsense tenacity to match them all, with no more lack of ability to spot a potential lie than Mr. O showed in spotting the absence of door slamming in Mr. A account of his departure from Ms. G's office. Yet, Ms. Q was sitting in the same room, heard the same stood-the-doorway response from Mr. X, was not barred from piping up, but from all that is known in the record, remained mute.

This lack of questioning by either Ms. P or Ms. Q, beyond that necessary to affirm the conclusion that the incident was but another case of a "failure of communications" between a supervisor and a subordinate, and that the grievant had been highly emotional, and thus untrustworthy in her grievance account, is suspicious. It is so out of the norm of what would reasonably be expected with a serious investigation as to force the conclusion that it was purposeful, and not solely the result of Ms. P's inexperience or naivety. After all, Ms. Q was there not only to take notes, but as Ms. P explained, had

been assigned "from the get-go" by the OGC to assist, and by implication of their GS
difference, to guide Ms. P.

Second. Unexplained is the December 17 e-mail traffic between Ms. P and Mr. F
when, at 10:11 AM, Mr. F told her that, "HRD was provided a copy of the grievance by
[the General Counsel]." Nineteen minutes later, at 10:30 AM, Ms. P responded; "This
investigation stems from [the grievant's] allegations -- It is not related to the step-2 grie-
vance."

That response, with its 19 minute lag, was strange. As conscientious as Ms. P was
about keeping her investigations separate, during that 19 minute interval, she must have
gone to Ms. Q or Mr. N with Mr. F's e-mail insistence that she look at the grievance, and
asked one or both for guidance, and gotten it. With an alertness for peculiarities already
heightened, and with Ms. P's testimony that she coordinated with Ms. Q in preparing
her final report, it would be highly unusual if Ms. P's 10:30 AM response to Mr. F's mes-
sage was formulated by her alone.

Instead, Ms. P had help in preparing an e-mail designed to send an implied mes-
sage. Either Ms. Q or Mr. N suggested to Ms. P, though she may not have recognized
the implication, that she tell Mr. F, in effect, that if the grievant expected the Agency to
pursue her complaint against Mr. X, she must submit to a face-to-face interview, know-
ing that the message would at least further aggravate the grievant, and could, if she
continued to decline a direct interview, solidify a basis for closing the investigation with
a conclusion based solely on Mr. X's version of events. Just such a result is what Mr. N
testified would follow,[16]

**The Management Investigation** was a farce, never intended to truly explore
whether Mr. X had violated the Professional Courtesy Directive, much less the Work-
place Violence Policy. Were either violation discovered, the General Counsel would
have been placed in the embarrassing position of having to retract his shoot-from-the-
hip conclusion that the grievant's complaint had grown out of no more than a "commu-
nication failure." No principal player from the OGC or HRD wanted to see that happen.

---

[16] The burden to conduct a competent investigation of the grievant's complaint was on the
OGC and HRD, and they are held to account for what occurred. But the grievant is not without fault.
As horrific as she thought the experience with Mr. X, and as disappointing as Mr. T's and the General
Counsel's responses may have been, that they remained emotional blocks to her cooperation with Ms. P
a month later is out of the ordinary, and played into the hands of those who wanted the General Coun-
sel's assessment of her incident with Mr. X affirmed. Ms. P showed herself to be without an ulterior
motive. A frank and cooperative discussion with Ms. P might have opened her eyes to the importance of
Mr. E and Mr. U. That, in turn, might have prompted the realization Ms. P would not have until she was
a witness in this arbitration, that Mr. X's conduct "bordered on" violations of Agency's courtesy and
violence policies.

This is ironic. By the directness of his testimony and his general demeanor, the General Counsel left the impression of a man who would have had no problem admitting he had made a mistake. Nevertheless, others in the OGC (Messrs N, S and Ms. Q) and HRD (Ms. P, as she understood her mission) felt it was their responsibility to protect him from being confronted with any facts that would call for that admission.

**The Grievance Investigation** fell to Ms. Q to complete. It too was an inexcusable farce, but especially so because it could have been spared that judgement. With the federal Christmas holiday subtracted out, she had seven work days to add flesh to the bare bones of information she and Ms. P had gathered. However, Ms. Q's Step-2 response makes clear that with Ms. P's departure, Ms. Q put the brakes on her own inquisitive mind.

Unlike the Management Investigation, where Ms. P was coddled into feeling the allegations in the grievance were no substitute for the grievant relating them orally, in no way could Ms. Q ignore the grievant's detailed account of Mr. X's confrontation with her on November 13; how Mr. X had advanced into her office, grown so close to her that she rose from her chair to receive, face to face, his threatening and repeated, "keep pushing it." Surely Ms. Q recognized that Mr. X's statement made to her and Ms. P, that he had not left the doorway, did not square with the grievant's account.

Ms. Q was experienced in checking facts and formulating Agency responses to grievances, and it is unimaginable she set the grievance aside as had Ms. P. Rather, from shortly after it was filed on December 9, she must have had a copy, closely read and digested its allegations, and recognized that the central issue was whether Mr. X got too close to the grievant and been too threatening in his words, tone, and the volume of his voice. She couldn't have missed that the grievant identified Mr. E and Mr. U in the vicinity of the incident, and that they should be interviewed.

Ms. Q's failure to undertake interviewing Mr. E and Mr. U could only have been intentional, there being no evidence that they too were on leave. Due to his illness at the time of the hearing, Mr. U was unavailable for cross examination and his testimony was stipulated, but Mr. E took the stand and no questions were asked to place him out of Ms. Q's reach as she composed the Step-2 response. She did not have any of the naivete or trusting nature of Ms. P, but a well trained scepticism and eye for inconsistencies and conflicts in witnesses' accounts. Only if made not to dig deeper into the facts of November 13 incident can her failure be explained. And, since Mr. N was in immediate command, he is held responsible.

But, there are more reasons for holding the top ranks of the OGC and HRD labor relations hierarchy responsible for the farce played out in this arbitration. It is understandable that the Management Investigation ended with Ms. P's report, but no reason

was presented or argued as to why the Grievance Investigation was terminated with the Step-2 response, except that it was unworthy of the persistence of the investigation previously conducted to substantiate Ms. G's similar, but less serious charge of discourtesy directed against Mr. A.

Reasons and opportunities abounded for investigating the grievance further. The Union rejected the General Counsel's Step-2 denial, and advanced the grievance to Step-3, and later to this arbitration. At each step, nothing prevented the Agency from appreciating the obvious; the Union and grievant would rely on Mr. E and Mr. U to put the lie to any testimony from Mr. X in line with Ms. P's recollection that he said he never left the doorway or entered the grievant's office.

Without perceiving the situation facing them, Mr. N, Ms. Q, and the rest of the OGC and HRD staff, sailed off toward arbitration with nothing new to cause them to rethink the General Counsel's characterization of the incident as a "conversation," rather than the loud verbal commotion Mr. E and Mr. U overheard, or more critically, the General Counsel's certainty that there were no "facts to suggest that [Mr. X] communicated a threat," when both would have circumstantially placed Mr. X inside her office while shouting (a fair characterization of "raised voices," or "loud conversation" when uttered in that small space) was heard.

As it was, only during the discovery phase of the grievant's Title VII "hostile work environment" suit that morphed out of her September 2002 EEO complaint was "bingo" heard by Agency counsel, signaling that not everything jibed. It could not be missed that despite why Mr. N said he directed Ms. P to undertake Management Investigation ("I wanted to make sure that there wasn't more to it, [and that in his anxiousness to quickly get to the heart of things, [the General Counsel] hadn't overlooked anything"), and despite the reassuring reports produced by Ms. P and Ms. Q, by golly, some things of consequence were overlooked.

For purposes of this arbitration, this late realization of the obvious is important only as a further demonstration of the sloppiness and inadequacy of the Management and Grievance Investigations, and to highlight the question, why the shortcomings of the OGC and HRD efforts?[17] The answer is complex, but in the end, clear.

_____

[17] What is not important here, played no part in deciding the issues, and was not recognized but upon reflecting back on the prolonged hearing and what was suggested by the reaction of participants in the arbitration and the overall "feel" generated by the testimony of both parties' witnesses, is the belated impression left that had the OGC and HRD gathered the facts prior to District Court discovery, and had those with the power to call the shots acted reasonably, the issues in this arbitration would have been settled, sparing the expense of 13 days of hearing and untold days of preparation and brief writing by both sides.

## Contrasts in Agency Investigations

**The Ground Rules:**  Throughout its brief the Agency states and restates the claim that any questioning of the underlying Agency policy or reasoning for the priorities it set in terms of time, energy, costs and resulting intensity assigned or devoted to different employee complaints is out of arbitral bounds.  Ever concerned about the Supreme Court's "strict employer liability" pronouncements in <u>Burlington Industries, Inc.</u> v. <u>Ellert</u>, 524 US 742, at 765 (1998) and <u>Faragher</u> v. <u>Boca Raton</u>, 524 US 775 at 807 (1998), it specifically notes that it is "an Arbitrator's job to interpret the [Labor Agreement], Agency policies and EEO law, [and] not to change them by imposing some new standard for 'non-sexual harassment' complaints not indicating immediate need for intervention."

With but one exception, the limitations on arbitral jurisdiction argued for by the Agency will be observed, and its adopted policies and procedures on when, where and how it devotes its investigative resources, or the actions it takes in response to the results, will not be placed in issue.  They will be treated as protected "Management Rights" under 5 USC§7106(a)(2)(B), "to assign work, to make determinations with respect to contracting out, and to determine the personnel by which agency operations shall be conducted."

What is properly in issue in here is whether the Agency has consistently applied its adopted policies.  Even the small exception which will be taken to the Agency's reading of <u>Ellerth</u> and <u>Faragher</u> involves a question of consistency, if not a plainly proper arbitral construction of the law.

**The Investigation of Ms.G's Complaint Against Mr. A.**  The Directive on Professional Courtesy has no set procedures for investigating complaints.  Rather, as it explains in its brief, the Agency practice is an <u>ad hoc</u> one based on experience that shows, "while some incidents are not serious enough to investigate, others [are]."  It is the impossibility of objectively finding any reasons why the incident between the grievant and Mr. X was "not serious enough to investigate," but that involving Ms. G and

---

But, by the time the court discovery revelation uncovered the deficiencies of the OGC and HRD investigations, attitudes among OGC and HRD personnel toward the grievant and her complaints against Mr. X, the General Counsel, and now, them, were hardened.  There is no evidence the Executive Director or the General Counsel were told of these developments, nor is there reason for any evidence on that point to be here.  It's immaterial what motivates a party to push on to arbitration.  Nor is it material that those within the OGC and HRD who thought more rationally, were either without authority to stop the less-clear thinking from pushing ahead, or were simply shouted down.  Also of no account is that for the vindictive among the OGC and HRD staffs, who knew the costs of the fight to the Agency would be a taxpayer burden and not their's personally, there was the realization that NAGE had left the grievant to her own means, and that her own tenacity would cost her one way or another.

FMCS Case No. 03-08992
NAGE R33-77/PBGC

Mr. A was, putting biases aside.

Both Ms. G and the grievant sought redress under the Professional Courtesy Directive, expecting meaningful responses from the OGC and HRD, but their complaints were processed and disposed of quite differently. One complainant was speedily vindicated, while the other was left in further distress. At no point did OGC and HRD treat the grievant's complaint as seriously as was Ms. G's. The contrast was marked. Of all the investigations of misconduct, including those of sexual harassment, none was a more impressive demonstration of OGC and HRD investigative knowhow and resourcefulness than Mr. O's investigation into the behavior of Mr. A. Nothing in the arbitral record exceeded it. It was at the top of the effectiveness scale.

At the bottom of the scale was Ms. P's investigation of Mr. X. The Agency made no attempt to show it had ever undertaken an investigation of an employee complaint that equaled the missed cues, incompetency, and general bungling that occurred with regard to the initiation and conduct of that investigation. It was without peer. According to the Agency, the differences in what it took the complainants to get the two investigations launched, the brain power the OCG and HRD assigned to each, the instructions or guidance given, and the tenacity of pursuit, can be explained by the difference in reputations of Mr. A, whose volatile nature had generated complaints, and Mr. X, who had never before been accused of an impropriety.

But the reputation difference goes only so far. It's a valid explanation for the delay in grasping the seriousness of the grievant's charges against Mr. X, while having assumed that the charge against Mr. A was seriously based. The initial "forum invoked by the complainants" was the same. Both the grievant and Ms. G took their complaints directly to the General Counsel; Ms. G by memo, the grievant by e-mail and at the November 15 meeting. In large part because of the reputations of the accused, the General Counsel responded differently.

Without interviewing Ms. G, he immediately directed Mr. O to investigate her complaint. After reading the grievant's e-mail messages and meeting with her to hear her complaint against Mr. X, he did nothing. He did not direct any of his staff or the HRD to determine the facts because, beside the likely influences Mr. X's untarnished record had on him, as well as version of events he got from Mr. X prior to hearing the grievant's account, in the words of the Agency's brief:

> [The General Counsel] handled the [the grievant's allegations] in a low key manner. He offered a legitimate justification for his approach, namely that he did not share [the grievant]'s view that the matter was a serious infraction; rather in his view, after listening to both sides, he concluded that it was a simple communications failure.

While the grievant adamantly argues in her brief to the contrary, up to this point, and until she filed her written grievance, this difference in the General Counsel's response and that of the OGC and HRD staffs were understandable. This is so even if the grievant's emotional and animated recitation of the events of November 13 and her dissatisfaction with the lack of OGC response on November 14 and 15, can be seen as out-of-the-ordinary for her and thus suggestive that Mr. X's conduct was out-of-the-ordinary for him.

But, once the grievant's step-2 grievance was in hand, acceptable excuses for treating the two complaints differently to the detriment of the grievant's stop, and a search for pretext begins. The seriousness of the grievant's allegations couldn't be missed by Mr. N, though he could detect the flourish of Mr. A's skillful hand in its wording and immediately suspected exaggerations. It was still time to drop subjective determinations, and move to as equally an objective, hard-nose inquiry as that Mr. O conducted.

That did not happen. Instead, Mr. N assigned the confusing dual Management and Grievance Investigations to Ms. P, predetermining their outcome by imparting to her that the General Counsel had pronounced the matter a "communication failure." He knew she was more a mediator or employee relations pacifier than an investigator suited to ferret out the facts of a contentious encounter between two employees. He welcomed her mind set going in and trusted that it would not be dislodged by an investigative curiosity, to read the actual grievance and pursue the leads suggested before she finished her reports. Never would similar expectations have been held for Mr. O or any other rational investigator.

Throughout this arbitration, the Agency proclaimed OGC and HRD policy to be that a "detailed and formal disciplinary investigations [will] not begin without some prima facie indicator that the result could likely lead to discipline, so as to warrant the greater expenditure of time and resources for the formality and writing required." Ms. G's complaint against Mr. A was judged as warranting "the greater expenditure of time and resources for the formality and writing required" by the report Mr. O produced. If the explicit and implicit standards of the policy were applied to the grievant's written grievance, her complaint would have more than justified the full-court-press investigation that Ms. G's complaint received, including a winning shot comparable to the interview of Ms. G's mother.

The differences between the incidents are what made the grievant's experience with Mr. X more serious than that between Ms. G and Mr. A. By any measure of plain rudeness, Mr. X beat out Mr. A repeatedly. Contrary to the Agency's assertion that Mr. A "barged into her office while [Ms. G] was on the phone with her mother," uninvited, the evidence reveals no such thing.

First of all, Ms. G never alleged that Mr. A "barged" into her office. In her complaint to the General Counsel, she related a peaceful, business like prelude to the incident she complained about:

> I was in my office with the door closed. I was on the telephone. There was a knock at my door, and I called out, "Come in." [Mr. A] opened the door and entered my office. I was still on the telephone and was holding the receiver in my hand. [Mr. A] handed me some correspondence in an EEO case we are currently handling. I took the letter from him and said, "Thank You."

Furthermore, the meticulously developed facts of Mr. O's step by step reconstruction of the confrontation also established that while on the phone, Ms. G "called out for [Mr. A] to come in" to her office to drop off the papers he had.

On the other hand, the grievance is clear that Mr. X was never asked to "come in," or otherwise get any closer to the grievant than her office door's threshold. It related that when Mr. X arrived and found the grievant on the telephone, she held up her hand with the index finger raised, signaling to him that she would be off the phone in a minute. But, there is no evidence that once she hung up, the grievant invited Mr. X to enter her office. Rather, since at that point Mr. X surprised the grievant with his angry accusation that she had left "the meeting before it ended," it's inconceivable that she would have asked him to draw closer with his loudly stated allegations. That he did angrily advance on her can justifiably be characterized as "barging."

Of course, no evidence of Mr. X's "barging" was developed by Ms. P and Ms. Q since they accepted unquestioningly Mr. X's assurance that he had not entered the grievant's office. Had it been questioned and his deception discovered, he would have had to answer why he entered her office rather than stay in the doorway. And whatever he answered, a question would linger. Ms. P and Ms. Q knew the grievant's office was so small that a discussion would only be conducted with the visitor standing at the threshold.

The differences in rudeness went further. Ms. G did not assert that Mr. A delivered a tirade directly in Ms. G's face, while the grievant specifically made that allegation against Mr. X. Also, Ms. G did not claim that Mr. A's utterances caused her any fright, while the grievant related in her Step-2 grievance that she was frightened by Mr. X's "keep pushing" tirade and close proximity. Certainly, an allegation of "frighteningly rude conduct" would be judged by any objective observer as exceeding the allegation of "simple rudeness" which met the OGC and HRD policy standard of "some prima facie indicator that the result could likely lead to discipline."

FMCS Case No. 03-08992
NAGE R33-77/PBGC

- 60 -

In so far as being an "indicator" of the seriousness of the grievant's complaint, any objective observer would find more important than differences in degrees of rude-ness, the difference in the participants' relationship. Mr. X was the grievant's superior, while neither Mr. A nor Ms G was subordinate to the other. In his open salvo of accu-sations, Mr. X had an advantage over the grievant's freedom to fire back, not enjoyed by Mr. A over Ms. G.

Both Mr. A and Ms. G were well seasoned labor relation advocates, with skins toughened by their previous emotional and angry encounters which likely were more intense than anything disclosed by Mr. O's investigation of their fracas over the service of documents. Rougher exchanges of invectives and rude behavior by both sides occurred during the hearing in the present case than anythhing alleged by Ms. G or described by Mr. O in his report.[18]

On the other hand, the grievant was a temporary subordinate of Mr. X and had no reason to have developed a comparable thick skin off which Mr. X's verbal assault could be expected to bounce without leaving abrasions. Unlikely Mr. A's snarls and barks which were well known to Ms. G, the grievant had no reason to expect any lack of civility from Mr. X. She hardly knew the man, and certainly not in the context of the ever present hostilities of PBGC labor relations.

There are other causes for doubting the reasons offered up for not treating the grievant's complaint as "serious." Putting aside the finding in this arbitration that Mr. X violated the Agency's Policy on Workplace Violence, there were allegations in the grie-vance which should have been treated at least as "aggravating circumstances," enhanc-ing the "prima facie indicators" of a violation of the less serious Professional Courtesy Directive, which was all the grievant wanted enforced when she met with the General Counsel. That was the message sent to Mr. N by Mr. S in his e-mail memo immediately following the November 15 meeting. He wrote, "she expects him [the General Counsel] to enforce the courtesy directive."

However, Mr. S's e-mail related some of the specifics of the grievant's allegations made to the General Counsel, like, "He should not have gotten one foot away from her in the confrontation." And, on December 9, Mr. N got the written grievance with the full "specifics." Among them were the grievant's accusation that after Mr. X entered her office and approached so close that she stood up because he had made her "uncom-fortable with [his] tone of voice and proximity," and rendered her "visibly distraught and

---

[18] Always free of hearing room rudeness and scowls were Mr. Forster for Management and Mr. Jeffers for the Union, both of whom remained gentlemen and calming influences throughout. They bear no guilt for the conduct of their associates, most of whom would advance their careers by learning to smile in facing their adversaries.