upset." As Ms. P was to recognize on the stand after reading the allegations carefully, the grievant had been saying that Mr. X violated her "personal space," and for Ms. P, that made it "a more serious matter," and took the incident beyond the bounds of a simple "communications failure."

This recognition must have come immediately to Mr. N and Ms. Q. No excuses were even attempted for their missing the "prima facie indicators" of an alleged incident of rude behavior with extenuating circumstances of inappropriate physical conduct. Unlike Ms. P, they knew that among their concerns was going to be the "superior/subordinate" relationship of Mr. X and the grievant. They could not have failed to. Their combined experience and above average common sense would have failed them if they thought that any outside observer would ignore or discount it. Perhaps those qualities did fail them, but more likely they decided to rough and bluff it out should it reach the point of outside scrutiny.

Otherwise, before launching the OGC and HRD investigations, Mr. N and Ms. Q needed to make sure Ms. P understood that it was important whether Mr. X did or did not get as close to the grievant as she alleged, especially so because of their differences in rank, and she should not be satisfied with a simple denial from Mr. X without interviewing Mr. E and Mr. U, who the grievant alleged were in the area and may have seen or heard the ruckus.

Ms. P knew the difference was there, but because she received no worthwhile guidance from Mr. N or Ms. Q, she accepted Mr. X's assurance that he had spoken to her from the hallway, and had not crossed the threshold of her office. As a result, Ms. P could not picture anything untoward happening when he spoke to the grievant.

The Agency's justification for the differences in the competency and thoroughness of the two investigations was Mr. A's reputation for rudeness in dealing with Management representatives and anyone else who crossed him. His treatment of Ms. G simply presented a long overdue opportunity for Management to pounce. As it inadvertently explains in its brief, Mr. A had long been presenting himself as a target, but rarely being caught sufficiently far across the misconduct line to warrant discipline:

> While additional seriousness was given to complaints received about [Mr. A], several of the complaints were not deemed serious enough to investigate, others were investigated without further action, and several led to apologies [by Mr. A] and promises not to repeat misconduct, a warning, and a reprimand which he did not challenge.

The Agency's irritation with Mr. A is understandable. His testimony showed he enjoys the reaction he gets out of Management with the tart darts he can fling when

zealously pursuing the interests of bargaining unit members. But, the "he deserved it" aspect of the Agency's argument cannot obscure that nothing in the way of an objective analysis was made of the grievant's complaint to judge its potential seriousness, or if it was, the response was steps to ensure that an investigation minimized the seriousness.

In short, it is not enough that Mr. A had a track record of alleged overbearing conduct such as to regularly provoke a "here we go again" reaction with the OGC and HRD staffs, while Mr. X had only a reputation of being demanding and lecturing as a supervisor. The difference in their "usual personalities" does not explain away the the lack of seriousness given by the OGC and HRD once they had the specifics of the Step-2 grievance.

If this arbitration did not involve retaliation claims, it could end with the finding that the difference in the intensity of pursuit of the grievant's complaint and Ms. G's was because the target in one was a supervisor, and the target in the other was a pain-in-the-neck R3-77 steward. Fortifying that conclusion would be that the grievant's complaint was not the only case where inappropriate supervisor conduct was ignored or brushed over by the OGC and HRD.

When it comes to ignoring a supervisor's egregious conduct, nothing beats the kitten give-away poster created by Mr L, for which sexual harassment of a subordinate, the Agency took no action against him; no reprimand or counseling memo to mar his personnel file, but instead he walked away scot-free. Not only was that result remark-able as another case of how a serious complaint against a supervisor was treated, but it takes the wind out of the Agency's Ellerth and Faragher arguments which it repeatedly made in its brief and through testimony, as justification for the marked disparity between the investigative resources devoted to the grievant's complaint and those used where the conduct complained could be classified as sexual harassment.

In a recent discussion in 20 The Labor Lawyer 177 (2004) on Labor and Employ-ment Law Decisions of the Supreme Court, devoted to last term's decision in Pennsyl-vania State Police v. Suder, 124 S.Ct. 2342 (2004), the effects on employers of the hold-ings in Ellerth and Faragher were nicely summarized:

> Where harassment results from a supervisor's official action, the employer
> bears a greater degree of responsibility because it empowered its 'agent to
> make economic decisions affecting [ ] employees under his control.'

> \*      \*      \*

> On the other hand, when a supervisor engages in harassing behavior that
> involves no official employment action, strict liability for the employer is
> less appropriate. So, for example, if a supervisor harasses an employee

FMCS Case No. 03-08992
NAGE R33-77/PBGC

- 63 -

through unwelcome verbal or physical conduct, the supervisor is engaging
in acts 'which might be the same acts a co-employee would commit
[where] the supervisor's status [would] make little difference. Further,
since the employer observes no objective signal in the change in terms
and conditions of employment in such circumstances, it has less opportun-
ity to countermand the harassing behavior. In this context, accordingly,
the employer should be liable only if the victim reported the offensive
conduct and provided the employer's anti-harassment policy a chance to
correct the problem.

Two points need to be made as they relate to the present case. First, the supe-
rior/subordinate relationship, which <u>Ellerth</u> and <u>Faragher</u> warned could give rise to
strict liability for the Agency, existed between Mr. L and Ms. I. Second, the incident
came to the attention of the OGC and HRD in 2000, two years after the 1998 decisions
in <u>Ellerth</u> and <u>Faragher</u>. These two points refute much, and weaken the rest of the
Agency's answer to the disparity in its disciplinary treatment of Mr. L and Mr. D. The
answer was:

the complaint made against [Mr. L] occurred some ten years before it was
discovered by Management, had been long resolved by an apology made
by [Mr. L], and had not been raised again by [Ms. I].

Even if the record supported, which it doesn't, the idea that the "incident" took
place way before <u>Ellerth</u> and <u>Farragher</u>, sexual harassment by a supervisor of a subor-
dinate should be of the highest concern to the PBGC, no matter when it occurred. One
would especially think so since (1) complaints about Mr. L's conduct with Ms. I on that
occasion continued to be raised after <u>Ellerth</u> and <u>Farragher</u>, and (2) strictest of strict lia-
bility flows from that involving supervisory misconduct when the employer is on notice.

But that the natural inference is that nothing was done before or after <u>Ellerth</u> and
<u>Faragher</u> because the subject of possible discipline or counseling would have been a
supervisor, is not the only thing that is important. Also important is that the Agency's
assertion that <u>Ellerth</u> and <u>Farragher</u> justified its inquisition of Mr. D on the basis of Ms.
J's complaint, and that it had nothing to do with his being an R3-77 activist, is refuted.

The reason the Agency's file on the case of Ms. J's complaint against Mr. D was
placed in evidence was the contribution it, and the accompanying tale of how the OGC
and HRD came to possess that sexual harassment complaint,[19] made to the evidence of

---

[19] In defense of its digging in the internal files of R3-77 and finding the complaint, the Agency
argues that once in the possession of the District Court, they became public records open to perusal and
copying by anyone and thus, the digging for intelligence on players within the fractious R3-77 was "law-

files. The Agency's antagonists had been swept away by the national office of NAGE. Ms. K, Mr. A, and Mr. D were stripped of their power to bring annoying grievances, and under the emergency trusteeship, the trustee had pulled the rug from under the grievant in this case, leaving her to her own wits and purse to go forward, as well as doing the same to other grievants. What more could the OGC and HRD have wanted?

The answer apparent from the testimony and demeanor of Management's witnesses is that they relished the prospects of never seeing R3-77 reemerge as the pesky organization it had been with its leadership in the hands of Ms. K, Mr. A, or even Mr. D. And if more discrediting material in the R3-77 files could be found, so the better. Its disclosure might even promote a decertification drive in the unit. In any event, it could sow further discord in the ranks.

Mr. W did not provide the specifics of what he hoped his agent would "learn from what is going on in the internal union thing." If he intended a simple "fishing expedition," then with a threatened inference of a union animus being made clear to the Agency, it needed to draw from him convincing proof that his motives had nothing to do with seeking to cripple R3-77. This, the Agency failed to do. Instead, the inference was reinforced that Mr. W's agent was sent to find what dirt she could that might be useful. That gathering such documents was "lawful" in the sense that it was not a theft,[19] does not carry the day in dispelling the inference of union animus.

But there is more to this matter. The assignment of the grievant's Step-2 grievance as the second of a confusing pair of in-house investigations, was nothing like the decisive action of the OGC and HRD in immediately contracting-out Ms. J's complaint for thorough development and prosecution. To explain the difference, the Agency invoked its anxiety over potential Farragher and Ellerth liability. Since the holdings in those cases arose from incidents of sexual harassment, as a policy matter, the Agency gives sexual harassment complaints the highest investigative priority in terms of speed, costs and other assets. No other type of complaint, it argues, warrants equal treatment.[20]

---

[19] In defense of its digging in the internal files of R3-77 and finding the complaint, the Agency argues that once in the possession of the District Court, they became public records open to perusal and copying by anyone and thus, the digging for intelligence on players within the fractious R3-77 was "lawful." Whether or not it would pass muster with the FLRA if challenged as a U L P is not an issue here, just a fascinating question.

[20] Of course, without going further, the treatment the OGC and HRD gave to Mr. D's complaint against Ms. AA over her e-mails containing the "Grandma's Doggy Style" video clip and a tasteless joke with sexual references, which was ignored, casts doubt on the fidelity of the Agency's concern over Farragher and Ellerth.

FMCS Case No. 03-08992
<u>NAGE R3-77/PBGC</u>

As the Agency explains, since the grievant's complaint was not a sexual harassment complaint, it got lesser attention and a less competently conducted investigation. In fact, it argues in its brief that she was lucky she got what she got:

> [The grievant] was not, by virtue of any law, policy, or contract provision, entitled to an HRD/Management investigation, yet such an investigation was done, not out of any duty owed to [the grievant], but as part of Management's independent duty to the Agency to investigate and minimize potential liability.

It's hard to know what in this statement to address and what simply to ignore. It contains both errors and admissions (not omissions, but admissions). On the matter of no "law, policy, or contract provision" requiring any investigation, the statutes the grievant seeks relief under, Title VII and the CSRA, place a burden on the employer to provide a workplace free of those practices and conduct they declare unlawful. Compliance, if it is to work, is dependent upon thorough, good faith investigations of employee complaints of violations.

Similarly, the Agency's Professional Courtesy Directive and Workplace Violence Policy would be meaningless if allegations of violations were ignored or incompetently investigated. Absent a "polite conduct" police and a "violence intervention" squad patrolling the hallways and eavesdropping on the offices and conference rooms of the PBGC, enforcement of these Agency policies is dependent upon the Agency's responsiveness to complaints.

But, enough of these aspects of the statement. What is more intriguing is its assertion that the investigation which the grievant's complaint received was not intended to determine whether she was entitled to an apology from Mr. X, or some other acknowledgment that she had been rudely treated, any one of which would probably have satisfied the grievant. Rather, the basis was to "minimize potential liability." What this suggests and what the testimony of Mr. W and others confirm, is that the Management Investigation was only undertaken to satisfy the compulsive concern that whatever took place between Mr. X and the grievant, the Agency was not open to <u>Farragher</u> and <u>Ellerth</u> sexual harassment liability.

Without directly questioning that obsession, it will simply be pointed out that the Court never said or suggested in <u>Farragher</u> or <u>Ellerth</u> that other classes of complaint were less susceptible to strict liability. Before <u>Farragher</u> and <u>Ellerth</u>, workplace violence was near the top, if not on top, of the list of strict liability concerns for employers.

It's true that few workplace violence cases have involved supervisor aggression or physical retaliation against a subordinate. But that is not a reason to dismiss the

possibility of the occurrence. That relationship could easily translate into "strict liability" should the supervisor strike out during a future confrontation, especially with the Agency on notice through a grievance that the supervisor had earlier become excessively angry and placed himself a bit too close to a subordinate while ranting.

The grievant laid out a "prima face" case of the violation of the Workplace Violence Policy, which the thorough fact finding of this arbitration has established. This is not intended as a hindsight judgement, but simply a confirmation that in this instance, where there was smoke in the grievance, there was fire in the facts. The smoke was there. Available to Mr. N and all others in the OGC and HRD before Ms. P and Ms. Q set out on their quests were the written allegation that:

> As [the grievant] attempted to defend herself [against Mr. X's accusations], Mr. X left her office doorway and came into her office, stood within arm's length of [the grievant] and said, 'you better not push it.' [The grievant] stood up from her chair because she was uncomfortable with [Mr. X]'s tone of voice and proximity.

> [The grievant] told [Mr. X] that she had shown him respect and requested that he give her the same respect. [The grievant], who was visibly distraught and upset by [Mr. X]'s actions, nevertheless sought to convey to [Mr. X] that she was not being insubordinate, but simply trying to explain herself against his accusations. [Mr. X] repeated several times 'keep pushing it,' in [the grievant]'s face then he turned and walked out of her office and told her it was 'over.'. . After the incident, [the grievant] was stunned and extremely upset by [Mr. X]'s actions; . . .

This was notice that Mr. X was being charged with becoming excessively angry and having gotten too close to a subordinate while venting that anger. It could not have escaped Mr. N, that the allegations against Mr. X were more serious that the General Counsel believed. But at this point, December 9 or 10, when Mr. X had not been interviewed, Mr. N cannot be faulted for deciding to commit no more resources to the dual investigations than Ms P and Ms. Q.

Because of the importance Mr. N placed on the Management Investigation, Ms. P and Ms. Q kept him advised of developments as they progressed with their fact finding. Certainly, he was keenly interested in Mr. X's version of events. So, Ms. P and Ms. Q must have reported what Mr. X had said about not entering the grievant's office and how that conflicted with the grievance statement of events. Even if Ms. P missed the conflict because she had not read the grievance, and even in the completely unlikely event Ms. Q had missed it, Mr. N was too smart not to noted the problem, and Farragher and Ellerth cannot serve as an excuse for his ignoring it.

FMCS Case No. 03-08992
- 67 -                                    NAGE R3-77/PBGC

This judgment has nothing to do with questioning the Agency policy of giving the highest priority to sexual harassment complaints when it comes to committing investigation resources. It recognizes the Management right, at its peril, to give sexual harassment complaints a higher priority than either Courtesy Directive, or even Workplace Violence Policy complaints. But that policy does not provide a carte blanc excuse for relegating the grievant's complaint with its clear indication that a workplace violence incident was being alleged to the bottom tier of priority when Ms. G's similar complaint came to rest much closer to the Farragher and Ellerth tier at the top. An objective assessment certainly did not warrant the Agency assessment that the grievant was lucky it got any attention at all.

It was up to Mr. N to decided which resources to match against the seriousness of a complaint. In the absence of guidance within either the Professional Courtesy Directive or the Workplace Violence Policy, it was within his discretion as to whether to bring in an outside investigator with the persuasive features used in the investigation of Mr. D, or something considerably less.

The grievant never called for, and there is nothing in the evidence to suggest that the high powered approach taken with Mr. D was needed with the grievant's complaint despite its potential of exposing the Agency to liability. Rather, what was called for was an investigation as effective as that undertaken by Mr. O in response to Ms. G's complaint of rudeness on the part of Mr. A. This does not mean that Mr. O needed to be called into service.

Mr. N could have accomplished the same degree of effectiveness simply by exercising closer supervision of Ms. P and Ms. Q. As their direct supervisor, it was Mr. N's responsibility upon learning on, or shortly after, December 12 that Mr. X was maintaining that he never entered the grievant's office, to straighten out the fumbling and bungling in the thinking of Ms. P about what was clearly before her, and get into her head that this was a serious matter, and that Mr. E and Mr. U needed to be interviewed to see if they could cast light on which of the two antagonists was "mistaken."

The first chance was not the only chance Mr. N had to straighten out Ms. P and Ms. Q. When the grievant refused a face-to-face interview on December 16, it was Mr. N's responsibility to get Ms. P and Ms. Q to focus on the written grievance as the only available alternative. If acting in good faith, he would have again pointed to its reference to Mr. E and Mr. U and emphasized the need to followed up on its. Even though had Mr. E and Mr. U only seen Mr. X standing in the hallway speaking loudly to the grievant in her office, that would not have cleared Mr. X of the grievants charge since she conceded in her grievance that Mr. X started his berating of her while still at her office threshold, but if they placed him in her office, there would be a concern that Mr. N should have wanted to know about. Instead, Ms. P was told to hold the line and tell

- 68 -

the grievant's representative that, in effect, a face-to-face interview or no resolution of her complaint, and on December 17, to refuse the representative's offer to convey Ms. P's or Ms. Q's questions and the grievant's answers back and forth.

There certainly must have been further opportunities for Mr. N to provide guidance as things progressed, but the last opportunity at the investigation stage would have been when he got Ms. P's report and Ms. Q's Step-2 response, both relying on the grievant's lack of cooperation as the basic justification for accepting Mr. X's version of events. Without requiring interviews of Mr. E and Mr. U, Mr. N was allowing the investigations to terminate and the potential liability of the Agency to await exposure in arbitration. No matter that the investigations were "done, not out of any duty owed to [the grievant], but as part of Management's independent duty to the Agency to investigate and minimize liability," they failed to satisfy either reason. His letting Ms. P's report and Ms. Q's response to go forward to the General Counsel raises the question fundamental to this grievance. Why did he do it?

Farragher and Ellerth cannot explain away Mr. N lack of supervision. What the evidence established was that the grievant's complaint got drawn into the web of OGC and HRD hostility toward Local R3-77 officers and their protected union activities.

The hostility of some members of the OGC and HrD toward the now deposed officers of R3-77 and their activities, and the disdain, mistrust, and wariness felt by the former R3-77 members toward those OGC and HRD personnel, were evident without testimony or documents. They permeated the hearing room, the atmosphere of which would figuratively swing from icy cold to heated anger with rarely a pause at civility when antagonists were present. And, when there were verbal exchanges, they were sharp. On and off the record, accusations of lying, slander, and libel freely flew with the grievant an active participant.[21]

These impressions were not dispelled by the testimony of the witnesses called by the vying sides. Laid bare were the perceived aggravations of one or the unfairness of the other.

The "hard" evidence of the OGC and HRD animus toward R3-77 in the form of discipline and other actions and non-actions taken by Management served to confirm the impressions. But, among the incidents discussed in the findings of fact, there was one involving Mr. N which removed any doubt about the lengths to which the OGC and HRD would go with their hostility. The incident is also important here in explaining why

---

[21] It was close to a tossup as to who had the greater emotional investment in this case, the grievant or an attorney from the OGC. Figuratively speaking, when both were present, often only claps of thunder were missing from the lighting flashes of negative regards exchanged between them.

the OGC and HRD were retaliating against the grievant in their handling of her complaint against Mr. X.

The matter was that of Ms. K and the Agency's Institutional Grievances. By reason of proximity in time (three weeks) and Ms. K being the target of the Agency's unusual action of posting throughout the building its inflammatory grievance against her, it established that the OGC and HRD, and of those who testified, especially Mr. W and Mr. N, harbored a collective grudge over the loss to R3-77 of the EEO Structure arbitration. This was not a grudge held by the General Counsel. His testimony was convincing. He was unfazed by the arbitration and general above the fray. But Mr. W and Mr. N were not.

From the grievance's inception to its conclusion Ms. K, as President of R3-77, supported the grievance and testified against the way the PBGC discharged its EEO responsibilities, as did the grievant. And, recall that when Ms. K enquired by e-mail as to who had authorized the posting of the Agency's institutional grievance throughout the Agency, it was Mr. N who took credit on behalf of the OGC and HRD by replying, "We posted the institutional grievance on the PBGC bulletin Boards."

Mr. N's hostility toward the Union, and that of Mr. W expressed in both his testimony and his actions, go to whether there was an unlawful motive behind the general lack of competency in the OGC and HRD dual Investigations, and specifically behind the Mr. N's failure to direct a self-apparent follow-up of the grievant's complaint against Mr. X. The evidence of the mental sharpness and investigative acumen of Mr. N preclude finding inadvertent oversights on his part as the reason for the failure to run to ground with independent witnesses, the issue as to which of the competing versions of the event was closest to the truth. His failure to supervise and direct was purposeful.

Mr. N on his own or with the help of Ms. Q, intentionally confused both Ms. P and the grievant as to the purpose of Ms. P's efforts, and encouraged (in the sense of never discouraging) Ms. P's natural predilection to find the root cause of human conflicts to be "failures in communications," while never encouraging her to read the grievance or assisting her in understanding that some of its allegations, if true, would indicate Mr. X's words and actions crossed the line into impermissible conduct under the Profession Conduct Directive and, more troubling, the Agency's Workplace Violence Policy.

That the incompleteness and incompetence of the two investigations were by design does not render them, or the reasons behind the design, unlawful if the objectives were no more than to paper over the General Counsel's poor judgment and to pass back to the grievant her burden to prove her account of the November 13 incident as her grievance passed to the next step toward arbitration. These are not statutorily

prohibited bases for overseeing, and even assuring a defective investigation of the grievant's complaint against Mr. X.

On the other hand, if added to the mix of motives was an intent to thwart the grievant because of her race, sex or national origin, and but for it there would have been a quick resolution of her complaint with a forced apology from Mr. X for his breach of courtesy, then a violation of Title VII would have occurred.

That, however, was not a motive the grievant proved. She failed to carry her burden of establishing even a prima facie case that the handling of her complaint against Mr. X by Mr. N, or the OGC and HRD in general, was because of her race, sex or national origin. Where she did carry her burden was in establishing a prima facie indication that Mr. N and the OGC and HRD treated the investigation of her complaint differently from the way Ms. G's complaint against Mr. A was handled because of her participation as a witness in the EEO Structure arbitration at Mr. A's behest.

That is, while the grievant did not prove that she was unlawfully discriminated against on the basis of her race, sex, color or national origin, those were not the only arrows in her quiver. Her grievance also alleges that all that befell her in the treatment of her complaint was because of her protected EEO and union activity in testifying in the EEO Structure arbitration and her later EEO complaint against an alleged hostile work environment. She failed to prove that such retaliation were motives for either Mr. X's objectionable conduct, Mr. T's unobjectionable conduct, or the General Counsel's quick rebuff of her complaint.

However, she and the testimony of witnesses for both sides, and accompanying exhibits, established that the failure of Mr. N and the OGC and HRD to undertake with the grievant's complaint anything near the thoroughly competent investigation of Ms. G's complaint against Mr. A violated 5 USC §7116(a). Piece by interlocking piece, the evidence fell together, as did the law.

First, as to whether 5 USC §7116(a) has a place in this arbitration, Issue 2 encompasses any law of the United States and poses the question whether a violation has occurred. It asks:

Whether the Agency, through the actions and/or inactions of the General Counsel and the Office of General Counsel or other components of the Agency, in response to the grievant's complaint about Mr. X's conduct on November 13, 2002, failed to comply with or violated any Labor Agreement provisions, internal rules, regulations or policies of the Agency, or the laws, rules or regulations of the United States, and if so, what should the remedy or remedies be?

Second, as for the reach of 5 USC §7116(a), in relevant part, with emphasis added, it provides:

> For the purposes of this chapter [71], it shall be an unfair labor practice for an agency ---
>
>> (1) to interfere with, restrain, or coerce any employee in the exercise by the employee of any right under this chapter;
>>
>> (2) to encourage or discourage membership in any labor organization by discriminating in connection with hiring, tenure, promotion, or other conditions of employment;
>>
>>            *        *        *
>>
>> (4) to discipline or otherwise discriminate against an employee because the employee has filed a complaint, affidavit, or petition, or has given any information or testimony under this chapter [71].

Third, §§7116(a) has been regularly invoked before the Federal Labor Relations Authority (FLRA), their primary, but not exclusive, enforcer. Arbitration is also a forum of enforcement under §7116(d), which provision the grievant invoked.[22] However, to keep arbitration awards consistent with FLRA rulings, Congress subjected 'arbitrators' ULP awards to FLRA review.

For that reason, arbitrators are bound by the guidance the FLRA has provided, and the most relevant with regards to the shifting burdens of proof in the present case is Letterkenny Army Depot and Int'l. Brotherhood of Police Officers, 35 FLRA 113 (1990). However, there is an important difference between Letterkenny and one aspect of this grievance which the Agency disingenuously fails to recognize in its arguments. Letterkenny was a §7116(a)(2) case. That provision makes it a ULP when an agency action serves:

> to encourage or discourage membership in any labor organization by

---

[22] Prior to deciding the issues ruled on in the June 2, 2004 Jurisdictional Award in this arbitration, the parties were asked to submit all of the grievant's administrative appeal filings. No ULP appeals appeared in the bundle, and it was §7121(d) which was the primary "election" provision of the Title 71 which received scrutiny because of the grievant's many EEO complaints. Still, because as the testimony and documents submitted at the hearing kept flowing in, it became obvious that serious ULP issues were surfacing. For that reason, the parties were asked to include in their post-hearing briefs the ULP facts and law. Neither party has raised any §7116(d) questions, so under the broad sweep of Issue 2, ULPs, or at least ULP type legal considerations, are treated as open to scrutiny.

discriminating in connection with hiring, tenure, promotion, or other conditions of employment.

On the other hand, while §7116(a)(2) is in play here by force of the grievant's allegations, she also relies on §7116(a)(4), which seems most relevant. It makes it a ULP:

> to discipline or <u>otherwise discriminate against</u> an employee because the employee has filed a complaint, affidavit, or petition, or has given any information or testimony under this chapter [71].

In <u>Letterkenny</u>, the Authority was specifically and only addressing an alleged §7116(a)(2) situation where the "discrimination" must be tied to "hiring, tenure, promotion, or other conditions of employment." It was not a §7116(4) retaliation case. By its terms, §7116(a)(4) recognizes that "discrimination" as the chosen instrument of retaliation for having filed "a complaint, affidavit, or petition, or [ ] given any information or testimony," will rarely be confined to "hiring, tenure, promotion, or other conditions of employment."[23] Less restrictive language is found in §7116(a) (4) appears designed to cover retaliation through discrimination against an employee for his or her protected activity no matter the sundry forms that discrimination might take.

And, by the context of its placement, "discrimination" as used in §7116(a)(4) must simply means being "treated different from" the treatment accorded employees not engaged in protected activity. In the case here, §7116(a)(4) covers such "discrimination," <u>inter alia</u>, as the difference in the treatment given by Mr. N and the OGC and HRD to the grievant as opposed to that accorded Ms. G when both had complaints of breaches of the Agency's Professional Courtesy Directive, with the tilt in seriousness of the alleged misconduct going to the grievant's complaint.

But having said that, despite the difference in the wording of §7116(a)(4), <u>Letterkenny</u> will be followed in identifying the stages of the shifting burden of proof, and in sifting through the evidence to determine whether the appropriate degree of persuasiveness has been met.

---

[23] This is said without certainty as to how the Authority construes the §7116(a)(2) phrase, "condition of employment," which subject to certain exceptions not applicable here, 5 USC §7103(a)(14) defines to mean, "personnel policies, practices, and matters, whether established by rule, regulation, or otherwise, affecting working conditions." This appears broad enough to cover the Agency's Professional Conduct and Workplace Violence Policies as "personnel policies . . . established by rule . . . or otherwise, affecting working conditions," here being courtesy and workplace safety "conditions."

First to be recognized is that "the burden of proof always rests with the [grie-vant],"[24] and that it must be satisfied by a "preponderance of the evidence." She also is required to start the process by establishing that (1) she had "engaged in protected activity," and (2) "such activity was a motivating factor in the Agency's treatment of [her] in connection with [the handling of her complaint against Mr. X]."

The grievant's "protected activity" of testifying against the Agency in the EEO Structure arbitration was established by her own testimony and that of witnesses both sides, but also it was acknowledged by the Agency when Mr. N cited her and her testimony by name in the August 2002 Agency brief filed in that arbitration. She also established that her testimony was behind the discriminatory actions of Mr. N and the OGC and HRD in frustrating any possibility of an effective investigation of her grievance. The evidence on this point is complicated, involving as it does, Mr. A.

In the eyes of Mr. S, the grievant was contaminated by her association with Mr. A. Particularly clear from his tone of voice and general demeanor in responding to questions from the grievant, was the resentment he felt toward her reliance on Mr. A to assist in making her November 15 demands on the General Counsel to investigate Mr. X under the Professional Courtesy Directive. Mr. S had been present at the meeting and undoubtably had read the Step-2 grievance's unflattering characterization of his con-duct that day.

Seeing the degree of ire in Mr. S's testimony was at first a surprise,[25] but when considered in the context of other witness testimony and documents in evidence, the reason for it became clear. It was because the grievant had been one of the witnesses relied on by Mr. A in presenting the Union's evidence in the EEO Structure arbitration. Mr. S, high in the labor relations structure, and Mr. N's immediate supervisor, "knew [about her testimony in that arbitration] long before [the] November 15 [meeting]." Mr. N, as "senior counsel" responsible for defending the Agency in that arbitration, had kept

---

[24] Letterkenny arrived before the Authority by means of the §7116(d) statutory optional route of the aggrieved employee convincing the FLRA General Counsel to be his or her champion, rather than going it on his or her own through the parties' negotiated grievance as has occurred here. For that reason, the Authority addressed the "parties" before it as the "General Counsel" and the "Respondent." Henceforth in this decision, the brackets will be dropped from quotes when "grievant" is substituted for "General Counsel" and "Agency" for "Respondent."

[25] Mr. S's open hostility toward the grievant during his cross examination became a matter of such obstruction that he had to be told, "frankly, [Mr. S] I don't understand why you are so hostile to-ward her questions," and shortly thereafter, both he and the grievant had to be warned, "I don't want the witness fighting with the questioner or the questioner fighting with the witness. I just want both of you to get on with it [the cross examination]." No witness wore his hostility toward the grievant and Mr. A on their sleeve more prominently than Mr. S.

FMCS Case No. 03-08992
NAGE R3-77/PBGC

him advised.

For Mr. N, it was the two-way-street nature of the relationship that fueled his hostility toward the grievant and her grievance. It was he who detected in its wording the hallmarks of Mr. A's drafting skills, revealing to him the grievant's reliance on Mr. A, and of course, having been an addressee on Mr. S's e-mail account of the November 15 meeting with the General Counsel, he knew of Mr. A's presence. This mutual reliance of the grievant and Mr. A, especially in filing of her Step-2 grievance, was recognized from top down among the staffs of the OGC and HRD, especially in the ranks of the labor relations attorneys.

However, to lock in motive, the grievant had the burden of establishing a reasonably close proximity in time between her protected activity and the retaliatory discrimination of Mr. N and the OGC and HRD. She carried this burden. Contrary to an argument advanced by the Agency, the proximity in time of the EEO Structure arbitration and the grievant's December 9, 2002 Step-2 grievance, which initiated the OGC and HRD investigations, was more than sufficiently close to meet the "circumstances" element of a prima facie showing.[26]

The grievant's testimony in the EEO Structure arbitration was on April 9 and 17, 2002, during the remedy stage of the arbitration, and it was in his August 30, 2002 brief to the arbitrator on remedy that Mr. N referred to the grievant's testimony:

Finally, you heard from one --- and only one --- employee who claimed she did not use PBGC's EEO program out of concerns for the absence of confidentiality and reprisal. Yet her concerns do not hold up under scrutiny. With those alleged concerns in mind, she chose to speak [about her GS-13 promotion delay] to her department director, the General Counsel, directly, outside any statutory framework.

Within five months of his disparaging assessment of the grievant's testimony in a case which he lost, Mr. N had her grievance protesting Mr. X's conduct on November 13 and the General Counsel's "communications failure" judgment. By December 11, no doubt with the participation of Mr. S, who had become emotionally involved because of his resentment of the grievant and Mr. A's involvement, Mr. N made his selection of the investigation team which purposefully bore no resemblance in quality to the investi-

[26] Only with twinkles in their eyes could those responsible for the Agency's brief have staked out the grievant's 1999 meeting with the General Counsel about her GS-13 promotion as the starting point in measuring "reasonable proximity." Otherwise, the assertion that "a three year gap between the time [the grievant] first engaged in protected activity and the November, 2002 incident and investigation about which she complains," is a line of reasoning they expected only a dimwit to adopt.

gative resources previously unleashed on Mr. A who faced Ms. G's less serious complaint invoking the Professional Courtesy Directive. He did so despite the grievance including both alleged Professional Courtesy and Workplace Violence breaches, and Mr. S's clear understanding of the implication of the grievant's declaration to the General Counsel, which he had recorded in his e-mail summary of their meeting, that, "[Mr. X] should not have gotten one foot from her in the confrontation," as well as the implications of an angry superior/subordinate encounter, including Mr. A's responsibility "to but a damper on the situation." That was a short enough time span to hold that the grievant established by a preponderance of the evidence each element of the ULP retaliation motive.

Under Letterkenny, even though the grievant "made [her] 'prima facie' showing, the Agency will not be found to have violated [§7116(a)(4)] if the Agency [has] demonstrate[d], by a preponderance of the evidence, that (1) there was a legitimate justification for its action; and (2) the same action would have been taken even in the absence of protected activity."

The first burden placed by Letterkenny on the Agency is to demonstrate "there was a legitimate justification for its action." The key word in assessing the Agency's success is the word "legitimate." Any justification for discriminating against the grievant's complaint and in favor of Ms. G's must have been "legitimate," a word that goes beyond just not being unlawful, but also being "valid," or even, "fair."[27]

The only asserted Agency justification for differentiating between the complaints was the OGC and HRD perceptions that Mr. A deserved anything that could be proved against him, while Mr. X had no record comparable (or at all) to Mr. A's of alleged or proven rudeness. That might be a legitimate consideration had the validity of both complaints been proved, and in considering Douglas, or Douglas-like factors, disparate penalties had resulted.

But when a non-frivolous complaint with recitation of details has been filed, it's another thing. To relegate that complaint to an incompetent and manipulated investi-

---

[27] Beside the common sense meaning of "legitimate," there is the meaning of "legitimate" under the parties' Labor Agreement. The Labor Agreement is the "law" between the parties. In Section 55.6 of the Arbitration Procedures set out in the Agreement, the parties declare they "are strongly in favor of resolving employee complaints at the lowest organizational level [at which the complaint is presented]." In furtherance of that objectives, and recognizing Management's frequent need for time beyond that otherwise provided by the Procedures in order to conduct a fully responsive investigation of the facts, another provision of Section 55.6 extends the time limits where "the supervisor needs further information to respond" and the parties "agree a later date is appropriate." By implication, these provisions recognize that a purposefully less than competent investigation of a complaint violates the Labor Agreement, and in that sense is "not legitimate" even if the phrase equates only with "unlawful."

gation with exonerating results for the accused all but preordained, while having assign-
ed the quick wit and savvy of Mr. O to Ms. G's complaint to assure Mr. A was brought
down a notch or two, is an Agency "action" the asserted "justification" for which fails the
legitimacy test. And, the lack of its legitimacy is enhanced by the absence from Ms. G's
encounter with Mr. A of any aggravating circumstances or considerations comparable in
seriousness to those surrounding and made a part of the grievant's experience in her
encounter with Mr. X.

The conclusion that the Agency failed to "demonstrate, by a preponderance of
the evidence" that there was a legitimate justification for its action is based on all the pro
and con evidence surrounding the Agency's asserted motive, including the summarized
history of complaints about Mr. A contained in an appendix to its brief, but nothing
more. Under Letterkenny, more must be considered:

> If, in response to a prima facie case established by the grievant, the Agen-
> cy offers evidence, it is necessary to determine whether the Agency's
> rebuts the grievant's prima facie showing. This determination is made on
> the basis of the entire record, including any evidence the grievant offered
> in rebuttal to the Agency's showing (emphasis added).

Arguably, at the first, or "legitimate justification" step, of the two-step burden
placed by Letterkenny on the Agency, the search of "the entire record" would be limit-
ed to finding additional evidence supporting the legitimacy of the "justification" advanc-
ed by the Agency for how grievant's complaint was handled. If so, the record as a
whole discloses that, as between Mr. A and Mr. X, when they were watched and listen-
ed to during their testimony, Mr. A exceeded Mr. X in his tendency to irritate, be argu-
mentative and hair-splitting. And, other witnesses on the question testified to the same
effect about Mr. A and his propensities. But it all fell short of decisively adding enough
to validate the Agency's claimed "legitimate" justification for its action.

The failure of the Agency to successfully rise to the challenge of the first step of its
Letterkenny burdens might excuse consideration of what is ordinarily the second step
question of whether "the same action would have been taken even in the absence of
protected activity?" However, ignoring the question and its answer, which is "yes,"
would miss why the "non-legitimacy" of the Agency's asserted justification is further
established.

Besides the record as a whole showing the grievant had not proved a Title VII
prohibited basis for the OGC and HRD treatment of her grievance, it also showed that
just as likely as not, had the complainant been a white, native born male, without any
history of protected activity, the reactions of Mr. N and the OGC and HRD would have
been the same; protect the General Counsel from his pronouncement of a "commun-

ications failure," and send Ms. P forth to do so by finding "facts" consistent with her mind-set.

That is, the testimony of Mr. S and Mr. N, including the "body language" compo-nent of their demeanor, established that if confronted by a complaint under the same circumstances and with the same issues as those presented and raised by the grievant, without regard to the complaint's protected activity or complete lack thereof, Mr. N and the OCG/ HRD would have circled the wagons and dispatched Ms. P, no matter what. That, however, is a reaction (motive) that cannot be called "legitimate," no matter how the term is used. And, to accept this likely reaction as appropriate proof under the second step of the <u>Letterkenny</u> burden on the Agency that "the same action would have been taken even in the absence of protected activity," would hardly be what the Authority expects <u>Letterkenny</u> to produce. It would place members of Management (such as the General Counsel) and supervision (such as Mr. X) above Agency policies otherwise applicable to all.[28]

Perhaps relying on its "legitimate justification" argument to carry it through both steps of its <u>Letterkenny</u> burden, the Agency's brief points to no evidence in the record which would compel the conclusion that the same second class response to the grie-vant's complaint against Mr. X "would have been taken even in the absence of the protected activity." To do so would require evidence that the investigation of Mr. X's alleged con-duct was not without peers at the bottom of the competency scale, but lumped there with it were equally incompetent investigations of other misconduct complaints that had not made the preferential treatment cut under the OGC and HRD policy that a "detailed and formal disciplinary investigations [will] not begin without some prima facie indicator that the result could likely lead to discipline, so as to warrant the greater expenditure of time and resources for the formality and writing required."

Instead, only first class investigations, mostly of R3-77 activists such as those undertaken into the conduct of Mr. A and Mr. D, are in the record. There are plenty of misconduct complaints that fell off the scale all together, such as the ones against Ms.

---

[28] There was no other situation like that of the grievant's, where the General Counsel's prema-ture dismissal of her complaint against Mr. X as stemming from a "communications failure" had the effect of shielding Mr. X from a serious investigation. This effect was unintended by the General Counsel whose testimony was of a sincere expectation that her complaint against Mr. X would receive a full and fair air-ing through either the EEO or grievance procedure, whichever she opted. The matter has been raised because the record as a whole revealed a OGC and HRD attitude that suggested that no complaint of a nature like the grievant's which came from the lower ranks of PBGC employees would have been pur-sued vigorously. This triggered the imagination of a novel way an agency could arguably carry its <u>Let-terkenny</u>,"same action" burden. It also made apparent that besides their unlawful retaliation motive, the Management and Grievance Investigations had another overriding, non-legitimate, motive that doomed the grievant's complaint on its December 9 arrival as a Step-2 grievance in the OGC and HRD.

AA, Mr. L, and those persons listed by Mr. D as alleged political blackmailers, all judged by the OGC and HRD as not warranting investigations. But no investigations were offered that got the same second class treatment which Mr. N directed and Ms. P and Ms. Q provided. Despite Ms. P's referring in her testimony to her past experience of finding a "failure in communications" as the root cause of conflict, none of her PBGC investigative product to that effect was presented by the Agency in its defense. That left only the first class investigation of Ms. G's complaint against Mr. A with which to compare the OGC and HRD investigation of Mr. X's alleged misconduct.

In terms of "mixed motive" and "pretext," there seems no need to catagorize this case as being one or the other. However, if <u>Letterkenny</u> dictates that a determination be made, this would not be a "mixed motive" case. "In a 'mixed motive' case, both lawful and unlawful reasons (motives) for the Agency's actions have been established."[29] In the present case, what eliminates a "mixed motive" classification is the Agency's failure to establish <u>any</u> lawful motive for its different treatment of the grievant's complaint as compared to its handling of Ms. G's complaint.

For that reason, this case most resembles a "pretext" case as defined in <u>Letterkenny</u> where the Authority stated: "In a 'pretext' case a motive asserted by the Agency to be lawful is found to be unlawful (pretextual)." Due to the more serious nature and further aggravating circumstances surrounding the charges made against Mr. X compared to those made against Mr. A, the motive asserted by the PBGC (Mr. A had long been found by the OGC and HRD to be short on manners in tense situations, while no such perception of Mr. X had been established) was a pretext for the difference in the treatment of the two complaints.

Recognizing the ultimate burden of proving by a preponderance of the evidence that the Agency violated 5 USC §7116(a)(4) rested with the grievant, and considering it a hard one to bear, the record as a whole established that she carried her burden.

However, before concluding that no further violation of §7116(a) is to be found, it appears there is one. It is compelled by §7116(a)(1), which makes it a ULP:

(1) to interfere with, restrain, or coerce any employee in the exercise by the employee of any right under this chapter;

The event is disclosed and documented in the record, but neither party addressed it in its brief as a ULP, nor was the perpetrator, Mr.X, motivated to retaliate against

---

[29] It is a standard relatively easily applied in a disciplinary case where there is a legitimate motive for a five day suspension (e.g. third time caught sleeping on the job after prior written warnings), and a non-legitimate reason (annoying union steward).

the grievant because of her protected EEO Structure arbitration testimony, since he knew nothing of it and was unaffected by it.

The incident in question occurred when Mr. X responded to Mr. Y's inquiry about the performance of his employees while under the temporary supervision of Mr. X. The information was specifically sought by Mr. Y to assist him in preparing the annual performance appraisals of his employees. By e-mail, Mr. X advised:

> Turnabout is fair play, right? Your folks were likewise pleasant and self-sufficient with one noted exception, [the grievant]. Her performance in the [TRW] case in the area of following-up with the client [CFND] and accepting and responding appropriately to supervisory feedback was absolutely unacceptable. We should talk about how that will be reflected in her [performance appraisal], as I didn't and still don't care for her over-the-top reaction.

As discussed earlier in the course of determining Mr. X's "temperament," the text of the e-mail, and evidence on the question as a whole, established that his statement, "turnabout is fair play, right?," and the phrase, "her over-the-top reaction," referred not only to the grievant's November 13 - 15 complaints to the General Counsel, but also her subsequent grievance in which she asked that Mr. X be disciplined for his discourtesy and threatening conduct.

Mr. Y did not take any action against the grievant based on Mr. X's assessment, but that is not required for the message to be a ULP. As a general matter, a true "no, no" among ULP conduct is to reference a protected activity, such as here, the filing of a grievance, as a negative consideration in an employee's job performance appraisal.

However, there is no per se Authority condemnation, nor is the affected employee's reaction determinative, although here the grievant introduced Mr. X's e-mail in part for the "chilling effect" she claimed it had on her because of her continuing concern at the time it was sent that Mr. X's statements of "keep pushing it," his pledge to report her conduct to Mr. Y, and his parting shot, "it's over," all referencing the frail prospects, as she understood them, of her continued PBGC employment.

Rather, in 1990 the Authority cleared the air when in <u>EEOC, Jackson Area Office and National Council of EEOC Locals 216, AFGE Local 3599</u>, 34 FLRA 928, 932-33, it stated the proper test to be: "whether, under the circumstances, the statement could reasonably tend to interfere with, restrain or coerce employees in exercising their rights under the Statute."

FMCS Case No. 03-08992

- 80 -                    <u>NAGE R3-77/PBGC</u>

Applying that test here, an employee regularly or temporarily under the supervision of Mr. X, knowing of his reaction to the filing of a grievance against him, could "reasonably tend" to be "restrained" in the exercise of his or her right to file a grievance over any matter which was liable to place a burden on Mr. X, or heaven forbid, irritate him. Accordingly, the Agency will be held to have violated §7116(a) as a result of Mr. X's e-mail, especially with its venomous tone.

As for Labor Agreement violations tied in with the Agency's ULP conduct, besides its violation of Article 55 which has already been noted, there are three other Labor Agreement violations committed by the Agency in the OGC and HRD handling of the grievant's complaint against Mr. X. First, by force of the findings that the OGC and HRD was retaliating against the grievant because of her statutorily protected activity of testifying in the EEO Structure arbitration, necessarily, it also violated Article 2, Section 2.1, which in material part states:

> <u>Section 2.1</u> . . . Employees who have relevant information concerning any matter for which remedial relief is available under this Agreement will, in seeking resolution of such matter, be assured freedom from restraint, interference, coercion, discrimination, intimidation or reprisal.

Second, the Agency has violated its explicit and implied pledges in the Agreement to evenhandedly enforce its policies, rules, and directives. Specifically, by its failure to take seriously the grievant's claim made in her grievance that Mr. X's conduct violated the Agency's Workplace Violence Policy, it ignored that Policy's declaration that "all reports of incidents will be taken seriously and will be dealt with appropriately," thereby violating at least Sections 42.1(A): "The Employer will provide a safe and healthy work environment for employees," and 42.2, "employees are encouraged to inform the Employer of any unsafe or unhealthy practice."

Third, by discriminating against the grievant in the design and execution of the investigation of the her complaint, which among other claims alleged violations of Title VII and retaliation for engaging in protected activities, the Agency violated Article 5, Section 5.7, which provides:

> <u>Section 5.7</u>  Any employee seeking to file [an EEO] complaint shall be free from restraint, coercion, interference, reprisal or further discrimination. . .

## Title VII Defense and Claims

As counterintuitive as it seems, the Agency's argument that the grievant's Title VII claims are barred in this arbitration needs to be addressed first.

**The Agency's Title VII Defense.** After the hearing in this arbitration ended, the grievant move for and was granted a voluntary dismissal with prejudice of her Title VII suit in District Court. The Agency argues that her voluntary action bars any further pursuit in this arbitration of the grievant's allegations of unlawful Title VII discrimination. Specifically, it urges that:

> The Judge's Order in the civil action operates as an adjudication on the merits in PBGC's favor on [the grievant]'s Title VII claims. And, consistent with its [previous] Motion to Dismiss this arbitration, PBGC preserves its argument that, as a matter of law, the events of November 13, 2003, and PBGC"s response thereto, were covered by the district court complaint, and by discovery and PBGC's Summary Judgment Motion in that action, and thus were adjudicated in PBGC's favor as part and parcel of the Judge's Order dismissing the case with Prejudice. Accordingly, although non-Title VII issues remain in this arbitration proceeding, PBGC submits that [the grievant]'s voluntary dismissal with prejudice of her district court discrimination complaint, precludes a finding of discrimination or reprisal in violation of Title VII on the facts alleged here.

Since arbitral jurisdiction can be questioned at any time, the Agency will not be taken to task for presenting its same underlying argument a second time when a turn of events presented the opportunity. But, like with its first presentation, the second try is also rejected for lack of merit. As was explained in the June 2, 2004 Decision on Arbitral Jurisdiction, whether the parties or the arbitrator like it or not, 5 USC §7121(d) set the rules, and the sequence in which the grievant filed her various EEO complaints and her grievance determined the outcome.

The §7121(d) rules are simple. An employee with a complaint over an EEO "matter" which can be processed either through the Agency's statutory EEO procedures or through the negotiated grievance procedure, can elect one or the other route, but not both over the "same matter;" and when both are attempted, the first forum to get a written and signed complaint or grievance has exclusive jurisdiction over that "matter."

Relevant to the Agency's argument, the sequence of filing began with the grievant's written and signed, October 3, 2002 EEO complaint filed with the Agency's EEO Office, for which she later got a right to sue letter or other authorization to take it to District Court without further ado within the Agency. Subsequent to the filing of that EEO complaint, the November 13, 2002 incident with Mr. X occurred, as did the General Counsel's and the OGC and HRD responses to that incident. Upset with Mr. X's conduct and dissatisfied with the responses thereto, the grievant elected to complain about those "matters" by filing her written and signed, December 9, 2002, Step-2 grievance on which this arbitration is predicated.

Next in the order of her filings, on December 11, the grievant ignored the §7121 (d) prohibition against a double filing, and two days after filing her Step-2 grievance, filed an EEO complaint with the intent to tack on to her October 3 EEO complaint the November 13 incident with Mr. X and the November 14 and 15 handling of her complaint about Mr. X by Mr. T and the General Counsel, as further examples of the "hostile work environment" she had claimed in her September 3 EEO complaint. Then, to top it off, the grievant raised the "matters" of Mr. X, the General Counsel, et al., in the District Court, and under the liberal discovery allowed by the Federal Rules of Civil Procedure, proceeded to take the depositions of Mr. X and others to develop, in effect, her case in this arbitration.

In the Decision on Arbitral Jurisdiction, jurisdiction over the "matters" of Mr. X's conduct and the General Counsel's response thereto, and thereafter the OGC and HRD responses to both, were found to lie solely in the present forum of arbitration. This was so because, sequentially, the conduct and actions grieved occurred after the grievant's October 3, 2002 EEO complaint with its "hostile work environment" claim and were not embraced by or brought into the orbit of that earlier claim which was based on pre-October 3 events involving different people, different conduct and actions, different facts, etc. In short, jurisdiction did not lie with the District Court under the definitions given "matter" in Facha v. Cisneros, 914 F.Supp. 1142 (E.D.Pa. 1996) and Dept. of Treasury, Oxon Hill and NTEU, Chapter 65, 56 FLRA 292 (2000), which cases were found most persuasive.[30]

In conference with the parties prior to the issuance of the Decision on Arbitral Jurisdiction, the Agency's exasperation with what was going on in the District Court discovery process were sympathetically heard. However, in the Decision the Agency was told:

> Although an issue solely to be decided by the District Court in the litigation before it, and not by this arbitrator, it follows from what is decided here that §7121(d) also means there is no jurisdiction in that court to pass on the merits of the grievant's claims arising from the November 13,

---

[30]    As an aside, during the hearing on the merits a document surfaced demonstrating the all around utility which the Agency found in §7121(d). On January 16, 2003, when Mr. M, an Agency EEO investigator sough to pursue his investigation of the grievant's informal EEO complaint to determine the facts about what occurred on November 13, 2002 between her and Mr. X, Mr. P, Senior Counsel to the Principal Deputy General Counsel, sent him an e-mail blocking him from interviewing any witnesses. Mr. P's asserted basis was that the grievant had first filed a written grievance over the matter, and under the Labor Agreement, which tracks the provisions of §7121(d), the EEO complaint Mr. M was handling was a nullity. Mr. P took this position before the Agency asserted one to the contrary in this arbitration, and then in the District Court, back to that raised by Mr. P with Mr. M, , all intended to block a determination of the grievant's complaints against Mr. X, et al., on their merits in any neutral forum.

2002 incident with Mr. X, or from the General Counsel's response.

*          *          *

As for the Agency's concern that it is being forced to defend against the November 13 and 15, 2002 incidents both here and in the ongoing discovery phase of the grievant's Title VII suit, there is nothing that can be done here about that. By shutting out any intent the grievant might have had to inject into this arbitration matters covered by her October 3, 2002 EEO complaint, and limiting the purposes to which even the mention of an event preceding that date involving her and Mr. X or the General Counsel can be used, all in the way of "protective orders" an arbitrator has authority to grant have now been issued [by me].

The Agency has raised in the District Court the issue of the force and effect of §7121(d) on the litigation before it, and it is in that forum that the Agency should seek such protective order or other measures based on §7121(d) it deems necessary and appropriate to shut the grievant off from those of her discovery activities the Agency finds objectionable. It is certainly not for an arbitrator to interfere in that litigation, much less to dictate what the District Court can allow in the course of discovery and later consider in the case before it.

Thus, since under §7121(d) the District Court never had jurisdiction over the Title VII issues raised in this arbitration, the dismissal of the grievant's Title VII action with prejudice in that forum does not disturb the jurisdiction had here, including that had over her Title VII claims based on Mr.X's conduct and the General Counsel's response to it, as well as based on the OGC and HRD handling of the investigations of her grievance.

**The Grievant's Title VII Claims**. In mounting her Title VII assault in this arbitration, the grievant spared only her religion as a basis for alleged discrimination by Mr. X, Mr. T, the General Counsel, and the OGC and HRD. As is, all but one of her Title VII claims have been denied because the grievant failed to carry her burdens of persuasion and proof to even the prima facie level with regard to her race, sex, color, or national origin. Even with the remaining claim of retaliation for protected EEO activity, Mr. X, Mr T. and the General Counsel have been cleared for lack of evidence that their actions were motivated by an invective determination to respond to either her EEC complaint or her earlier testimony in the EEO Structure arbitration. That leaves Mr. N, Mr. W. Mr. S, and others in the OGC and HRD, with the remaining questions of whether they violated 42 USC §2000e-3(a), which in its application to the Agency as an "employer" provides:

FMCS Case No. 03-08992
NAGE R3-77/PBGC

It shall be an unlawful employment practice for an employer to discrimi-
nate against any employee [ ] because he has opposed any practice made
an unlawful employment practice by this subchapter [2000e], or because
he has made a charge, testified, assisted, or participated in any manner in
an investigation, proceeding, or hearing under this subchapter.

The fact questions posed by §2000e-3(a) are answered as they were in the discus-
sion of ULPs. Not surprising, what the FLRA set out in Letterkenny on the shifting bur-
den of proof in ULP's cases closely parallels that set out for intentional Title VII discrimi-
nation by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 US 792, 802
(1973). As in Letterkenny, the McDonnell Douglas burden is first on the grievant (or
complainant, or plaintiff) to establish a prima facie case of protected class membership,
and that he or she was treated differently than a non-member of the protected class for
no discernable reason other than the unlawful discriminatory motive charged. If a
prima facie case is made, the burden shifts to the Agency "to articulate some legitimate,
nondiscriminatory reason for the [action, or inaction, taken against the complainant].

As already found:

1. The grievant testified for Mr. A in the EEO Structure arbitration;

2. That testimony was resented by the OGC and HRD, and especially by Mr. S
and Mr. N who lost the EEO Structure arbitration case. That resentment was likely
enhanced by the grievant's later reliance on Mr. A to assist her in presenting her com-
plaint against Mr. X to the General Counsel;

3. When the grievant presented her complaint against Mr. X, and the failures of
the General Counsel and the OGC and HRD to respond to that complaint as a formal
Stp-2 grievance in order to force an investigation, Mr. N assigned Ms. P and Ms. Q,
knowing it would bear no resemblance to the competence and effectiveness of the
investigation of Ms. G's complaint against Mr. A;

4. The close "temporal proximity" between the grievant's testimony, most
recently referenced in the Agency's August 30, 2002 brief filed in the EEO Structure
arbitration and Mr. N's assignment of Ms. P and Ms. Q to investigate the grievant's
grievance, established a nexus between the two, establishing a prima facie case of
retaliation;

5. The Agency asserted what it claimed was a "legitimate justification" for the
disparity in the quality and effectiveness of the two investigations;

6. The Agency's asserted reason was a pretext intended to mask the real, non-

legitimate motive of retaliation or reprisal for the grievant's protected union activity of testifying in the EEO Structure arbitration;[31]and,

7. By a preponderance of the evidence, the grievant established a ULP had been committed by the Agency.

By carrying her ultimate Letterkenny burden of proof, so too did the grievant carry her McDonnell Douglas factual burden.  See, Dept. of Commerce, Patent and Trademark Office and NTEU Chapter 243, 52 FLRA 358 (1996), involving an EEO grievance taken to arbitration which had proof issues similar to those raised here and in which the Authority applied McDonnell Douglas.

That leaves two questions of law.  The first is whether the grievant's protected §7116(a) union activity of testifying in the EEO Structure arbitration also qualifies as protected 42 USC §2000e-3(a) Title VII activity.  The answer is in the affirmative.  The grievant's testimony in the EEO Structure arbitration was about her fear to file an EEO complaint with the Agency.  Under regulations making Title VII applicable to federal employment, an initial filing with the alleged discriminating Agency is required to perfect a complaint over which either the EEOC or the courts will later have jurisdiction.

The PBGC practice of structuring and manning its EEO complaint processing procedures in a manner so related to its labor and employee relations apparatus as to make employees fearful of that initial filing, was a "practice made an unlawful employment practice by [§2000e]" through its implementing regulations.  Thus, the grievant's testimony was an action taken by her in opposition to the practice.

As the Award in that arbitration states, the purpose of the grievance was to force the Agency to comply with 29 CFR Part 1614.  Compliance with those regulations, and the further implementing Management Directives issued by the EEOC, is mandatory for the PBGC, and noncompliance by the PBGC was tantamount to noncompliance with Title VII.  But even if her and the arbitral analysis of the law was and is incorrect, retaliation for providing testimony in a proceeding over the matter is a §2000e-3(a) protected activity.  That's to say, the grievant was engaged in a Title VII protected activity when she "testified, assisted, [and] participated . . . [in a]  proceeding, or hearing under this

[31] Just as with Letterkenny, it was recognized in assessing the evidence that the Agency "need not persuade the [arbitrator] that it was actually motivated by the proffered reasons, [but that] it is sufficient if the [Agency's] evidence raises a genuine issue of fact as to whether it discriminated against [the grievant]." Texas Department of Community Affairs v. Burdine, 450 US 248, 254-55 (1981).

- 86 -

subchapter [2000e of Title VII]."[32]

      The last remaining question is whether discrimination in the form of treating the grievant's complaint disadvantageously when compared with the treatment accorded Ms. G's complaint against Mr. A is discrimination under §2000e-3(a). Here too, the answer is, "yes." To start with, unlike much of the rest of Title VII which subsections are confined "discrimination" to that in hiring, discharging, and matters of "compensation, terms, conditions, or privileges of employment," for example in §2000e-2, §2000e-3(a) is unrestricted. On its face, and by its plain language, it bars any kind or type of discrimination when motivated by retaliation.

      But, because that discrimination could be ever so trivial, its boundaries are confined to something of reasonable substance. That does not mean at the "liability" stage the grievant need to have shown she suffered statutorily recoverable damages, just that an illegal act under Title VII occurred. In its <u>Compliance Manual</u>, the EEOC rejects the limits such as argued for by the PBGC, and takes the position that an "adverse action" taken against a complaining party such as the grievant "need not qualify as 'ultimate employment actions' or materially affect the terms or conditions of employment to constitute retaliation." Quite rightly, beyond the immediate effect on the grievant of an act of illegal reprisal, there must be a concern based on the statute's "complaint filing" reliance on enforcement. Much like the FLRA in its treatment of §7116(a) ULPs, the Commission has recognized that for Title VII to be effective:

> The statutory retaliation clauses prohibit <u>any</u> adverse treatment that is based on a retaliatory motive and is reasonably liable to deter the charging party or others from engaging in protected activity. Of course, petty slights and trivial annoyances are not actionable, as they are not likely to deter protected activity. More significant retaliatory treatment, however, can be challenged regardless of the level of harm [to the grievant].

      Of Title VII's prohibited areas of discrimination, courts have looked to §2000e-2's prohibition against an employer's discriminating with respect to an employee's "terms, conditions, or privileges of employment,' with emphasis on the "privileges of employment" aspect. In <u>Hishon v. King & Spalding</u>, 467 US 69, 74-5 (1984), the Court explained the breadth of the "privilege of employment" prohibition:

---

[32] Eliminated as a retaliatory motive is the grievant's October 3, 2002 EEO complaint over a hostile work environment. Mr. S convincingly testified that he knew nothing about it at the time of her December 9, 2002 grievance, and there was no evidence that notice of it had emerged from the Agency's EEO process to the attention of Mr. N or anyone else in the OGC or HRD of consequence, by December 11 when Mr. N decided to cripple the investigation of the grievant's complaint by assigning Ms. P and Ms. Q, and giving Ms. P his misleading instructions.

An employer may provide its employees with many benefits that it is under
no obligation to furnish by express or implied contract. Such a benefit,
though not a contractual right of employment, may qualify as a 'privilege'
of employment under Title VII. A benefit that is part and parcel of the
employment relationship may not be doled out in a discriminatory fashion,
even if the employer would be free under the employment contract simply
not to provide the benefit at all. Those benefits that comprise the 'inci-
dents of employment,' S. Rep. No. 867, 88th Cong. 2d Sess., 11 (1964) or
that form 'an aspect of the relationship between the employer and em-
ployees..' <u>Chemical & Alkali Workers v. Pittsburgh Plate Glass Co.</u>, 404 US
157, 178 (1971), may not be afforded in a manner contrary to Title VII.
[footnotes omitted]

An example of a privilege of PBGC employment might be found in the enhanced
security measure it takes by locking its restrooms. The "privilege" is a key. If the grie-
vant was denied a key in retaliation for her EEO Structure testimony, that would be an
adverse action that would meet the <u>Hishon</u> test. Even though she would be allowed to
use the bathrooms as sanitation and health laws dictate, she would be relegated to the
status of a visitor, such as an arbitrator, who must beg to borrow a key from a privileged
employee, or wait at the restroom door for the appearance of such an employee and
"breach security" by a surreptitious entry on their heals.

This dependency on others in order to get into a bathroom, would not likely be
treated as a "petty slight or trivial annoyance" by the EEOC and the courts in a Title VII
retaliation case, or as such by the FLRA in a ULP case of reprisal for protected union
activity. While other employees might initially find the plight of the grievant's "keyless"
state comical, its chilling effect would quickly set in if the prospect of filing their own
Title VII or ULP charge, or engaging in any other protected activity, was their substitu-
tion in her place.

For any of the forums mentioned to find this key-denial action as too insignificant
to violate an anti-retaliation provision of a statute entrusted to its enforcement would
require rejecting the idea that the whole reason for the provision was to ensure "unfet-
tered access to statutory remedial mechanisms," and to ignore that no matter the de-
gree or quality of harm to the grievant, "retaliation harms the public interest by deter-
ring others from engaging in what Congress has designated in various statutes [the
NLRA, FLSA, etc.] as protected activity." <u>Robinson v. Shell Oil Co.</u>, ___ US ___, 117
S.Ct. 843, 848 (1997).

So too would the primary purpose of 5 USC §2000e-3(a) have to be ignored if the
OGC and HRD action taken with regard to the grievant's complaint against Mr. X in re-
taliation for her protected activity in the EEO Structure arbitration were discounted in

this arbitration. The chilling effect not only on her but any other employee who might be called on to testify against the Agency in an EEO related proceeding before an EEOC AJ or an arbitrator is self evident. To paraphrase the FLRA in EEOC, Jackson Area Office, "under the circumstances, the [action would] reasonably tend to interfere with, restrain or coerce employees in exercising their rights under the Statute."

Of course, in Hishon, the plaintiff alleged sex discrimination when she was not advanced from "associate" attorney to "partner" by her employing law firm. This adverse action was arguably more severe in its consequence for her than was the OGC and HRD action of relegating the grievant's complaint to a level of investigation and follow-through designed to assure it would go nowhere. But on the other hand, because Hishon was not a retaliation case, it lacked the broader statutory policy considerations of cases which are, and therein lies the reason why its explanation of what can constitute a "privilege of employment" is all the more relevant here.

There is another difference between there and here. There, as the Court's discussion disclosed, Hishon lacked the strength of evidence to establish more than an implied "privilege" of employment. Here, the evidence established an explicit "privilege" of employment. As already noted, the Agency's Workplace Violence Policy pledged that "all reports of incidents will be taken seriously and will be dealt with appropriately." The pledge in the Profession Courtesy Directive was almost as explicit, "PBGC will not tolerate discourteous behavior and other forms of incivility which constitute unprofessional behavior and unacceptable conduct."

## Award

On the basis of the foregoing findings of fact and the conclusions of law drawn from the parties' Labor Agreement and statutes of the United States:

**Issue 1**, the grievance against **the conduct of Mr. X** on November 13, 2002 during his confrontation with the grievant over her abrupt departure from the TRW meeting and her failure to attend the OGC/CFND post-meeting conference is **granted** in so far as Mr. X is found to have violated the **PBGC Professional Courtesy Directive**, and the **PBGC Workplace Violence Policy**, the appropriate applications of which can be sought through the grievance procedures of the Labor Agreement as construed here.

**Issue 1**, the grievance against the **conduct of Mr. X** on November 13, 2002 during his confrontation with the grievant over her abrupt departure from the TRW meeting and thus her failing to attend the OGC/CFND post-meeting conference, is **denied** in so far as Mr. X is found not to have violated **Title VII** of the Civil Rights Act of 1964 as amended (42 USC §2000e-16).

**Issue 2**, the grievance against the **conduct of Mr. T** on November 14 and 15, 2002 concerning the e-mail complaints and requests he received from the grievant while he was service in the place of the General Counsel is **denied** in its entirety because Mr. T is found not to have violated **Title VII** of the Civil Rights Act of 1964 as amended (42 USC §2000e-16), the **Civil Service Reform Act** (5 USC §7116), or any provision of the parties' **Labor Agreement**.

**Issue 2**, the grievance against the **conduct of the General Counsel** on November 15, 2002 during the meeting he held with the grievant is **granted** in that he is found to have violated the **PBGC Professional Courtesy Directive**, the enforcement of which can be sought through the grievance procedures of the **Labor Agreement**.

**Issue 2**, the grievance against the **response of the General Counsel** on November 15, 2002 to the e-mail complaints and requests he received from the grievant before and during the meeting he held with the grievant is **denied** in that he is found not to have violated **Title VII** of the Civil Rights Act of 1964 as amended (42 USC §2000e-16), the **Civil Service Reform Act** (5 USC §7116), or any provision of the **Labor Agreement**.

**Issue 2**, the grievance against the **conduct and actions of the Office of General Counsel and the Human Resource Department of the PBGC** following the filing of the Step-2 grievance by the grievant on December 9, 2002 is **granted** in that they, and thereby the Agency, are found to have violated the **Civil Service Reform Act** (5 USC §7116), and **Title VII**, since the evidence was that they were aware of the grievant's protected activity of testifying in the EEO Structure arbitration, which was over the Agency's compliance with implementing regulations of Title VII, as applicable to it, and retaliated against her because of it in violation of both statutes.

## Remedies

Up to the point of this Decision on Agency Liability, this arbitration has been limited to the question of "liability," with the grievant halted from making any more than a minimal showing that she suffered emotional and physical effects from the discriminatory treatment she received from the OCR and HRD which have required medical and other professional attention. By advance agreement of the parties, the arbitration was bifurcated with the present liability stage being decided in advance of any consideration of what remedies, if any, are available.

This is consistent with the common practice in federal sector arbitration, and has been approved by the FLRA numerous times. It is also common in Title VII retaliation cases within that sector to note that "the question of statutory violation and appropriate statutory remedy are conceptually distinct. An illegal act of discrimination -- whether

based on race or some other factor such as a motive for reprisal -- is a wrong in itself under Title VII, regardless of whether that wrong would warrant an award of [damages]."  Smith v. Secretary of the Navy, 659 F.2d 1113, 1120 (DC Cir. 1981).

By separate letter orders and rulings, the parties will be given conference, briefing, document submission, and hearing schedules and dates as determined necessary and appropriate for the rapid and more economical resolution of the final stages of this arbitration.

### Retained Jurisdiction

For purposes of allowable correction of typographical, nonmaterial factual and mathematical errors (especially in reference to the coded identifications of persons), and for purposes of deciding the Remedial Stages of this arbitration, jurisdiction is retained.

**DONE**, this 26th day of April, 2005.

Robert T. Moore
Arbitrator