# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| VALDA T. JOHNSON, *et al.*, | ) |
| Plaintiffs, | ) |
| v. | ) Civil Action No. 03-2513 (ESH) |
| DAVID HOLWAY, *et al.*, | ) |
| Defendants. | ) |

## MEMORANDUM OPINION

On December 9, 2003, plaintiffs Valda T. Johnson and Stuart E. Bernsen[1] -- employees of the Pension Benefit Guaranty Corporation ("PBGC"), a federal agency, and former officers of the National Association of Government Employees ("NAGE") Local R3-77 -- filed suit under the Labor-Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 401 et seq., seeking to overturn a trusteeship imposed by the national union on their local. Following the Court's denial of plaintiffs' two motions to temporarily enjoin the emergency trusteeship, *see Johnson v. Holway*, 329 F.Supp. 2d 12 (D.D.C. 2004), plaintiffs moved to amend their complaint on October 20, 2004, to add claims against Stephanie Zaiser, then-trustee of Local R3-77 ("the local"), and Gerald Flynn, a national vice president who presided at the local's trusteeship hearings. The amended complaint alleged defamation, additional violations of the LMRDA, and discriminatory and retaliatory conduct under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq.

---

[1] Elizabeth A. Baker, the former Secretary of Local R3-77, was also included as a plaintiff in the original and amended complaints. Baker's claims, however, were dismissed on December 6, 2005. *See Johnson v. Holway*, Civ. No. 03-2513 (D.D.C. Dec. 6, 2005) (Order).

In a December 6, 2005 Memorandum Opinion, the Court granted defendants' motion for summary judgment in part, concluding that the challenge to the trusteeship was moot as a result of the trusteeship's February 2, 2005 termination; plaintiffs had failed to demonstrate that the trusteeship was either procedurally or substantively improper under Title III of the LMRDA and they were unable to challenge the trusteeship under Title I of the LMRDA; they had failed to show any procedural deficiencies with respect to their disciplinary hearings; their various challenges to the national's investigation and funding of arbitration cases could not be sustained under Title I; they lacked standing to raise the Title VII claims of other local members; Johnson had failed to demonstrate discrimination based on her sex or her race (African-American); and there was, as a matter of law, no claim for defamation. *See Johnson v. Holway*, Civ. No. 03-2513, 2005 WL 3307296 (D.D.C. Dec. 6, 2005) (Mem. Op.). Plaintiffs were allowed, however, to go forward with three allegations: (1) that NAGE removed them from office pursuant to the imposition of the trusteeship in retaliation for conduct protected under Title VII; (2) that they were disciplined in retaliation for their civil rights activities, in violation of Title VII; and (3) that they were disciplined in retaliation for their criticism of the national union, in violation of Title I of the LMRDA.

The case was tried before the Court between April 3 and April 7, with an additional trial day on April 27, 2006. Seven witnesses testified for plaintiffs: Valda Johnson; Ms. Johnson's husband, Jeffery Johnson; Stuart Bernsen; Elizabeth Baker, the former Secretary of Local R3-77 (*see* n. 1, *supra*); former members of the local Stephen Williams and Duncan Cooper; and Joseph Donnellan, former Chief Counsel of NAGE. Defendants introduced fourteen witnesses: Jennifer Wasserstein, a former attorney for NAGE; Jason Weyand, a former PBGC attorney and local steward; Cynthia Greene, another former PBGC attorney and member of the local; Dwayne

Jeffers, an actuary with the agency and a former steward of the local; Robert Perry, a PBGC

auditor and former Vice President at Large of the local; Mychael Patterson, a member of

NAGE's Executive Board; Marc Lawson, a NAGE National Vice President and the hearing

examiner during both plaintiffs' disciplinary proceedings; Barbara Osgood, a NAGE National

Executive Vice President; Gina Lightfoot-Walker, former Washington Regional Counsel for the

national union and its current Deputy General Counsel; Susanne Pooler-Johnson, a NAGE's

National Representative; David Bernard, former administrator to NAGE's National Executive

Board and the national union's current National Director for the International Association of

EMTs and Paramedics; John Sabulis, a National Representative and NAGE monitor prior to the

trusteeship; Stephanie Zaiser, NAGE's Director of Communications and the former trustee of

Local R3-77; Richard Barry, Jr., General Counsel of NAGE; and David Holway, President of the

national union.  Based on the testimony and documentary evidence, the Proposed Findings of

Fact and Conclusions of Law submitted by the parties, and governing law, the Court makes the

following Findings of Fact and Conclusions of Law.

**FINDINGS OF FACT**

As the origins of this dispute are as old as Local R3-77, the Court must begin its factual

recitations with the union's formation.

**I.    Formation of the Local**

1.    Prior to the establishment of the NAGE Local R3-77, bargaining unit employees

of the Pension Benefit Guaranty Corporation were represented by a chapter of the National

Treasury Employees Union ("NTEU").  (*See* Bernsen Test. at 258:11-12; Johnson Test. at 8:13-

16.)  In 1995, following a round of contractual negotiations between the agency and the national

union, dissatisfaction with NTEU's representation emerged among the chapter's members.

3

(Bernsen Test. at 259:8-10.) Subsequent events affirmed the membership's desire to leave

NTEU. According to Stuart Bernsen -- who joined PBGC's NTEU chapter in 1988 -- the union's

inadequate response to the termination of minority employees Louis Snead and Sylvia Pierce,

among other issues, solidified members' discontent. (*Id.* at 258:11-12, 259:10-14.) According to

Valda Johnson -- who joined the chapter in 1996 and later served as its Vice President at Large --

NTEU refused to take the "EEO cases" arising at the agency, leading many employees to

conclude that "management was over the union as well as the EEO." (Johnson Test. at 9:3-8.)

2.      A committee formed to identify an alternate union ultimately settled on NAGE, a

45,000-member labor union that represented municipal, state and federal employees. (Bernsen

Test. at 258:24–259:3, 259:17-24; Johnson Test. at 9:11-13; Holway Test. at 1292:18–1293:4.)

NAGE, including its President, Kenneth Lyons; National Vice President, Susanne Pooler-

Johnson; and one of the union's attorneys, Edward Smith, campaigned for the support of PBGC's

employees by promising to contest the terminations of Snead and Pierce and providing both with

representation prior to the election. (Bernsen Test. at 260:21–261:15.) The union also

distributed campaign literature regarding its representation of workers in "lawsuits, arbitrations

and in collective bargaining[,]" declaring that members with "a workplace complaint regarding

discrimination, workers' compensation, or an adverse action" were "entitled to representation by

an attorney employed by NAGE *at no cost*[.]" (Pls.' Ex. 3 (emphasis in original); *see also*

Bernsen Test. at 562:11–563:9.) With the assistance of Johnson, Bernsen and others, NAGE

prevailed in the election and was certified as the official representative of Local R3-77 on

January 29, 1999. (*See* Bernsen Test. at 259:23-24.)

3.      In April 1999, Johnson and Bernsen ran without opposition in the first of the

local's elections. (Johnson Test. at 10:21–11:4.) Johnson was elected President, and Bernsen

4

was elected Executive Vice President. (*Id.*; Bernsen Test. at 265:24-25.) Plaintiffs were

similarly unopposed in two subsequent elections, winning the same offices in August 2000 and

March 2003. (Johnson Test. at 11:9–12:5.)

## II.    The Local's Bylaws

4.    In the year following their election, Johnson, Bernsen and other members of the

Executive Committee worked to draft a governing set of bylaws for the local. (*See* Bernsen Test.

at 267:19–268:3; Johnson Test. at 13:3-22.) After a series of discussions with the membership, a

final document was adopted on June 29, 2000, and later approved by the national office. (*Id.*;

Pls.' Ex. 2 at 000273 (hereinafter "Bylaws").)

5.    The local's bylaws consist of thirteen Articles. Under Article III, membership

meetings are "normally" to be held monthly, requiring a quorum of thirty percent for ordinary

business. (Bylaws Art. III.) Article IV establishes a five-member Executive Committee --

consisting of the union's President, Executive Vice President, Secretary, Treasurer, and Vice

President at Large -- responsible for "the overall governing authority of the Local between

membership meetings." (*Id.* Art. IV § 1, Art. V § 1.) The Executive Committee is required to

hold "regular meetings at least monthly" -- meetings that are to be, "[t]o the extent practicable,"

both "publicized and open to Local members." (*Id.* Art. IV § 2; *see also id.* ("All Executive

Committee members' voices and votes shall be of equal weight in deciding matters of policy or

procedure.").) The bylaws, however, also provide that "[t]he Executive Committee may hold

closed, executive sessions and may close portions of sessions." (*Id.*) Emergency Committee

action is also provided for: "[i]n emergencies, the President may confer with at least two other

officers and reach a decision on behalf of the Executive Committee provided that at least two

officers and the President agree to the decision." (*Id.* Art. VI.)

6.    The functions and authority of the Executive Committee are defined in Article IV. The Committee is responsible for union appointments, including the local's stewards. (Bylaws Art. IV § 4.) This power includes the authority to "remove appointees" who, under the same provision, are expressly barred from making "statements or representations concerning policies, practices, rules and procedures of the Local without the specific authorization of the Executive Committee." (*Id.*) The local's Executive Committee also serves as the Grievance Committee required by Article IV of the NAGE Constitution. (*Id.* § 10; Pls.' Ex. 1 Art. IV § 5 (hereinafter "NAGE Const.").) Under Article IV § 10 of the bylaws, "the Local Grievance Committee is responsible for and has the authority to determine policy and strategy relating to issues involved in all grievances and to decide on proceeding with grievances . . . [w]ith input from the stewards and members, as appropriate[.]" (*Id.* Art. IV § 10.) The Committee also holds the authority to "decide whether any grievance will proceed to arbitration." (*Id.*) Consistent with Article IVA of the national union's constitution, the bylaws indicate that members dissatisfied with the Committee's decision not to pursue a grievance may appeal to NAGE. (*Id.*; NAGE Const. Art. IVA.)

7.    The local's bylaws also provide for the maintenance of union records. Under Article VI, the local's Secretary is required to "[r]ecord[] minutes of all meetings of the Executive Committee and the Local and read[] them at meetings." (Bylaws Art. VI.) The local's Treasurer is obligated to "[k]eep[] a current record of all receipts and expenditures in accordance with accepted accounting practices[,]" to "[m]ake[] financial reports at regular Executive Committee and membership meetings" and to "[p]repare[] and submit[] financial reports required by the Department of Labor, the IRS and NAGE." (*Id.*) Each of the local's officers is required to maintain union records "with due care" and, "[u]pon vacating an office or at the end of a term,"

turn over any documents held. (*Id.*) According to the bylaws, "[w]here records to be turned over contain confidential or privacy information pertaining to individuals, the records will be sanitized to remove identifying information unless the affected individual in writing authorizes the records to be turned over with the identifying information." (*Id.*)

### III.    NAGE's Trusteeship and Local R3-77's Complaints

8.       Though a union of 45,000 members, NAGE is itself a local of the Service Employees International Union ("SEIU"). (*See* Bernsen Test. at 410:12-15; Barry Test. at 1240:13-14.) In August 2001, after four decades under the leadership of President Kenneth Lyons, NAGE was placed into a trusteeship by SEIU. (Barry Test. at 1240:13-14; Pls.' Ex. 33 at 46.) As a result, National Trustee Joseph Buckley assumed control of the union, remaining in office through the union's 2002 election. (Barry Test. at 1240:16-19.)

9.       On January 16, 2002, almost a year before David Holway took office as the national union's president, Johnson wrote Buckley in order "to put . . . on the record" a number of issues regarding the national's representation of local members -- issues echoing those that lead to the local's separation from NTEU. (Pls.' Ex. 8A at 000445; *see* Johnson Test. at 9:3-8.) Johnson complained that despite its campaign promises, NAGE had failed to do anything more than "miss deadlines" in the Snead and Pierce cases. (Pls.' Ex. 8A at 000445-46.) Johnson further suggested that the national attorney assigned to assist in the local's contract negotiations was in conversation with management and otherwise stalling the process. (*Id.* at 000446.) Finally, Johnson raised a matter "of gravest concern" -- the national's alleged failure to support her in a June 26, 2001 grievance against PBGC. (*Id.* at 000446-47.) In a separate letter to NAGE General Counsel Richard Barry, Bernsen stressed the local's need for "*experienced* legal representation[,]" declaring that the national attorney with whom the local had worked

7

previously had proven himself inadequate to handle the union's cases. (Pls.' Ex. 8B at 000448

(January 16, 2002 letter).) Bernsen went so far as to request "more information" about the prior

experience of a new national attorney, Gina Lightfoot-Walker, in order to determine whether her

counsel would be sufficient for the local's "legally complex and politically serious matters" -- a

number of which Bernsen outlined. (*Id.* at 000449.)

10.    Despite Johnson and Bernsen's letters, their dissatisfaction with the national union

did not end with the tenure of Trustee Buckley.

**IV.    The National Convention**

11.    In September 2002, a national convention was held in Las Vegas, Nevada.

(Holway Test. at 1293:13-17.) Bernsen attended the gathering as the elected representative of

Local R3-77 and joined a slate of candidates opposed to Holway, who had earlier announced his

candidacy for the national presidency. (Bernsen Test. at 262:4–263:2.) Holway prevailed in the

election, winning approximately 78% of the vote. (Holway Test. at 1295:1.) He was sworn into

office on October 28, 2002. (*Id.* at 1293:6.)

12.    In the wake of the national election, Bernsen and other members of the opposition

slate signed a petition contesting the conduct of the convention vote for numerous national board

positions. (Bernsen Test. at 263:6-10.) The Department of Labor investigated the claim and

later filed an August 8, 2003 complaint against NAGE and SEIU. *See Johnson*, 2005 WL

3307296, at *1.

**V.    Local Dues Rebates**

13.    Among the issues discussed at the national union's 2002 convention was the

amount of the per capita dues rebate that NAGE would pay to locals as a means of funding their

operation. (Holway Test. at 1295:8-12.) During a debate regarding two competing proposals for

increasing the amount of the rebate -- one to $36.00 for each member each year, and the other to
$48.00 for each member each year -- Trustee Buckley stated that locals were presently owed
$30.00 per member, per year. (Bernsen Test. at 404:12-23.) In response, Bernsen stated from
the convention floor that Local R3-77 had only received $22 for each of its members and asked
whether it could be reimbursed for the difference.[2] (Id. at 404:24–405:7, 406:8-13.) According
to Bernsen, Buckley responded by instructing all locals claiming to have been shortchanged to
submit a written request to the national's next president. (Id. at 405:9-10.) Following his
election, Holway reiterated to convention delegates that local's seeking unpaid dues rebates
should submit a request to him in writing. (Id. at 408:8-19.) According to Bernsen, Holway
stated that locals would receive the difference with "[n]o questions asked." (Id.)

14.    Two months after the convention, in November 2002, Johnson and Bernsen
submitted a letter to the newly-elected president indicating that Local R3-77 was owed "at least
$3,048" in dues rebates for the prior three-year period. (Bernsen Test. at 407:8-10.)[3] Plaintiffs
documented their claim with copies of the local's income checks from the relevant years and a
record of the local's membership numbers for each of the pay periods. (Id. at 407:19-21;
Johnson Test. at 272:15-19.)

15.    According to Johnson and Bernsen, President Holway did not respond to the
request. (Johnson Test. at 276:18–277:6; Bernsen Test. at 412:22–413:1 (stating that as of
November 2003, "Mr. Holway had not given the local a response to the letter from a year before

---

[2] According to Johnson, the local received between $3,000 and $4,000 in dues rebates annually
during 2000, 2001 and 2002, while receiving around $4,500 in 2003. (Johnson Test. at 1459:25–
1460:11.)

[3] During the same period, plaintiffs notified national officials that they had not received dues
rebate checks for four or five months while NAGE was under the control of National Trustee
Buckley. (Johnson Test. at 91:12-16.) The delayed checks, however, were provided to the local
in December 2002. (Osgood Test. at 1090:18-25; Pls.' Ex. 21 at 000551.)

about the per capita dues.").) This assertion, however, is contrary to the record. In a January 7, 2003 letter to the local's membership, President Holway stated that the national union's financial department was "looking into the 'supposed deal' that [Local R3-77 member's] dues would be $13 per pay period" with a resulting per capita dues rebate of "22.36 per Member per year." (Pls.' Ex. 151 at 1.) The union's inquiry was a product of the "loose" rebate structure put into place during the Lyons presidency. (Barry Test. at 1258:6-17.) In recruiting new locals to the national union, President Lyons often offered a reduction in their members' dues in exchange for a reduced per capita dues rebate. (*Id.* at 1258:18-22.) As a result of these side deals, many locals received less than a yearly $30 per member from the national union. (*Id.* at 1258:15-17.) After reviewing the records regarding Lyon's financial arrangement with Local R3-77, NAGE's financial department determined that the local's membership was paying less than full dues, and as a result -- contrary to plaintiffs' claim -- it had not been shortchanged. (*Id.* at 1259:2–1261:12; Holway Test. at 1304:8–1306:3.) According to Holway, local officials were informed of the national's determination in February 2003. (Holway Test. at 1305:9-18.) Even President Johnson recalls that the local learned of its arrangement with Lyons after filing charges with the Federal Labor Relations Authority ("FLRA"). (Johnson Test. at 278:8–279:3; *see also* Pls.' Ex. 144 ¶ 1 (Johnson's written statement before Hearing Officer Flynn).)

16.     In the months following their request for back dues, Johnson and Bernsen's complaints regarding the funds became increasingly strident. At a November 21, 2002 meeting, Bernsen informed members that the local was "waiting to see" if the national would provide it with the requested sum. (Pls.' Ex. 6 at 000599 (minutes).) In December emails to President Holway, National Executive Vice President Osgood and members of the local, Johnson noted the local's "concern[]" regarding the issue. (Pls.' Exs. 19 and 20.) By May 23, 2003, Johnson

asserted that NAGE's withholding of the money was motivated in part by its hostility toward her,

declaring to the FLRA that the union had "failed to pay more than $3,000 due Local R3-77 in

part to prevent [her] from proceeding with an arbitration [against PBGC] concerning [her]

working conditions and to deprive [her] of support and protection." (Pls.' Ex. 31 (May 23, 2003

Unfair Labor Practice charge).) Finally, on November 15, 2003, Johnson and Bernsen wrote

Andrew Stern, International President of the Service Employees International Union, protesting

Holway's "refus[al] to pay more than $3,000 that former NAGE President Ken Lyons withheld

from SEIU/NAGE Local R3-77" and lodging charges against Holway under SEIU's Constitution.

(Pls.' Ex. 131 at 1, 3.) However, based on the testimony of Barry and Holway, the Court finds

that plaintiffs have failed to prove that the local was in fact owed this money.

## VI.    Kaplan's Letter

17.    Shortly after Holway was sworn in, Arbitrator Roger Kaplan notified NAGE

General Counsel Richard Barry that Local R3-77 had failed to pay a $3,500 bill for his services

despite previous indications that it would soon pay the debt. (Defs.' Ex. 81 at 000028.) In a

November 7 letter, Kaplan advised Barry that he planned to "sue NAGE Local R3-77, NAGE

National and Ms. Valda Johnson and Mr. Stuart Bernsen individually to recover the[] just and

earned fees" unless payment was received within two weeks. (Id.)

18.    Arbitrator Kaplan's protest to the national was not limited to the local's

delinquency in paying its arbitration bill. In response to the arbitrator's October 1, 2002 demand

for payment, Bernsen had mailed an October 21 letter to Kaplan indicating that he had charged

too high a daily fee; challenging as improbable the number of days he claimed to have spent on

the case; asking that he provide an accounting of the time spent on the local's case and other

matters for each of the days billed; declaring that he had already received compensation "in the

form of secretarial services" due to PBGC's provision of a written transcript at his request; and

instructing him to provide the local with a "four day discount" due to his failure to order PBGC

to provide a local representative with four days "official time" to work on final briefs for the

arbitration. (Defs.' Ex. 81 at 000025.) Kaplan informed Barry that "[n]ever in [his] professional

career ha[d] [he] received a letter as unprofessional as the one [he] received from Mr. Bernsen"

-- a career that included more than two decades as an arbitrator and three years as NAGE's

General Counsel. (*Id.* at 000028.)

      19.    Barry considered Kaplan's letter a "very serious matter in labor circles," one that

could negatively impact the national union. (Barry Test. at 1250:23–1251:17.) In a November

13, 2002 letter to President Johnson, Barry noted the issue's significance, stated that the local's

action "ha[d] an adverse impact on the National and other locals of th[e] union" and reminded

Johnson that "the incurring of a liability by the local running to the National is prohibited by the

Constitution and By-Laws recently adopted at the National Convention." (Defs.' Ex. 81 at

000023.)

      20.    The local settled its bill with Arbitrator Kaplan in January 2003 by paying him

$3,500. (Johnson Test. at 380:12.) Johnson never questioned the wisdom in authorizing Bernsen

to challenge the arbitrator's invoice. (*Id.* at 283:6-8.) To the contrary, Johnson apparently

believed that the letter had accomplished its underlying purpose, *i.e.*, to buy more time to pay the

balance. (*Id.* at 283:11-13.)

## VII.   President Johnson's Arbitration

      21.    At the time of President Holway's election, the local was heavily invested in a

number of protracted arbitration proceedings. The Kaplan matter itself involved the union's

collective bargaining agreement with PBGC. (Bernsen Test. at 503:18–504:6.) After reaching

an impasse over ten of the agreement's articles, the local took their disagreement before

Arbitrator Kaplan, where proceedings continued for a year and a half. [4]  (*Id.* at 504:2-6.)    A

number of individual grievances were pursued during the same period.  In September 2002,

arbitration proceedings began on behalf of local member Robinette Walters, an employee raising

discrimination, retaliation and disability claims.  (Johnson Test. at 22:17-20; 23:25–24:1; Pls.'

Ex. 12.)  In 2003, the local invoked arbitration for Rhonda Baird, another member with Title VII

claims.  (Johnson Test. at 22:21–23:2.)  Johnson and Bernsen provided substantial assistance in

each of these matters, as well as other grievance and EEOC proceedings on behalf of local

members.  (*Id.* at 22:11–28:11; Bernsen Test. at 417:2–420:13, 429:14–442:8.)

22.    Prime among the local's arbitrations, however, was that of President Johnson.  On

June 20, 2001, PBGC Human Resources Department Director Sharon Barbee Fletcher posted an

"institutional grievance" against Johnson, alleging that she had violated the NTEU-PBGC

Collective Bargaining Agreement by distributing an email message suggesting that another

Human Resources Department employee was a racist.  (Pls.' Ex. 4 at 1.)  Fletcher characterized

Johnson's accusation as "unconscionable and irresponsible" -- "but the latest of several

completely unsupported allegations of racism against the Corporation."  (*Id.* at 2; *see id.* at 2 ("In

your December 7, 2000 newsletter you accused the Corporation of killing Sylvia Pierce because

it allegedly denied Ms. Pierce her civil liberties.  And in your March 2000 newsletter, you

compare your fight against the Corporation to the Allies' fight against Hitler and Nazi Germany

in World War II.  These outrageous accusations reflect your unprofessional and undisciplined

conduct as union president.").)  Fletcher requested that Johnson apologize for the incident, "[t]hat

Local R3-77 cease making unsupported allegations of racial discrimination," and that "before

---

[4] The local appealed portions of the arbitrator's May 2002 decision to the FLRA, which
ultimately affirmed Kaplan in September 2004.  (Bernsen Test. at 504:7–505:12.)

Local R3-77 decides to file a grievance or proceed to arbitration, it obtain a signed certification from a NAGE national representative that the representative has personally investigated the facts and believes the grievance or arbitration request is appropriate under the circumstances." (*Id.* at 2-3.)

### A.    PBGC's Settlement Offer

23.    On June 26, 2001, the local filed a first step grievance against the agency, alleging that it had engaged in unlawful discrimination and retaliation by posting the institutional grievance. (Defs.' Ex. 82 at 3 (arbitrator's decision).) Arbitration was invoked on November 26, 2001. (*Id.* at 13.) In the months following, Johnson filed a series of grievances alleging that PBGC had discriminated against her in failing to select her for a number of vacancies. (*Id.* at 13-14.) The union invoked arbitration with regard to these grievances in March and October of 2002. (*Id.*)

24.    In the fall of 2002, with Johnson's arbitration date approaching, attorneys in the national union's Alexandria, Virginia office received a request for assistance in the matter. (Lightfoot-Walker Test. at 1101:18-21.) Attorney Gina Lightfoot-Walker, an African-American, was initially assigned to the case. (Johnson Test. at 192:15-17; Lightfoot-Walker Test. at 1101:18-1102:5.) In a September 2002 discussion with one of the agency's attorneys, Lightfoot-Walker was notified that PBGC was willing to settle the matter by promoting Johnson into a non-bargaining unit position. (Lightfoot-Walker Test. at 1102:15-18.) Consistent with her obligations as Johnson's legal representative, Lightfoot-Walker conveyed the offer to Johnson. (*Id.* at 1102:19-20.) Johnson indicated a lack of interest in a non-bargaining unit position, and Lightfoot-Walker reported her decision to the agency. (*Id.* at 1102:21-1103:3.)

14

25.    After declining the agency's offer, Johnson distributed messages to President Holway, other national officials, and members of Local R3-77 characterizing the settlement as a "[b]ribe" offered by PBGC and NAGE in order to get her out of the union. (Pls.' Ex. 15 at 2.) In a later charge with the FLRA, Johnson declared that "the Union [had] attempted to coerce [her] to move to a non-bargaining unit position where [she] would no longer be able to serve as a union representative and where [she] would lose important protections." (Pls.' Ex. 35 at 000624.) According to Johnson's testimony, had management actually intended to settle her grievance, they would have presented it to her in writing. (Johnson Test. at 193:14-23.) Contrary to Johnson's position, Lightfoot-Walker did what was required of her as an attorney and the Court finds that Lightfoot-Walker did not coerce plaintiff to accept PBGC's offer.

**B.    Johnson's Decision to Proceed without NAGE Representation**

26.    Following Johnson's rejection of PBGC's settlement offer, her case was transferred from Lightfoot-Walker to Jennifer Wasserstein, a new attorney in NAGE's Alexandria office. (Lightfoot-Walker Test. at 1103:4-10; Wasserstein Test. at 757:15-18.) Johnson informed Wasserstein that she wished to expand the arbitration beyond the posting issue raised in the first of her grievances and include within it her subsequent claims for discriminatory nonselection. (Johnson Test. at 288:15–289:1; Wasserstein Test. at 758:24–759:3; Barry Test. at 1254:19–1255:5.) In response to Johnson's request, Wasserstein contacted PBGC and requested that it consent to a consolidation of the posting arbitration with the later-invoked proceedings concerning Johnson's promotion claims. (Johnson Test. at 211:8-12; Wasserstein Test. at 758:24–759:6; Barry Test. at 1255:1-5.) PBGC refused. (Johnson Test. at 211:12-19; Wasserstein Test. at 759:4-6; Defs.' Ex. 8 at 006099 (Wasserstein's November 27, 2002 email message to Richard Barry).) Because arbitrations had been independently invoked for the later

grievances and there was a year separating the relevant events, Wasserstein was not surprised by

the agency's decision. (Wasserstein Test. at 759:4-6; Defs.' Ex. 8 at 006099.) After researching

the possibility of proceeding with Johnson's nonselection claims unilaterally under a "continuing

violation" theory, Wasserstein concluded that the later grievances could not properly be raised in

the December arbitration.[5] (Wasserstein Test. at 758:24–759:6; Defs.' Ex. 8 at 006099.) On

November 26, 2002, Wasserstein met with Johnson and Bernsen for more than five hours,

notifying them of her conclusion, indicating that the agency's institutional grievance did not

appear to violate the union's collective bargaining agreement, and stating that she would

nonetheless handle the arbitration, which should require no more than one day. (Defs.' Ex. 8 at

006099; Wasserstein Test. at 761:18-21.)

      27.    Johnson responded with a November 27 email informing Wasserstein that "[a]fter

careful consideration," she had "decided that the Local w[ould] handle [her] case." (Defs.' Ex. 8

at 06100.) The message requested that Wasserstein provide Johnson with her file and noted that

while it would be "helpful" to have the attorney's research as well, she would "understand" if

Wasserstein did not wish to share it. (Id.) On the same afternoon, Bernsen wrote Wasserstein to

---

[5] Wasserstein's recommendation was prescient, since Arbitrator Applewhaite decided in his May
26, 2004 decision in Johnson's arbitration that he was without jurisdiction to consider the
promotion claims. (Defs.' Ex. 82 at 32.) The arbitrator noted that "[m]uch of the evidence
presented during the fifteen days of hearings concerned events that occurred either well before or
well after the initial grievance was filed on June 26, 2001" -- evidence that was ultimately of no
relevance to the case. (Id. at 29.) As to the merits of Johnson's claims, the arbitrator concluded
that there was "no clear and convincing evidence that [PBGC] engaged in a policy to
discriminate or retaliate against [Johnson] because of her race, sex, religion, union activity or
EEO activity or to subject her to disparate treatment." (Id. at 32.) Labor relations, the arbitrator
noted, "is by its very nature confrontational." (Id.) In Johnson's case, he concluded, "it
appear[ed] that both sides ha[d] allowed conflicting personalities and agendas to cause a
breakdown in labor relations." (Id. at 33.) According to Applewhaite, "[h]ad the parties spent
half of the energy and effort that was spent in fifteen days of hearings . . . (not to mention the
hours spent in preparation before and after the hearings) on building an environment of open
commutations between both sides, [Johnson's] grievance would never have taken place." (Id.)

thank her for "all [her] hard work" on Johnson's case. (Defs.' Ex. 10.) Upon receiving Johnson's message, Wasserstein forwarded the requested file with a letter "confirming that, as a result of [Johnson's] request," NAGE's involvement in the grievance had come to an end. (Defs.' Ex. 9 (Wasserstein's November 27, 2002 letter to Johnson).)

28.     With this, which she perceived as an unforgivable slight to her position as President of the local, Johnson's tone changed dramatically. In her December 2, 2002 reply to Wasserstein, Johnson declared that she had been "coerced to drop important aspects of the grievance" and that the national union had offered no more than a day's representation. (Pls.' Ex. 18 at 0088.) Johnson further stated her "assum[ption]" that Wasserstein's comments regarding the merits of the posting grievances were "National's way of getting back at [her]" for a November 19, 2002 message to national officials and the local membership, in which Johnson had protested NAGE's alleged representational failures and suggested that the union had conspired with PBGC in its handling of the Kaplan matter. (Id.; Pls.' Ex. 15.) In addition, after President Holway distributed a letter to the Local R3-77 membership indicating that NAGE would not be financially responsible for the arbitration as a result of Wasserstein's removal from the case (Pls.' Ex. 151), Johnson's rhetoric became even more shrill. In a January 15, 2003 message to national officials and members of the local, Johnson declared NAGE "never intended to pay for the case I carried to them." (Pls.' Ex. 22 at 1.) "National didn't want to invest in [the] arbitration," Johnson explained, "because they [were] interested in a 'cushiony' relationship with management without having to pay monies on our behalf." (Id.) NAGE's failure to support the arbitration of Local R3-77's president, Johnson concluded, "show[ed] . . . blatant disrespect for the Local." (Id.) Finally, in a statement to Hearing Officer Flynn, Johnson declared that national officials had refused to support her arbitration because "[t]hey were working with management

to interfere with [her] work and [her] relationship with managers and [her] peers." (Pls.' Ex. 144 ¶ 12.)

## VIII. NAGE Arbitration Policy

29.    Johnson and Bernsen's mounting frustration with the national union's handling of her case was fueled by their conclusion that the NAGE had amended its policy for funding arbitrations and applied it retroactively to her case. (Johnson Test. at 293:9-20.) On December 16, 2002, NAGE's National Executive Board initiated an arbitration policy developed for the purpose of "provid[ing] fair and equitable legal services to members and . . . establish[ing] a clear policy for arbitration requests." (Defs.' Ex. 79 at 2.) Under the system, each case was to be submitted to the national union's legal staff "for review." (*Id.*) A case determined meritorious received legal and financial support, the national paying half of the union's bill; one "found to lack merit" was instead returned to the local with a written notice outlining the deficiencies identified and providing an opportunity to offer further information in support of the arbitration. (*Id.*) Those cases that "continue[d] to lack merit" were forwarded to the Chief Counsel for consideration. (*Id.*) When in agreement with the staff attorney's determination, the Chief Counsel provided the local president and grievant with a notice explaining that the national would not be responsible for either the costs of the arbitration or legal representation. (*Id.*) The Chief Counsel's determination was appealable to an appellate board and, ultimately, the national union's president. (*Id.*)

30.    Plaintiffs' contention that the December 16 policy was inappropriately and discriminatorily applied to Johnson's case -- like their related suggestion that the nationwide policy was instituted as a means of retaliating against the Local R3-77 president -- is without support in the record. (*See* Johnson Test. at 52:4-12, 292:19–293:20; Pls.' Ex. 26 (Johnson's Apr.

1, 2003 request for reconsideration).) There is no evidence that the policy was relevant to the handling of Johnson's case by national officials. In notifying local members that NAGE would not "accept any responsibility" for her arbitration costs, President Holway explained that Johnson had opted to proceed without the national's legal assistance. (Pls.' Ex. 151 at 0095.)

31.    Moreover, NAGE's December 16 policy was not the departure that plaintiffs try to portray it as. While national officials such as Barbara Osgood indicated that the cost of an arbitration should not govern a local's arbitration decisions (*see* Bernsen Test. at 450:2-25; *see also* Pls.' Ex. 33 at 58 (Holway's statements at June 11, 2003 meeting)), the cost of an arbitration is distinct from an assessment of its merits, and it is evident that the national union's practice of evaluating the merits of arbitrations before accepting legal and financial responsibility predated December 16, 2002. Whether this practice was in place prior to the removal of President Kenneth Lyons by an SEIU trusteeship in 2001 is unclear (*see* Donnellan Test. at 1420:3–1421:7; *but see* Barry Test. at 1245:17-23), but it was undoubtedly operational during the term of National Trustee Joseph Buckley. (Barry Test. at 1244:11–1245:15.) The same is true of members' claims with the EEOC, which NAGE attorneys consistently reviewed before accepting responsibility. (*Id.* at 1246:18–1247:5; Lightfoot-Walker Test. at 1098:8–1099:2; Defs.' Ex. 102.) Bernsen conceded this in a November 17, 2002 letter to Richard Barry, stating that the local "kn[ew] that the Union [was] not a charity, and that the merits of cases must be evaluated." (*Id.*) As President Holway and Barry credibly testified, the December 16 policy functioned only as an extension of union members' rights, providing an avenue of relief for those grievants dissatisfied with the decision of the national's reviewing attorney. (Barry Test. at 1247:21–1248:24; Holway Test. at 1300:17–1301:10.)

IX.    **December 18, 2002 Meeting**

32.    In the weeks following Johnson's November 27, 2002 decision to conduct her arbitration without national representation, plaintiffs' relations with some members of the local and the national leadership deteriorated steadily. Internally, there were increasingly pronounced signs of dissent. In a message distributed to the membership and NAGE officials, Johnson confirmed that "a few Local members" -- later identified as five employees within the Office of General Counsel, including Joe Burns, Lorraine Johnson and Jason Weyand -- had asked the national to impose a trusteeship. (Pls.' Ex. 20 at 2 (Dec. 5, 2002 email message); Johnson Test. at 197:11–199:25.) Johnson explained that the members were "in cooperation with management to overturn [the] Local leadership[,]" being "displeased that the Union [was] representing certain other members in promotion cases that involve their non-Union friends."[6] (Pls.' Ex. 20 at 2.)

33.    At the same time, Johnson's statements regarding NAGE's newly-elected President and other national officials became unmistakably vicious. In a November 19, 2002 email message to Holway, other national officials, and the local's membership, Johnson complained that after going to the National Convention to "show . . . support" for Holway and "receiving promises" that he would "honor [his] word and pay outstanding dues money[,]" no one from his office even "bother[ed] to pick up the phone to call [the local] and tell us what is going on." (Pls.' Ex. 15 at 1.) "All of this occurs[,]" Johnson declared, "when the Local Union president asks for [the national's] support in legal matters." (*Id.*) The national attorney responsible for her case, she protested, had "state[d] that she owe[d] me Nothing as a Local President[,]" while another NAGE attorney had "[o]n other EEO matters . . . missed important

---

[6] These statements followed Johnson's "caution" that local members "should not be sending e-mail messages to more than 20 employees at once unless it has been approved by the Union President -- according to PBGC's electronic policy." (Pls.' Ex. 17 at 1 (Nov. 26, 2002 email message from Johnson to local members and the national leadership).)

court dates for an[] employee without apology." (*Id.*)  After declaring PBGC had attempted to prevent her from receiving Barry's letter regarding the local's outstanding arbitration and thus force a lawsuit, Johnson stated that the agency was "playing" the local and national "against each other" and "us[ing] Roger Kaplan to do it." (*Id.*)  The local had members, according to Johnson, willing to "donate to keep [it] operational until [Holway] ma[de] good on sending . . . dues." (*Id.* at 2.)  "I certainly believe we can work this out[,]" Johnson closed. (*Id.*)  "All you have to do is want to work it out." (*Id.*)

34.     Less than two months after taking office, Holway asked National Executive Vice President Barbara Osgood to schedule a meeting with Local R3-77 in an attempt to address the issues that Johnson had raised. (Osgood Test. at 1088:8-14; Holway Test. at 1298:6-22.)  It was the first time the national president -- who had yet to even meet Johnson -- had given such attention to a local. (Osgood Test. at 1088:24–1089:4; Holway Test. at 1298:23–1299:3; Johnson Test. at 197:22–198:3.)  Even the planning of the meeting proved contentious.  In a December 5 email message, President Holway notified local members that it was "[his] understanding that National Executive Vice President Barbara Osgood will be meeting with your local in Washington on Thursday, December 12th." (Pls.' Ex. 19 at 3.)  Johnson and Bernsen responded immediately, instructing the membership that "[t]here w[ould] not be a membership meeting on Dec. 12 because we are doing the arbitration for the Local President on Dec. 12 and Dec. 13," but suggesting that "if Barbara is available on December 12, 2002, she might be willing to sit in on the arbitration for the Local President and help with the proceeding." (*Id.* at 1-2.)  Johnson's message added another item to the list of the "concerns" to be discussed with NAGE officials once the meeting was rescheduled: the national's "willing[ness] to meet at a time that would jeopardize the career/future of [the] Local President at the request of a few members

. . . who won't do work when asked." (*Id.* at 1.)

35.    Plaintiffs grounded their open hostility toward President Holway and the national on two misconceptions. First, Johnson and Bernsen concluded that Holway had selected the date in order disrupt Johnson's case, believing that the national president was aware of the arbitration's timing as a result of Gina Lightfoot-Walker's involvement in the scheduling process and subsequent email messages indicating that a meeting could not be held "before December 15" because the local had "important arbitrations to do." (Johnson Test. at 34:8–35:16; Bernsen Test. at 445:4-16; *see also* Pls.' Ex. 17.)  The record, however, does not support such a conclusion. As Holway and Osgood credibly testified, it was Osgood who arranged the gathering. (Osgood Test. at 1088:8-14; Holway Test. at 1298:6-22; *see also* Pls.' Ex. 19 at 3 (Holway's December 5 email message indicating an "understanding" that Osgood would be meeting with local members on December 12).)  In any event, the meeting date was changed in order to accommodate Johnson's request. (Johnson Test. at 35:8-16; Bernsen Test. at 447:15-17.)  Second, Johnson and Bernsen viewed the scheduling of a meeting by the national as an affront to local autonomy, believing that the local's Executive Committee alone had authority to make such arrangements. (*See* Bernsen Test. at 445:20–447:5; Pls.' Ex. 24 at 1 (January 22, 2003 email from Johnson complaining that the national was attempting to schedule a meeting without consulting the Executive Committee and asking Holway "not send any more e-mail messages to my members without my consent").)  At trial, however, Bernsen conceded that the national could "meet with any members [it] want[ed] to[.]" (Bernsen Test. at 446:9-10.)  While Bernsen nonetheless argued that "'membership meeting' is a term of art" referring to a meeting where "business can be conducted" and Holway thus acted inappropriately by "us[ing] the term

. . . quote, unquote, 'membership meeting'" in reference to NAGE's sessions with local members (*id.* at 446:9–447:5), this by no means supports plaintiffs' charge that holding a meeting was a violation of local autonomy.

36.     On December 18, 2002, Barbara Osgood, Chief Financial Officer Bernard Flynn, National Vice President Debra Ennis, and National Executive Board Member Mychael Patterson met with thirty to forty members of Local R3-77. (Osgood Test. at 1089:10-16; Bernsen Test. at 448:1-2.) At the meeting, President Johnson addressed issues she had outlined in her previous email messages: the national's payment of dues rebates; "National counsel's intimidation earlier [in the] year when [the local] questioned the behaviour of one of its attorneys[;]" General Counsel Barry's November 13 letter addressing the Kaplan matter and "suggesting that the Local had committed a prohibited action[;]" PBGC's "request . . . that National deal directly with . . . Management" without input from the local; the request of "[a] few Local members" for a trusteeship; "National counsel's implication that Stuart had written an unprofessional letter because Stuart was concerned about National counsel's errors in its analysis and refusal to try an EEO case for a Union member[;]" unelaborated "Boston connections between our National and our Head of Agency[;]" and the cooperation of local members with the agency. (Pls.' Ex. 20 at 1-2; Bernsen Test. at 448:3-12.) Bernsen spoke about Johnson's arbitration, stating that the national's failure to support a local president in her case would amount to "scabbing[.]" (Bernsen Test. at 450:5-9.) According to Bernsen, when those in attendance were asked whether they supported Johnson's arbitration and believed the national should fund it, all raised their hands. (*Id.* at 450:9-13.) The local's members were also given opportunity to speak. (*Id.* at 448:12-13.) On behalf of the national union, Osgood informed the membership that the merits of an arbitration -- not its cost -- should govern the union's decision with regard to its pursuit. (*Id.* at

450:16-451:1.) She later reported to President Holway, noting the local's issues regarding finances, its dues rebate, and pending arbitrations. (Osgood Test. at 1090:5–1091:10.)

## X.    February 7, 2003 Meeting

37.    Following the meeting, leaders of the local and national wrote local members in order to address the issues that had been raised. In a January 3, 2003 message to the membership, Bernsen described "a unanimous feeling that [the] new national union leadership need[ed] to provide [the local] with reinforcement to stop management's escalating attacks and management's mistreatment and disrespect." (Pls.' Ex. 21 at 000550.) Reporting "only . . . some of the basics . . . [s]ince management monitor[ed] [the local's] emails," Bernsen stated that national representatives had promised to provide a check for several months of unpaid dues, take action on behalf of a member with pending EEO deadlines, "[h]ave National President David Holway issue a letter supporting the Local" and meet with an agency official on the local's behalf, "[l]ook into providing support" at Johnson's next arbitration hearing and "[l]ook into" assisting local representatives in obtaining official time from the agency for work on representational matters. (*Id.* at 000550-51.) According to Bernsen, the local had "made it clear that the National union must provide both financial and legal support for Valda's arbitration." (*Id.* at 000551.) In closing, Bernsen acknowledged grudgingly that NAGE had since provided a check for the previous months' dues and "provide[d] the assistance that one member urgently needed in her EEO case." (*Id.*)

38.    On January 7, 2003, President Holway distributed his own letter to members of Local R3-77, stressing that "the National Association of Government Employees support[ed] all its members and w[ould] continue to support the members of R3-77 in an appropriate capacity." (Pls.' Ex. 151 at 0095.) Responding to concerns discussed at the December 18 meeting, Holway

noted that the missing dues payment had been replaced, that the national's financial department was "looking into the 'supposed deal' that [the local's] dues would be $13.00 per pay period" with a "pro-rated" per capita yearly payment of $22.36 per member and that a letter had been sent to a PBGC official in order to request that he meet with the national president. (*Id.*) Addressing Johnson's case specifically, Holway stated that the national "fully support[ed]" her and would have National Representative Susanne Pooler-Johnson attend her January 22, 2003 arbitration date. (*Id.*) "However," Holway noted, "because [the local's] President requested that NAGE Attorneys withdraw from the case, the National w[ould] not accept any financial responsibility for th[e] arbitration." (*Id.*)

39.     Johnson's response to Holway's letter -- sent to local members, President Holway and Barbara Osgood -- was vituperative. (*See* Pls.' Ex. 22 (Johnson's January 15, 2003 message to local members and national officials).) The local president first challenged Holway's characterization of the national's withdrawal from her arbitration, declaring that NAGE had "never intended to pay for the case" and thus she had little choice but to proceed without its representation. (Pls.' Ex. 22 at 1.) The national's newly-elected president, Johnson declared, "ha[d] shown his blatant disrespect for the Local by not supporting a Union president financially." (*Id.*) Johnson went further, however, asserting that Holway had noted the national's lack of financial responsibility for her case so that the information could "be leaked to management a week before [her] arbitration." (*Id.*; *see also* Johnson Test. at 233:10-11 ("He was letting management know he was not taking the bill.").) According to Johnson, "National didn't want to invest in [her] arbitration, because they are interested in a 'cushiony' relationship with management without having to pay monies on our behalf. But to hell with Valda's career after she ha[d] represented employees as a NAGE Local President." (*Id.*) Holway's letter, she

suggested, was simply an "attempt to unrattle" them before the following week's arbitration. (*Id.*
at 2.) Johnson asked that local members pray she would "be victorious" and "pray for the
hardened hearts of those in power at NAGE National." (*Id.* at 1-2.) At the time of the message,
she had not yet spoken or met with President Holway. (Holway Test. at 1306:5–1307:5; Johnson
Test. at 231:25–232:5.)

     40.    At trial, Johnson identified the root of her animosity toward Holway and the
national union. When notified that the national would not accept financial responsibility for her
arbitration, Johnson "felt like they chopped [her] off at [her] knees." (Johnson Test. at 242:9–
243:2.) Johnson and Bernsen had campaigned vigorously for the union. (*Id.* at 241:17–242:5.)
When it appeared that NAGE was not fulfilling its campaign promises, Johnson felt both "used"
and disrespected in her role as Local R3-77 president. (*Id.* at 241:24–242:21.) Moreover,
Johnson believed that national leaders were "playing politics." (*Id.* at 243:8-17.) When asked if
she believed, by February 2003, that NAGE was discriminating against her by refusing to
support her arbitration, Johnson testified that she instead "felt that they wanted the Collective
Bargaining Agreement ["CBA"] in place" as they had "expressed . . . their disgruntlement"
regarding "EEO proceedings" that were preventing the finalization of the local's contract. (*Id.* at
243:4-17.) While acknowledging that the union had a responsibility to negotiate a CBA,
Johnson believed that the agreement should not be pursued "at the expense of EEO issues on
behalf of members." (*Id.* at 244:17-15; *see also* Bernsen Test. at 701:18–702:16 (indicating that
the allocation of resources between individual grievances and collective bargaining is difficult
and context-specific).)

     41.    Holway responded to Johnson in a January 21, 2003 message to the local's
membership, expressing "amaze[ment] not only at the contents but also the tone of [her] email."

(Pls.' Ex. 23 at 1.)  "For an elected member of a local to believe that those in the national office spend their efforts to conspire with management against our members[,]" he declared, was "ludicrous[.]"  (*Id.*)  Holway noted that Johnson's "diatribe" against the national's staff was "unprecedented" -- "[t]o think that all the decisions made at the national headquarters are designed to undermine you[,]" he told Johnson, "brings the paranoia level to new heights."[7]  (*Id.*)  Holway stated, however, that Johnson's allusions to leaving the union were the "most damaging[,]" as management "love[d] to see" such an outburst on "the opposite side of the table."  (*Id.*)  The president concluded by noting that another membership meeting would be scheduled "so we can again air our concerns."  (*Id.* at 2.)

42.    President Holway's meeting with Local R3-77 -- his first ever visit of this sort with any of the national's approximately 500 locals -- was scheduled for February 7, 2003.  (Holway Test. at 1293:4, 1308:1-13.)  Again, even the scheduling of the meeting proved contentious.  In a January 22, 2003 message, Johnson protested Holway's alleged "insist[ence] upon having a meeting without first confirming the time and date with the executive committee[,]" declaring that she would "not allow him to come in . . . and try to start running things . . . as Management ha[d] suggested."  (Pls. Ex. 24 at 1.)  After stating that there would be "a meeting for the executive committee and advisory committee only on . . . February 7," Johnson asked that Holway "not send any more e-mail messages to [her] members without [her] permission."  (*Id.* at 1-2.)

---

[7] In her relations with national officials, Johnson was not reluctant to raise the possibility of rather elaborate conspiracies against the local's leadership.  In early 2003, Johnson returned a bracelet to National Representative Susanne Pooler-Johnson weeks after its disappearance in the local's office, explaining that she had had to have it examined to determine if it was a bug. (Pooler-Johnson Test. at 1134:1–1135:17.)  While Johnson contradicted this account (Johnson Test. at 1467:4-15), Pooler-Johnson's testimony on the matter was believable, given the overwhelming evidence regarding Johnson's interaction with both the national and various individuals in the local over the course of these proceedings.

43.    On February 7, President Holway arrived in Washington, finding an inch of slush on the ground. (Holway Test. at 1308:20–1309:2.) Prior to his meeting with Local R3-77 members, Holway traveled to the national's Alexandria office. (*Id.* at 1309:3-4.) While there, Holway learned that Susanne Pooler-Johnson was on the telephone with Johnson, who was again protesting the propriety of a meeting scheduled without her approval. (*Id.* at 1309:1719; Pooler-Johnson Test. at 1132:5-16.) Holway asked to speak with Johnson, and informed her that the meeting would go forward. (Holway Test. at 1309:19-21; Pooler-Johnson Test. at 1132:17-20; Pls' Ex. 33 at 48-49 (transcript of June 11, 2003 meeting).) Johnson, however, was undeterred. In a subsequent message to the membership, the local president announced that the meeting with national officials had been "cancelled due to inclement weather." (Defs.' Ex. 110; Holway Test. at 1310:2–1311:15.)

44.    Holway's first meeting with Local R3-77 members was sparsely attended as a result of Johnson's message. (Holway Test. at 1310:2-9.) Bernsen was present; Johnson participated by speakerphone. (*Id.* at 1311:16-25.) General Counsel Richard Barry, attorney Gina Lightfoot-Walker and local members Dwayne Jeffers, and Robert Perry were also in attendance. (Jeffers Test. at 918:9-12.) Bernsen spoke again at length, outlining the EEO cases the local was pursuing and the issues it faced with the agency. (Bernsen Test. at 452:19-453:11.) According to Jeffers, Bernsen was confrontational at the gathering, calling Barry a "scab" and declaring that the national was "selling out" Johnson's arbitration. (*Id.* at 919:3-8.)

## XI.    Johnson's Unfair Labor Practice Charge

45.    On April 1, 2003, nearly three months after Local R3-77 members were notified that the national would not be accepting financial responsibility for their president's arbitration, Johnson wrote Holway "to confirm in writing [her] appeal of the decision made by [him] in [his]

28

capacity as National President of NAGE, SEIU 5000 requiring [her] to pay for the National's portion of the arbitration cost" in her case. (Pls.' Ex. 26.)  In the letter, Johnson again asserted that NAGE had failed to provide legal counsel, failed to support her financially, and denied such support on the basis of a policy that "was not the policy in effect when [her] case began." (*Id.*)

46.    After Johnson failed in her efforts to get the national to pay for her arbitration, she filed with the FLRA an unfair labor practice charge ("ULP") against NAGE on May 23, 2003.[8] The charge, drafted with Bernsen's assistance, alleged that NAGE had violated its duty of fair representation and discriminated against her on the basis of race, color, creed, and sex "[b]eginning November 26, 2002 . . . [,] act[ing] initially and primarily through Chief Counsel Richard Barry, who was aided and supported by NAGE President David Holway, Executive Vice President Barbara Osgood, Bernard Flynn, and Jennifer Wasserstein." (Pls.' Ex. 35 at 000624; Bernsen Test. at 516:21–517:4.)  The focus of her charge was her arbitration: the union, she alleged, had "failed to fairly represent [her] and discriminated against [her] in connection with the processing and handling of grievances and arbitrations concerning [her] working conditions where [she was] employed at the Pension Benefit Guaranty Corporation[.]" (Pls.' Ex. 35 at 000624.)  This allegation was supported by a familiar set of complaints -- the union, she declared, had refused to pursue certain issues as part of her case, had refused to provide legal and financial support for the arbitration, had attempted to "coerce" her into taking a non-bargaining unit position, and had "failed to pay more than $3,000 due Local R3-77 in part to prevent [her] from proceeding with [her] arbitration . . . and to deprive [her] of support and protection." (*Id.*)  The charge added other allegations as well, stating that the national union had "interfered" with her service as an officer and representative of the local, interfered with her "right to run for

---

[8] Johnson filed an amended charge on June 24, 2003.  (Pls.' Ex. 35.)

office," attempted to cause PBGC to retaliate against her, and "acted to discredit [her] in the eyes of members of NAGE Local R3-77 and PBGC management through innuendo, slander and public ostracism." (*Id.*) As relief, Johnson asked "to be reimbursed for all costs, expenses and legal fees [she] incurred as a result of the Union's violation," for "proper payments" to the local, and for the posting and distribution of "appropriate notices."[9] (*Id.*)

47.    Johnson's move was an unusual one.    While disagreement between local leaders and the national union was not unprecedented, such conflict was generally not aired in a public forum. (Cooper Test. at 803:24–804:11.) Johnson's charge exposed the rift between the local's leadership and NAGE, undoubtedly compromising the union's bargaining strength in its negotiations with PBGC. (*Id.* at 804:12-22.) In the words of Duncan Cooper, a former local member and witness for plaintiffs, the ULP was thus "a very extreme step to take." (*Id.* at 804:6.)

48.    As is clear from the record, Johnson sought to gain a tactical advantage by filing. Though the May 23 charge was her first against the union, she had earlier threatened such an action in an attempt to sway the national's handling of her case. (*See* Pls.' Ex. 15 at 2 (Johnson's November 19, 2002 email asking Holway to "[t]ell Mr. Barry I'll apologize for threatening a DFR if he'll apologize for the way he has treated me").) As Bernsen reiterated after her filing of the ULP, Johnson would have withdrawn the charge upon receipt of a check from the union. (Bernsen Test. at 704:7–705:12; Pls.' Ex. 33 at 69-70 (Bernsen's June 11, 2003 statement that if Holway were to call Johnson "this thing will settle and it will go away"); Defs.' Ex. 104 (Bernsen's June 12, 2003 email message to member Jason Weyand stating that NAGE "would

---

[9] On March 5, 2004, the FLRA concluded that Johnson's unfair labor practice charge did not warrant the issuance of a complaint. (Defs.' Ex. 43 App. B at 002419.) Johnson's appeal of that decision was denied on May 3, 2004. (*Id.* at 002426)

have avoided all or most of this" had they "ke[pt] their pledge and pa[id] the National's share of the arbitration fee in Valda's case").)  As Johnson recounted, "I filed the duty of fair representation charge against David Holway.  And I also offered him an informal way to deal with it."  (Johnson Test. at 300:2-7.)

## XII.    June 11, 2003 Meeting

49.    President Holway declined to take the informal route.[10]  In a June 5, 2003 letter, Holway notified local members that their president "ha[d] filed a charge with the Federal Labor Relations Authority claiming that NAGE ha[d] violated its duty of fair representation."  (Pls.' Ex. 31A at 000290.)  The charge itself was enclosed for each member's review.  (*Id.* at 000291.)  "In [Holway's] judgment," Johnson's filing of the charge was "an emergency situation" that required him to "act to the best of [his] ability to further the purposes and objectives of th[e] organization and to protect the interests of its members."  (*Id.* at 000290.)  Holway assured members that NAGE "denie[d]" the charges and asked that they attend a June 11, 2003 meeting for the purpose of "discuss[ing] the future representation of NAGE with [their] local" and ensuring that their interests "continue[d] to be protected."  (*Id.*)

50.    Unbeknownst to the others in attendance, Bernsen attended the June 11 meeting with a tape recorder concealed in his jacket.  (Bernsen Test. at 461:15–462:22.)  At trial, Bernsen identified two purposes for surreptitiously recording the event: (1) for the benefit of Johnson, who was not in attendance, and (2) in order to "have a record in case [he] needed it because of

---

[10] After receiving Holway's June 5 letter, Johnson complained to local members that NAGE had "chosen to deal with personal matters in a very public manner" by sharing her charge with the membership "without first calling . . . to try to handle the situation."  (Pls.' Ex. 32 (Johnson's June 10, 2003 letter to Local R3-77 members).)  "Had they called me FIRST," Johnson explained, "they would have found that I had chosen to handle this matter in . . . Alternative Dispute Resolution . . . fashion."  (*Id.*)  Johnson's frustration was misplaced, since she was the one to bring the dispute into the public arena.

anything that happened at the meeting." (*Id.* at 460:25–461:14, 620:14-23.) According to

Bernsen, neither of these ends could have been accomplished with the recorder exposed as

Holway would not then have spoken as freely. (*Id.* 622:22–623:18.) The resulting transcript,

marred by sporadic and at times suspicious lapses,[11] thus documents an uneven exchange. What

it fails to document, however, is the retaliatory animus that plaintiffs have alleged.

51.     Holway opened the meeting with an acknowledgment of its catalyst, stating that

he had "called the meeting because . . . [he] was . . . quite shocked . . . when [he] received a

National Labor Relations complaint against [the] Chief Counsel," other national officials, and

himself. (Pls.' Ex. 33 at 2.) Holway acknowledged the seriousness of the charges. Never before,

he noted, had he "been accused of being biased against anybody." (*Id.* at 2-3.) All of the named

officials, in Holway's words, considered the charges "very serious allegations made against

[them] personally" -- allegations that could "destroy" the officials' reputation and prove quite

detrimental in labor circles. (*Id.* at 3, 17.) The purpose of the meeting, Holway indicated, was

"to have a discussion as to where we go." (*Id.* at 3.) The national's leaders were "trying to figure

out, quite honestly, how [to] get on with [their] job . . . , which is to service [the local] and the

40,000 other members of NAGE." (*Id.*) "I don't know how I can represent you, quite honestly,"

he explained, "when my integrity, the integrity of the General Counsel and my staff and

everybody else on this Board is in question." (*Id.* at 6.)

52.     After setting the context for the meeting, Holway acknowledged the difficulty

inherent in the union's predicament. If a majority of the local's membership wished to separate

---

[11] In attempting to explain the inaudible portions of his recording, Bernsen asserted that he was "walking around" during the meeting. (Bernsen Test. at 708:2-8.) This testimony was contradicted, however, by prior and subsequent statements that he in fact stood "three or four feet" from Holway during the discussion. (*Id.* at 462:23–463:1; 708:12–709:5.) Bernsen acknowledged this contradiction during cross-examination. (*Id.* at 708:12–709:5.)

itself from NAGE, Holway stated, the national would "walk away." (Pls. Ex. 33 at 7, 25-26.)
With arbitrations in progress, however, the union's departure would "call[] into question whether
the contract would continue[.]" (*Id.* at 7.) According to Holway, NAGE did not want to "hurt
anybody[.]" (*Id.*) All involved had to "figure out a way to make this thing work, if everybody
wants to make it work." (*Id.*) Otherwise, the union would have to "figure out a way" to
withdraw that would "protect[]" local members' rights. (*Id.* at 26-27.)

53.    Holway did not leave the merits of Johnson's charges unaddressed. Early in the
meeting, he stressed that he had not met the local's president "until a month-and-a-half ago"
despite her allegation that he had "been discriminating, and conspiring to discriminate with the
General Counsel since November of 2002." (Pls.' Ex. 33 at 5.) Moreover, Holway observed,
Johnson's allegations were fundamentally inconsistent with the officials' work as union leaders.
"[W]hy would we be in this business[,]" he asked, "if we discriminated against you?" (*Id.* at 7.)
"I'm not having this problem anywhere else," Holway asserted. (*Id.* at 34.)

54.    Bernsen was the first of the local's members to speak, emphasizing the need for
further arbitration support and the national's failure to assist in the case of the local's president.
(Pls.' Ex. 33 at 7-18.) Had Holway agreed to meet with Johnson, Bernsen declared, "this
probably could have been resolved and there wouldn't have been charges," for Johnson was
"asking [Holway] to talk to her about supporting her case, and whether [the local's] dues money
is going to go to help support a case like hers." (*Id.* at 17-18.) "[Y]ou get on the phone with
Valda," Bernsen suggested to Holway, "and this thing will settle and it will go away." (*Id.* at
70.) In response, Holway reiterated that arbitrations should not be abandoned due to a lack of
funds, but noted that Johnson's case had been "taken away" from NAGE. (*See, e.g., id.* at 11-12,
14, 19-20, 58.) Representational issues were raised by others as well, some indicating a need for

further support, others suggesting that Johnson and Bernsen had mischaracterized the national's

handling of Johnson's case. (*See, e.g., id.* at 19-21, 35-37.) Communication was also an issue,

members speaking about the unproductive and often acrimonious dialogue between local and

national officials, as well as the acrimony arising within the local itself. (*See, e.g., id.* at 22-24,

27-29, 31-35, 38, 40-43.) Finally, at least one member complained that the local "ha[d] yet to

have that financial report at any meeting" that he had attended. (*Id.* at 74-75.)

     55.    Throughout the TRO and summary judgment proceedings, Bernsen

mischaracterized what transpired at this meeting. For instance, in a December 15, 2003

declaration filed in this Court, Bernsen indicated that Holway had responded to members'

requests for a trusteeship by stating "that his attorney advised him that he could not impose a

trusteeship at that time." (Pls.' Ex. 60 at 000337.) At a December 16 hearing on plaintiffs'

motion for a temporary restraining order, Bernsen went further, alleging that Holway had "stated

. . . he couldn't impose a trusteeship right away but he was basically planning to do that just

because Ms. Johnson filed an unfair labor practice charge and exercised her rights to notify

members that the national union NAGE was not providing support, financial support, assistance

and representation in a number of cases." (Tr. 711:23–712:8; *see also* Compl. ¶ 24

(characterizing Holway as "incit[ing] vengeance against Johnson and instigat[ing] threats and

actions to take control over and trustee Local R3-77").)[12]

     56.    Such language is conspicuously absent from the tape. While the possibility of

disciplinary action was discussed at the meeting, it was raised by a union member -- identified by

---

[12] Bernsen's lack of credibility is further demonstrated by Arbitrator's Applewhaite's finding, in a
matter related to Johnson's arbitration (*see* note 5, *supra*), that Bernsen concealed the existence
and terms of a memorandum of understanding, thereby "creat[ing] an embarrassment to
Arbitrator Applewhaite" and "a degradation of the entire arbitration process." (Defs.' Ex. 83 at
8-9.)

Bernsen as Richard Petta -- who asked if the discipline "shoe" was "going to drop." (Pls.' Ex. 33 at 47 ("I need to go to Article V. And, I'm kind of sitting here waiting to hear, is that shoe going to drop."); *id.* at 48 ("Article V is where the National President has the authority to . . . exact disciplinary action . . . on a member or officer who has exceeded or . . . improperly performed their duties."); Bernsen Test. at 483:24–484:1.) Holway responded unequivocally, stating that "[t]he answer to that is no." (*Id.* at 48.) The president acknowledged that he had earlier considered disciplining Johnson, stating that:

> I came very close, to be honest with you, back when we met here in January, because of the email that went out saying I wasn't going to be here, after I spoke to the National President and told her I was going to be here, and actually she was on speaker phone with us . . . . I came very close then to disciplining because of her -- well, you know, let's just try to continue to work this thing out. But I had no intention of doing that. Quite honestly, from a lawyer's point of view, the . . . Failure to Represent that was filed sort of inoculates a President from me doing that because then it would be retaliation, and I'm not about to retaliate against anybody.

(*Id.* at 48-49.) When the possibility of a trusteeship was raised -- again by Mr. Petta -- Holway responded similarly. (Bernsen Test. at 486:25–487:2.) As recorded in the transcript, Holway stated:

> Let me just say . . . this is your local. . . . [M]y predecessor didn't think twice about [inaudible] the local. . . . [Y]ou know, I'm not going to do that. If somebody was scamming money, obviously, I'd do that. But if we have a philosophical . . . disagreement, I'm not going to do that.

(Pls.' Ex. 33 at 50; *see also id.* at 54 (Holway's statement that "we're not here to have a discussion about removal of officers").)

57.     Contrary to his sworn testimony to this Court, Bernsen ultimately conceded at trial that Holway *did not* "state[]" on June 11 "that . . . he couldn't impose a trusteeship right

away but he was basically planning to do that just because Ms. Johnson filed an unfair labor practice charge and exercised her rights . . . ." (*See* Tr. 711:23–712:8.) Nor does it make sense for Bernsen to attempt now to buttress his prior court filings by suggesting that Holway meant the "opposite" of what he said. (*See* Bernsen Test. at 718: 12-20, 719:11-25, 725:12–726:17.) Holway, as he credibly testified, did not visit Local R3-77 for the purpose of imposing a trusteeship but rather "to have a conversation with the members as to whether or not they wanted [NAGE] to continue to be their agent." (Holway Test. at 1320:4-10, 1324:14–1325:6.) There is thus no basis for the many false innuendos that Bernsen has attempted to perpetuate throughout these proceedings.

## XIII.  The NAGE Inquiry

58.      In response to the concerns voiced by members at the June 11, 2003 meeting, Holway asked that National Executive Vice President James Farley contact Johnson and obtain copies of the local's meeting minutes and financial information. (Holway Test. at 1325:7-1326:4.) On July 1, 2003, Farley informed President Johnson by letter that "several individuals" at the June 11 meeting had "indicated that the membership meetings did not provide them with an adequate amount of information[,]" particularly with regard to "financial matters." (Defs.' Ex. 13.) Noting that President Holway had referred the matter to him in furtherance of his "duty to act in the best interest of all the members[,]" Farley asked that Johnson send by July 11, 2003 "copies of the minutes including executive sessions and financial reports of your local union meetings for the last twelve . . . months." (*Id.*)

59.      Johnson responded on July 2, 2003, by "refus[ing] th[e] request because in many of the[] meetings, members discussed National's inadequacy in representing [the local]." (Defs.' Ex. 14.) Johnson also challenged the basis for Farley's action, stating that Holway had violated

the local's bylaws in calling the June 11 meeting and, regardless, complaints from "seven of 148 members does not give rise to an emergency." (*Id.*) Addressing the national's request for financial reports, Johnson stated that he would get them at the close of the fiscal year -- when they were filed with the Department of Labor. (*Id.*) Addressing the national's request for minutes, Johnson stated that the local's bylaws "d[id] not require that written minutes be passed out" and thus the national should contact a member who had taken notes. (*Id.*)

60.     At trial, Johnson offered an alternate justification for her refusal to cooperate with Farley's July 1 request. According to Johnson, the National Executive Vice President's failure to include a "cc:" to President Holway on the letter made her doubt his authority. (Johnson Test. at 308:4–309:1.) When pressed on the point, Johnson added that Farley had "been involved with the trusteeship for Mr. Lyons," and thus, though she had never met the man, she "didn't trust him." (*Id.* at 309:3–311:23.)

## XIV.   Conflict within Local R3-77

61.     In the wake of the June 11 meeting, strife within Local R3-77 became increasingly pronounced. In early July, local Vice President at Large Robert Perry announced his resignation from the Executive Committee, outlining a lengthy set of concerns in a July 10, 2003 message to Susanne Pooler-Johnson. (Defs.' Exs. 15 and 17.) According to Perry, Johnson and Bernsen often made decisions independently of members and the Executive Committee, in violation of the national and local bylaws; members of the union and the Executive Committee received too little information, with membership meetings generally being held only "when the President . . . ha[d] some good news to share[;]" when membership meetings were held, they failed to comply with the bylaws, as members had not been given a financial report or recorded minutes in years; and members with views contrary to those of Johnson and Bernsen were

"berated" and "retaliated" against as a result of their dissent. (Defs.' Ex. 15 at 1-2.) Perry's

resignation was followed in the same month by those of stewards Jason Wolf and Jason Weyand.

(Defs.' Ex. 18.) In explaining his decision, Wolf told local members and national officials that

"it ha[d] been made clear . . . that [his] dissent [was] not welcome." (*Id.* at 1; Holway Test. at

1329:1-5; 1331:24–1332:11.) Weyand offered a more detailed justification for his resignation,

stating that Johnson and Bernsen had retaliated against him for his views by "manufactur[ing]

some reputation smearing charges" and reporting him to management for alleged violations of

the agency's email policy;[13] that Johnson and Bernsen had failed to obtain a CBA in four years to

the substantial detriment of members; that Johnson and Bernsen were "dedicated to fighting with

everyone on all sides of the labor-management community" and were "dangerously close to

being paranoid[,]" making frequent allegations of conspiracy against individuals who had long

fought for employees' rights; and that a July 30 financial report was the Committee's first in

years but likely inaccurate, omitting substantial arbitration expenses "that pretty much render[ed]

[the local's] treasury insolvent." (Defs.' Ex. 18 at 1-3.)

      62.    The concerns voiced by Perry, Weyand and Wolf were echoed in a memorandum

dated July 29, 2003 and ultimately provided to President Holway in early September by member

Cynthia Greene. (*See* Defs.' Ex. 19.) In the four-page memorandum, which was signed by

thirteen members, they requested that the national union "conduct a full investigation into the

propriety of the conduct of [the local's] Executive Committee[.]" (*Id.* at 000062.) First, the

---

[13] On July 10, 2003, R.M. Lattimer, PBGC's Chief of Labor Relations, notified Holway of a
dispute between Johnson "and a Vice President of Local R3-77" regarding use of the agency's
email system. (Defs.' Ex. 16.) "Apparently," Lattimer stated, "these two officers have
conflicting views on whether they can utilize the system to communicate about internal union
matters." (*Id.*) Lattimer asked that Holway resolve the issue, as the agency did not wish to act as
"arbiter of an internal union dispute." (*Id.*) At no other local, Holway testified, did such
acrimony exist. (Holway Test. at 1327:24–1328:20.)

petitioners complained that the Executive Committee had yet to secure a CBA for the membership and had filed an appeal of Kaplan's decision to the FLRA "without having a formal membership vote on the matter."[14] (*Id.* at 000063.) Second, the petitioners stated that the local appeared insolvent, having "engaged in at least 25 days of arbitrations for various cases" -- with Johnson's case alone having extended over more than fourteen days. (*Id.*) The petitioners noted their uncertainty as to the local's financial state, indicating that an accounting had not been provided to the membership in more than two years. (*Id.*) Third, the petitioners complained that the local's Executive Committee "subject[ed] any members who speak out about problems within the Local to vicious retaliation[,]" making "unfounded accusations that are defamatory in nature" and otherwise reporting dissenters to management for alleged violations of PBGC's email policy. (*Id.* at 000063-64.) Fourth, the petitioners contended that the local leadership had jeopardized members' interests "by engaging in combative, argumentative, and unreasonable behavior in their interactions with NAGE representatives[.]" (*Id.* at 000064.) Finally, the petitioners complained that Johnson and Bernsen often operated outside the bylaws, having "essentially eliminated the Grievance Committee" and holding few membership meetings. (*Id.* at 000064-65.)

63.    To be sure, the concerns expressed in the July 29 memorandum were not necessarily shared by a majority of Local R3-77's members. At a July 30, 2003 membership meeting[15] -- during which the Executive Committee offered members a bank statement, an LM-4

---

[14] According to Johnson, the CBA issue was "falsely rais[ed]" as a number of the petition's signers had attended a 2002 meeting where those present voted in support of the appeal. (Johnson Test. at 245:2–246:19.)

[15] NAGE's Executive Committee also met on July 30, 2003. In his minutes of the meeting, National Executive Board administrator David Bernard reported that:

> President Holway updated the Committee on the situation with our
> PBGC Local in Washington DC. The president and vice president

form, and an oral financial report indicating a balance of $3,217, liabilities of $3,500, and an

outstanding entitlement to more than $3,000 from NAGE (*but see supra* Section V)[16] -- a motion

in support of the national union was tabled in order to permit the incorporation of language

asking that the national fulfill its campaign promises. (Defs.' Ex. 97 at 000607 (minutes);

Johnson Test. at 111:17–112:14 (financial report), 112:16–116:13 (motion), 314:5–315:12

(motion).) In addition, in October 2003, 85 signatures were gathered on a handwritten petition

stating: "To All Whom May Be Concerned, We Have Confidence in our Current Local

Leadership." (Pls.' Ex. 47.)

      64.      Johnson and Bernsen's view of the dissenting minority, as Weyand protested in

his letter of resignation, took a decidedly conspiratorial cast. In a September 12, 2003 message

to the membership, Johnson declared that those challenging the Executive Committee were

"acting as agents of management and of the National Union" -- "go[ing] around in corners and

---

      of the local seem to be out of control. They have filed charges
      with the Department of Labor against NAGE, President Holway,
      and Chief Counsel Rick Barry. The charges are totally without
      merit. Vice President Deb Ennis stated the two leaders of the local
      are like uncontrollable rebels. They refuse to listen to any reason
      or direction from the National. President Holway said it is a
      situation he will continue to monitor and update the Committee.

(Pls.' Ex. 38 at 2.) Plaintiffs make much of this report, contending that it evidences a retaliatory
motive on the part of Holway. (*See* Pls.' Mem. at 27.) The document, however, cannot support
such a reading. As Bernard testified at trial, the description of plaintiffs as "out of control" and
"uncontrollable rebels" was not a verbatim transcript. (Bernard Test. at 1160:22–1162:9.)
Regardless, the minutes do not reflect an inappropriate fixation on Johnson's charge but rather
document accurately plaintiffs' unwillingness to cooperate with the national's efforts and the
obvious need for further monitoring.

[16] According to Johnson, members present at the July meeting voted to accept the Executive
Committee's oral report of finances "after having seen the LM-4 form." (Johnson Test. at
111:17–112:14.) The Executive Committee's minutes of the meeting reflect the vote, as well as
questions from "[s]everal members" regarding the number of days that had been spent in
arbitration and their cost. (Defs.' Ex. 97 at 000607.)

tell[ing] lies . . . because they [were] not in the majority and they want[ed] to have it their way."

(Pls.' Ex. 41; *see also* Johnson Test. at 323:14–324:3 (stating that information regarding the

local's liabilities was withheld as the members requesting the information were part of a

"political movement . . . instigated by management or whomever else").) "Isn't it ironic[,]"

Johnson added, "that the National w[ould] listen to less than 10% of [the] membership, but fail to

represent Minorities in very important arbitration cases." (*Id.*) According to Bernsen, there was

a far-ranging conspiracy to retaliate against plaintiffs for their civil rights activities that consisted

of both national employees -- including African-Americans Gina Lightfoot-Walker, Susanne

Pooler-Johnson, Deborah Ennis, and Marc Lawson -- and the local dissidents. (Bernsen Test. at

626:22–627:18.)

65.    Those viewed as conspirators were treated accordingly. According to both

Johnson and Bernsen, Cynthia Greene -- the African-American member responsible for

forwarding the July 29 memorandum to President Holway -- conspired with both NAGE and

PBGC to retaliate against Johnson for her civil rights activities. (Johnson Test. at 338:9–343:2;

Bernsen Test. at 626:22–627:13.) When Greene ignored Johnson's demand that she stop

distributing email messages to the membership, she was removed from her office as steward for

"being disruptive" and "usurping authority." (Johnson Test. at 340:25–341:14, 343:1-2; Defs.'

Ex. 35 at 0518 (November 18, 2003 message to local leaders, copied to national officials,

requesting explanation for removal).) Dissenters Robert Perry and Dwayne Jeffers (who are also

African-American) were similarly removed from their steward posts. (Defs.' Ex. 29 (Perry's

November 12, 2003 message, copied to NAGE officials, requesting meeting to appeal his

removal as steward); Johnson Test. at 353:3-13.) Johnson later went so far as to prevent them

and others from receiving meeting announcements. (Defs.' Ex. 80 (complaints by Perry, Jeffers,

Wolf, Weyand and Baird regarding their exclusion from Johnson's October 1 email message);
Johnson Test. at 330:13-20 (acknowledging that she "may have taken a few of the troublemakers
off" of the local's email list); *id.* at 353:3-13 (explaining that Jeffers was removed from his
steward post "because he refused to stop sending e-mail messages that were unauthorized" and
"was usurping the authority of the local president").) Eventually, Johnson "took Robert Perry's
emails, . . . Jason Weyand's emails, Cynthia Greene's, Rhonda Baird's, and Dwayne Jeffers'
emails and had them forwarded to a delete mailbox so they would not continuously disrupt [her]
work day." (Johnson Test. at 329:19-24.) This was not accomplished without protest, as Perry
complained to the Executive Committee and national officials that his requests for financial
information and minutes were being ignored. (Defs.' Ex. 27; Defs.' Ex. 30.)

## XV.    Baird Arbitration

66.    Predominant among the issues dividing the local during the final months of
Johnson and Bernsen's leadership was the arbitration of Rhonda Baird, an African-American. In
late 2002, the local initiated the grievance process for Baird, who alleged that the agency had
subjected her to "unprofessional treatment, discrimination and retaliation[.]" (Defs.' Ex. 1 at
000140; Johnson Test. at 22:21–23:2.) In 2003 the local's Executive Committee approved
Baird's grievance for arbitration, but the national subsequently determined that the arbitration
lacked merit and therefore denied funding.[17] (Defs.' Ex. 1 at 000140; Johnson Test. at 22:21–
23:2; Defs.' Ex. 28 at 000137 (Baird's September 24, 2003 letter to Holway indicating that
NAGE was "currently reviewing it's denial of [her] request for the payment of a portion of fees
and costs associated with the arbitration"); Lightfoot-Walker Test. at 1106:9-22.) According to

---

[17] Baird appealed the national's decision through the process established on December 16, 2002.
(Defs.' Ex. 109.) Her appeal was denied on November 10, 2003. (*Id.*)

Johnson, Baird asked to go forward with her arbitration ahead of members who had filed

grievances prior to hers. (Johnson Test. at 389:21–390:5; Defs.' Ex. 28 at 000142 (Johnson's

September 15, 2003 message to Baird recalling that "[n]o one had ever been so forceful in the

timing, not even me").) On July 3, 2003, Baird signed an agreement whereby the Executive

Committee authorized her personal attorney to conduct the arbitration on her behalf, with the

local accepting no responsibility for the costs of the attorney's representation. (Defs.' Ex. 1 at

000140; Defs.' Ex. 28 at 00137 (Baird's statement to Holway that she paid for her own attorney

"[i]n order for the arbitration to go forward and not be affected by the Local's apparent lack of

resources to pay for it").) The agreement, however, preserved Johnson and Bernsen's

involvement in the case, providing that they "or any Union representative whom they approve

. . . [could] attend any arbitration hearing" and requiring Baird's attorney to "keep Valda and

Stuart up to date on the progress of [the] case, . . . notify them in advance of deadlines and

scheduling, and . . . provide them with copies of any documents filed with respect to the

arbitration proceeding."[18] (Defs.' Ex. 1 at 000140.)

---

[18] Johnson and Bernsen's desire to oversee Baird's case was consistent with their other actions.
For instance, in October 2003, Bernsen interrupted Robert Perry's EEOC mediation, asserting
that he was a union official and had the right to be present during the proceeding. (Perry Test. at
962:6–963:16.) Though Perry's representative was able to escort Bernsen from the room and
convince him to leave, Perry recalls that the agency gathered "easily ten individuals" in order to
force him out if necessary. (*Id.* at 963:2-9; *see also id.* at 962:10-17 (incident reported to
Hearing Officer Flynn during the trusteeship hearing).)
    Bernsen's interference with the affairs of others was not, however, limited to members'
EEO proceedings. During a November 14, 2003 conversation in an agency conference room,
members Cynthia Greene and Loraine Johnson were informed that the Executive Vice President
was standing in the hall and listening to them. (Greene Test. at 885:12-21; *see also id.* 883:8-14
(incident reported to Hearing Officer Flynn during the trusteeship hearing).) When Johnson
explained that the conversation was a private one and attempted to force the door closed,
Bernsen resisted, asserting that he had a right to know what was going on in the room. (*Id.* at
885:22–886:10.) According to Greene, Bernsen left only when she threatened to call security.
(*Id.* at 886:11-14.)

67.     After entering into the agreement, Baird decided to use local representatives during her arbitration, modifying the retainer agreement with her attorney accordingly. (Defs.' Ex. 28 at 000137.) As Baird recounted in a September 24, 2003 letter to President Holway, the local's handling of the case became unexpectedly contentious. (*Id.*) On September 12, 2003, Johnson informed Baird that her arbitration, then scheduled for October 2 and 3, would have to be postponed for at least a month if her attorney was no longer going to be handling the proceeding. (*Id.* at 000147.) Baird protested, indicating that Bernsen had previously agreed that that the local would act as her representative during the October arbitration. (*Id.* at 000146-47.) Shortly thereafter, Baird notified Johnson of "great news": Jason Weyand's agreement to return as steward "for the limited purpose of assisting [her] with [her] arbitration." (*Id.* at 000146.) Weyand contacted Johnson to confirm the arrangement, noting that while he had had his "share of disagreements with the way some things [were] done" in the local, he "want[ed] to continue helping out employees[.]" (*Id.* at 000145.)

68.     Johnson's rejection of Weyand's offer was swift. In response, she told Weyand "[t]hank you, but No," explaining that "[w]e are just not certain that you are acting in the best interest of the Local and all of its members." (Defs.' Ex. 28 at 000145.) If Baird wanted her arbitration "back to the Local[,]" Johnson declared, "she will have to wait." (*Id.*) After Baird informed Johnson that she would "UNDER PROTEST agree to [Johnson and Bernsen] serving as [her] representatives on October 2 and 3," Johnson proposed that Baird and member Dwayne Jeffers "do the prep work" for the proceeding, with Johnson or Bernsen "sit[ting] in with [her] on the date of the arbitration[.]" (*Id.* at 000143.)

69.     Baird's dispute with Johnson did not go unnoticed by the membership. During the month of September, 63 of the local's members signed a petition calling for a "special meeting

. . . to address the issue of whether Rhonda Baird's arbitration should go forward on October 2 and 3 and who her Local representative should be." (Defs.' Ex. 28 at 00158-64.) When Johnson learned that the petition was circulating among members, she notified all of them that it "ha[d] been gotten together under false pretenses and [was] invalid[,]" as the local's bylaws "state[d] that a grievant may petition the Local for a meeting if . . . her case was dropped." (*Id.* at 000169 (Johnson's September 17, 2003 message to members).) Baird's case, Johnson noted, had not been dropped. (*Id.*) The petition was nonetheless delivered to the local's treasurer by Robert Perry. (*Id.* at 000168.) When no meeting was scheduled, some called for a second petition and "collective DFR" against the Executive Committee. (*Id.* at 000179 (Jeffers' September 25, 2003 message to members).) Ultimately, Johnson notified members of an October 21 meeting -- nearly three weeks after the arbitration dates at issue in the members' petition -- to address Baird's case. (*See* Johnson Test. at 349:8–350:8 (stating that a special meeting was held for Baird and "she had all the opportunity in the world . . . to slam [Johnson] in front of everybody"); *id.* at 1463:8-9.) On October 29, 2003, Baird filed a ULP against Johnson, contending that the local president had acted contrary to her duty of fair representation.[19] (Defs.' Ex. 31 at 000092, 000105 (Sabulis's November 14, 2003 report to Holway).)

## XVI.  Sabulis Investigation

70.     On September 5, 2003, President Holway notified Local R3-77's members of his decision, under Article VII of the NAGE Constitution, to appoint National Representative John Sabulis as "[his] representative and monitor" to investigate the situation at the union and "make

---

[19] Johnson challenges Baird's recollection of the handling of her case by the local, asserting that she had lied about Bernsen's willingness to represent her in light of his previously-scheduled leave. (Johnson Test. at 350:9–351:12; *see also id.* at 1463:10-22 ("I thought that [Baird] was maybe sick or couldn't remember things.").) At a minimum, however, Johnson's statements about Baird offer further insight into the turmoil within the local prior to the trusteeship.

recommendations to address the internal needs of the Local." (Defs.' Ex. 20.)  Holway

acknowledged that complaints like those he had received were generally referred to local officers

for investigation.  (*Id.*)  He explained, however, that such an approach would be "inappropriate"

in light of Johnson's refusal to "provide documents to the National as part of an investigation in

connection with allegations that repeated requests for an account of the Local's treasury had been

ignored."  (*Id.*)  Holway emphasized that "all members" were to "cooperate" with Sabulis.  (*Id.*)

In closing, the national president noted his confidence that the investigation would resolve the

problems that had been brought to his attention.  (*Id.*)

71.    Prior to his appointment, Sabulis was unfamiliar with the local's leadership and

the concerns that had arisen in the preceding months.  (Sabulis Test. at 1166:8-19; Holway Test.

at 1335:7-9.)  Sabulis's mandate, as he testified at trial, was to "investigate and find out what the

problems, what the root of the problems were."  (Sabulis Test. at 1194:21–1195:4; *see also*

Holway Test. at 1335:11-12 (Sabulis told "[t]o go down and try to figure this out and make it all

work" and "to get the information the members were looking for").)

72.    Sabulis wrote Johnson on September 15, 2003.  (Defs.' Ex. 21 at 000275.)  His

letter summarized the charges contained in the petition and outlined the evidence that was

required "to determine if the charges should be repudiated or have been substantiated."  (*Id.*)

With regard to the petition's allegations regarding the lack of financial accountability, Sabulis

requested copies of the local's most recent meeting announcement, the minutes and treasurer's

report from that meeting, the local's latest bank statement, and the last LM-4 form that was filed

with the Department of Labor.  (*Id.*)  With regard to the petition's allegations regarding Johnson

and Bernsen's circumvention of the local's Grievance Committee, Sabulis requested

documentation demonstrating "approval of all grievance complaints and arbitration cases in

question." (*Id.* at 000276.)  With regard to the petition's remaining allegations of procedural

irregularities, Sabulis requested a copy of the local's bylaws.  (*Id.*)  Finally, Sabulis requested a

meeting "at a time and place of [Johnson's] choosing" to discuss the needs of the local.  (*Id.*)

Sabulis advised that Johnson's failure to comply with his requests might "result in the

appointment of a Trustee for the purpose of correcting corruption or financial malpractice,

assuring the . . . performance of collective agreements or other duties of a bargaining

representative, restoring democratic procedures, or otherwise carrying out the legitimate

objectives of the National Union." (*Id.*)

      73.    Despite the monitor's subsequent attempts to proceed with the investigation --

including a September 30 email message indicating that Johnson's continuing refusal to

acknowledge his request required him to assume she had chosen not to participate -- Johnson

failed to acknowledge the letter until October 7, when she wrote to thank Sabulis for "telling

[her] that the certified letter was from [him]." (Defs.' Ex. 25 at 000071-73, 000081, 000085.)

On the same day, Johnson and Bernsen filed ULP charges against NAGE with the FLRA.[20]

(Pls.' Exs. 43 and 44.)  Johnson alleged that the national union, "through its National President,

David Holway, and others under his direction and instigation," had engaged in discrimination

and retaliation following the May 23, 2003 filing of her original ULP charge.  (Pls.' Ex. 43.)

Johnson declared that President Holway had "denounc[ed]" her for filing the charge in his June 5

letter; "demanded as vengeance" that the local's officers be removed during the June 11 meeting;

directed members to utilize the agency's email system "to send messages to all members of Local

R3-77 denouncing and attacking [her] and demanding that [she] be removed" due to her charge;

sought to obtain information through James Farley for use against her in the ULP proceedings;

---

[20] On April 29, 2004, the FLRA declined to issue a complaint with respect to either charge.
(Defs.' Exs. 116 and 117.)

directed members to make the "false and scurrilous" charges contained in the July 29

memorandum; circulated the September 5 letter to "denounce and smear" her and to "incite

vengeance" against her; and through the appointment of a monitor, implemented a plan to

remove her and prevent the local from pursuing actions against PBGC that "include claims of

discrimination based on race, disability or retaliation." (*Id.*) Bernsen alleged, *inter alia*, that the

national union, "through its National President, David Holway, and others under his direction

and instigation," had engaged in retaliation, citing Holway's "belie[f]" that Bernsen had assisted

Johnson in the filing of her May 23 charge, as well as Bernsen's representation of other local

members in discrimination proceedings. (Pls.' Ex. 44.)

        74.    On October 18, 2003, Johnson composed a response to the September 4 petition,

addressing each of "the 'Overthrowers'" eight charges. (Pls.' Ex. 45.) In the letter to Local R3-77

members, Johnson asserted that a contract had been negotiated; cited the national's failure to

fully pay the local's dues rebate; asserted that Greene had misused the agency's mail system and

disrupted members in their work; argued that the petitioners had "failed to realize the risk of

National failing to represent a Local leader against management attacks when that leader is

standing up for justice[;]" reiterated that some members and the national leadership were

conspiring with the agency; contended that it had been "impossible" for the local's Grievance

Committee to "meet on every single item[;]" noted that the Executive Committee had "started

scheduling monthly meetings again and . . . gave financial reports" when "reminded" that it had

been "falling short[;]" and defended the Committee's refusal to disclose information regarding

the length of arbitrations on the ground that it had not wanted "to make individual cases political

so as to cause them to fail." (*Id.* at 000592-95.) Sabulis received Johnson's letter but did not

forward it to Holway with his November 14, 2003 report. (Sabulis Test. at 1197:6–1198:23; Defs.' Ex. 31 at 000091-94.)

75.     On November 19, 2003 -- despite Johnson's attempt to disrupt the meeting with a message to members Robert Perry, Dwayne Jeffers, Jason Weyand, Rhonda Baird, Loraine Johnson, and Cynthia Greene that stated that the monitor had cancelled it "at [her] request" -- Sabulis and National Vice President Deborah Ennis met with members of Local R3-77. (Defs.' Ex. 31 at 000113; Defs.' Ex. 37; Sabulis Test. at 1179:8–1180:8; Johnson Test. at 1466:7-18 ("I didn't intentionally cancel [Sabulis's meeting with the membership], it was just a misunderstanding about when it would happen, just as I didn't intentionally cancel Holway's meeting.").)

76.     Sabulis met with the local's Executive Committee the following day. (Sabulis Test. at 1181:1-11.) At the meeting, Johnson provided the monitor with a 25-page packet of information responsive to his September 15 request -- information Johnson had offered to mail him in late October. (Pls.' Ex. 52; Johnson Test. at 124:13-23; Bernsen Test. at 520:9-21.) Included in the materials was Bernsen's announcement of an August 28 membership meeting, the meeting's minutes; the local's bylaws; and a signed certification from Executive Committee members Valda Johnson, Stuart Bernsen, Elizabeth Baker and Barry Greenhill stating that the Committee had "approved the grievances and arbitrations indicated in the letter of September 15, 2003 from J.A. Sabulis[,]" as well as the arbitrations of Robinette Walters, Rhonda Baird, and Valda Johnson.  (Pls.' Ex. 52 at 000722-24, 000732-44.) The packet also contained a series of documents relating to Sabulis's request for financial information.[21]

---

[21] These included (1) an October 29, 2003 handwritten document indicating that an "oral statement of finances" had been provided to the membership at an August 2, 2003 meeting along with a bank statement reflecting a balance of $4,868.42; (2) the local's LM-4 report for Fiscal

77.    Prior to the November 20 meeting, Sabulis had been informed that members were

not receiving information regarding the local's outstanding liabilities -- liabilities, he was told,

that "eclipsed" the funds available in the local's account.[22]  (Sabulis Test. at 1183:10–1184:2.)

The documents provided to him, however, gave no indication of the extent of the local's current

liabilities.  (See Pls.' Ex. 52; see also Sabulis Test. at 1182:19–1184:20.)  Also absent were any

minutes from the local's Grievance Committee.  (See Pls.' Ex. 52; Sabulis Test. at 1184:8-17.)

According to Sabulis, a member of the committee responded to his request for such minutes by

explaining that they did not exist.  (Sabulis Test. at 1184:18–1185:1.)  According to Johnson,

Sabulis was told that the documents could not be immediately provided as she "would need time

to sanitize the minutes" before giving them to him.[23]  (Johnson Test. at 138:23–139:8; Bernsen

Test. at 532:8–533:23.)

---

Year 2003, which stated that Local R3-77 had received $4,888 during the period, disbursed
$3,612, and retained $4,706 in assets at the period's close, but omitted any indication of the
local's outstanding liabilities, stating that they "ha[d] not been invoiced[;]" (3) the local's 2002
LM-4, which reported $4,243 in receipts, $3,217 in disbursements, $3,429 in remaining assets,
and $3,500 in total liabilities, going on to explain that NAGE owed the local $3,048, and thus
"[a]ccounts received would make [the local's] total value of assets equal [to] $6,477[;]" and (4)
the local's August 29, 2003 bank statement, which reflected a balance of $4,706.16.  (Defs.' Ex.
52 at 000725-31.)

[22] In her reports to President Holway following the imposition of the trusteeship, Trustee Zaiser
confirmed members' fears regarding the local's arbitration debts.  On March 24, 2004, Zaiser
notified Holway that the local already owed $1,775 for Baird's arbitration, $2,300 for Walters'
arbitration, and $4,225 for Johnson's arbitration.  (Defs.' Ex. 41 at 5642-43.)  In Zaiser's words,
even "[i]f the Local did not incur a single additional expense in the . . . cases, and did not take on
any new arbitrations, it would owe arbitrators' fees of $6,525" -- in excess of the local's present
balance of $2,495.  (Id. at 5643.)  On August 9, 2004, Trustee Zaiser informed Holway that the
local had received a May 26, 2004 bill for Johnson's arbitration totaling $9,000, of which the
local had paid $1,500.  (Defs.' Ex. 42 at 5648.)  The bill, she wrote, "included an extraordinary
15 days of hearing plus 9 additional days of review of transcripts, briefs, and tangential issues."
(Id.; see also supra note 5.)

[23] Significantly, in the course of the trusteeship and disciplinary proceedings, Johnson refused to
provide all requested minutes of the local's membership and Executive Committee meetings,

## XVII. Recommendations for a Trusteeship

78.    On November 24, 2003, Sabulis completed a third and final report to President

Holway recommending that Local R3-77 be placed under an emergency trusteeship.[24] (Defs.'

Ex. 28 (final report); *see also* Defs.' Ex. 38 (recommendation for emergency trusteeship).) The

monitor's report recounted the difficulty in working with Johnson, recounting that "more than

two months of evasive maneuvering, verbal remonstration and defensive posturing by the

President had passed before a meeting date with the executive board could be agreed upon" and

that Johnson later made "numerous attempts . . . to re-schedule, re-locate and even cancel"

Sabulis's meeting with the membership. (*Id.* at 000127.) Sabulis described a union in deadlock,

noting that a third of dues-paying members was required to constitute a quorum to conduct

business and that no membership meeting achieved a quorum in March, April, May, June, July

or August of 2003. (*Id.* at 000128.) Sabulis also outlined the numerous complaints he had

---

sometimes invoking the need to sanitize them due to members' comments regarding the
inadequacy of NAGE. (*See supra* ¶ 59.) Despite Johnson's protestations, the local's bylaws at
best permit only the removal of "confidential or privacy information pertaining to individuals[.]"
(Bylaws Art. VI.) But more importantly, it is apparent that Johnson consistently stonewalled the
national's efforts to obtain this information, and in fact, she did not disclose that she was still in
possession of these documents until her rebuttal testimony. (*See* Johnson Test. at 1436:15-25,
1439:10-14.) Unexpectedly, after the close of evidence, Johnson submitted "excerpts" of
minutes from "several Executive Committee meetings." *See* Notice of Plaintiff Johnson to Make
Appearance before Court *Pro Se* for Purposes of Turning over Documents; Notice to
Court/Attorney to Act *Pro Se* Only for Purposes of Turning Over Documents and Notice to Turn
Over Documents, filed May 14, 2006, at 3. While these documents were apparently not called
for in discovery, the fact that Ms. Johnson chose to disclose the existence of such relevant
material only during her rebuttal testimony and later submitted them to the Court and opposing
counsel two weeks after the close of the evidence is further proof of her willful defiance of the
monitor and trustee's lawful requests for this information.

[24] Plaintiffs argue that it is likely that Holway did not receive Sabulis's final report prior to his
imposition of the trusteeship, noting that the monitor testified that he completed the report on
November 24 while working at his Rhode Island home. (See Pls.' Mem. at 14, 24; *see* Sabulis
Test. at 1204:22–1205:25.) This inference is contrary to the evidence. (*See* Defs.' Ex. 39
(November 24 trusteeship order referencing Sabulis's report and recommendation); Holway Test.
at 1341:5-6.)

received from local members, including the unsuccessful September 16 petition for a meeting addressing the local's handling of the Baird arbitration. (*Id.*) With respect to the local's finances, the monitor reported that Robert Perry's requests for an accounting had been ignored and that the LM-4s provided appeared to have been altered. (*Id.* at 000129.) Finally, Sabulis outlined the substantial degree of "restraint" he had seen "perpetrated" on members' expression of opinions, receipt of information and participation in union affairs. (*Id.*)

79.    Sabulis was not alone in recommending that President Holway impose a trusteeship on Local R3-77. "I was in a situation[,]" Holway testified, "where everybody was telling me it was my responsibility to take [such] action." (Holway Test. at 1344:17-25.) In the months preceding the trusteeship, NAGE National Representative Susanne Pooler-Johnson had received complaints from local members about the Executive Committee's failure to comply with the local's bylaws; the withholding of information from the membership; the infrequency and insubstantiality of membership meetings; the leadership's retaliation against dissenters; and the leadership's long-term failure to negotiate a collective bargaining agreement. (*See, e.g.,* Defs.' Ex. 15 (Perry's July 10, 2003 email to Pooler-Johnson); Defs.' Ex. 18 (Weyand and Wolf's resignation letters); Weyand Test. at 841:24–842:8, 845:15–846:10 (concerns relayed to Pooler-Johnson and Lightfoot-Walker); Jeffers Test. at 920:2-10; Perry Test. at 956:6-9.) The situation within Local R3-77, Pooler-Johnson testified, was "far different" from that at any other local with which she had worked. (Pooler-Johnson Test. at 1151:10–1152:19.) Pooler-Johnson advised Holway and other NAGE officials of the situation and the national's need to "do something to quiet down all the complaints[.]" (Pooler-Johnson Test. at 1127:19–1129:3, 1150:1-18; Holway Test. at 1331:1-23, 1343:23–1344:25 (discussing conversations with Pooler-Johnson).) Richard Barry and James Rucidlo, both of whom had been in close contact with

NAGE's Alexandria staff, also advised Holway to take action. (Pooler-Johnson Test. at 1128:18–1129:3; Barry Test. at 1263:24–1265:2; Holway Test. at 1344:4-25.)

80.    On November 21, 2003, National Vice President Deborah Ennis wrote President Holway to advocate for a trusteeship. (Defs.' Ex. 37.) Ennis described Johnson and Bernsen's attempts to cancel the national's November 19 meeting with local members, their confrontation with management officials prior to the event, their attempts to exclude Ennis from the meeting, and their later "outbursts" as she spoke. (*Id.* at 000205-6.) In conclusion, Ennis stated that "the current leadership ha[d] failed the members of Local R3-77 and therefore, the imposition of a Trusteeship should be considered for NAGE Local R3-77." (*Id.* at 000206.)

81.    President Holway also received information directly from local members. In a November 4, 2003 message, Jason Weyand reported that the situation had "continue[d] to deteriorate" to the point that "many members [were] beginning to question whether they should continue to pay their dues." (Defs.' Ex. 51; Weyand Test. at 852:21-25, 853:11-22.) Moreover, "a majority of the members [were] so disenfranchised and apathetic towards internal union politics that it [was] nearly impossible to get the required quorum at a meeting to remove [the Executive Committee] from office." (Defs.' Ex. 51.) Weyand feared that absent a change in leadership before the year's end, Local R3-77 might lose "up to a quarter" of its members. (*Id.*) "Any help you can provide[,]" he concluded, "would be greatly appreciated." (*Id.*)

## XVIII. Establishment of the Trusteeship

82.    On November 24, 2003, President Holway imposed an emergency trusteeship on Local R3-77, appointing Stephanie Zaiser as trustee. (Defs.' Ex. 39.) In an order distributed to the local's membership, Holway indicated that Sabulis "ha[d] conducted an investigation and recommend[ed] the appointment of a trustee to take charge and control of the affairs of Local

R3-77." (*Id.* at 000211.) Holway recounted Sabulis's conclusions and, relying on Article XII of

the NAGE Constitution, he claimed that Local R3-77 had: (1) "through its misfeasance,

malfeasance and nonfeasance . . . failed to meet its duty of fair representation to its members[;]"

(2) " failed to meet its financial obligation to the National[;]" (3) " failed in its duty to the

membership[;]" and (4) "failed to preserve and protect the assets, failed to meet its legal

obligation, and failed in its other duties such that its obligation to its members, the National and

the Local itself [were] not being met." (*Id.*) In light of these findings, Holway determined under

Article XII § 3(B)(iii) that "an emergency situation exist[ed] with Local R3-77" and thus "the

interests of the membership require[d] the immediate appointment of a trustee and the

establishment of a trusteeship." (*Id.*) Johnson and Bernsen were, therefore, automatically

removed from office.

     83.    "[A]n hour or two" after receiving word of the trusteeship, Bernsen "walked over

to the Equal Employment Opportunities Commission and filed papers to initiate a charge" of

retaliation.[25] (Bernsen Test. at 535:8-19, 546:21–547:1; *see also* Pls.' Exs. 134 and 140.) Two

weeks later, Johnson, Bernsen and former local Secretary Elizabeth Baker filed this suit, citing

various violations of Title I and Title III of the LMRDA. (*Johnson v. Holway*, Civ. No. 03-2513

(D.D.C. Dec. 9, 2003) (Complaint).)

     84.    As Holway credibly testified at trial, his decision to impose the trusteeship on an

emergency basis was not done to appease the agency or otherwise retaliate against Johnson and

Bernsen for their protected conduct:

---

[25] On September 16, 2005, the EEOC notified Bernsen that it was "unable to conclude that the
information obtained establishe[d] violations of the statutes" and closed his file accordingly.
(Defs.' Ex. 118.)

> I ha[d] a fiduciary responsibility to the union and to the members of the union, and matters had been brought to my attention over almost a six-month period . . . concerning financial irregularities and the running of the local. I had done everything I could possibly [do] to try to straighten out the situation and get the information that the members were requesting, and I had been unsuccessful. And any further delay would really be against my fiduciary responsibility.

(Holway Test. at 1346:22–1347:7.) "[G]iven the actions of the president and vice president and the stonewalling of the monitor," Holway later reiterated, "I felt . . . I had no other choice."[26]

(*Id.* at 1389:24-1390:1.)

85.     Plaintiffs' contention that the lack of majority support for the trusteeship itself demonstrates a retaliatory animus is without merit. While President Holway acknowledged that NAGE would respect a decision by the local's membership to separate from the national union, his decision regarding the imposition of a trusteeship was another matter entirely. As he testified at trial, his decision was the product of his "fiduciary responsibility to the union and to the members of the union":

> [M]atters had been brought to my attention over almost a six-month period . . . concerning financial irregularities and the running of the local. I had done everything I could possibly [do to] try to try to straighten out the situation and get the information that the members were requesting, and I had been unsuccessful. And any further delay would really be against my fiduciary responsibility.

---

[26] On December 12, 2003, Holway submitted a declaration in opposition to plaintiffs' application for a temporary restraining order. (*See* Defs.' Ex. 1 at 000008.) While Holway's declaration addresses Johnson's ULP charge -- stating that it was "entirely without merit" but might have, under the circumstances, "cause[d] members to the Local to become concerned about their representation" -- it gives no indication that the trusteeship was itself a response to the complaint. (*See id.* at 000011.) Plaintiffs seriously misrepresent the contents of this declaration. (*See* Pls.' Mem. at 15 ("In his declaration . . . , Holway stated that Johnson's ULP charge was at least one of the reasons for his imposition of the trusteeship because of his concern over the nature of the charge.").)

(Holway Test. at 1346:22–1347:7; *id.* at 1411:24–1412:11 ("[U]nder the constitution and bylaws

of the National Association of Government Employees, I'm charged with certain responsibilities.

And I'm not charged to do popular things. Every decision that we make isn't put out to a

[plebiscite]."); *see also* NAGE Const. Art. XII § 1(B) (setting forth the circumstances under

which a local union may be trusteed, none of which turn on a determination of majority will).)

## XIX.   Trusteeship Hearings

86.    Holway's November 24, 2003 announcement notified Local R3-77 members that

a hearing regarding the emergency imposition of the trusteeship would be held within 30 days, as

required under Article XII of the NAGE Constitution. (Defs.' Ex. 39 at 000212.) On December

3, 2003, Holway appointed National Vice President Gerald Flynn[27] to be the hearing officer in

the case. (Defs.' Ex. 43; Holway Test. at 1347:16-21.)

87.    In the course of the six-day proceeding, which concluded on July 1, 2004,

Bernsen submitted 76 exhibits and an extensive brief arguing that the trusteeship was "unlawful

because it [was] for a political purpose" -- "overturn[ing] the March 2003 election . . . and

remov[ing] the officers and . . . groom[ing] and prepar[ing] Weyand and other Overthrowers to

take office." (Pls.' Ex. 150 (list of the local's trusteeship exhibits); Pls.' Ex. 152 at 24 (brief).)

Bernsen also spoke at length during the hearings, recounting his Title VII activities and at one

point declaring that the national union "should be ashamed" but was incapable of such emotion

as it had "lost [its] principles" and, with them, its "conscience." (Bernsen Test. at 603:16-21.)

---

[27] As plaintiffs note, Flynn ran with Holway in the September 2002 election, received a
substantial salary determined by Holway in accordance with the NAGE Constitution, and was
present at the July 30, 2003 national Executive Committee meeting where Holway had reported
on the situation within Local R3-77. (Holway Test. at 1372:20–1373:7; Pls.' Ex. 38 (minutes).)
There is no evidence, however, that Flynn was motivated by any animus or bias. Moreover,
plaintiffs may not revive procedural challenges which this Court has already rejected in its
decision on summary judgment. *See Johnson*, 2005 WL 3307296, at *12-15.

His remarks against the trusteeship were joined by those of members Stephen Williams and

Rhonda Baird, as well as a February 2004 petition signed by 78 of the local's members in

opposition to the national's action. (Williams Test. at 797:2-7; Trans. at 820:13–821:13; Pls.' Ex.

69.)  In addition to her own testimony, Trustee Zaiser presented six witnesses: Cynthia Greene,

Robert Perry, Jason Weyand, John Sabulis, and Deborah Ennis.  (Defs.' Ex. 43 at 002380

(Hearing Officer's Report and Recommendation).)  Zaiser also introduced 44 exhibits, including

Sabulis's reports, a number of email exchanges between local members, and information

regarding the local's finances.  (*Id.*; Defs.' Ex. 1 at 000006-7.)

    88.    On August 24, 2004, Hearing Officer Flynn issued a Report and Recommendation

concluding that "the trusteeship was properly imposed on an emergency basis for valid and

compelling reasons," and that "the trusteeship should be maintained until such time as the

problems that gave rise to the trusteeship have been fully addressed."  (Defs.' Ex. 43 at 002377.)

In determining that Holway had acted appropriately in imposing the trusteeship on an emergency

basis, Flynn found that the national union had been made aware of "serious problems within the

Local," including the local's failure to timely pay Kaplan and a second arbitrator; the apparent

insolvency of the body as a result of its substantial arbitration costs; members' complaints

regarding the lack of information provided by the Executive Committee; the leadership's verbal

attacks and other retaliatory measures against those who questioned their handling of the union;

the Executive Committee's failure to secure a collective bargaining agreement; the leadership's

failure to act through those procedures established in the local's bylaws; and the Executive

Committee's "undisputed and well-document" efforts to impede the national's investigation.

(Defs.' Ex. 43 at 002381-90.)  "[T]hat information[,]" Flynn concluded,

        showed that . . . the Local was failing to meet its financial
        obligations; . . . the Local was experiencing an overall breakdown

> in its governance rending the Local dysfunctional; and . . . the
> Executive Committee -- acting through two of its officers, Ms.
> Johnson and Mr. Bernsen -- persistently failed to cooperate in any
> way with the National's efforts to investigate the situation and take
> corrective action.

(*Id.* at 002390-91.) Under such circumstances, Flynn wrote, "it would appear that the

establishment of an emergency trusteeship was not only the most logical step -- it was arguably

the only responsible action that could have been taken." (*Id.* at 002394-95.)

89.     Addressing the continuation of the trusteeship, Flynn determined with "little

difficulty" that "the trusteeship should be maintained." (Defs.' Ex. 43 at 002395.) In reaching

this conclusion, Flynn detailed Johnson and Bernsen's refusal to cooperate with Trustee Zaiser;

Johnson and Bernsen's mishandling of two local bank accounts; the local's "commitment[ment]

to financial obligations [for arbitration fees] amounting to more than $12,000" and corresponding

insolvency; the local's inability to pursue a number of member grievances as a result of its

finances; the domination of local affairs by Johnson and Bernsen in violation of the local's

bylaws; the withholding of financial information from the membership; and Johnson and

Bernsen's retaliation against dissenting members. (*Id.* at 002395-413.)

90.     Flynn's Report and Recommendation was presented to the National Executive

Committee, which voted unanimously for its approval. (Defs.' Ex. 46 at 002428.) David

Holway, Gerald Flynn and Marc Lawson abstained from the vote. (*Id.* at 002431, 002433,

002437; Holway Test. at 1356:2–1357:16.)

## XX.    The Trusteeship

91.     Not surprisingly, Johnson and Bernsen clashed with Trustee Zaiser. In his

November 24, 2003 order establishing the trusteeship, President Holway "direct[ed] that all

members of Local R3-77 cooperate" with Zaiser and that "[a]ll former officers and employees of

the Local . . . immediately make available to [her] and her Deputy all books, records, funds and other property of the Local in their possession and control." (Defs.' Ex. 39 at 000212.) Johnson and Bernsen did not readily comply. On December 3, 2003, Zaiser wrote former members of the local's Executive Committee, reiterating the substance of Holway's order and requesting that the listed materials be delivered by December 11. (See Defs.' Ex. 41 at 5640 (Zaiser's March 24, 2004 report to Holway); Defs.' Ex. 72 (Zaiser's December 3 letter to Johnson).) The local's former treasurer, Barry Greenhill, was the only one to reply. (Defs.' Ex. 41 at 5640.) Four weeks later, the trustee again requested delivery of "all books, records, funds, and other property of the Local that [were] in [the former officers'] possession" -- this time specifying a delivery date of January 8, 2004. (Defs.' Ex. 73 (Zaiser's December 31, 2003 letter to Johnson).)

92.     Johnson responded to the trustee's requests in a January 2, 2004 message to both Zaiser and Holway, remarking that "[t]he new year [was] hardly in and [they] ha[d] already started [their] harassment." (Pls.' Ex. 64 at 1 (Johnson continued, "I hope you had a peaceful holiday season, despite the harm you have caused to others").) Addressing Zaiser's request, Johnson stated that she had distributed minutes for the last year to the membership; that records "over 2 years" and "before Holway's 'illegal' commencement in office" did not need to be kept; that one of the national union's former attorneys should have records regarding the local's CBA negotiations; that her "personal electronic ledger" was part of her "personal file[;]" and that she did not have any of the local's funds. (Id.) "Your only contact with me henceforward[,]" Johnson concluded, "should be how you intend to duly represent me with respect to my arbitration and to quickly notify me of the date of the hearing." (Id.)

93.     According to Zaiser's March 24, 2004 report to Holway, Johnson delivered one box of documents on February 10, 2004, a second on February 18, and a third on March 3, 2004.

(Defs.' Ex. 41 at 5641.) In the same report, Zaiser informed Holway that Bernsen had responded

to her second request in a January 4 email referring her to 20 boxes of documents stacked in the

union office. (*Id.*)

94.    In the absence of assistance from Johnson and Bernsen, Trustee Zaiser and

Susanne Pooler-Johnson met with two officials from PBGC's human resources department in

order to determine what grievances and arbitrations were pending. (Zaiser Test. at 1216:18–

1217:5, 1217:11-19; Pooler-Johnson Test. at 1136:8-25.) To facilitate the review, Zaiser

obtained a 60-day postponement of the local's matters. (Zaiser Test. at 1236:23-25.) At the

close of the period, the trustee informed both Valda Johnson and Robinette Walters that the local

would no longer provide representation in their arbitrations. (*Id.* at 1235:18-21; Bernsen Test. at

426:24–427:10; *see also* Trans. at 825:25–826:5.) When the agency questioned whether Johnson

had a right under the local's collective bargaining agreement to proceed without the union, Zaiser

informed the arbitrator that the local had not withdrawn her grievance and thus the arbitration

should be allowed to proceed. (Defs.' Ex. 82 at 9-10 (Arbitrator Applewhaite's May 26, 2004

decision); Bernsen Test. at 427:13-21.) With Zaiser's authorization, Bernsen continued as

Johnson's representative, submitting a brief on Johnson's behalf on March 26, 2004. (Defs.' Ex.

82 at 20, 26.)

95.    Johnson and Bernsen were vocal in their opposition to the trusteeship. At Zaiser's

first meeting with local members on January 28, 2004, Bernsen condemned member Jason

Weyand as a "traitor," "scab" and "racist." (Bernsen Test. at 629:20–631:6.; Weyand Test. at

855:15–856:17.) In a message to the membership and Zaiser, Bernsen declared that the local

was now under a "dictatorship" with "Management and the Human Resources Department

run[ning] the 'union.'" (Pls.' Ex. 72 at 1 (February 12, 2004 email).) "Trustee/Dictator Zaiser"

had already said, Bernsen reported, that members could "forget about ever having a problem

heard by an arbitrator." (*Id.*) In a September 7, 2004 message, Bernsen described the trusteeship

as a "shameful and corrupt dictatorial takeover" done for the purpose of "stop[ping] arbitrations

and negotiations that exposed management's selfishness and won benefits and protections for

employees." (Pls.' Ex. 92 at 1.) The former President and Executive Vice President also filed

another round of charges. Bernsen amended to his prior EEO complaint of retaliation on March

2 and filed a second "amended" ULP on April 27, 2004.[28] Johnson filed charges of race and sex

discrimination, as well as retaliation, with the EEOC on April 2, 2004.[29] (Pls.' Ex. 141 to 143.)

## XXI.  Disciplinary Proceedings

96.     Through her investigation of the local's finances, Trustee Zaiser learned that

Johnson and Bernsen had been more than passive in their refusal to comply with the national's

inquiry. On October 28, 2003 -- prior to Johnson's response to the national monitor's request for

financial information -- Bernsen closed a "NAGE Local R3-77 Civil Rights Legal Defense

Fund" and transferred the balance of $1,540.57 into his own account. (Defs.' Ex. 41 at 5642

(Zaiser's March 24, 2004 report to President Holway).) On November 26, 2003 -- two days after

President Holway's emergency imposition of the trusteeship -- Johnson changed the mailing

address on the local's Wachovia Bank account, redirecting statements from the union's agency

office to her home. (Defs.' Ex. 41 at 5642 (Zaiser's March 24, 2004 report to President

Holway).)

---

[28] Bernsen withdrew his April 27, 2004 ULP on June 25, 2004. (Defs.' Ex. 121.)

[29] On September 7, 2004, the EEOC notified Johnson that after an investigation, it was "unable
to conclude that the information obtained establishe[d] violations of the statutes." (Defs.' Ex.
119.)

97.     Because the trustee "was not meeting with [her] on [her] case[,]" Johnson never

provided Zaiser with the local's November or December statements. (Johnson Test. at 366:20–

367:5.) Bernsen was no more forthcoming. At a meeting in March 2004, Trustee Zaiser notified

the membership that she had discovered a second Wachovia Bank account bearing the local's

name. (Bernsen Test. at 542:13-19.) Bernsen, though in attendance, offered no explanation. (*Id.*

at 543:3-12.) According to his later testimony, Zaiser "didn't ask." (*Id.*) Bernsen maintained his

silence through the opening of the trusteeship hearing. On April 29, 2004, when asked by

Hearing Officer Flynn if he was aware of the NAGE Local R3-77 Civil Rights Legal Defense

Fund, Bernsen answered simply "I'm not answering that question." (*Id.* at 636:5–637:7; *see also*

*id.* 729:16-19 (Bernsen's testimony that no information was provided with regard to the account

prior to the trusteeship hearing).) When pressed at the May 12, 2004 trusteeship hearing,

Bernsen again "refus[ed] to answer" questions regarding his closure of the fund, explaining that

he would not "answer any questions relating to documents where [he was] not allow[ed] . . . to

ask questions of Ms. Zaiser[.]" (*Id.* at 637:19–639:13.) Bernsen provided an alternate

explanation for his reticence at trial, stating that he had become concerned as a result of

statements by Jennifer Wasserstein and Hearing Officer Flynn about the potential for a

Department of Labor criminal investigation.[30] (*Id.* at 641:4-14.)

98.     In her reports, Trustee Zaiser informed Holway of the developments with regard

to each of the accounts. On March 24, 2004, after speaking with representatives of Wachovia

Bank, Zaiser reported Bernsen's the closure of the civil rights fund and Johnson's change of the

---

[30] At the prior trusteeship hearing, Bernsen testified on July 1, 2003 about the account
before Flynn, claiming that it had been opened to collect donations for the reimbursement of
$10,000 that Bernsen had paid in 2000 to support the appeals of former employees Snead and
Pierce. (*Id.* at 736:5–746:9.)

second account's mailing address. (Defs.' Ex. 41 at 5642.) On August 9, 2004, Zaiser reported

Bernsen's silence at the March membership meeting and his circulation in May of a newsletter

acknowledging the account's existence and contending that it had been opened solely for the

purpose of his reimbursement. (Defs.' Ex. 42 at 5649-50.)

99.     President Holway initiated disciplinary proceedings against Johnson and Bernsen

shortly after the receipt of Trustee Zaiser's August 9, 2004 report. As he testified, he took the

action in response to "the allegations contained in the trustee's report that Vice President Bernsen

had taken the money and put it in his own account, and that President Johnson had had the

records moved and didn't have authority to do so." (Holway Test. at 1357:24–1358:13.) In

notifying Johnson of her charges, President Holway indicated that "[i]t ha[d] come to [his]

attention that within a few days of the imposition of the trusteeship, [she] directed Wachovia

Bank to change the mailing address of NAGE Local R3-77's bank account to [her] home

address." (Pls.' Ex. 89 at 1.) "As a result of that action," Holway stated, "the Local's bank

statements were not sent to the NAGE R3-77 post office box at PBGC," preventing Zaiser from

obtaining and reviewing the statements "until she discovered the reason why the bank statements

were not being sent to the Local's post office box and took corrective action." (*Id.*) In failing to

cooperate with the trustee, Holway declared, Johnson had acted in a disloyal and inappropriate

manner, in violation of NAGE Constitution Article XII. (*Id.* at 1-2.) The letter notified Johnson

of a September 14, 2004 hearing before National Vice President Marc Lawson. (*Id.* at 2;

Holway Test. at 1352:4-8.)

100.     In notifying Bernsen of the disciplinary charges against him, Holway stated that

"[i]t ha[d] come to [his] attention that on October 28, 2003, after [the] appointment of

Representative/Monitor Sabulis," Bernsen, "while acting as an officer and a member of NAGE,

closed a bank account at the Wachovia Bank entitled 'NAGE Local R3-77 Civil Rights Legal

Defense Fund.'" (Pls.' Ex. 88 at 1.) "At the time that [Bernsen] closed the NAGE Local R3-77

Civil Rights Legal Defense Fund bank account," the notice stated, "the account had a closing

balance of $1,540.57." (Id.) According to Holway, Bernsen's appropriation of the funds violated

Article XII of the national constitution. (Id. at 1-2.) Like Johnson, Bernsen was informed of a

September 14, 2004 disciplinary hearing before National Vice President Lawson. (Id. at 2.)

101.    Johnson did not testify at her disciplinary hearing. In a written statement,

Johnson defended her conduct, asserting that she had changed the account's address in order to

prevent PBGC's management from obtaining access to the local's statements. (Tr. 395:13-17.)

The national, she argued, had taken no action to secure the account. (Id. at 395:18–396:14.)

Though it was her opinion that "the money belonged to the local, not the national[,]" Johnson

stressed that she did not take any of the funds after the trusteeship was imposed. (Id. at 400:13–

401:8.) She also acknowledged her anger, declaring that the national union had "beat [her] up

mentally, emotionally" and "smeared [her] reputation all because [she] asked them to come in

and do what they promised to do." (Id. at 401:13–402:22.) Johnson provided Lawson with a

written statement recounting her long conflict with national officials, including her filing of a

ULP charge against the union, and defending the appropriateness of her actions following the

trusteeship's imposition. (Pls.' Ex. 144.)

102.    On the advice of counsel, Bernsen chose not to testify at his disciplinary hearing,

relying instead upon the submission of a brief, a written declaration, and more than twenty

exhibits. (Bernsen Test. at 601:2-8; Pls.' Ex. 94 (brief); Pls.' Ex. 95 (declaration).) In defending

himself against the union's charges of misconduct, Bernsen did not deny closing the account but

argued in his declaration that he was entitled to its funds. (See Pls.' Ex. 94.) On June 29, 2000,

64

Bernsen provided the Heller, Huron law firm with a check for $10,000 in order to secure their

representation in an appeal of the dismissal of Louis Snead and Sylvia Pierce's discrimination

suits against PBGC.  (Pls.' Ex. 107 at 2 (Chertkof declaration); Pls.' Ex. 110 (check).)  *See also*

*Snead v. Strauss*, Civ. No. 99-1045 (D.D.C. May 8, 2000) (Mem.); *Pierce v. Pension Benefit*

*Guaranty Corp.*, Civ. No. 99-1794 (D.D.C. May 15, 2000) (Mem.).  Ten days before issuing the

check, Bernsen had opened the "NAGE Local R3-77 Civil Rights Legal Defense Fund" with

$500 of his own money, utilizing the local's tax identification number in the process.  (*See* Pls.'

Ex. 95 ¶ 16; Pls.' Ex. 115 (deposit slip); Johnson Test. at 165:19–166:24.)  The new account,

which members of the local's Executive Committee had "discussed" and "endorsed" on at least

an informal basis, was established with the Snead and Pierce litigation in mind.  (Pls.' Ex. 95 ¶¶

14-16; Bernsen Test. at 644:9–648:25; Johnson Test. at 165:5–167:11.)  In the months following

its creation, $1,540.57 in contributions were made to the account, including more than $800 from

Bernsen and $150 from then National Vice President Susanne Pooler-Johnson, who directed her

check to the "Fund for Snead/Pierce."  (Defs.' Ex. 5 at 4 (Lawson's Report and

Recommendation); Pls.' Ex. 95 ¶¶ 17-22.)  No union dues were deposited into the fund.  (*See*

Pls.' Ex. 52; Pls.' Ex. 94 at 1; Pls.' Ex. 95 ¶ 16.)  Bernsen attempted to explain under oath in his

declaration why he did not close the account until October 2003:

> On October 28, 2003, after the appeals in the Snead-Pierce cases
> had been denied by the Circuit Court, and it was clear that no
> further legal fees were owed, I closed the account of the Civil
> Rights Legal Defense Fund.  Since all of the money in the account
> consisted of donations earmarked exclusively for the Snead-Pierce
> legal fees, which I had previously fronted, I transferred the balance
> in the account ($1,540.57) to my own, personal account by way of
> a partial reimbursement.

(Pls.' Ex. 95 ¶ 25.)  This explanation is, at best, highly misleading since the district court's

opinions in the cases of Snead and Pierce were summarily affirmed on March 15, 2001 and

August 15, 2001 respectively. *See Snead v. Strauss*, No. 00-5322, 2001 WL 410464, *1 (D.C.

Cir. 2001) (Order); *Jordan v. Pension Benefit Guaranty Corp.*, No. 00-5262, 2001 WL 1154545,

*1 (D.C. Cir. 2001) (Order).

    103.    Lawson issued a Report and Recommendation in each case on November 29,

2004. (Defs.' Exs. 4 and 5.) Identifying the question in Johnson's case as "whether [she] was

somehow justified in changing the account address and failing to inform the Trustee . . . of her

actions[,]" Lawson concluded that "Johnson's explanation of her actions [were] not credible and

that no facts on th[e] record excuse her actions in changing the address or failing to inform the

Trustee of the change of address or failing to provide the account records to the Trustee." (Defs.'

Ex. 4 at 9.) Management, Lawson noted, had always had access to the local's mailbox; the

national's imposition of the trusteeship "offered no reason why management would . . . commit

such . . . a serious breach as opening the Local's bank statement." (*Id.* at 10.) Moreover,

Johnson had not offered an explanation for her failure to inform Trustee Zaiser of the account

and her actions in redirecting the local's bank statements. (*Id.* at 11.) While "Ms. Johnson and

Mr. Bernsen clearly took issue with the type and level of representation the local received from

NAGE over the years," Lawson acknowledged, "that issue [was] well beyond the scope of the[]

proceedings." (*Id.* at 12.) Addressing Johnson's ULP charge directly, Lawson stated that she had

"provided no evidence that [the disciplinary] charges against her were filed in retaliation," and

regardless, "filing a ULP would not shelter her from failing to comply with lawful internal union

rules and regulations." (*Id.* at 12.) The hearing officer also rejected Johnson's assertions that the

disciplinary action was an attempt to interfere with her representation of other members or

discriminate against her on the basis of her race or sex. (*Id.*) Based on Johnson's "calculated

attempt to keep information and property from the trustee[,]" Lawson recommended that the national union suspend her from membership for five years. (*Id.* at 14-15.)

104.    Lawson was similarly unpersuaded by Bernsen's defense, concluding that the NAGE Local R3-77 Civil Rights Legal Defense Fund belonged to Local R3-77. (Defs.' Ex. 5 at 13.) Even "[a]ccept[ing] that the purpose of the Fund was to pay for the Snead and Pierce appeals[,]" the hearing officer determined that the account had been established to "further the interests of the Local." (*Id.* at 14.) The absence of dues money was found irrelevant -- "[t]he solicitations were made in the name of the Local and individuals contributed in order to assist the Local in its desire to represent Snead and Pierce." (*Id.*) Moreover, Lawson noted, the fund was established before Heller, Huron's demand for the $10,000 retainer. (*Id.* at 15.) "If the contributions were earmarked for reimbursing him, he could have simply deposited them directly into his own personal account" and withheld his own contributions. (*Id.* at 16.) Finally, Lawson determined that the former officer's assertions regarding the purpose of the fund were belied by its closure more than two years following the conclusion of the Snead and Pierce appeals and in the midst of a national monitor's investigation of the local's finances. (*Id.*) Bernsen's allegations of retaliation were also rejected, Lawson noting that NAGE "did not prevent cases from going forward, but simply made determinations as to the level of the national's involvement" -- determinations the union had a "legitimate right" to make. (*Id.* at 17-18.) As Bernsen had not only interfered with the national's investigation but "wrongfully converted money from NAGE Local R3-77 to his personal account[,]" Lawson recommended that he be expelled from the union. (*Id.* at 22.)

105.    As Lawson credibly testified, his conclusions were based on his evaluation of the evidence and were not motivated by any retaliatory animus for plaintiffs' EEO activities or

their exercise of rights under Title I. (*See* Lawson Test. at 1046:25–1047:18; 1060:10–1062:2.) While plaintiffs make much of Lawson's admission that he could not recall -- a year and a half after the issuance of his reports -- reading Bernsen's brief, the hearing officer addressed each of Bernsen's contentions in his decision. (*See* Pls.' Mem. at 20-21; Defs.' Ex. 5 at 17-19.) Furthermore, Lawson's conclusions were entirely reasonable in light of the evidence adduced at the hearings.

106.     On November 30, 2004, President Holway adopted each Report and Recommendation. (Defs.' Exs. 6 and 7.)  Johnson was accordingly suspended from membership for five years. (Defs.' Ex. 6.)  Bernsen was expelled. (Defs.' Ex. 7.)  According to Holway's testimony, which the Court credits, his adoption of Lawson's decision was not motivated by plaintiffs' civil rights activities or their criticisms of NAGE. (Holway Test. at 1358:25–1359:22, 1364:5-23.)

107.     Plaintiffs amended their complaint to include challenges to their discipline under Title I of the LMRDA and Title VII, and to add a claim that the trusteeship was imposed in retaliation for their protected activity in violation of Title VII.

108.     NAGE's trusteeship over Local R3-77 was lifted on February 2, 2005.  In returning the local to self-governance, the national union paid approximately $18,000 in outstanding arbitration bills -- including those relating to Walters, Johnson and Baird. (Holway Test. at 1364:24–1365:9.)

## CONCLUSIONS OF LAW

1.     The legal issues remaining at trial involve Title VII and Title I of the LMRDA. *See Johnson*, 2005 WL 3307296, at *28.  Under Title VII, the issue is whether either plaintiff has proven by a preponderance of the evidence that defendants imposed a trusteeship and/or

disciplined them in retaliation for their having engaged in protected activity within the meaning

of Title VII. *See* 42 U.S.C. § 2000e-3(a). Under Title I, the issue is whether either plaintiff has

proven by a preponderance of the evidence that defendants disciplined them in retaliation for

their having exercised their right to speech under the LMRDA. *See* 29 U.S.C. §§ 411(a)(2), 529.

I.    **Title VII**

2.    Title VII bars labor organizations from "discriminat[ing] against any member"

because he has either "opposed any practice made an unlawful employment practice" by the

statute or otherwise "made a charge, testified, assisted, or participated in any manner in an

[statutory] investigation, proceeding, or hearing[.]" 42 U.S.C. § 2000e-3(a). The distinction

between the statute's "participation" and "opposition" clauses is substantial. "The participation

clause speaks in clear, absolute terms, and has accordingly been interpreted as shielding recourse

to the EEOC, regardless of the ultimate resolution of the underlying claim on its merits." *Parker

v. Balt. & Ohio R.R. Co.*, 652 F.2d 1012, 1019 (D.C. Cir. 1981). The opposition clause requires

more, for "an employee seeking the protection of the opposition clause [must] demonstrate a

good faith, reasonable belief that the challenged practice violates Title VII." *Id.* at 1020; *see also

George v. Leavitt*, 407 F.3d 405, 417 (D.C. Cir. 2005).

3.    Union members who have engaged in protected conduct can establish that they

were unlawfully subjected to an adverse action "because" of their civil rights activities in either

of two ways. *See* 42 U.S.C. § 2000e-3(a). Under the "pretext" or "single motive" framework of

*McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973), a member may establish a

*prima facie* case of retaliation by showing that a causal connection exists between her protected

conduct and the adverse action suffered, thereby requiring the union to "articulate" one or more

"legitimate, nondiscriminatory reason[s]" for the action. *Porter v. Natsios*, 414 F.3d 13, 17-18

(D.C. Cir. 2005); *McKenna v. Weinberger*, 729 F.2d 783, 790 (D.C. Cir. 1984). If the union

meets this burden of production, the member must "prove by a preponderance of the evidence

that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext

for discrimination" -- a burden that "merges with the ultimate burden of persuading the court that

she has been the victim of intentional discrimination." *Texas Dep't of Community Affairs v.

Burdine*, 450 U.S. 248, 253, 256 (1981). In such cases, pretext may be shown by "persuading

the court that a discriminatory reason more likely motivated the [union]" or "by showing that the

[union's] proffered explanation is unworthy of credence." *Id.* at 256.

      4.      Under the "mixed motive" framework of *Price Waterhouse v. Hopkins*, 490 U.S.

228 (1989), a union member may proceed instead by demonstrating that "retaliation played a

'motivating part' or was a 'substantial factor' in the [union's] decision." *Porter*, 414 F.3d at 18

(quoting *Price Waterhouse*, 490 U.S. at 244, 259, 276); *see also Thomas v. Nat'l Football

League Players Assoc.*, 131 F.3d 198, 202-03 (D.C. Cir. 1997). In the wake of such a

demonstration, the union can nonetheless avoid all liability with proof "that it would have made

the same . . . decision in the absence of the unlawful motive." *Porter*, 414 F.3d at 18 (quoting

*Price Waterhouse*, 490 U.S. at 244-45); *see also id.* at 18-19 (outlining the mixed motive

framework established by the Civil Rights Act of 1991, and noting that "although every circuit to

address the issue has held that the mixed motive provisions of the 1991 Act do not apply to

retaliation claims, it remains an open question in this circuit"). In "mixed motive" cases, the

ultimate question is again one of "discrimination *vel non*" -- "whether 'the defendant intentionally

discriminated against the plaintiff.'" *See United States Postal Serv. Bd. of Governors v. Aikens*,

460 U.S. 711, 714-16 (1983) (quoting *Burdine*, 450 U.S. at 253).

70

5.      Here, there is no question that Johnson and Bernsen's removal from office and their later discipline were adverse actions. *See Johnson*, 2005 WL 3307296, at *26. This case turns, instead, on the requirement that Title VII plaintiffs demonstrate, by a preponderance of the evidence, that they engaged in protected activity and that their removal from office or their discipline was imposed in retaliation for their having engaged in protected activity.

A.      **Protected Activity**

6.      As the Court ruled prior to trial, plaintiffs' filing of ULP charges fell within the opposition clause of the anti-retaliation provision of § 2000e-3(a). (March 20, 2006 Tr. at 10-12.) However, based on plaintiffs' Memorandum of Law Regarding Protected Activities (filed on March 29, 2006) and defendants' opposition thereto (filed on March 31, 2006), the Court ruled on April 3 that plaintiffs' activities on behalf of their union members who were involved in EEO proceedings or grievances or arbitrations that basically were the equivalent to an EEO proceeding were covered by the participation clause of § 2000e-3(a). (Tr. at 3.) *Cf. Barnes v. Small*, 840 F.2d 972, 977 (D.C. Cir. 1988) (treating plaintiff's participation in a Merit Systems Protection Board proceeding as participation rather than opposition).

7.      Based on the facts found herein, the Court concludes that Johnson's May 23, 2003 ULP charge against NAGE was not filed in good faith and is accordingly unprotected under Title VII's retaliation provision. Johnson premised the charge on the national union's refusal to provide legal and financial support for her arbitration. This premise is flawed as both a matter of fact and law.

8.      Johnson is mistaken when she argues that the union refused to provide legal and financial support for her arbitration. Rather, the union refused to cede control over the case to Johnson and to pursue claims that they determined were not meritorious. When the NAGE

71

lawyer concluded that she could not, consistent with the law, expand Johnson's grievance, Johnson chose to proceed without NAGE, relying instead on Bernsen to represent her. Therefore, it is factually incorrect to argue that NAGE refused to provide either legal or financial support.[31]

9.      Plaintiffs' position also reflects a fundamental misunderstanding regarding a local's ability to control an arbitration proceeding. In such a proceeding, the national serves as the certified bargaining agent ultimately responsible for the handling of the case. (Barry Test. at 1246:1-5.) While the local's bylaws undoubtedly provide its Grievance Committee with authority to "decide whether any grievance w[ould] proceed to arbitration" (Bylaws Art. IV § 10), plaintiffs have offered *no* legal or factual authority in support of their contention that NAGE "was legally obligated to provide financial and legal support to the Local, without question, in any case the Local decided to take to arbitration."[32]  (*See* Pls.' Mem. at 31.)  To the

---

[31] There is also no basis upon which the Court could infer that NAGE declined to proceed with any local member's arbitration for an unlawful reason, since the record is devoid of any evidence relating to the merits of these arbitrations. Instead, there is evidence that the national reviewed between 150 and 200 cases in which arbitration had been invoked and accepted representation of all but one or two cases from Local R3-77, including at least two that involved African-American members (Joseph Newman and Michael Jones). (Lightfoot-Walker Test. at 1100:5-15, 1104:13-20; Defs.' Ex. 103.)

[32] Plaintiffs' reliance on the Massachusetts Labor Relations Commission's decision in the Michael Mulvaney case, *In the Matter of Nat'l Assoc. of Gov't Employees and Michael Mulvaney*, 28 M.L.C. 218 (Mass. Labor Relations Comm'n Jan. 15, 2002), is misplaced. There, the Commission concluded that NAGE had breached its duty of fair representation in declining to provide representation in an arbitration regarding a member's off-duty misconduct -- a decision inconsistent with the union's prior practice and, accordingly, unlawfully arbitrary under the relevant statute. *Id.* at 221. The Commission noted, however, that while a union "may not arbitrarily ignore a *meritorious* grievance or process it in a perfunctory fashion . . . , a union has considerable discretion in determining whether to file a grievance and whether to pursue it through all levels of the contractual grievance-arbitration procedure." *Id.* at 221 (emphasis added).
        Similarly, plaintiffs' citation to *Flynn v. Tiede-Zoeller, Inc.*, 412 F.Supp.2d 46 (D.D.C. 2006), is inapposite. (*See* Pls.' Mem. at 31.) There, an employer moved to dismiss a number of

contrary, plaintiffs themselves acknowledged NAGE's ability to consider the merits of arbitrations before proceeding. (*See* Johnson Test. at 291:12-16 (responding to a question regarding the national's obligation to pay for local-approved arbitrations by stating that "the better way to look at it is how Ms. Osgood said in January of 2003, she said that the cost of an arbitration should never be the determining factor of whether you proceed or you cut [an arbitration] off . . . [a]nd if case has merit, you should proceed.").) No other policy would be reasonable, as NAGE is the certified bargaining agent with the corresponding right to control the strategy of arbitrations, and regardless, a national's obligations cannot be totally subservient to the whims of a local. *See Am. Fed. of Gov't Employees, AFL-CIO, Local 3882 v. Fed. Labor Relations Auth.*, 944 F.2d 922, 932 (D.C. Cir. 1991) ("[T]he union has the right to present and process the grievance on behalf of the employee and . . . the union or the agency may require submission of the dispute to binding arbitration. While it is the employee's decision whether to use the negotiated grievance procedure at all, the Supreme Court reminds us that '[t]he union and the agency possess the exclusive power to invoke the arbitral process.'") (quoting *Cornelius v. Nutt*, 472 U.S. 648, 652 (1985)); 5 U.S.C. § 7121(b)(1)(C)(iii) ("Any negotiated grievance procedure . . . shall . . . provide that any grievance not satisfactorily settled under the negotiated grievance procedure shall be subject to binding arbitration which may be invoked by either the exclusive representative or the agency."). (*See* Barry Test. at 1245:17–1246:8 (noting the importance of the national's control over arbitrations since it is "the certified bargaining agent

---

claims based on the international union's failure to exhaust contractual grievance procedures set forth in collective bargain agreements between the employer and three of the international's locals. *Id.* at 51. The Court granted the motion with respect to claims regarding a contractual dues provision, holding that the international union obtained the benefit as a result of its locals' contracts with the employer and should therefore be "required to shoulder a certain portion of the 'burden' of the collective bargaining agreements and comply with the grievance/arbitration terms." *Id.* at 55. *Flynn* has absolutely *no* relevance to the issues in this case.

and has ultimate responsibility for the arbitrations"); Bernsen Test. at 658:16–661:7 (arguing that the national's potential liability for local arbitrations was limited by the "potential income and other resources" of the locals, who had to split arbitration bills with NAGE); NAGE Const. Art. XIII ("Except as is otherwise specifically provided in this Constitution, no Local Unit, or affiliated body, nor any officer, employee, organizer or representative of a Local Unit or affiliated body of this National Union shall be authorized to make contracts or incur liabilities for or in the name of the National Union unless authorized in writing by the National President and the National Executive Board.").)

10.     In addition, the ULP charges filed by plaintiffs do not qualify as protected activity since plaintiffs have failed to demonstrate a "'good faith, reasonable belief that the challenged practice[s] violate[d] Title VII.'" *George*, 407 F.3d at 417 (quoting *Parker*, 652 F.2d at 1020). In May, plaintiff filed her charge not as a means to oppose a practice made unlawful under Title VII, but rather to force defendants to fund her arbitration. The Court concludes that the October 7, 2003 charges also do not enjoy a protected status, since plaintiffs were not opposing prohibited practices under Title VII. Rather, they filed the charges because of their dissatisfaction with NAGE's conduct in not recognizing their autonomy. These filings were plaintiffs' response to what they perceived as an affront to their autonomy and to the national's failure to fulfill its campaign promises. In large part, these filings were part of an ongoing political struggle between a local and its national, but at a minimum, they were totally unrelated to the protections afforded by Title VII.[33]

---

[33] In this regard, it is noteworthy that plaintiffs did not invoke Title VII when they filed their complaint on December 9, 2003, but only included it in their amended complaint, which was filed on October 20, 2004.

### B.     Causation

11.     No matter how one defines protected activity -- and even if plaintiffs' ULP

charges in May and October are viewed, along with their work on behalf of other local members

involved in EEO and/or arbitration proceedings, as participation rather than opposition --

plaintiffs have failed to sustain their burden of showing that they were either removed from

office or disciplined because of any protected activity.

### 1.     Removal from Office

12.     As noted by the Court in resolving defendants' Motion for Summary Judgment,

NAGE has proffered a number of legitimate, nondiscriminatory reasons for its imposition of the

trusteeship and concomitant removal of plaintiffs from office -- among them, Johnson and

Bernsen's financial malpractice, their obstructionist and retaliatory conduct against local

members and the national leadership, and the resulting breakdown in the local's governance. *See*

*Johnson*, 2005 WL 3307296, at *15-16.  Plaintiffs have failed to meet their burden of

demonstrating, by a preponderance of the evidence, that these were not the "true reasons" for

defendants' actions. *See Burdine*, 450 U.S. at 253.  On the present record, it is clear that

President Holway was confronted with a local in crisis.  In the opening months of his tenure,

Holway learned that Local R3-77 was failing to meet its financial obligations; that plaintiffs were

withholding financial information from the membership; that the local's Executive Committee

had not secured a CBA in the prior four years; and that plaintiffs often operated independently of

the local's bylaws while retaliating against those members who dared to question their

leadership. Under such circumstances, as he credibly testified at trial, he had "no choice" but to

place Local R3-77 under a trusteeship and thereby return it to functional governance.  Because

plaintiffs have failed to persuade the Court that retaliation "more likely motivated the [union]" or

the union's "proffered explanation is unworthy of credence[,]" they cannot prevail under a pretext theory. *See id.* at 256.

13.     For the same reasons, the evidence is insufficient to support a finding that plaintiffs' activities were more likely than not a substantial factor in NAGE's decision to place Local R3-77 into trusteeship. When accused in Johnson's May 23, 2003 ULP of discriminating against Johnson in the handling of the her arbitration, Holway openly rejected the possibility of a trusteeship or disciplinary action, instead dedicating unprecedented national attention to the local in an attempt to resolve the issues that Local R3-77 faced. President Holway's efforts, however, were met only by plaintiffs' obstructionism. Based on plaintiffs' testimony and demeanor at trial, the Court is convinced that their stonewalling resulted in an otherwise irremediable deadlock. Because they have failed to show it more likely than not that their civil rights activities were a substantial factor in the national's trusteeship decision, plaintiffs cannot prevail under a "mixed motive" theory.[34]

14.     In particular, plaintiffs are grievously mistaken when they attempt to argue in their Proposed Findings that the "problems" and "'turmoil'" were all "manufactured and invented[,]" that it was improper for defendants to consider accrued liabilities in addressing the solvency of the union, and that there was "simply no evidence . . . [of] 'retaliation,' 'secrecy,' and 'dysfunction.'" (Pls.' Mem. at 26, 34-35.) On the contrary, the evidence was overwhelming that the rights of at least some members of the local were being trampled upon in contravention of the

---

[34] Because the Court finds that plaintiffs' civil rights activities were not a substantial factor in either the imposition of the trusteeship or Johnson and Bernsen's discipline, there is no reason to address the question of whether defendants' would have taken the actions in the absence of plaintiffs' protected activity. *See Porter*, 414 F.3d at 18; *Thomas*, 131 F.3d at 202-03. The Court's finding that plaintiffs' protected conduct was not a substantial factor in the union's actions, of course, itself entails the conclusion that NAGE "would have made the same . . . decision in the absence of the unlawful motive." *Porter*, 414 F.3d at 18.

very laws that plaintiffs seek to invoke here; that plaintiffs were unwilling to work with or

cooperate with the national, always putting their personal agenda ahead of the needs of the union

as a whole; that they did not succeed in obtaining a new CBA for some four years, thereby

threatening the union's bargaining status; and that, if anything, the evidence of problems and

turmoil was both overwhelming and credible, in stark contrast to the story that plaintiffs have

told.

　　　2.　　　**Discipline**

　　　15.　　　The national union's discipline of Johnson and Bernsen was also supported by

legitimate, nondiscriminatory reasons -- namely, Johnson's redirection of the local's bank

statements to her home address following the imposition of the trusteeship, and Bernsen's closure

of the NAGE Local R3-77 Civil Rights Legal Defense Fund and transfer of its contents to his

personal account. *See Johnson*, 2005 WL 3307296, at *7-8.  Plaintiffs have again failed to

demonstrate by a preponderance of the evidence that these reasons were a pretext for unlawful

retaliation against Johnson and Bernsen for their filing of EEOC charges and their amended

complaint alleging Title VII violations or any other civil rights activity. *See Burdine*, 450 U.S. at

253.  Johnson's contention that she changed the account's address only to protect the local's

financial information from management does nothing to justify her subsequent refusal to provide

Trustee Zaiser with the statements; her conduct was consistent, instead, with her ongoing efforts

to obstruct NAGE in its performance of its lawful duties.  Bernsen's explanation itself requires

belief that he donated more than half of the funds intended for his reimbursement; left them

sitting, without interest, for more than two years after the close of the Snead and Pierce appeals;

and withdrew them for reasons unrelated to the national's initiation of an investigation into the

local's finances.  The Court is not persuaded, in short, that the union's proffered reasons for

plaintiffs' discipline are "unworthy of credence." *See id.* at 256.  The Court is similarly

unpersuaded that the union was "more likely motivated" by plaintiffs' civil rights activities than

their misconduct in the handling of the local's accounts.  *See id.*  The Reports and

Recommendations prepared by Marc Lawson -- the African-American hearing officer

responsible for the cases of both Johnson and Bernsen -- addressed and soundly rejected

plaintiffs' allegations of retaliation.  Moreover, Lawson and Holway testified credibly that they

were not motivated by Johnson and Bernsen's EEO activities.  Because plaintiffs have not shown

it more likely than not that NAGE's stated justifications for their discipline were not the true

reasons underlying the action or that their civil rights activities were a substantial factor in the

union's disciplinary action, they cannot prevail under either a "pretext" or "mixed motive"

theory.[35]

        16.        Moreover, while plaintiffs question the harshness of their discipline in light of the

reasons offered by NAGE, the Court's inquiry is limited to whether defendants were motivated

by an unlawful retaliatory animus, not whether it agrees with the wisdom of defendants' course

of action.  *See Fischbach v. District of Columbia Dep't of Corrections*, 86 F.3d 1180, 1183 (D.C.

Cir. 1996) ("[I]t is not enough for the plaintiff to show that a reason for a job action is not just, or

fair, or sensible," as "the issue is not the correctness or desirability of the reasons offered but

---

[35] Moreover, the timing of plaintiffs' discipline belies an inference of retaliatory motive, as the
actions followed plaintiffs' EEOC charges by more than six months, with Johnson's May 23,
2003 ULP charge -- characterized by plaintiffs as the root of Holway's alleged animus (*see* Pls.'
Mem. at 37 (arguing, with regard to plaintiffs' discipline, that "Holway viewed [Johnson's] ULP
charge as destroying his reputation" and was "[t]hereafter . . . out for revenge -- especially as
Plaintiffs' Title VII activities against him and NAGE multiplied")) -- preceding the discipline by
a year and a half.  *See Sanders v. Veneman*, 211 F.Supp. 2d 10, 21 (D.D.C. 2002) ("The more
time that passes between the protected activity and the alleged act of retaliation, the more
difficult it is to infer a causal connection between the two.").

whether the employer honestly believes in the reasons it offers.") (quotation marks and citations omitted).

## II.    Title I

17.    Under Title I of the LMRDA, "[e]very member of any labor organization" has the right, among others,[36] "to express any views, arguments, or opinions[.]" 29 U.S.C. § 411(a)(2). This right is not unlimited. A union has the authority "to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations." 29 U.S.C. § 411(a)(2).

18.    Labor organizations are barred from retaliating against those who exercise their right to speech provided by Section 411(a)(2). *See* 29 U.S.C. § 529 (prohibiting disciplinary actions against union members "for exercising any right to which [they are] entitled" under Title I); *Ritz v. O'Donnell*, 566 F.2d 731, 736 (D.C. Cir. 1977) ("Section [529] clearly prohibits a union from penalizing its members because they have exercised their rights of free speech and assembly, and the courts have not hesitated to nullify disciplinary actions that have infringed upon those rights."); *see also* 29 U.S.C. § 412 ("Any person whose rights secured by the provisions of this subchapter have been infringed by any violation of this subchapter may bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate."). In order to prevail on a claim of retaliation under Title I, a plaintiff must demonstrate by a preponderance of the evidence that her protected speech was a cause for the

---

[36] Title I also protects the right of union members "to institute an action in any court, or in a proceeding before any administrative agency, irrespective of whether or not the labor organization or its officers are named as defendants or respondents in such action or proceeding," and "to appear as a witness in any judicial, administrative, or legislative proceeding . . . ." 29 U.S.C. § 411(a)(4).

challenged disciplinary action. *Lamb v. Miller*, 660 F.2d 792, 794 (D.C. Cir. 1981) ("A union

official may not be dismissed for exercising [Title I] rights. When there is some evidence that

the reason for removal from office was permissible and some evidence that the reason was

impermissible, the question whether protected activities were a cause for the removal must be

resolved by a trier of fact."); *Commer v. McEntee*, 121 F.Supp. 2d 388, 396 (S.D.N.Y. 2000) ("A

union member who alleges that he has been retaliated against on the basis of protected speech

must show that his conduct constituted 'free speech' within the meaning of the LMRDA and that

the speech was a cause for the union's action against him."). This burden cannot be satisfied by

the unsupported contention that plaintiff's "vociferous criticism necessarily would have created

animus" and, as a result, retaliation. *Commer*, 121 F.Supp. 2d at 398. Nor can a plaintiff prevail

by demonstrating nothing more than proximity between the protected conduct and the union's

action. *See Yager v. Carey*, 910 F.Supp. 704, 725 (D.D.C. 1995) ("This court is not willing to

allow plaintiffs to proceed under a retaliation theory based solely on the fact that Carey leveled

his charges after plaintiffs had filed suit in Michigan.").

     19.    Plaintiffs have not shown it to be more likely than not that their criticism of the

national union motivated their discipline. To the contrary, the record amply supports the

conclusion that Johnson and Bernsen were disciplined for valid reasons and that Holway's

decision to initiate disciplinary proceedings and to adopt the recommended discipline was not the

product of any Title I violation. Moreover, there is no question that plaintiffs made liberal use of

their speech rights for many years before being disciplined, and thus, the Court does not find the

necessary causal connection between their discipline and their longstanding history of opposition

to both NAGE and its leadership.

20.    Moreover, even if plaintiffs were able to demonstrate that the discipline imposed on them was motivated, at least in part, by their protected activity under Title I, defendants would nonetheless prevail under the mixed-motives analysis of *Mt. Healthy School District v. Doyle*, 429 U.S. 274 (1977), because they have convincingly shown that they would have taken the same disciplinary actions against Johnson and Bernsen even in the absence of any protected conduct on their part.  (*See Johnson*, Civ. No. 03-2513 (D.D.C. Mar. 6, 2006) (Order that defendants are entitled to a *Mt. Healthy* defense under Title I).)

## CONCLUSION

As plaintiffs have failed to carry their burden with respect to any of their claims, judgment will be entered for defendants on all counts.


_____s/·_____
ELLEN SEGAL HUVELLE
United States District Judge


Date: July 21, 2006