# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ROBERT T. PERRY,

    Plaintiff,

    v.

JOSHUA GOTBAUM, Director of the
Pension Benefit Guaranty Corporation,

    Defendant.

Civil Action No. 06-1371 (CKK)

## MEMORANDUM OPINION
(February 28, 2011)

Plaintiff Robert T. Perry ("Perry"), a former employee of the Pension Benefit Guaranty Corporation (the "PBGC"), filed this action against the Director of the PBGC in his official capacity ("Defendant").[1]  The parties previously litigated two lawsuits before this Court that culminated in a Stipulation of Settlement and Dismissal in November 2005.  *See* Civil Action No. 03-2495, *Perry v. Chao* (Nov. 8, 2005), Docket No. [30]; Civil Action No. 04-1996, *Perry v. Chao* (Nov. 8, 2005), Docket No. [20].  Perry filed this action less than one year later, on August 2, 2006, and he filed an Amended Complaint on January 19, 2007 alleging retaliation, hostile work environment, and breach of the parties' Settlement Agreement.  On December 11, 2008, the Court granted-in-part Defendant's motion to dismiss any claims asserted under 42 U.S.C. § 1981, 1983, 1985, and 1986 and denied Defendant's alternative pre-discovery motion for summary judgment.  *See Perry v. Snowbarger*, 590 F. Supp. 2d 90 (D.D.C. 2008).  Following discovery,

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), present PBGC Director Joshua Gotbaum has been substituted as the official party defendant in this action.  Because Defendant is sued in his official capacity as Director of the PBGC, the Court shall use the terms "Defendant" and "PBGC" interchangeably.

Defendant filed its [29] Motion for Summary Judgment, which is now pending before the Court.

Perry filed an opposition, and Defendant filed a reply, and the motion is now ripe for

adjudication. For the reasons explained below, the Court shall grant Defendant's Motion for

Summary Judgment in its entirety.

## I. BACKGROUND

A.     *Perry's Prior Lawsuits Against the PBGC and the Stipulation of Settlement and Dismissal*

Plaintiff Robert Perry is an African American male who was employed as a GS-511-13

Auditor by the PBGC. Def.'s Stmt.[2] ¶ 1. In 2003 and 2004, Perry filed two civil actions in this

Court alleging that the PBGC engaged in employment discrimination and retaliation in violation

---

[2] The Court strictly adheres to the text of Local Civil Rule 7(h) (formerly Rule 56.1) when resolving motions for summary judgment. *See Burke v. Gould*, 286 F.3d 513, 519 (D.C. Cir. 2002) (finding that district courts must invoke the local rule before applying it to the case). The Court has advised the parties that it strictly adheres to Rule 7(h) and has stated that it "assumes facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." [25] Scheduling and Procedures Order at 5 (Jan. 29, 2009). Thus, in most instances the Court shall cite only to one party's Statement of Material Facts ("Stmt.") unless a statement is contradicted by the opposing party, in which case the Court may cite a party's Response to the Statement of Material Facts ("Resp. Stmt."). The Court shall also cite directly to evidence in the record, where appropriate.

In his Statement of Genuine Issues of Material Facts, Perry occasionally references his previous opposition brief "and corresponding Attachments" as support for his factual assertions, effectively asking the Court to comb through the voluminous record on its own to find the relevant material. This practice is improper and contravenes both Federal Rule of Civil Procedure 56(c) and Local Civil Rule 7(h). *See* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to *particular parts of materials* in the record . . . .") (emphasis added); LCvR 7(h)(1) ("An opposition to [a motion for summary judgment] shall be accompanied by a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, *which shall include references to the parts of the record relied on to support the statement*.") (emphasis added). Accordingly, the Court relies only on those facts supported by specific citations to the record.

of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"). *Id.* ¶ 3. On November 8, 2005, the parties resolved those lawsuits in a Stipulation of Settlement and Dismissal (hereinafter, "Settlement Agreement"). *Id.* Under the terms of the Settlement Agreement, Perry released the PBGC from any all liability for "all matters related to his employment with [the PBGC] up to and including the date of this Stipulation of Settlement and Dismissal." *Id.* ¶ 4. Perry agreed "not to institute any other actions, charges, complaints, appeals or other proceedings against defendants or any of Defendants' past or present employees, officers, agents or representatives concerning any matter relating to his employment with PBGC and the termination of his PBGC employment that are based in any way on action or inaction as of this date by Defendants or Defendants' past or present employees." *See* Def.'s Ex. A. (Settlement Agreement) ¶ 1. The Settlement Agreement did not contain a confidentiality provision, and it was publicly filed with the Court. Def.'s Stmt. ¶ 9.

In exchange for the dismissal and release of claims, the PBGC agreed to "enter a formal Personnel Action in [Perry's] Official Personnel File indicating [Perry] was promoted, without back pay, to a GS-13, Step 3 auditor position," effective October 31, 2004. Def.'s Stmt. ¶ 8; Def.'s Ex. A (Settlement Agreement) ¶ 2(a). The PBGC also agreed to promote Perry prospectively to a GS-13, Step 10, Series 511 Auditor position for a period of one year, beginning the first full pay period after the Settlement Agreement. Def.'s Stmt. ¶ 8; Settlement Agreement ¶ 2(b). Pursuant to the Settlement Agreement, Perry's appointment would expire before the end of this one-year period if he obtained employment outside the PBGC. Settlement Agreement ¶ 2(b). Perry also agreed to try to obtain a detail to another federal agency to commence within the first six months of the one-year period. *See id.* ¶ 2(e). If Perry secured

such a detail within six months, the PBGC would continue to pay him at a GS-13, Step 10 salary for the full year. *Id.* ¶ 2(e). If Perry did not obtain a detail to another agency, the PBGC would pay him a lump sum of $60,000 and place Perry on Leave Without Pay ("LWOP") status for the final six months of the year. *Id.* ¶ 2(f).

As part of the Settlement Agreement, the PBGC agreed to detail Perry to its Contracts and Control Review Department for six months, during which time Perry would be given time to attend job interviews and/or pursue training opportunities. *Id.* ¶ 2(c). As required by the Settlement Agreement, PBGC paid for approximately $10,100 in training opportunities for Perry. Def.'s Stmt. ¶ 11. The PBGC also provided Perry with an appropriate letter of recommendation and issued Perry a "fully successful" performance appraisal for FY 2005. *Id.* ¶¶ 13, 15.

Perry did not obtain a detail to another federal agency within the first six months after the Settlement Agreement, and therefore the PBGC paid him a lump sum of $60,000. Def.'s Stmt. ¶ 12.

B.     *The PBGC Takes Personnel Actions to Implement the Settlement Agreement*

In order to carry out its obligations under the Settlement Agreement, the PBGC took a series of personnel actions involving Perry. The Standard Form 52 ("SF-52") is used by federal government agencies to process requests for personnel actions. Def.'s Stmt. ¶ 5. After a request for personnel action is completed and approved, the form is sent to a Human Resources Specialist to process the action in the agency's personnel system, which generates the Standard Form 50 ("SF-50"). *Id.* The SF-50 is used to record personnel actions in an employee's Official Personnel Folder ("OPF"). With some exceptions that are not relevant to this case, all personnel actions require an SF-50 in an employee's OPF, and each action requires its own SF-50. *Id.* ¶ 6.

4

On November 23, 2005, the PBGC's Human Resources Department ("HRD") issued three SF-50 forms relating to Perry. *See* Aff. of Michele Pilipovich ("Pilipovich Aff.") ¶ 4. The first SF-50 granted Perry's promotion to GS-13, Step 3 retroactive to October 31, 2004. *See id.*, Ex. 2 at 1. Under the section of the SF-50 form captioned "Legal Authority," HRD wrote, "SETTLEMENT AGREEMENT DTD 11-08-05." *Id.* At the bottom of the form, under the label "Remarks," HRD wrote "PURSUANT TO A SETTLEMENT AND STIPULATION PRESENTED TO THE U.S. DISTRICT COURT FOR THE DISTRICT OF COLUMBIA ON NOVEMBER 8, 2005 EMPLOYEE IS NOT TO RECEIVE BACK PAY IN ACCORDANCE WITH COURT AGREEMENT." *Id.*

The second SF-50 promoted Perry to GS-13, Step 10 effective November 13, 2005. *See* Pilipovich Aff., Ex. 2 at 2. Under the section captioned "Legal Authority," HRD wrote, "REG 250.101." *Id.* Under the "Remarks" section, HRD wrote:

> PURSUANT TO A STIPULATION AND SETTLEMENT PRESENTED TO THE U.S. DISTRICT COURT FOR THE DISTRICT OF COLUMBIA ON NOVEMBER 8, 2005. EMPLOYEE IS PROMOTED FROM GS-12 STEP 06 BUT BASED ON COURT AGREEMENT PROMOTION IS FROM GS-13 STEP 3. EMPLOYEE IS NOT RECEIVING BACK PAY IN ACCORDANCE WITH COURT AGREEMENT.

*Id.* The third SF-50 was issued to indicate that Perry's promotion expired effective November 13, 2006. *See* Pilipovich Aff., Ex. 2 at 3. Under the "Remarks" section, HRD wrote, "PURSUANT TO A STIPULATION AND SETTLEMENT PRESENTED TO THE U.S. DISTRICT COURT FOR THE DISTRICT OF COLUMBIA ON NOVEMBER 8, 2005." *Id.* All three SF-50 forms were signed by Jacqueline A. Isaac on behalf of Michele Pilipovich, the Director of HRD. *Id.* at 1-3.

On or about December 13, 2005, Perry complained via email to Rick Lattimer in the HRD about the language appearing in the "Remarks" section of the SF-50 forms that had been issued. Def.'s Stmt. ¶ 18. Lattimer responded to Perry, explaining that the language on the SF-50 forms was necessary in order to explain to the Office of Personnel Management ("OPM") how Perry was promoted. *Id.* ¶ 19. The Director of the HRD, Michele Pilipovich, testified in her affidavit that the promotions required under the Settlement Agreement were inconsistent with OPM rules governing federal employment and would raise questions without some explanation as to why they were awarded. *See* Pilipovich Aff. ¶ 5. Pilipovich explained that OPM audits the PBGC for compliance with federal regulations governing personnel actions and that OPM may withdraw the PBGC's personnel authority if it is not in compliance. *Id.*; Suppl. Aff. of Michele Pilipovich ¶ 4. Perry responded to Lattimer's email on December 14, 2005, specifying the language he wanted to be removed from the "Remarks" section of the SF-50s. Def.'s Stmt. ¶ 20. Perry acknowledged that some of the information on the SF-50s was necessary and claimed that the "codes" on the forms revealed the necessary information for OPM. *Id.* The PBGC contacted OPM for guidance on how to document the personnel actions required by the Settlement Agreement. *Id.* ¶ 21.

On January 4, 2006, Perry's counsel contacted the U.S. Attorney's Office and questioned the propriety of the language included under the "Remarks" section of the SF-50s. Def.'s Stmt. ¶ 22. The U.S. Attorney's Office responded the following day with a letter explaining that the language at issue was included to protect the PBGC in the event that OPM questioned the personnel actions. *Id.* ¶ 23. The letter also informed Perry's counsel that in an effort to address Perry's concerns, the PBGC would issue Perry an SF-50 for his Cost-of-Living Adjustment

("COLA") increase that would not contain a reference to the Settlement Agreement in the "Remarks" section. *Id.* The COLA SF-50 was issued on January 9, 2006. *Id.* ¶ 24; Pilipovich Aff., Ex. 6. After January 9, if Perry had to submit an SF-50 to a prospective employer during the application process, he could submit the COLA SF-50 because it was the most recently issued SF-50. Def.'s Stmt. ¶ 24. HRD Director Pilipovich testified that not all federal job announcements require an SF-50 to be provided with a job application. *See* Suppl. Aff. of Michele Pilipovich ¶ 6. Announcements that do require an SF-50 are verifying the applicant's employment status and pay grade, and a prospective employee can submit any SF-50 reflecting this information. *Id.*

Lori Bledsoe, then-Acting Director of the PBGC's equal employment opportunity ("EEO") office, attempted to resolve Perry's complaint about the remarks on the SF-50s. Def.'s Stmt. ¶ 25. In late January 2006, OPM responded to the PBGC's inquiry about documenting the personnel actions, informing the PBGC that it could remove the remarks that Perry complained about and change the authority code to justify the actions taken pursuant to the Settlement Agreement. *Id.* ¶ 26. In February 2006, the PBGC reissued and backdated the three November 2005 SF-50s without any language in the "Remarks" section of the forms. *Id.* ¶ 27. However, two of the three reissued forms contained a reference to "SETTLEMENT AGREEMENT DTD 11/08/05" under the heading "Legal Authority." *See* Pilipovich Aff., Ex. 7 at 1, 2.

On May 14, 2006, Perry was placed on Leave Without Pay status for a period not to exceed six months. Def.'s Stmt. ¶ 28. To effectuate this personnel action, the PBGC issued Perry an SF-50 which described the "Nature of Action" as "LOWP NTE 11-12-06" with a corresponding code 460. *See* Pilipovich Aff., Ex. 8 at 1.

OPM maintains a "Guide to Processing Personnel Actions" that explains how agencies should fill out SF-50 forms. Chapter 3 of the Guide contains instructions for implementing "decisions," defined to include settlement agreements between an agency and an employee. The Guide provides in pertinent part:

> The agency that prepares personnel actions to implement a decision or take corrective action is responsible for . . . [i]nsuring that the reasons for cancellation are explained on the cancellation action and that the retroactive action and related documents in the Official Personnel Folder contain no reference to the reason the action is being processed retroactively - that is, no reference to the error, the grievance, or complaint that is the reason for the retroactive action being processed. The authority cited on a retroactive action is the authority that would have been cited if the action had been processed on or before its effective date. If, on the effective date of the action, the agency would not have had an appropriate authority to take the necessary action (for example, a decision orders the employee assigned to a position in a series for which standards were not issued until a year after the effective date), "Reg. 250.101" is cited as the authority. This is a general "do-what-the-decision-says" authority and its use avoids the need to cite a specific decision, Court Order, or other document which would identify more specifically the employee's original complaint and result in irrelevant information being placed on the action and in the Folder. This protects the employee's privacy and the usual intent of decisions.

*See* Def.'s Opp'n, Ex. 1 at 3-10. Chapter 32 of the OPM's Guide also contains guidance on what authority should be cited for certain cancellation actions. According to Table 32-E, if the cancellation is ordered or directed by "[a] court or an agreed-upon out-of-court settlement," then the authority cited should be the "court decision number and date." *See* Pl.'s Reply, Ex. C at 32-19. The parts of the Guide that have been provided to the Court do not reconcile the tension between these provisions.

The record shows that in May 2002, the PBGC issued an SF-50 to another employee, Dwayne Jeffers, citing "Reg. 250.101" as the authority for a promotion that was implemented pursuant to a settlement agreement. *See* Def.'s Opp'n, Ex. 4, Aff. of Dwayne Jeffers ¶¶ 9-10.

8

Similarly, an SF-50 was issued to an employee in 1998 who received a series of promotions pursuant to a settlement citing "Reg. 250.101" as authority. *See* Suppl. Aff. of Michele Pilipovich ¶ 3 & Ex. 1. These events occurred prior to Michele Pilipovich's tenure as Director of HRD, and there was significant turnover in personnel at HRD between 2002 and the time Perry's personnel actions were processed in 2005. *See id.* ¶¶ 2-3. Pilipovich believed that more authority than "Reg. 250.101" was necessary to document the personnel actions required for Perry under the Settlement Agreement. *Id.* ¶ 4.

      C.      *Perry's Co-Workers Circulate Flyers and Emails Criticizing Him*

Ten months prior to the Settlement Agreement, in February 2005, a representational election was held by the Federal Labor Relations Authority. Def.'s Stmt. ¶ 30. During that election, PBGC bargaining unit employees selected the National Association of Governmental Employees ("NAGE") to be their exclusive representative. *Id.* On February 2, 2005, Perry was sworn in as Acting Secretary/Treasurer of NAGE Local R3-77. *Id.* ¶ 31. Dwayne Jeffers was sworn in as Vice-President At Large, and Richard "Dick" Petta was sworn in as President. *Id.* Following the union election, individuals disseminated flyers that were critical of PBGC management and NAGE officials, including Perry. *Id.* ¶ 32.

On June 7, 2005, Perry sent an email to various members of the PBGC upper management, including the Executive Director, the EEO Manager, and the Human Resources Director, complaining about certain flyers that had been circulated within the PBGC. Def.'s Stmt. ¶ 33. Perry was concerned that the flyers might incite other to take "untold actions against [him]." *Id.* HRD Director Pilipovich responded to Perry's email the following day and informed him that management would investigate his complaint. *Id.* ¶ 34. While the PBGC investigated

9

Perry's complaint, it allowed Perry to work from home for a period of time to assuage his safety concerns. *Id.* ¶ 35. On June 16, 2005, the PBGC sent an email to all of its employees and contractors regarding its commitment to providing a workplace free from violence and harassment. *Id.*

On September 28, 2005, Perry contacted the PBGC's EEO office to request counseling. Def.'s Stmt. ¶ 36. Perry was represented by Dwayne Jeffers, who is African American. *Id.* The same day, Jeffers contacted the EEO office to request counseling for a similar complaint. *Id.* ¶ 37. Jeffers was represented by Perry. *Id.* On October 21, 2005, Perry sent his EEO counselor an email message providing documents relating to his EEO complaint. *Id.* ¶ 38. In this email, Perry stated that his complaint "consists fo PBGC's willingness to permit management and employees to commit retaliatory acts against [him] without taking appropriate actions to curtail or stop [his] workplace harassment and threats of workplace violence." *Id.*

On October 31, 2005, Perry sent an email to various PBGC management officials complaining that he had received what he alleged to be another harassing email. Def.'s Stmt. ¶ 39. On November 2, 2005, HRD Director Pilipovich issued a memorandum to Perry informing him that the PBGC had retained a law firm, Littler Mendelson, P.C., to complete the PBGC's investigation into his June 2005 complaint. *Id.* Her memorandum informed Perry that the investigation concerned "complaints made to HRD, not complaints which are or may be in the informal or formal EEO process." *Id.* On November 4, 2005, Perry sent an email to his EEO counselor informing her that he was withdrawing the EEO complain he had initiated on September 28, 2005. *Id.* ¶ 40. Perry had agreed to withdraw this complaint pursuant to the Settlement Agreement.

On December 22, 2005, the PBGC offered to resolve Dwayne Jeffers's informal EEO complaint by allowing Jeffers to work from the PBGC's remote location in Kingstowne, Virginia. Def.'s Stmt. ¶ 41. Jeffers rejected that offer, and on December 30, 2005, the EEO counselor gave Jeffers notice of his right to file a formal EEO complaint. *Id.* The PBGC did not make the same offer to Perry because his complaint had been withdrawn. *Id.* ¶ 42. Perry contends that he had filed a complaint with the Human Resources Department complaining of similar conduct. *See* Pl.'s Resp. Stmt. ¶ 42 (citing memorandum from Perry to HRD Director Pilipovich on January 13, 2004). However, Perry agreed in the Settlement Agreement to withdraw with prejudice "all other pending, existing or putative causes of action, charges, complaints and appeals against Defendants in any forum, whether administrative or judicial." Settlement Agreement ¶ 1.

On January 5, 2006, Perry sought EEO counseling. Def.'s Stmt. ¶ 43. Perry subsequently filed a formal complaint, EEO Complaint 06-04, on February 2, 2006. *Id.* Perry's complaint alleged race and sex discrimination and retaliation by the PBGC through: (1) inappropriate language in the SF-50s issued in November 2005; (2) hostile work environment by PBGC employees Stuart Bernsen, Valda Johnson, and Rhonda Baird, who had allegedly distributed flyers and emails about Perry; and (3) disparate treatment when Perry was not offered the same opportunity for "flexiplace" that was offered to Perry's representative, Dwayne Jeffers. *Id.* Among the documents Perry submitted in support of his complaint, Perry included several flyers and hundreds of emails. *Id.* ¶ 45. Perry contends that eight particular flyers circulated by Bernsen, Johnson, and Baird constituted blackmail, slander, defamation, libel, or threatened violence. *Id.* ¶ 46.

The first flyer, "The Truth Behind the Email Discipline," was disseminated on or about June 16, 2005. Def.'s Stmt. ¶ 48. The second flyer, "The Robert Perry-Dwayne Jeffers Scandal," was disseminated on or about June 16, 2005. *Id.* ¶ 49. That flyer cited a prior sworn statement by Perry that he admitted having adult conversations at work. *See* Def.'s Reply, Ex. G-3. The third flyer, "John Seal Fears the Truth: Employees Charge Violations of Free Speech and Civil Rights," was disseminated between June 16, 2005 and July 9, 2005. Def.'s Stmt. ¶ 50.

The fourth flyer, "NAGE Ordered to Pay $2.2 Million to Union Member," was disseminated on November 8, 2005. *Id.* ¶ 52. The flyer describes a jury verdict entered against NAGE for retaliation against one of its members and described NAGE as being in financial trouble. *See* Def.'s Reply, Ex. G-4. The flyer references Perry, Dwayne Jeffers, and Dick Petta in the last paragraph, which reads in part, "And look what NAGE local has done. Petta, Perry and Jeffers bad mouth other employees and rat on them to PBGC management to get people into trouble. NAGE needs to go." *Id.* The fifth flyer, "Belt - Petta Stop New Benefits for Employees; Management and NAGE Prepare for Cuts," was disseminated on November 9, 2005. Def.'s Stmt. ¶ 53. The flyer criticizes the PBGC Executive Director and NAGE local union leaders for failing to sign and implement a new collective bargaining agreement. *See* Def.'s Reply, Ex. G-5. The flyer states in part, "As for the so-called union–Dick Petta, Robert Perry and Dwayne Jeffers–they have sat back and let management do as it pleases," and "It is not that Dick Petta, Robert Perry and Dwayne Jeffers are in over their heads and are clueless. The problem is that management was dedicated all along to stopping a new collective bargaining agreement, and Petta, Perry and Jeffers helped them." *Id.*

The sixth flyer, "Court Orders Trial Against NAGE Over Retaliation," was disseminated

on or about January 10, 2006. Def.'s Stmt. ¶ 51. The flyer described a court ruling that a jury

would hear retaliation claims asserted by Valda Johnson and Stuart Bernsen against NAGE. *See*

Def.'s Reply, Ex. G-6. The flyer states that "[i]t is time to hold accountable NAGE and those

individuals here at PBGC who aided NAGE's wrongdoing," but there is no specific reference to

Perry. *See* Def.'s Reply, Ex. G-6. The seventh flyer, "New Years Resolutions That You Will

Never Hear From Dick Petta," was disseminated on or about January 11, 2006. Def.'s Stmt.

¶ 54. The flyer lists several "resolutions" in a mocking tone relating to Dick Petta's leadership of

the union. *See* Def.'s Reply, Ex. G-7. One of the "resolutions" on the flyer stated, "I will

denounce Robert Perry and Dwayne Jeffers for ratting on employees and helping management

fire contractors and discipline employees for use of the email system." *Id.* The eighth flyer,

"Sam Batsell for a Union with Management," was disseminated on or about January 12, 2006.

Def.'s Stmt. ¶ 55. The flyer contains a series of "statements" written in the voice of Sam Batsell

and purports to be paid by "Employees Against the Election of Sam 'Sell You Out' Batsell." *See*

Def.'s Reply, Ex. G-8. The flyer states in pertinent part, "When union officials Robert Perry and

Dwayne Jeffers along with the support of Dick Petta got employees and contractors into trouble

over e-mails, I did nothing about it. Management loved it." *Id.*

     Perry admits that these flyers never actually asked anyone to harm him and that no one

caused him physical harm as a result of the flyers. Def.'s Stmt. ¶ 46. Stuart Bernsen's stated

purpose in disseminating these flyers was "to get information to bargaining unit employees about

their working conditions and their union representation." *Id.* ¶ 47. Wayne Jeffers testified in a

declaration that he received threats of violence in the workplace as a result of these and other

flyers. *See* Decl. of Wayne Jeffers ¶ 13. However, only one of the flyers cited by Jeffers in his

declaration was issued after the Settlement Agreement.  *See id.*[3]

In support of his EEO Complaint 06-04, Perry also submitted eleven email messages from Rhonda Baird sent after November 8, 2005.  Def.'s Stmt. ¶ 56.  Most of the emails were sent to multiple recipients, and most of them referenced union-related matters.  *Id.*  Perry did not submit any emails sent by Valda Johnson or Stuart Bernsen after November 8, 2005.  *Id.* ¶ 57.  Perry claims this is because the emails sent after that date were sent to other people, not him.  Pl.'s Resp. Stmt. ¶ 57.[4]  On or about January 18, 2006, the PBGC blocked Rhonda Baird from sending emails to certain recipients, including Perry.  Def.'s Stmt. ¶ 58.  This block was lifted on or about January 25, 2006.  *Id.*

Following the completion of the investigation by Littler Mendelson, P.C. into the complaints raised by Perry and Dwayne Jeffers, HRD Director Pilipovich sent Perry a memorandum on February 16, 2006 explaining the results of the investigation and the PBGC's own determinations.  Def.'s Stmt. ¶ 59.  Pilipovich's memorandum explained that the PBGC had determined that the flyers and emails about which Perry and Jeffers complained did not violate any PBGC policies or directives, did not pose a safety threat, and fell within the scope of protected activity under federal law governing labor relations in the federal sector.  *Id.* ¶ 60;

---

[3] Paragraph 13 of Jeffers's declaration refers to "Exhibits 10, 11, 12, 13, 14, 18, 19, 20, & 21," referring to exhibits that were attached to his declaration accompanying Plaintiff's opposition to Defendant's first motion for summary judgment.  *See* [15] Pl.'s Mem. Opp'n to Mot. to Dismiss or, in the Alternative, Mot. for Summ. J, Ex. C.  Exhibits 11, 13, 14, and 18 refer to the first, second, third, and eighth flyers mentioned above, respectively.  Exhibits 10 and 12 refer to other flyers mentioning Jeffers and Perry.  Exhibit 19 is a declaration from an Assistant Inspector General at the PBGC; Exhibit 20 is letter from the Federal Labor Relations Authority to Stuart Bernsen; and Exhibit 21 is a copy of an arbitration decision.

[4] Perry's only support for this assertion is his own statement in a declaration, but Perry does not have personal knowledge of emails sent to others.

Pilipovich Decl., Ex. 15. Perry claims that Littler Mendelson, P.C. did not do a thorough investigation because it did not take any affidavits. *See* Decl. of Robert Perry ¶ 23 & Ex. 8 (Report & Recommendations).

On February 28, 2006, PBGC attorney Ray Forster sent a letter to Robert Moore, an arbitrator who maintained jurisdiction over an arbitration between Rhonda Baird and the PBGC in late 2004 and early 2005. Def.'s Stmt. ¶ 61. The letter informed Moore that Perry and Dwayne Jeffers had breached a protective order in the arbitration by emailing the arbitration decision with the confidential identification key attached, revealing the identity of all the employees and supervisors Moore had referenced only by letter to protect their identities. *Id.* The letter outlined the breaches and asked Moore to impose appropriate sanctions if the grievance in the case had not been resolved and request the return of confidential materials and transcripts if the grievance had been resolved. *See* Def.'s Mem., Att. M (2/28/2006 Letter from Raymond Forster to Robert Moore).

On March 15, 2006, Perry sought EEO counseling relating to the memorandum he had received from HRD Director Pilipovich on February 16, 2006. Def.'s Stmt. ¶ 62. On April 18, 2006, Perry filed a formal complaint, EEO Complaint 06-11, alleging race and sex discrimination and retaliation. *Id.*

On May 10, 2006, Perry again sought EEO counseling, and he filed another complaint, EEO Complaint 06-18 on July 24, 2006. Def.'s Stmt. ¶ 63. Perry's complaint alleged race and sex discrimination and retaliation by the PBGC through: (1) inappropriate language on the SF-50 issued May 14, 2006 when Perry went on Leave Without Pay status; and (2) dismissal of Perry's EEO Complaint 06-04 on May 3, 2006. *Id.*

## II. LEGAL STANDARD

Defendant has moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials); or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e). When considering a motion for summary judgment, the court may not make credibility determinations or weigh the evidence; the evidence must be analyzed in the light most favorable to the nonmoving party, with all justifiable inferences drawn in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "If material facts are at issue, or, though undisputed, are susceptible to divergent inferences, summary judgment is not available." *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009) (citation omitted).

The mere existence of a factual dispute, by itself, is insufficient to bar summary judgment. *See Liberty Lobby, Inc.*, 477 U.S. at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary

judgment." *Id.* For a dispute about a material fact to be "genuine," there must be sufficient admissible evidence that a reasonable trier of fact could find for the nonmoving party. *Id.* The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. "If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted). The adverse party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute. *See Ass'n of Flight Attendants-CWA v. U.S. Dep't of Transp.*, 564 F.3d 462, 465-66 (D.C. Cir. 2009).

## III. DISCUSSION

In his Amended Complaint, Perry asserts causes of action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, for discrimination based on race, hostile work environment, and retaliation, all pertaining to conduct that post-dates the Settlement Agreement. In addition, Perry asserts a cause of action for breach of the Settlement Agreement itself.[5] Perry's claims revolve around four sets of actions taken by Defendant. First, Perry contends that Defendant breached the Settlement Agreement and retaliated against him by processing SF-50 forms with information referencing his prior lawsuits and the settlement. Second, Perry claims that Defendant discriminated and retaliated against him by allowing a hostile work environment

---

[5] Although the Court of Federal Claims generally has exclusive jurisdiction over contract claims in excess of $10,000, *see Hansson v. Norton*, 411 F.3d 231, 232 (D.C. Cir. 2005), the Court previously ruled that Perry's claim for breach of the Settlement Agreement falls within this Court's ancillary jurisdiction. *See Perry v. Snowbarger*, 590 F. Supp. 2d 90, 93 (D.D.C. 2008).

to persist after the settlement. Third, Perry claims that Defendant retaliated against him by failing to offer him the same opportunity to work from an alternate work site as another complainant, Wayne Jeffers. Fourth, Perry claims that Defendant retaliated against him by informing arbitrator Robert Moore that Perry had breached a protective order issued in the arbitration. The Court shall discuss each of these claims below.

### A. The PBGC's Issuance of SF-50 Forms Referencing the Settlement Agreement

Perry contends that Defendant breached the Settlement Agreement and unlawfully retaliated against him by issuing SF-50 forms containing language that explicitly referenced the Settlement Agreement. Perry claims that this language had a "chilling effect" on his ability to obtain employment outside the PBGC because he feared that the remarks would hamper his ability to get a job, and he claims that this was the reason he did not apply for any positions for the first six months after the settlement. Perry does not dispute that the SF-50 forms were necessary to implement the personnel actions required by the Settlement Agreement, but he claims that the inclusion of language referencing the Settlement Agreement was retaliatory and violated OPM policy. Defendant disclaims any retaliatory intent and contends that the language referencing the Settlement Agreement was put on the SF-50 forms to explain to OPM the reasons for the personnel actions. The Court shall address these claims below.

### 1. Perry's Retaliation Claim

Title VII makes it unlawful for an employer to "discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42

U.S.C. § 2000e-3(a).  Title VII claims are assessed pursuant to a burden-shifting framework

initially set out by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-

03 (1973).  As the D.C. Circuit has explained:

> Under that framework, a plaintiff must first establish a prima facie case of retaliation
> by showing (1) that he engaged in statutorily protected activity; (2) that he suffered
> a materially adverse action by his employer; and (3) that a causal link connects the
> two.  If the plaintiff establishes a prima facie case, the burden shifts to the employer
> to produce a legitimate, nondiscriminatory reason for its actions.  If the employer
> does so, the burden-shifting framework disappears, and a court reviewing summary
> judgment looks to whether a reasonable jury could infer retaliation from all of the
> evidence, which includes not only the prima facie case but also the evidence the
> plaintiff offers to attack the employer's proffered explanation for its action and other
> evidence of retaliation.

*Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009) (citations and quotations omitted).

There is no dispute that Perry engaged in statutorily protected activity by filing his prior lawsuits,

but Defendant disputes that the language on the SF-50 forms referencing the Settlement

Agreement constituted a "materially adverse action."  A "materially adverse action" is an action

that "could well dissuade a reasonable worker from making or supporting a charge of

discrimination."  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006).  In

addition, Defendant contends that Perry has not produced any evidence to discredit its legitimate

nondiscriminatory explanation for including the language at issue.

The Court agrees with Defendant that Perry did not suffer a materially adverse action by

having SF-50 forms issued with language referencing the Settlement Agreement.  "An

employer's words and other actions must be considered in context to determine whether they

would 'dissuade a reasonable worker' from filing a claim and thus result in actionable

retaliation."  *Gaujacq v. EDF, Inc.*, 601 F.3d 565, 578 (D.C. Cir. 2010) (quoting *Burlington*, 548

U.S. at 57). In this case, the SF-50 forms were issued for the purpose of implementing the Settlement Agreement, which had been filed as part of the public record in Perry's prior lawsuits. Although Perry characterizes the language on the forms as "inflammatory," it did not denigrate Perry but merely acknowledged that the Settlement Agreement was the reason for taking the personnel actions. Therefore, the SF-50 forms did not intrude on Perry's privacy by exposing information that was not publicly available, and no reasonable employee would be offended by such innocuous language. *Cf. Burlington*, 548 U.S. at 68 (noting that "petty slights" and "minor annoyances" are not actionable as retaliation).

Perry contends that the SF-50 forms were materially adverse to him because they "chilled" him from applying for jobs outside the PBGC out of fear that prospective employers would see the language and learn about Perry's past litigation. But Title VII's antiretaliation provision explicitly prohibits employers from discriminating against job applicants based on their protected activity. It was not reasonable for Perry to assume that his prospective employers would unlawfully discriminate against him based on the language on his SF-50 forms. Moreover, Perry has not produced any evidence indicating that he would have been required to provide an SF-50 form to any prospective employers. The record suggests that many federal employers do not require submission of an SF-50 with a job application. Perry also admits that he could have used the COLA SF-50 issued on January 9, 2006 for this purpose.[6] Accordingly,

---

[6] Perry admits this in response to Defendant's Statement of Material Facts Not in Dispute ¶ 24. In his opposition brief, however, Perry argues that he could not use the "fourth" SF-50 issued by the PBGC because it was predated to effectuate his Leave Without Pay status from May 2006 to November 2006. *See* Pl.'s Opp'n at 20. But Perry's citation refers to the SF-50 form issued in May 2006 placing him on LWOP status, not the COLA SF-50 issued in January 2006. Therefore, Perry's argument is clearly contradicted by the record and his own admission that he could have used the COLA SF-50 for any job applications after January 9, 2006.

any potential effect on Perry's job prospects was temporary and entirely speculative.

Additionally, Perry contends that Defendant should have cited "Reg. 250.101" as the legal authority for taking personnel actions pursuant to the Settlement Agreement, in accordance with OPM guidance. But OPM guidance explicitly identifies "Reg. 250.101" as "general 'do-what-the-decision-says' authority," so even this code could be a red flag for a potential employer seeking to discriminate against Perry for his protected activity. This further underscores the limited impact of the language referencing the Settlement Agreement on the SF-50 forms issued to Perry.

In light of the foregoing, no reasonable jury could conclude that Defendant's inclusion of language on Perry's SF-50 forms relating to the Settlement Agreement constituted a materially adverse action. On that basis alone, the Court may dismiss Perry's retaliation claim regarding the SF-50 forms. However, the Court shall alternatively consider whether Perry has produced evidence to discredit Defendant's legitimate nonretaliatory explanation for its actions.

Even assuming that the language on the SF-50 forms constitutes a materially adverse action, Perry cannot survive summary judgment unless he produces evidence sufficient to undermine Defendant's explanation that the language was necessary to explain to OPM why it was taking personnel actions otherwise prohibited by federal regulations. Perry argues that the PBGC's explanation is not credible because the record reveals that the language referencing the Settlement Agreement was not required by OPM.[7] However, the issue is not whether the PBGC

_____

[7] Perry also argues that the explanation is not credible because the PBGC would have included similar language on an SF-52 form if it believed that such language was necessary. *See* Pl.'s Opp'n at 20. However, the record shows that the SF-52 submitted by the PBGC did contain similar language referencing the Settlement Agreement. *See* Suppl. Aff. of Michele Piliopovich ¶ 4 & Ex. 2.

was correct in its belief that the language was required but rather whether it honestly believed that it was necessary. *See Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) ("Once the employer has articulated a nondiscriminatory explanation for its action . . . the issue is not the correctness or desirability of the reasons offered but whether the employer honestly believes in the reasons it offers.") (quotation marks and alterations omitted). "If the employer's stated belief about the underlying facts is reasonable in light of the evidence, . . . there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts." *Brady v. Off. of the Sergeant at Arms*, 520 F.3d 490, 495 (D.C. Cir. 2008). Here, the record shows that the OPM regulations were somewhat unclear about how Perry's promotions should be processed using SF-50 forms, and there is uncontroverted testimony from employees in the PBGC Human Resources Department that they believed the explanatory language was necessary.

Perry argues that the PBGC's explanation is not credible because it did not use the same language or authority codes when it processed an SF-50 form for a promotion for Dwayne Jeffers in May 2002. But the record shows that there was significant turnover in staff at the PBGC Human Resources Department between Jeffers's promotion and Perry's promotion in November 2005. The fact that the PBGC properly processed an SF-50 three-and-a-half years earlier does not plausibly undermine the PBGC's claim that it made an honest mistake in interpreting OPM guidelines.

Although the PBGC erred by including specific language referencing the Settlement Agreement on the SF-50s, Perry has not produced evidence sufficient to rebut Defendant's claim that this was an honest mistake. Having just settled Perry's prior lawsuits, Defendant had no

incentive to retaliate against Perry as he was preparing to leave the PBGC. In fact, it was in Defendant's financial interest to hasten Perry's departure from the PBGC, not to tarnish his image with prospective employers. The record also demonstrates that the PBGC responded quickly to his concerns about the remarks on the SF-50s and reissued them in a timely fashion. In sum, Perry has not come forward with evidence from which a reasonable jury could conclude that Defendant's actions in issuing the SF-50 forms were retaliatory. Accordingly, the Court shall grant Defendant's motion for summary judgment on this claim.

### 2. Perry's Breach of Contract Claim

In addition to claiming that the language on his SF-50 forms constituted retaliation under Title VII, Perry claims that Defendant's action in issuing the forms constituted a breach of the Settlement Agreement. "To recover for breach of contract, a party must allege and establish (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach." *Pryor v. United States*, 85 Fed. Cl. 97, 104 (Fed. Cl. 2008) (quoting *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989)). There is no dispute that the Settlement Agreement is a valid, enforceable contract between the parties.

Perry argues that including additional language on the SF-50 forms was a breach of the Settlement Agreement because, according to Perry, the Settlement Agreement specifically indicates what language should appear on the SF-50 forms. However, the Settlement Agreement is not specific about what language may or may not be used to implement the required personnel actions; the Settlement Agreement is decidedly silent on that issue. Perry argues that including language referencing the Settlement Agreement is contrary to the spirit and intent of the

Settlement Agreement, but the Settlement Agreement itself does not purport to impose any restrictions on the manner in which Defendant must implement the personnel actions required. Therefore, Perry cannot establish that Defendant had any obligation arising out of the Settlement Agreement to avoid referencing the Settlement Agreement on the SF-50 forms. Furthermore, assuming *arguendo* that Defendant's actions did constitute a breach of the Settlement Agreement, Perry cannot recover for that breach because he has failed to produce any evidence of damages resulting therefrom. *See Pryor*, 85 Fed. Cl. at 104 (dismissing claim for breach of settlement agreement where plaintiff failed to show that she missed any job opportunities or was denied a job due to mistake on SF-50 form). Perry claims only that he was "chilled" from applying for jobs because of the language on his SF-50 forms. However, such non-pecuniary damages are generally not recoverable in breach of contract actions. *See generally Bohac v. Dep't of Agriculture*, 239 F.3d 1334, 1340 (Fed. Cir. 2001). Therefore, Perry has failed to establish that he has any recoverable damages resulting from the alleged breach. Accordingly, the Court shall grant Defendant's motion for summary judgment on Perry's claim for breach of the Settlement Agreement.

B.    *The PBGC's Failure to Halt the Circulation of Harassing Flyers*

Perry's second claim is that the PBGC breached the Settlement Agreement and retaliated against him by allowing a hostile work environment to persist following the Settlement Agreement.[8] Perry's hostile work environment claim is premised on the PBGC's failure to stop

---

[8] Perry also claims that the PBGC improperly investigated him for sexual harassment. *See* Pl.'s Opp'n at 24, 27. However, the record clearly shows, and Perry admits, that the investigation and the arbitration decision that followed it were completed before the Settlement Agreement. *See* Dep. Tr. of Robert Perry at 186-88. Therefore, Perry has released any claim against the PBGC with respect to this investigation.

Stuart Bernsen, Valda Johnson, and Rhonda Baird from circulating flyers and emails critical of him.

          1.     <u>Discrimination and/or Retaliation Based on Hostile Work Environment</u>

Title VII makes it unlawful for an employer to "requir[e] people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Systems*, 510 U.S. 17, 21 (1993). A hostile work environment is actionable under Title VII "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Id.* (citations omitted) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67 (1986)). In determining whether a work environment is hostile or abusive, courts must look at all the circumstances, including the frequency and severity of the discriminatory conduct, whether the conduct is physically threatening or humiliating as opposed to merely offensive, and whether there is unreasonable interference with an employee's work performance. *Id.* at 23. In order to be actionable under the statute, a work environment "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998). The "standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" *Id.* (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)). A hostile work environment can amount to retaliation under Title VII. *See Singletary v. District of Columbia*, 351 F.3d 519, 526 (D.C. Cir. 2003). "To sustain a hostile work environment claim based on retaliation, the plaintiff must produce evidence that establishes a causal connection between the harassment and his protected activity." *Graham v.*

*Holder*, 657 F. Supp. 2d 210, 216 (D.D.C. 2009).

Perry contends a hostile work environment was created by the circulation of flyers and emails by Stuart Bernsen, Valda Johnson, and Rhonda Baird. However, many of these flyers and emails were circulated prior to the effective date of the Settlement Agreement. As part of the Settlement Agreement Perry agreed not to institute any other actions against the PBGC (or its officers or agents) concerning "any matter related to his employment with PBGC . . . that are *based in any way* on action or inaction of [November 8, 2005]" by the PBGC or its past or present employees. *See* Def.'s Ex. A (Settlement Agreement) ¶ 1. Therefore, any claims relating to conduct prior to November 8, 2005 have been settled and released by Perry, and the Court may not consider such conduct as a basis for Perry's hostile work environment claim.

The record shows that five flyers were circulated on or after November 8, 2005 relating to Perry.[9] While these flyers are critical of Perry, the record shows that they relate solely to union activity and Perry's role as a local union officer.[10] The uncontroverted testimony from one of the flyers' distributors explained the purpose of the flyers as informing bargaining unit employees about their local union leadership, and there is no evidence of any discriminatory animus based

_____

[9] Defendant argues that two of these flyers were circulated more than 45 days before Perry sought EEO counseling for them, making them untimely. *See* 29 C.F.R. § 1614.105(a)(1) (providing that aggrieved persons must initiate contact with an EEO counselor within 45 days of the alleged discriminatory action). To the extent Perry is asserting a hostile work environment claim, the Court may consider these events as part of the same unlawful employment practice. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115-16 (2002).

[10] Perry argues that the flyers were not all union-related, relying on deposition testimony from Rhonda Baird. *See* Dep. Tr. of Rhonda Baird at 50-52. However, it is unclear from the excerpt of Ms. Baird's testimony provided to the Court which flyers she was specifically testifying about; it appears she was asked only about flyers disseminated "after June of 2005." *See id.* at 50. Based on its own review of the flyers at issue, the Court sees no evidence that the flyers involve anything other than union-related complaints.

on sex or race.  Perry admits that the flyers do not advocate violence and that no one caused him any harm as a result of the flyers.  Perry argues that the flyers created a concern over workplace safety, citing deposition testimony from Rhonda Baird that the language in one of the flyers may have created an "unsafe environment" for Perry.  *See* Dep. Tr. of Rhonda Baird at 68-69, 72.  However, Ms. Baird was referring to the flyer issued in June 2005 that referenced Perry's admission that he had engaged in adult conversations at work, not to any flyers circulated after the Settlement Agreement.  *See id.*  Similarly, Mr. Jeffers testified in a declaration that he received threats of violence in the workplace as a result of flyers distributed by Bernsen, Johnson, and Baird, but only one of the nine exhibits he cites in support of that assertion is a flyer issued after the Settlement Agreement.

Perry contends that the emails sent by Rhonda Baird contained inappropriate and harassing language.  *See* Pl.'s Resp. Stmt. ¶ 56.  However, he does not cite any language from the emails in support of this contention.  Instead, he cites to statements in his own declaration that Baird had harassed him and humiliated him by sending emails to multiple recipients with humiliating language about him.  *See* Decl. of Robert Perry ¶¶ 20, 27.[11]  Perry's own conclusory characterization of the emails is insufficient to establish the existence of a hostile work environment.  *Cf. Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999) (affirming grant of summary judgment against plaintiff whose claim for retaliation was supported only by her conclusory representation in an affidavit that she was more qualified than another job applicant without any supporting facts).  Although Perry has not identified any of the emails in the record,

---

[11] The cited paragraphs in Perry's declaration also refer to a complaint Perry filed in January 2004 against Stuart Bernsen and Valda Johnson and various union-related flyers.  *See* Decl. of Robert Perry, Exs. 7 & 11.

Defendant has done so, at least in part, and the Court has reviewed them. *See* Def.'s Mem., Att. L at 1-13; Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."). These emails focus on primarily on union issues—which Perry does not dispute—and do not contain any language that could be reasonably characterized as inflammatory. The fact that the PBGC temporarily blocked Ms. Baird from sending emails to Perry and others does not demonstrate that the emails were creating a hostile or abusive atmosphere.[12]

Although Perry was undoubtedly bothered by Ms. Baird's emails and the flyers that were circulated criticizing his involvement in the local union, no reasonable jury could conclude that these actions were so severe or pervasive as to constitute a hostile work environment. Although the emails and flyers recurred fairly frequently, their contents were not physically threatening, and there is no evidence that the flyers and/or emails unreasonably interfered with Perry's work performance. Therefore, even assuming that Perry could demonstrate a causal connection between his race, sex, or protected activity and Defendant's failure to stop the circulation of flyers and emails, his claim must fail because no reasonable jury could conclude that the flyers and emails were "sufficiently severe or pervasive to alter the conditions of [his] employment."

---

[12] Perry purports to bring a separate claim of retaliation against Defendant for blocking Ms. Baird's emails. *See* Pl.'s Opp'n at 29. However, Perry does not assert this claim in his Amended Complaint. Moreover, Perry acknowledges that "[t]he materiality of this fact is not so much the retaliatory nature of the action taken to block the e-mails, but rather the failure to prevent such hostilities, as well as take similar action with regard to the flyers and action[s] of other individuals." *Id.* Therefore, Perry does not actually argue that the act of blocking the emails was retaliatory. Rather, he argues that this act demonstrates that Defendant was capable of stopping the distribution of flyers and/or emails—a fact that is not in dispute. Accordingly, the Court shall dismiss any claim of retaliation relating to Defendant's blocking of Ms. Baird's emails.

*Meritor Savings Bank*, 477 U.S. at 67.

Furthermore, even assuming that the flyers and emails constituted a hostile work environment, Perry has failed to rebut the PBGC's explanation that it could not have stopped the flyers and emails because they were protected union activity. Pursuant to the Federal Service Labor-Management Relations Statute, which governs labor relations in the federal sector, "[e]ach employee shall have the right to form, join, and assist any labor organization or to refrain from any such activity, freely and without fear of penalty or reprisal, and each employee shall be protected in the exercise of such right." 5 U.S.C. § 7102. "The right to refrain from joining or supporting a union encompasses the right to distribute letters or other publications urging fellow employees to do likewise." *Overseas Educ. Ass'n*, 11 F.L.R.A. 377, 387 (1983). It is an unfair labor practice for an agency to "interfere with, restrain, or coerce any employee" exercising their rights under the statute. 5 U.S.C. § 7116(a)(1). Here, the record shows that the PBGC hired an outside law firm to investigate the conduct about which Perry was complaining, and based on that investigation and its own review of the record, the PBGC determined that the flyers and emails were protected activity. As noted above, the issue is not whether the PBGC was correct in its legal conclusion but rather whether the PBGC honestly believed the flyers and emails were protected. *See Fischbach*, 86 F.3d at 1183.

Perry attempts to discredit the PBGC's rationale by claiming that Littler Mendelson's investigation was a sham and that the PBGC acted improperly by relying on it. However, he provides no evidence to support these allegations. Perry argues that the investigation was inadequate because Littler Mendelson did not take affidavits from the witnesses it interviewed. While Defendant does not dispute this fact, Perry fails to explain why affidavits would be

necessary to conduct a meaningful investigation; a lack of affidavits does nothing to suggest that the investigation was a sham. Perry also claims that the PBGC's reliance on the investigation was "already found to be improper," but the only evidence he cites in support this proposition is a January 2002 letter from the PBGC's general counsel relating to legal staffing for EEO matters, which has nothing to do with the Littler Mendelson investigation. *See* Def.'s Resp. Stmt. ¶ 39. Perry further claims that two PBGC attorneys improperly attended an interview of Michele Pilipovich in violation of an EEOC Management Directive. *See id.* However, Perry's only evidence in support of this claim is the same letter from the PBGC's general counsel, which does not directly address this issue. *See id.* Defendant explains in its reply brief that the interview in question occurred in February 2007 during the initial counseling stage for a later complaint filed by Perry. *See* Suppl. Decl. of Michele Pilipovich ¶ 9. This interview has nothing to do with the Littler Mendelson investigation, and it cannot provide the basis for any claim in this action because it occurred after Perry filed his Amended Complaint. *See Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995) ("Title VII requires that a person complaining of a violation file an administrative charge with the EEOC and allow the agency time to act on the charge.").

Because Perry has not produced any evidence to discredit the PBGC's explanation for failing to stop the circulation of flyers and emails critical of Perry's union activities, he cannot survive summary judgment. There is no evidence in the record from which a reasonable jury could conclude that the PBGC was motivated by discriminatory or retaliatory animus in failing to stop the flyers and emails. Therefore, any discrimination, retaliation, or hostile work environment claims based on the PBGC's failure to stop such conduct must fail. Accordingly, the Court shall grant Defendant's motion for summary judgment on these claims.

2.      Breach of the Settlement Agreement

Perry also purports to bring a claim for breach of the Settlement Agreement based on the PBGC's failure to ameliorate a hostile work environment.  *See* Am. Compl. ¶ 14.  However, the Settlement Agreement provides no guarantees about the conditions of Perry's workplace.  Paragraph 2(m) of the Settlement Agreement states that "[Perry] shall abide by any and all PBGC directives and/or policies, including but not limited to the policy against harassment in the workplace and improper use of electronic mail, although no inference is intended by this provision that [Perry] has ever engaged in such harassment and [Perry] expressly denies having done so."  This provision of the Settlement Agreement obligates Perry to follow PBGC policies relating to workplace harassment, but it does not specifically obligate the PBGC to ensure that Perry is not subjected to a hostile work environment.  Therefore, Perry cannot establish a breach of the Settlement Agreement even assuming he could establish that the PBGC tolerated a hostile work environment, which, as shown above, he cannot.  Accordingly, the Court shall grant Defendant's motion for summary judgment as to this claim.

C.      *The PBGC's Failure to Offer Perry the Opportunity to Work from an Alternate Work Site*

Perry claims that Defendant retaliated against him when it failed to offer him the same opportunity to work from an alternate work site that it offered Wayne Jeffers to settle Jeffers's EEO complaint.  Defendant explains that the reason that Perry was not made a similar offer was because Perry had settled his EEO complaint as part of the Settlement Agreement, and therefore there was no pending EEO complaint to be settled.  Perry argues that Defendant's explanation is just pretext for retaliation because Perry had an outstanding complaint filed with the PBGC's

Human Resources Department that raised the same issues. *See* Pl.'s Opp'n at 26. However, the record reveals that the complaint Perry relies on was filed in January 2004. *See* [15] Pl.'s Mem. Opp'n to Mot. to Dismiss or, in the Alternative, Mot. for Summ. J, Ex. B-10 (1/13/2004 Letter from Robert Perry to Michele Pilipovich). Therefore, Perry released any claims relating to this complaint as part of the Settlement Agreement. Perry cannot establish a claim for retaliation based on Defendant's failure to offer him a remedy for a complaint that he had already settled. Accordingly, the Court shall grant Defendant's motion for summary judgment as to this claim.

> D.     *The PBGC's Reporting Perry for Breaching the Confidentiality of a Protective Order in an Arbitration*

Perry contends that the PBGC retaliated against him when one of its attorneys informed arbitrator Robert Moore that Perry had breached a protective order issued during the arbitration. Perry does not argue that he did not breach the protective order; rather, he claims that the timing of the letter to arbitrator Moore—sent in February 2006—suggests that the motive for sending it was retaliatory. Perry also contends that his breach of the protective order was unrelated to any pending arbitration, but he cites no record evidence in support of that contention, and the letter sent to Moore indicates that the PBGC believed the arbitration had not been completely resolved. Perry has no evidence to discredit the PBGC's legitimate explanation for sending the letter to Moore, and the timing of the letter itself—filed nearly three months after the Settlement Agreement and over three weeks after Perry's most recent EEO complaint—is not enough evidence from which a reasonable jury could infer retaliation by the PBGC. *See Brady*, 520 F.3d at 495 ("If the employer's stated belief about the underlying facts is reasonable in light of the evidence, . . . there ordinarily is no basis for permitting a jury to conclude that the employer is

lying about the underlying facts.").  Accordingly, the Court shall grant Defendant's motion for summary judgment on this claim.

## IV.  CONCLUSION

For the foregoing reasons, the Court finds that Perry has failed to demonstrate that there is a genuine dispute as to any material fact and that Defendant is entitled to judgment as a matter of law on all of Perry's claims.  Specifically, the Court finds that no reasonable jury could conclude that the issuance of SF-50 forms with language referencing Perry's Settlement Agreement constituted a materially adverse action, and Perry has failed to produce evidence to rebut Defendant's explanation that it believed the language was necessary to explain to OPM why it was taking actions required by the Settlement Agreement.  Furthermore, the Court finds that the Settlement Agreement did not obligate the PBGC to issue the SF-50 forms in a certain way or to guarantee Perry that his workplace would be free from harassment.  The Court also finds that no reasonable jury could conclude that the flyers and emails criticizing Perry after the Settlement Agreement created a hostile work environment or that the PBGC's justification for failing to stop them was a pretext for retaliation or discrimination.  Perry's claim that the PBGC retaliated against him by failing to offer him an alternate work site is barred by the Settlement Agreement, and the Court finds that Perry has produced no evidence from which a reasonable jury could conclude that the PBGC retaliated against him by informing arbitrator Robert Moore that Perry had breached a protective order.

Accordingly, the Court shall GRANT Defendant's [29] Motion for Summary Judgment in its entirety. An appropriate Order accompanies this Memorandum Opinion.


Date: February 24, 2011


_____/s/_____
**COLLEEN KOLLAR-KOTELLY**
United States District Judge